KEKER, VAN NEST & PETERS LLP
ERIC H. MACMICHAEL - # 231967
emacmichael@keker.com
NICHOLAS S. GOLDBERG - # 273614
ngoldberg@keker.com
ANJALI SRINIVASAN - # 304413
asrinivasan@keker.com
KELLY S. KAUFMAN - # 328827
kkaufman@keker.com
PAUL VON AUTENRIED - # 335917
pvonautenried@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Plaintiff THE PAC-12 CONFERENCE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PAC-12 CONFERENCE,<br><br>                Plaintiff,<br><br>        v.<br><br>THE MOUNTAIN WEST CONFERENCE,<br><br>                Defendant. | Case No.: 4:24-cv-6685<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT [28 U.S.C. § 2201]**<br><br>Date Filed:  September 24, 2024 |

Plaintiff THE PAC-12 CONFERENCE ("the Pac-12"), by and through its attorneys, brings this Complaint for Declaratory Judgment against defendant THE MOUNTAIN WEST CONFERENCE ("the MWC"). The Pac-12 seeks a declaration under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that Section 7.01 of the Scheduling Agreement (the "Poaching Penalty") between the MWC, the Pac-12, and non-parties Oregon State University ("OSU") and Washington State University ("WSU") dated December 1, 2023, is invalid and unenforceable.

## I.      INTRODUCTION

1.      This action challenges an anticompetitive and unlawful "Poaching Penalty" that the MWC imposed on the Pac-12 to inhibit competition for member schools in collegiate athletics. The Poaching Penalty saddles the Pac-12 with exorbitant and punitive monetary fees for engaging in competition by accepting MWC member schools into the Pac-12. The MWC imposed this Poaching Penalty at a time when the Pac-12 was desperate to schedule football games for its two remaining members and had little leverage to reject this naked restraint on competition. But that does not make the Poaching Penalty any less illegal, and the Pac-12 is asking the Court to declare this provision invalid and unenforceable.

2.      The Pac-12 is one of the preeminent NCAA Division 1 collegiate athletic conferences and boasts a storied history spanning over a century. Last year, the Pac-12 found itself on the verge of collapse after ten member schools precipitously announced their departures and intent to join rival collegiate athletics conferences. Schools departing conferences to join other conferences is nothing new to collegiate athletics; it has happened for decades. Those departures left the Pac-12 with only two remaining members, OSU and WSU, for the 2024-2025 athletic season. In the wake of this mass exodus from the Pac-12 caused by fierce competition from rival conferences, the Pac-12 had only months to salvage the 2024-2025 season and create opportunities for its one thousand student-athletes to compete with other schools.

3.      The MWC is a competitor college athletics conference that includes member schools from the same Western United States region in which the Pac-12 has historically competed for member schools. In December 2023, the MWC reached an agreement with the Pac-12 to schedule football games against OSU and WSU for the 2024-2025 season (the "Scheduling

Agreement"). Exploiting the Pac-12's weakened position, the MWC extracted a heavy price.

4.    Knowing that the Pac-12 was running out of time and short on leverage, the MWC not only charged the Pac-12 supra-competitive prices to schedule football games—over $14 million for OSU and WSU to play just six games each—but it also forced the Pac-12 to accept an unprecedented Poaching Penalty provision wholly unrelated to scheduling football games and designed to limit the Pac-12's ability to compete with the MWC for *years into the future*, even after the Scheduling Agreement will expire:

> [I]f . . . at any time prior to the two year anniversary of the expiration or termination of this Agreement . . . the Pac-12 makes an offer to any MWC Member Institution (other than an offer to all MWC Member Institutions . . .) to join the Pac-12 as a Pac-12 member institution or affiliate member, which any such MWC Member Institution accepts, or announces that it will accept . . . the Pac-12 **shall pay liquidated damages to MWC in the form of . . . a termination fee** as set forth on Schedule 7.

*See* **Exhibit 1** (Scheduling Agreement) at Section 7.01. Schedule 7, in turn, sets forth a series of escalating "termination fees" ranging from $10 million to $137.5 million, depending on the number of MWC member schools that join the Pac-12.

5.    The Poaching Penalty is an unlawful horizontal restraint on competition. It nakedly restricts competition for MWC member schools for one particular competitor: the Pac-12. Not coincidentally, the Pac-12 is the most logical competitor conference for members of the MWC to join, given the geographic proximity and makeup of the universities. Indeed, for years *prior* to the imposition of the Poaching Penalty, MWC member schools had approached the Pac-12 about joining the conference.

6.    The Poaching Penalty was designed by the MWC to stifle this competition by imposing an artificial barrier to entry for members of the MWC to join the Pac-12. The Poaching Penalty improperly restricts and limits the competitive offers the Pac-12 can make to MWC members because it places an exorbitant tax on any such offers. In this way, the Poaching Penalty limits the ability of MWC member schools to benefit from competition among athletic conferences—placing one of their most logical options at a severe competitive disadvantage. The Poaching Penalty thus functions in the same manner as no-poach, no-hire, and non-solicitation

2783470

agreements that have been declared unlawful in this District and around the country because they suppress competition.

7.     There is no legitimate justification for the Poaching Penalty.  In fact, the MWC already seeks to impose tens of millions of dollars in "exit fees" on MWC schools that depart from the conference.  To the extent the MWC would suffer any harm from the departures of its member schools, these exit fees provide more than sufficient compensation to the MWC.  There is no reason why the schools' new conference should be responsible for compensating the MWC further, or why such penalties should apply to only one competitor conference: the Pac-12.  The MWC's purpose in imposing the Poaching Penalty was to reduce competition by the Pac-12 for member schools and weaken the Pac-12 financially.  The Poaching Penalty is duplicative, unnecessary, and entirely punitive.

8.     Enforcing the Poaching Penalty also threatens the Pac-12's ability to remain a viable competitor.  Under NCAA bylaws, top-tier collegiate athletic conferences are required to have at least eight member schools.  When ten Pac-12 schools departed the conference earlier this year, the NCAA afforded the Pac-12 a two-year grace period to operate below the eight-school minimum that will expire in fall 2026.  If the Pac-12 is forced to pay the Poaching Penalty, it will have diminished resources to rebuild and maintain its longstanding status as a leading conference.  Enforcing the Poaching Penalty would also weaken the Pac-12 as a competitor in numerous other ways by depleting vital resources needed by Pac-12 member institutions to compete at the highest levels of collegiate athletics.

9.     Notwithstanding the MWC's draconian and unlawful Poaching Penalty, the Pac-12 remains steadfast in its commitment to re-grow in a fair and competitive manner, to best serve its member schools and student-athletes.  To that end, on September 12, 2024, the Pac-12 accepted applications from four current members of the MWC to join the Pac-12 beginning with the 2026-2027 season, which is when the MWC's current media rights agreement will expire.  The same day, the MWC demanded that the Pac-12 pay $43 million in "liquidated damages," citing the Poaching Penalty.  *See* **Exhibit 2** (Letter from MWC Commissioner Gloria Nevarez to Pac-12 Chief Legal Officer Scott Petersmeyer).  On September 23, 2024, the Pac-12 admitted a fifth

MWC member, Utah State University, beginning with the 2026-2027 season.  The MWC has signaled that it intends to collect (or withhold from distributions) exit fees from its departing members.

10.     The MWC's excessive and punitive Poaching Penalty violates federal and state antitrust law, California's Unfair Competition Law (UCL), and basic principles of contract law. ***First***, the Poaching Penalty is a *per se* violation of antitrust law because it is a naked, horizontal agreement in restraint of trade.  The Poaching Penalty weakens the Pac-12 in competition with other conferences for MWC member schools, diminishes the compensation available for schools interested in joining the Pac-12, and reduces MWC member schools' options for mobility.  On the flip side of the coin, the Poaching Penalty does nothing to increase the amount of college football played, which was the purpose of the Scheduling Agreement.  ***Second***, the Poaching Penalty is unfair and unlawful under the UCL because its only purpose is to distort competition by locking up MWC member schools and preventing them from leaving for a competitor (the Pac-12). ***Third***, the Poaching Penalty is an unenforceable penalty because the "liquidated damages" it threatens are excessive and bear no reasonable relationship to the amount the MWC may be harmed from the loss of its member schools.  Nor could it, since the MWC is already seeking tens of millions in exit fees from the departing schools that more than compensate for any such harm.

11.     The Pac-12 therefore seeks a declaratory judgment that the Poaching Penalty is invalid and unenforceable, and any other relief the Court deems proper to redress these violations.

## II.    PARTIES

12.     The parties are both NCAA Division 1 collegiate athletics conferences whose football teams compete in the Football Bowl Subdivision ("FBS"), the country's highest level of college football.  Both conferences currently include, and have historically included, member schools from the Western United States.

13.     The plaintiff, the Pac-12, is a California unincorporated nonprofit association that has its headquarters and principal place of business in San Ramon, California.

14.     The defendant, the MWC, is a Colorado nonprofit corporation that has its headquarters and principal place of business in Colorado Springs, Colorado.

## III.   JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

15.     The Pac-12 brings one cause of action for violation of the Sherman Act, 15 U.S.C. § 1, a federal statute, as well as three causes of action under state law, all concerning the Poaching Penalty.

16.     The Court has subject matter jurisdiction over the Pac-12's federal antitrust cause of action under (a) Section 4 of the Sherman Act, 15 U.S.C. § 4; (b) 28 U.S.C. § 1337; and (c) 28 U.S.C. § 1331 (federal question).  The Court has supplemental jurisdiction over the state law causes of action, which arise from the same case or controversy, under 28 U.S.C. § 1337.

17.     The Court has personal jurisdiction over the MWC under Section 12 of the Clayton Act, 15 U.S.C. § 22, because the MWC has sufficient minimum contacts with California, and its California contacts give rise to the causes of action here.  The MWC has three member schools located in California.  The MWC contracted with the Pac-12, which is headquartered in California, to arrange a football schedule that includes games to be played in California.  Further, the MWC seeks to recover money from the California-headquartered Pac-12 pursuant to that contract (the Scheduling Agreement).  The MWC therefore transacts business in California and purposefully avails itself of the forum state.

18.     Venue is proper in this judicial district under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, because the MWC both is an inhabitant of the Northern District of California (as one of its member schools is San Jose State University) and transacts business in the Northern District of California, including but not limited to by directing commerce to this District.

19.     Venue is also proper under 28 U.S.C. § 1391(b)(2), as a substantial part of the acts or omissions giving rise to the Pac-12's claims occurred in Contra Costa County.  The headquarters of the Pac-12, with whom the MWC signed the Scheduling Agreement that contains the Poaching Penalty at issue, is located in San Ramon, California.

20.     Under the Northern District of California's General Order No. 44, Section D.3, venue for this antitrust case is proper in any courthouse in this district.

2783470

## IV.    FACTUAL ALLEGATIONS

### A.    The Pac-12 and MWC are Competitors for Member Schools

21.    Collegiate athletics conferences compete with one another to recruit schools to become members.  The Pac-12 and the MWC are two competitor conferences that compete for member schools.

22.    Competition among conferences for member schools is robust, and schools moving from one conference to another ("realignment") has become increasingly common.  Since 1978, when the modern era of the NCAA's Division 1 competition began, hundreds of schools have moved from one conference to another, many moving multiple times.[1]  For the 2024-2025 season alone, 23 schools joined a new conference from the one they had participated in the year before.[2]

23.    Schools benefit from membership in an athletics conference in a variety of ways. A conference enables its member schools to share resources, exert greater leverage in media rights negotiations, and schedule games for the schools' student-athletes to compete against one another.

24.    Student-athletes likewise benefit from their schools' membership in an athletics conference, and competition for member schools among conferences, as well.  Being part of a conference—or moving from one conference to another—can promote student-athletes' professional prospects by matching them with well-suited competitors, increase the value of their name-image-likeness ("NIL") rights, and expose them to new geographic markets and media opportunities.

25.    Given this robust competition among conferences, it is common for conferences to approach schools with offers (or vice versa), even while a school is currently part of a different conference.

---

[1] *See* Kaleb Henry, *A History of Conference Realignment*, KLIN News (Aug. 13, 2023), *available at* https://klin.com/2023/08/13/a-history-of-conference-realignment/ ("Conference realignment is not a new concept.").

[2] *See* Lawrence Price, *College football conference realignment breakdown for 2024-25: Teams in new conferences*, NCAA (Sept. 8, 2024), *available at* https://www.ncaa.com/news/ncaa/article/2024-08-22/college-football-conference-realignment-breakdown-2024-25-teams-new-conferences.

2783470

1

### 1.   The Pac-12

26.     The Pac-12 is a NCAA Division 1 collegiate athletics conference that boasts a storied history and reputation.  Founded in 1915, the Pac-12 is dedicated to developing the next generation of leaders by championing excellence in academics, athletics, and the well-being of student athletes.  Since its establishment more than a century ago, the Pac-12 has earned more team sport national championships than any other conference in history.

27.     Oregon State University (then known as Oregon Agricultural College) was one of the four founding members of the Pac-12 in 1915.  Washington State University joined the Pac-12 just one year later, in 1916.  For over 100 years, OSU and WSU have dedicated themselves to promoting the conference and its mission.

28.     Collegiate athletics, and the Pac-12 specifically, underwent a major realignment in 2022 and 2023.  Between June 2022 and August 2023, ten schools announced their departure from the Pac-12 to join competing conferences for the 2024-2025 academic year.  Each school was recruited away from the Pac-12 by a rival conference, as part of competition among conferences for members: (a) the University of California, Los Angeles (UCLA), the University of Southern California (USC), the University of Oregon, and the University of Washington joined the Big Ten Conference; (b) the University of Colorado, the University of Arizona, Arizona State University (ASU), and the University of Utah joined the Big 12 Conference; and (c) the University of California, Berkeley and Stanford University joined the Atlantic Coast Conference.

29.     Unlike other conferences, including the MWC, the Pac-12's bylaws did not impose "exit fees" on the departing member schools.

30.     The ten departures from the Pac-12 left the conference with multiple pressing issues in late 2023.

31.     First, the Pac-12 and its two remaining schools, OSU and WSU, faced the prospect of a 2024-2025 season without a full schedule of football games for their student athletes and only months to arrange a new one.  That is because conference members typically schedule most football games against fellow conference members each season, and only a few games against non-conference opponents.  The departure of ten schools left the Pac-12 with a significant gap in

scheduling athletic competitions for OSU and WSU, particularly for those schools' football programs where schedules are often set in years in advance.

32.     Second, the NCAA's bylaws afford the Pac-12 only a two-year grace period, beginning with the 2024-2025 season, to participate in the FBS without the requisite eight active member schools.[3]  If the Pac-12 is unable to rebuild to eight schools, it forfeits participation in the top-flight of college football, the FBS.  The Pac-12 thus has limited time to recruit new members and remain eligible to participate as a conference in the NCAA FBS.

## 2.     The MWC

33.     The MWC is a NCAA Division 1 collegiate athletic conference and a competitor of the Pac-12.

34.     Like many conferences, the MWC has benefited from recent conference realignment and grown because of open competition for member schools.

35.     The MWC was formed in 1999 by eight schools that defected from the Western Athletic Conference (WAC).[4]  In 2005, the MWC successfully recruited Texas Christian University away from Conference USA.  Between 2011 and 2013, the MWC successfully recruited six more WAC members to join the MWC:  Boise State University; California State University, Fresno; the University of Hawaii; the University of Nevada, Reno; San Jose State University; and Utah State University.  In none of these instances did the MWC pay any "poaching penalties" to the conferences from which it recruited members.

36.     MWC member schools have also discussed joining other conferences, including the Pac-12, for years prior to the Scheduling Agreement.  San Diego State University ("SDSU") had entertained discussions about potentially joining the Pac-12 or the Big 12 Conference for

---

[3] *See* NCAA Bylaws, Article 20 ("Division Membership") at Sections 20.02.9 (minimum membership), 20.02.9.2 (grace period).

[4] *See Mountain West Chronology*, Mountain West https://themw.com/mountain-west-chronology/ (listing founding members Air Force Academy; Brigham Young University; Colorado State University; the University of New Mexico; San Diego State University; the University of Nevada, Las Vegas; the University of Utah; and the University of Wyoming).

2783470

many years before the Scheduling Agreement was executed.[5]  And it has been reported that the Air Force Academy has discussed joining the American Athletic Conference.[6]  Those other conferences are not subject to any "poaching penalties."

37.    Schools have departed from the MWC for other conferences in recent years.  In none of those instances did the new conference pay the MWC "poaching penalties."

38.    The MWC imposes "exit fees" on member schools that resign from the MWC and seek to join competing conferences.  Specifically, the MWC bylaws require departing member schools to pay "an amount equal to three (3) times the average per Member Institution Conference distribution payment for the year preceding" if notice of departure is provided more than a year in advance.  If notice is provided less than a year in advance, this prohibitive "exit fee" is doubled.  The MWC is reportedly seeking to recover as much as a combined ***$80 million*** in exit fees from just four MWC schools that have announced they will join the Pac-12 for the 2026-2027 season.

### B.    The Pac-12 and MWC Reach a One-Year Scheduling Agreement for Football Games

39.    Following the ten departures from the Pac-12, and with only months until the 2024-2025 season was set to begin, the Pac-12 and its remaining members, OSU and WSU, immediately began exploring scheduling options.

40.    The Pac-12 ultimately reached a Scheduling Agreement with the MWC, providing dates and matchups for OSU and WSU to compete against MWC schools in football for the 2024-2025 season.  The Scheduling Agreement became effective December 1, 2023.  *See* **Exhibit 1** at 2 (preamble).

---

[5] *See* Alex Kirshner, *Here's what San Diego State's Big 12 pitch looked like*, SB Nation (Vox) (Oct. 14, 2016), *available at* https://www.sbnation.com/college-football/2016/10/14/13291382/sdsu-big-12-expansion-pitch; Derek Togerson, *San Diego State to the Big 12? Aztecs Still a Wild Card as Realignment Drama Continues*, NBC San Diego (Aug. 7, 2023), *available at* https://www.nbcsandiego.com/news/local/san-diego-state-to-the-big-12-aztecs-still-a-wild-card-as-realignment-drama-continues/3279837/.

[6] *See* Pete Thamel, *Sources: Air Force emerges as serious target for AAC*, ESPN (Sept. 16, 2024), *available at* https://www.espn.com/college-sports/story/_/id/41291626/air-force-emerges-serious-.

41.     The fundamental purpose of the Scheduling Agreement was to arrange a full season of college football games for the Pac-12's two member schools to play the MWC's twelve member schools.  To do so, the parties agreed that OSU and WSU would each participate in six football games against MWC opponents, comprised of three home games and three away games.  *See* **Exhibit 1** at Section 2.01; Schedule 1 ("Football Event Scheduling").

42.     The MWC received more than $14 million in compensation from Pac-12 member schools for one season of football games under the Scheduling Agreement.  In exchange for "scheduling and related administrative services" associated with arranging the 2024-2025 season, the Pac-12 member schools collectively paid the MWC a one-time fee of $2 million.  *See* **Exhibit 1** at Section 2.02.  On top of the one-time fee, the Pac-12 member schools also paid the MWC over $12 million in "Participation Fees."  *See* **Exhibit 1** at Section 3.01(b), (d).  Under the Scheduling Agreement, each conference is still responsible for providing referees, replays, and other "necessary services" for home games hosted by their respective member schools.  *See id.*

43.     The fees the Pac-12 paid the MWC far exceeded the market value of integrating OSU and WSU into the MWC's schedule.  As multiple news outlets reported, these fees were exorbitant:  "The $14 million this year comes out to $2.3 million per home game, which is above the going rate for a nonconference home game."[7]  Indeed, the per-game price the Pac-12 is paying the MWC under the Scheduling Agreement appears to be more than *any* school will pay for football games this season.[8]  The Scheduling Agreement extracted an extraordinarily high

---

[7] *See* Chris Vannini, *Pac-12, Mountain West Conference miss deadline for 2025 football schedules: What's next?*, The Athletic (The New York Times) (Sept. 2, 2024), *available at* https://www.nytimes.com/athletic/5740549/2024/09/02/pac-12-mountain-west-2025-schedule-agreement/?partner=slack&smid=sl-share; *see also* Chris Murray, *What's next for the Mountain West after football scheduling alliance with Pac-2 not extended*, Nevada Sports Net (Sept. 3, 2024), *available at* https://nevadasportsnet.com/news/reporters/whats-next-for-mountain-west-after-football-scheduling-alliance-with-pac-2-not-extended ("well above the going rate").

[8] *See* David Rumsey, *College Football's Guarantee Games:  High Risks and Higher Payouts*, Front Office Sports (Aug. 30, 2024), *available at* https://frontofficesports.com/college-footballs-guarantee-games-high-risks-and-higher-payouts/?utm_medium=email&utm_campaign=FOS%20AM%20Aug%2030%202024&utm_content=FOS%20AM%20Aug%2030%202024+Version+A+CID_ac10afed1d32c3a9bafe30ef3761a405&utm_source=FOS%20Daily%20Newsletter&utm_term=College%20Footballs%20Guarantee%20Games%20High%20Risks%20and%20Higher%20Payouts ("Nobody, to my knowledge, has crossed the $2 million threshold yet [for a single game].").

price for OSU and WSU to play football.

44.     The MWC benefited from the inclusion of Pac-12 member schools OSU and WSU in the MWC football schedule.  The MWC Commissioner admitted that OSU and WSU have "really added a pump to our football strength of schedule and we look forward to meeting them on the gridiron this year."[9]  Nevertheless, it was the Pac-12 that paid the MWC for the ability to participate, not the other way around, because the MWC "[felt] it ha[d] the leverage" over the Pac-12, which lacked a full schedule.[10]

45.     Beyond the scheduling of games for the 2024-2025 season, the Scheduling Agreement also contemplates the possibility of future transactions between the Pac-12 and the MWC, none of which have materialized, and none of which require the inclusion of the Penalty Provision.

46.     First, the conferences can "mutually agree," by September 1, 2024, to a one-year extension of the Scheduling Agreement, which would provide a second year of football games at an undetermined price.  *See* **Exhibit 1** at Section 4.01(b).

47.     After the Scheduling Agreement was signed, the conferences discussed the possibility of a one-year extension but were unable to reach an agreement.  The conferences' negotiations broke down after the MWC demanded $30 million from the Pac-12 for the 2025-2026 season, more than ***double*** the already exorbitant price the MWC charged the Pac-12 for games during the 2024-2025 season.  After the parties were unable to reach agreement in the face of the MWC's financial demands, the MWC Commissioner broke off further discussions, stating,

---

[9] *See* Jason Walker, *Mountain West Commissioner Gloria Nevarez touts conference successes at Media Days*, Cache Valley Daily (July 11, 2024), *available at* https://www.cachevalleydaily.com/sports/mountain-west-commissioner-gloria-nevarez-touts-conference-successes-at-media-days/article_9079dbb0-3ed5-11ef-9485-0bfe9d760a78.html.

[10] *See* Chris Vannini, *Pac-12, Mountain West Conference miss deadline for 2025 football schedules: What's next?*, The Athletic (The New York Times), *available at* https://www.nytimes.com/athletic/5740549/2024/09/02/pac-12-mountain-west-2025-schedule-agreement/?partner=slack&smid=sl-share.

2783470

"I think we have to move on."[11]

48.    Second, the Scheduling Agreement contemplates that the two conferences will "negotiate in good faith the consummation, as promptly as reasonably practicable, of a [D]efinitive [T]ransaction" in which all MWC member schools would join the Pac-12 after the conclusion of the 2024-2025 season. *See* **Exhibit 1** at Section 8.01. Section 8.01 does not involve any commitment to actually enter into a definitive transaction, nor does it identify any terms that would be relevant to reaching such an agreement. The agreement to negotiate in good faith regarding such a possibility was not a primary purpose of the Scheduling Agreement or a material inducement for entering into the Scheduling Agreement.

49.    The parties have had preliminary discussions but neither side has made a proposal for a Definitive Transaction. As of the time of filing this complaint, the parties have not entered into any such Definitive Transaction.

**C.    The MWC Imposes an Anticompetitive Poaching Penalty on the Pac-12**

50.    Unrelated to the Scheduling Agreement's purpose of scheduling football games for the 2024-2025 season, the MWC insisted on including an anticompetitive and unlawful provision to prevent the Pac-12 from recruiting MWC member schools to join the Pac-12 in future seasons.

51.    Specifically, the MWC proposed a one-sided Poaching Penalty that punishes the Pac-12 if it recruits some (but not all) MWC member schools to join the Pac-12. The Poaching Penalty provides that if any MWC school accepts an offer from the Pac-12 to join the conference, the Pac-12 "shall pay liquidated damages to MWC in the form of [a] termination fee." *See* **Exhibit 1** at Section 7.01. There is no similar provision or penalty if the MWC successfully recruits a Pac-12 school.

52.    The MWC-imposed Poaching Penalty does not end at the conclusion of the 2024-2025 season; instead, the Poaching Penalty extends for an additional two years *after* the

---

[11] *See* Mark Zeigler, *Does San Diego State, Mountain West fit into Pac-2's plans?*, The San Diego Union-Tribune (Sept. 11, 2024), *available at* https://www.sandiegouniontribune.com/2024/09/09/does-san-diego-state-mountain-west-fit-into-pac-2s-plans/; *see also* Kyle Bonagura, *Sources: Pac-12, Mountain West football don't reach deal for '25*, ESPN (Sept. 2, 2024), *available at* https://www.espn.com/college-football/story/_/id/41100415/sources-pac-12-mountain-west-football-reach-deal-25 ("There's too big a gap [between the parties].").

2783470

Scheduling Agreement's expiration date.  As a result, the Poaching Penalty handcuffs the Pac-12 until at least August 1, 2027, which is the year *after* the Pac-12's NCAA grace period expires.  In other words, the Pac-12 must re-build to the minimum eight member schools required under the bylaws, while hampered *at all times* by the Poaching Penalty.

53.    The "termination fees" threatened in the Poaching Penalty are severe monetary penalties.  If a single MWC school accepts an offer to join the Pac-12, the Pac-12 would owe the MWC $10 million.  Each additional school would cost even more:  If two schools depart, the Pac-12 would owe $20.5 million; if three schools depart, it owes $31.5 million; if four schools depart, $43 million; if five schools depart, $55 million; and so on.  *See* **Exhibit 1** at Schedule 7.

54.    By all accounts, the Poaching Penalty was intended to insulate the MWC from competition by the Pac-12 and weaken the Pac-12 as a competitor.  The MWC Commissioner has admitted that the MWC's express purpose in imposing the Poaching Penalty was to "***protect ourselves against what we knew could potentially break us apart***"[12]—*i.e.*, competition for MWC member schools.  As one journalist put it, the Poaching Penalty effectively "safeguard[s] [MWC] against potential poaching" because even though it does not "completely rule out" agreements between the Pac-12 and some MWC member schools, "it puts in place huge financial hurdles."[13]

55.    With the Pac-12 under considerable pressure to secure a 2024-2025 football schedule only months before the season was set to begin, the MWC forced the Poaching Penalty provision on the Pac-12 as a condition of the scheduling deal, even though it bears no relationship to scheduling.[14]

---

[12] *See* Mark Zeigler, *Does San Diego State, Mountain West fit into Pac-2's plans?*, The San Diego Union-Tribune (Sept. 11, 2024), *available at* https://www.sandiegouniontribune.com/2024/09/09/does-san-diego-state-mountain-west-fit-into-pac-2s-plans/ (emphasis added).

[13] *See* Chris Murray, *Inside the Mountain West, Pac-12 contract: Why it could cost Oregon State, Washington State nearly $140M to poach MW*, Nevada Sports Net (Jan. 10, 2024), *available at* https://nevadasportsnet.com/news/reporters/inside-the-mountain-west-pac-12-contract-why-it-could-cost-oregon-state-washington-state-nearly-140m-to-poach-mw.

[14] *See also* Mark Zeigler, *Does San Diego State, Mountain West fit into Pac-2's plans?*, The San Diego Union-Tribune (Sept. 11, 2024), *available at* https://www.sandiegouniontribune.com/2024/09/09/does-san-diego-state-mountain-west-fit-into-pac-2s-plans/ ("[T]he Mountain West scheduling agreement . . . includes, for lack of a better term, "poaching penalties" . . . [that were] a non-negotiable part of the deal for the Mountain West.  OSU and WSU, desperate for a 2024 football schedule, swallowed and signed it.").

**D.**     **Five MWC Member Schools Agree to Join the Pac-12**

56.     On September 12, 2024, the Pac-12 admitted four current members of the MWC that had long been interested in joining the Pac-12—Boise State University, California State University, Fresno, Colorado State University, and SDSU—beginning with the 2026-2027 season.  The Pac-12's decision came after receipt and review of formal written applications for admission submitted by these schools.

57.     The same day, the MWC demanded the Pac-12 pay $43 million pursuant to the Poaching Penalty.  *See* **Exhibit 2** (Letter from MWC Commissioner Gloria Nevarez to Pac-12 Chief Legal Officer Scott Petersmeyer); *see also* **Exhibit 1** at Section 7.01; Schedule 7 (listing an aggregate fee of $43 million for the four schools).

58.     On September 23, 2024, the Pac-12 admitted a fifth MWC member, Utah State University, beginning with the 2026-2027 season.

59.     The MWC has stated that it intends to collect (or withhold from distributions) exit fees from its departing members.

**E.**     **Anticompetitive Harm**

60.     The Poaching Penalty stifles competition by imposing an artificial barrier to entry for members of the MWC to join the Pac-12.  The Poaching Penalty puts an exorbitant tax on the Pac-12's recruitment of MWC member schools, each of whom would otherwise be logical candidates to join a reconstituted Pac-12 given their geographic location.  By forcing the Pac-12 to pay tens of millions of dollars in "termination fees," the Poaching Penalty improperly interferes with the Pac-12's ability to present its most competitive offer to members of the MWC.  In this way, the Poaching Penalty limits the mobility of MWC member schools—placing the Pac-12, one of their most logical conference options, at a severe competitive disadvantage and suppressing the offers the Pac-12 can make to them.

61.     Additionally, if enforced, the Poaching Penalty threatens the Pac-12's ability to compete against the MWC and other conferences.  If the Pac-12 does not have at least eight member schools before the 2026-2027 season (*i.e.*, within the grace period offered by the NCAA bylaws), it will lose the ability to compete in the FBS, depriving its student-athletes the

opportunity to compete in the highest tier of college football.  Paying $55 million to the MWC as a penalty for recruiting five of its member schools—conduct in which athletic conferences, including the MWC, regularly and fairly engage—would significantly deplete the Pac-12's resources to recruit additional schools and rebuild.

62.     The Poaching Penalty bears no rational relationship to the purpose of the Scheduling Agreement, which is to arrange football games during the 2024-2025 season.  It extends beyond the Scheduling Agreement's term, it does not affect the schedule in any respect, and it does not in any way impact the amount of football played, games scheduled, or anything else relating to the 2024-2025 scheduling of games.

63.     Instead, the Poaching Penalty serves only to increase the MWC's profits by locking up its member schools and preventing them from leaving for a competitor (the Pac-12).

**F.     There are No Legitimate Justifications for the Poaching Penalty**

64.     Because the Poaching Penalty is *per se* unlawful, it is inherently illegal, and no justifications are available; the analysis should end there.

65.     But even if the rule of reason applied, the purported justifications for the Poaching Penalty set forth in Scheduling Agreement are pretextual, illusory, and designed by the MWC solely to conceal its anticompetitive purpose.

66.     Section 7.01 recites that the MWC insisted on the Poaching Penalty because it planned to share "confidential information" with the Pac-12.  But no such confidential information has been shared with the Pac-12, nor is it clear how any such information would be relevant to MWC member schools in deciding they want to join the Pac-12 or why such information would necessarily justify tens of millions in fees.

67.     Section 7.01 also posits that the Poaching Penalty is justified because the MWC will share with the Pac-12 "unique access to MWC Member Institutions" to which the Pac-12 "would not otherwise be entitled."  *See* **Exhibit 1** at Section 7.01.  Again, no such "unique access" has been provided to the Pac-12.  The Pac-12 had the same "access" to the MWC members after it signed the Scheduling Agreement as it did before.  Indeed, the Pac-12 had discussions with several members of the MWC about joining the conference well before the

Scheduling Agreement was ever contemplated.  And Pac-12 member schools have competed in football games against MWC schools for decades prior to the Scheduling Agreement.

68.     Finally, Section 7.02 of the Scheduling Agreement claims that the $10 million-plus-per-school "termination fees" in the Poaching Penalty are "fair, reasonable, and appropriate approximations of the losses that MWC may incur as a result of MWC's loss of any MWC Member Institution to [the] Pac-12 and the failure to consummate the Definitive Transaction." *See* **Exhibit 1** at Section 7.02.  But the severe exit fees that the MWC imposes on its member schools already more than compensate the MWC for any loss of departing member schools.

69.     As explained above, the MWC's bylaws provide that departing member schools will pay "Exit Fees" to the conference, separate and apart from any Poaching Penalty in the Scheduling Agreement.[15]  The MWC's bylaws require departing member schools to pay "an amount equal to three times the average per Member Conference distribution payment for the preceding year" if notice of departure is provided more than a year in advance.[16]  This "prohibitive exit fee[]" is doubled if a member's notice is late.[17]

70.     In other words, the MWC has ***already*** accounted for any losses from the departures of member schools.  With the Poaching Penalty in place, the MWC gets compensated for "poaching" two times over.  The MWC seeks to recover exit fees under the bylaws if a member leaves for a rival conference.  There is no reason the MWC should get paid ***even more*** if that rival conference happens to be the Pac-12.

71.     Further, the Poaching Penalty, which increases based on the number of schools

---

[15] *See also* Mark Zeigler, *Does San Diego State, Mountain West fit into Pac-2's plans?*, The San Diego Union-Tribune (Sept. 11, 2024), *available at* https://www.sandiegouniontribune.com/2024/09/09/does-san-diego-state-mountain-west-fit-into-pac-2s-plans/ (noting termination fees are "separate from what Mountain West defectors would owe in exit fees, which will approach $20 million with more than a year's notice and $40 million inside that").

[16] *See* Bylaws of Mountain West Conference at Section 1.04 ("Resignation"), *available at* https://s3.amazonaws.com/sidearm.sites/mountainwest.sidearmsports.com/documents/2020/8/5/Appendix_A_Bylaws_.pdf.

[17] *See* Chris Murray, *Inside the Mountain West, Pac-12 contract: Why it could cost Oregon State, Washington State nearly $140M to poach MW*, Nevada Sports Net (Jan. 10, 2024), *available at* https://nevadasportsnet.com/news/reporters/inside-the-mountain-west-pac-12-contract-why-it-could-cost-oregon-state-washington-state-nearly-140m-to-poach-mw.

involved, bears no relationship to any purported "failure to consummate the Definitive Transaction." The Scheduling Agreement does not require that the parties enter into any such transaction; it requires only that they negotiate in good faith. Any failure to consummate such a transaction cannot justify one-sided penalties against the Pac-12. Nor would it make sense for any penalty for a "failure to consummate the Definitive Transaction," which would involve every MWC member school, to vary based on the number of schools who later actually depart from MWC to the Pac-12, as the "termination fees" do here.

72. The MWC's stated rationale in Section 7.02 for the Poaching Penalty is disingenuous: the exorbitant penalties it imposes purport to remedy either (a) a harm the MWC has already more than insured itself against via exit fees, or (b) a hypothetical harm (a failure to enter into a hypothetical future transaction) that is unrelated to the Scheduling Agreement and cannot conceivably be compensated by variable "termination fees."

73. Indeed, the description of the Poaching Penalty's required sums as "liquidated damages" reveals the MWC's true intent—to prevent the Pac-12 from accepting offers from MWC schools entirely, with a liquidated damages provision designed to deter any such "breach"—notwithstanding the lack of an explicit contractual commitment by the Pac-12 not to accept MWC members into the Pac-12.

**G.    There is an Actual and Concrete Controversy**

74. The MWC's attempt to enforce the Poaching Penalty, and thereby harm competition and the Pac-12 specifically, gives rise to an actual and concrete controversy warranting declaratory judgment.

75. On September 12, 2024, after four new Pac-12 members were announced, the MWC Commissioner sent a letter to the Pac-12 seeking to enforce the anticompetitive and unlawful Poaching Penalty, stating the Pac-12 is "obligated to pay the MWC $43,000,000 (forty-three million dollars) in 'Aggregate Withdrawal Fees' within 30 (thirty) days of the date of this letter." *See* **Exhibit 2** at 2.

76. On September 24, 2024, the Pac-12 Commissioner responded to the MWC's letter and explained that the Pac-12 disagreed with the MWC's position because the Poaching Penalty

is "unlawful and unenforceable."  *See* **Exhibit 3** (Letter from Pac-12 Commissioner Teresa Gould to MWC Commissioner Gloria Nevarez).  As the Pac-12 Commissioner explained, the Poaching Penalty seeks to "inhibit competition by placing exorbitant and punitive monetary fees on the Pac-12 simply for engaging in competition by accepting MWC member schools into the Pac-12." *See id.*

## V.   CAUSES OF ACTION FOR DECLARATORY JUDGMENT

### Count One

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

77.   The Pac-12 hereby incorporates paragraphs 1 through 76.

78.   The Poaching Penalty is *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No complex analysis is required to demonstrate the anticompetitive character of this agreement.

79.   The Pac-12 and the MWC are separate entities.

80.   The Pac-12 and the MWC are direct competitors for member schools.

81.   The Poaching Penalty is a horizontal agreement between direct competitors in restraint of trade.  The Poaching Penalty is a form of market allocation, whereby the MWC has prevented the Pac-12 from freely soliciting the MWC's schools for membership.  By insisting on the Poaching Penalty, the MWC effectively required the Pac-12 to agree not to compete for particular member schools.

82.   The Poaching Penalty suppresses competition between the Pac-12 and the MWC by imposing an artificial barrier, in the form of a one-sided penalty, on the Pac-12's efforts to recruit MWC's member schools.

83.   The Poaching Penalty unfairly disadvantages the Pac-12 compared to other competitor conferences.  Nothing in the Scheduling Agreement prevents or otherwise penalizes other conferences from soliciting MWC member schools; only the Pac-12 is penalized.

84.   The Poaching Penalty prevents the Pac-12 from being able to offer competitive, attractive membership offers to schools as it attempts to rebuild the conference.  *See supra* ¶¶ 60-61.

85.     The Poaching Penalty is a naked, horizontal restraint that has no purpose except to stifle competition.

86.     The Poaching Penalty is not an ancillary restraint that is reasonably necessary to achieving the pro-competitive purpose of the Scheduling Agreement.

87.     The Poaching Penalty cannot qualify as ancillary merely because it accompanies the Scheduling Agreement, which is otherwise lawful.

88.     Although the Scheduling Agreement has the pro-competitive purpose of facilitating scheduling of football games, the Poaching Penalty does not further that purpose and is not necessary to achieving it.  The Poaching Penalty does nothing to facilitate the scheduling of football games or to increase the amount of college football played.  Rather, the Poaching Penalty is designed solely to stifle competition by imposing an artificial barrier to entry for members of the MWC to join the Pac-12, and in turn, to weaken the Pac-12's standing as a competing conference.

89.     In the alternative, the Poaching Penalty is also an unreasonable restraint of trade that is unlawful under the rule of reason.

90.     The Poaching Penalty has no legitimate pro-competitive justification, and its entire effect is anticompetitive: it prevents the Pac-12 from being able to freely compete for schools, while delivering the MWC a windfall.  *See supra* ¶¶ 64-73.

91.     As a direct and proximate result of the Poaching Penalty, the Pac-12 has and will continue to suffer competitive harm because of the inability to freely compete with other conferences for schools.

## Count Two

## Violation of California's Cartwright Act, Cal. Bus. & Prof. Code § 16720 *et seq.*

92.     The Pac-12 hereby incorporates paragraphs 1 through 91.

93.     The Poaching Penalty is a *per se* unlawful trust that restricts trade in violation of California Business and Professions Code, Section 16720 *et seq.* (the "Cartwright Act"), and is therefore unenforceable, *see* Cal. Bus. & Prof. Code § 16722.

94.     The Pac-12 is a "person" for purposes of the Cartwright Act as an association

authorized by the laws of California.  *See* Cal. Bus. & Prof. Code § 16702.

95.     The MWC is a "person" for purposes of the Cartwright Act as a corporation authorized by the laws of Colorado.  *See id.*

96.     The Poaching Penalty is a combination between the Pac-12 and the MWC.  *See* Cal. Bus. & Prof. Code § 16720.

97.     The Poaching Penalty has no purpose or effect that promotes, encourages, or increases competition or furthers trade; instead, its only purpose is to stifle competition.

98.     In the alternative, the Poaching Penalty is also an unreasonable restraint of trade that is unlawful under the rule of reason.

99.     The Poaching Penalty has no legitimate pro-competitive justification, and its entire effect is anticompetitive: it prevents the Pac-12 from being able to freely compete for schools, while delivering the MWC a windfall.  *See supra* ¶¶ 64-73.

100.    As a direct and proximate result of the Poaching Penalty, the Pac-12 has and will continue to suffer competitive harm because of the inability to freely compete with other conferences for schools.

**Count Three**

**Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.***

101.    The Pac-12 hereby incorporates paragraphs 1 through 100.

102.    The MWC's actions to suppress competition through the Poaching Penalty constitute unfair competition and unfair and unlawful business acts and practices in violation of California Business and Professions Code, Sections 17200, *et seq.* (the "UCL").

103.    The Poaching Penalty violates the UCL as an unlawful business practice because it violates the Sherman Act and the Cartwright Act.  *See supra* ¶¶ 77-100.

104.    The Poaching Penalty, whether or not in violation of the Sherman Act or Cartwright Act, otherwise violates the UCL as an unfair business practice.  The harm to competition, and the Pac-12 specifically, is substantial and far outweighs any countervailing benefit to the MWC of locking in its member schools.

105.    As a direct and proximate result of the Poaching Penalty, the Pac-12 has and will

continue to suffer competitive harm because of the inability to freely compete with other conferences for schools.

106. Unless the Poaching Penalty is declared invalid and unenforceable, the Pac-12 will suffer severe, irreparable harm. Absent such a declaration, the Pac-12 will be inhibited from engaging in free competition and will be weakened as a competitor.

**Count Four**

**Invalid Contract for Unenforceable Penalties**

107. The Pac-12 hereby incorporates paragraphs 1 through 106.

108. The "termination fees" due under the Poaching Penalty are unenforceable penalties as a matter of contract law.

109. The Poaching Penalty requires the Pac-12 to pay "liquidated damages to MWC in the form of [a] termination fee" that, according to the MWC, "approximat[e] . . . the losses that MWC may incur as a result of MWC's loss of any MWC Member Institution to Pac-12 and the failure to consummate the Definitive Transaction." *See* **Exhibit 1** at Sections 7.01 & 7.02.

110. A clause that "fix[es] unreasonably large liquidated damages" is unenforceable on grounds of public policy as a penalty. Restatement (Second) of Contracts, § 356(1). A liquidated damages clause becomes an unenforceable penalty if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach of the relevant obligation. Absent a reasonable relationship, a clause purporting to predetermine damages must be construed as a penalty and declared null and void. Further, the parties to a contract cannot circumvent the law prohibiting excessive liquidated damages by merely stating that the amount is not a penalty.

111. To the extent the "liquidated damages" are intended to estimate the amount of damages that would flow from the Pac-12's breach of some independent contractual provision within the Scheduling Agreement, Section 7.01 does not identify any such provision, nor has the Pac-12 breached any such contractual commitment. Indeed, the true purpose of the purported "liquidated damages" is merely to forestall competition by penalizing the Pac-12 for recruiting MWC schools.

112.    The only identified "losses" the Scheduling Agreement identifies as justifying the "termination fees"—loss of member schools and failing to consummate a Definitive Transaction, *see* **Exhibit 1** at Section 7.02—bear no reasonable relationship to the fees due under the Poaching Penalty, which range from $10 million to $137.5.

113.    First, the "termination fees" bear no reasonable relationship to any loss the MWC would incur from losing member institutions.  Before the Scheduling Agreement was signed, the MWC had already ensured that it would be more than compensated for the loss of any member schools through the imposition of exit fees for departing members.

114.    The MWC's bylaws require departing member schools to pay hefty "Exit Fees" that are calculated based on a three- or six-times multiple of the average yearly distribution the conference made to its members.  *See supra* ¶ 38.

115.    The additional $10-million-plus "termination fees" due under the Poaching Penalty cannot be reasonably related to the damages that would flow from the MWC's loss of member schools because the "Exit Fees" already compensate any purported loss.

116.    If the MWC were permitted to recover both "Exit Fees" under its bylaws and the "termination fees" under the Scheduling Agreement, it would receive a double-recovery, constituting a windfall for the same harm.

117.    Second, the "termination fees," which increase based on the number of schools that depart for the Pac-12, bear no reasonable relationship to any loss the MWC would incur from the failure to enter a "Definitive Transaction."  Even if the Scheduling Agreement required the consummation of an agreement—which it unambiguously does not, *see supra* ¶ 48—any loss to the MWC would be a sum certain, not a sliding-scale penalty like those set forth in Schedule 7.

118.    Moreover, the "termination fees" are excessive and unreasonable in light of the gross imbalance of bargaining power between the parties when the Scheduling Agreement was signed.  Unlike the MWC, which had a full football schedule and "[felt] it ha[d] the leverage," the Pac-12 was in critical need of a schedule for its student-athletes in the upcoming school year, having lost ten of its twelve members.  The Pac-12 had no meaningful alternative but to accede to the MWC's demands.

1 119. Thus, the "termination fees" demanded pursuant to the Poaching Penalty are

2 duplicative of the "Exit Fees" the MWC already stands to collect, unmoored from any rational

3 estimate of damages flowing from any purported violation of the Scheduling Agreement (and

4 there has been no such independent violation), and excessive given the circumstances surrounding

5 the Scheduling Agreement.

## VI.    PRAYER FOR RELIEF

7 WHEREFORE, the Pac-12 prays for the following relief:

8 1. A declaratory judgment stating that:

9 a. The Poaching Penalty is an unlawful and unenforceable agreement in

10 restraint of trade in violation of Section 1 of the Sherman Act and the

11 Cartwright Act;

12 b. The Poaching Penalty is an unfair and unlawful business practice in

13 violation of the UCL;

14 c. The Poaching Penalty's "termination fees" are an unenforceable penalty;

15 and

16 d. Because the Poaching Penalty violates the Sherman Act, the Cartwright

17 Act, the UCL, and contract law, it is null and void, and the MWC is barred

18 from enforcing it.

19 2. Such other and further relief as the Court deems just and proper.

20

21

22 Dated:  September 24, 2024                    KEKER, VAN NEST & PETERS LLP

23

24                                          By:   /s/ Eric H. MacMichael
                                                ERIC H. MACMICHAEL
25                                               NICHOLAS S. GOLDBERG
                                                ANJALI SRINIVASAN
26                                               KELLY S. KAUFMAN
                                                PAUL VON AUTENRIED
27
                                                Attorneys for Plaintiff THE PAC-12
28                                               CONFERENCE