**WILLKIE FARR & GALLAGHER LLP**
SIMONA AGNOLUCCI (SBN 246943)
sagnolucci@willkie.com
EDUARDO E. SANTACANA (SBN 281668)
esantacana@willkie.com
333 Bush Street, 34th Floor
San Francisco, CA  94104
Tel: 415 858 7400
Fax: 415 858 7599

WESLEY R. POWELL (SBN 230430)
wpowell@willkie.com
787 Seventh Avenue
New York, NY 10019
Tel: 212 728 8000
Fax: 212 728 8111

MATT D. BASIL (*pro hac vice* pending)
mbasil@willkie.com
300 N. LaSalle Street
Chicago, IL  60654
Tel: 312 728 9000
Fax: 312 728 9199

*Attorneys for Defendant*
*THE MOUNTAIN WEST CONFERENCE*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| THE PAC-12 CONFERENCE,<br><br>                        Plaintiff,<br><br>   vs.<br><br>THE MOUNTAIN WEST CONFERENCE,<br><br>                    Defendant. | Case No. 5:24-cv-06685-SVK<br><br>**DEFENDANT THE MOUNTAIN WEST CONFERENCE'S NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT**<br><br>Date:        March 25, 2025<br>Time:       10:00 AM<br>Courtroom:  Courtroom 6, 4th Floor<br>Judge:     Magistrate Judge Susan van Keulen |

1

## NOTICE OF MOTION AND MOTION

2    **TO ALL PARTIES AND ATTORNEYS OF RECORD:**

3    PLEASE TAKE NOTICE that the following Motion to Dismiss will be heard on

4    March 25, 2025, at 10:00 AM, or as soon thereafter as counsel may be heard, in Courtroom 6,

5    4th Floor, of the United States District Court for the Northern District of California, located at

6    280 South 1st Street, San Jose, CA 95113, with the Hon. Susan van Keulen presiding.

7    Defendant The Mountain West Conference ("MWC") will and hereby does move the Court pursuant

8    to Federal Rule of Civil Procedure 12(b)(6) for an order dismissing the complaint with prejudice

9    because any amendment of the complaint would be futile.  The Motion is based on this Notice of

10    Motion and Motion, the Memorandum of Points and Authorities contained herein, all pleadings and

11    other papers on file in this action, and any other evidence or argument that may be presented to the

12    Court in connection with the Motion.

## STATEMENT OF ISSUES TO BE DECIDED

14    1.    Whether the complaint should be dismissed for failure to state a claim upon which relief

15    can be granted under Federal Rule of Civil Procedure 12(b)(6).

16    2.    Whether the claims should be dismissed with prejudice because amendment would be

17    futile.

18

19    Dated: November 25, 2024              **WILLKIE FARR & GALLAGHER LLP**

20

21

22                          By: _/s/ Eduardo E. Santacana_
                               Eduardo E. Santacana (SBN 281668)
23                             Wesley R. Powell (SBN 230430)
                               Simona Agnolucci (SBN 246943)
24                             Matt D. Basil (*pro hac vice* pending)

25                             *Attorneys for Defendant*
                               *THE MOUNTAIN WEST CONFERENCE*
26

27

28

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................... 1

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    A.    Rival Conferences Compete for Pac-12 Schools ................................................. 2

    B.    The Pac-12 Engages With the MWC, and the MWC Agrees to Help. ....................... 3

    C.    The Pac-12 Admits Five MWC Schools, Refuses to Compensate the MWC as Agreed, and Sues the MWC. .......................................................................... 4

LEGAL STANDARD ........................................................................................................... 5

ARGUMENT ....................................................................................................................... 5

    A.    Counts I and II Fail to State a Claim Because the Pac-12 Lacks Antitrust Standing. ........................................................................................................ 6

        1.    The Pac-12 Fails to Allege any Antitrust Injury. ................................... 7

        2.    The Pac-12's Alleged Harms Are Speculative ....................................... 10

    B.    The Pac-12 Also Fails to Plead Plausible Antitrust Claims .................................. 11

        1.    The Pac-12 Has Agreed That Section 7.01 Is Ancillary to the Scheduling Agreement. .................................................................. 12

            a)    The Pac-12 Does Not Allege a Rule of Reason Violation. .................. 14

    C.    Count IV Fails to State a Claim Because the Termination Fees Are Not "Unenforceable Penalties." ........................................................................... 17

    D.    Count III Fails to State a Claim Because the Pac-12's Other Claims Fail. ................ 20

CONCLUSION ................................................................................................................... 22

MOUNTAIN WEST CONFERENCE'S MOTION TO DISMISS COMPLAINT
Case No. 5:24-CV-06685-SVK

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

*In re Actimmune Mktg. Litig.*,
5    No. C 08-02376 MHP, 2009 WL 3740648 (N.D. Cal. Nov. 6, 2009) ...................................... 21

6 *Arcell v. Google LLC*,
   No. 22-CV-02499-RFL, 2024 WL 3738422 (N.D. Cal. Aug. 9, 2024) ......................... 7, 10, 11

7

8 *Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................... 5, 6

9 *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
10    9 F.4th 1102 (9th Cir. 2021) .................................................................................. *passim*

11 *Banks v. Cnty. of San Mateo*,
   No. 16-CV-04455-YGR, 2017 WL 3434113 (N.D. Cal. Aug. 10, 2017) ................................ 6

12

13 *Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................................... 5, 7

14 *Brantley v. NBC Universal, Inc.*,
15    675 F.3d 1192 (9th Cir. 2012) .......................................................................................... 9

16 *Campfield v. State Farm Mut. Auto. Ins. Co.*,
   532 F.3d 1111 (10th Cir. 2008) ...................................................................................... 17

17

18 *Cargill, Inc. v. Monfort of Colo. Inc.*,
   479 U.S. 104 (1986) ...................................................................................................... 7

19 *Carrico v. City & Cnty. of San Francisco*,
20    656 F.3d 1002 (9th Cir. 2011) ......................................................................................... 5

21 *Cascades Computer Innovation LLC v. RPX Corp.*,
   No. 12-CV-01143 YGR, 2013 WL 316023 (N.D. Cal. Jan. 24, 2013) ................................ 20

22

23 *Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
   95 F.3d 593 (7th Cir. 1996) ............................................................................................ 8

24 *City of Oakland v. Oakland Raiders*,
   20 F.4th 441 (9th Cir. 2021) ................................................................................ 7, 10, 11

25

26 *Coronavirus Reporter v. Apple, Inc.*,
   85 F.4th 948 (9th Cir. 2023) ............................................................................... 11, 15, 17

27

28 *Davis v. HSBC Bank Nevada, N.A.*,
   691 F.3d 1152 (9th Cir. 2012) ....................................................................................... 20

*Fed. Trade Comm'n v. Microsoft Corp.*,
    681 F. Supp. 3d 1069 (N.D. Cal. 2023) .................................................................. 8, 11

*Flaa v. Hollywood Foreign Press Ass'n*,
    55 F.4th 680 (9th Cir. 2022) ............................................................................. 6, 14, 17

*Flaa v. Hollywood Foreign Press Ass'n*,
    No. 220CV06974SBEX, 2021 WL 1399297 (C.D. Cal. Mar. 23, 2021) ........................... 15, 16

*Fonseca v. Hewlett-Packard Co.*,
    No. 20-56161, 2021 WL 4796540 (9th Cir. Oct. 14, 2021) ....................................... 12

*Frost v. LG Elecs. Inc.*,
    No. 16-cv-05296, 2018 WL 6256790 (N.D. Cal. June 22, 2018) ................................. 12

*In re German Auto. Manufacturers Antitrust Litig.*,
    497 F. Supp. 3d 745 (N.D. Cal. 2020) .................................................................. 15, 16

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
    433 F. App'x 598 (9th Cir. 2011) ........................................................................ 17

*GSI Tech. v. United Memories, Inc.*,
    No. 5:13-CV-01081-PSG, 2014 WL 1572358 (N.D. Cal. Apr. 18, 2014) ....................... 10

*Hadley v. Kellogg Sales Co.*,
    243 F. Supp. 3d 1074 (N.D. Cal. 2017) .................................................................. 21

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ...................................................................... 15, 16, 21

*High Tek USA, Inc. v. Heat & Control, Inc.*,
    No. 12-CV-00805 YGR, 2012 WL 2979051 (N.D. Cal. July 18, 2012) .......................... 15

*Korea Kumho Petrochemical Co. v. Flexsys Am. LP*,
    370 F. App'x 875 (9th Cir. 2010) ................................................................... 7, 9, 10

*Lambrix v. Tesla, Inc.*,
    No. 23-CV-01145-TLT, 2023 WL 8265916 (N.D. Cal. Nov. 17, 2023) .......................... 21

*Langan v. United Services Auto. Ass'n*,
    69 F. Supp. 3d 965 (N.D. Cal. 2014) .................................................................... 19

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
    884 F.2d 504 (9th Cir. 1989) ............................................................................. 12

*Mahlum v. Adobe Sys. Inc.*,
    No. 14-CV-124663, 2015 WL 124663 (N.D. Cal. 2015) ............................................ 18

*MLW Media LLC v. World Wrestling Ent., Inc.*,
    655 F. Supp. 3d 946 (N.D. Cal. 2023) .................................................................. 16

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984) ........................................................................................ 12, 13

*Nemcik v. Stevens*,
  No. 16-cv-00322-BLF, 2017 WL 2834120 (N.D. Cal. June 30, 2017) .................................... 5

*Oracle America, Inc. v. CedarCrestone, Inc.*,
  938 F. Supp. 2d 895 (N.D. Cal. 2013) ........................................................................ 14

*Paladin Assocs., Inc. v. Mont. Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) ................................................................................. 9

*Polk Bros., Inc., v. Forest City Enters., Inc.*,
  776 F.2d 185 (7th Cir. 1985) ............................................................................ 12, 13

*Pool Water Prod. v. Olin Corp.*,
  258 F.3d 1024 (9th Cir. 2001) ......................................................................... 8, 9, 10

*Punian v. Gillette Co.*,
  No. 14-CV-05028-LHK, 2016 WL 1029607 (N.D. Cal. Mar. 15, 2016) ................................... 21

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997) ................................................................................. 16

*Reilly v. Apple Inc.*,
  578 F. Supp. 3d 1098 (N.D. Cal. 2022) ....................................................................... 15

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
  471 F. Supp. 3d 981 (N.D. Cal. 2020) ......................................................................... 8

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1986) ............................................................................... 14

*Sabol v. PayPal Holdings, Inc.*,
  No. 23-CV-05100-JSW, 2024 WL 3924686 (N.D. Cal. Aug. 23, 2024) .................................. 7

*SCFC ILC, Inc. v. Visa USA, Inc.*,
  36 F.3d 958 (10th Cir. 1994) ........................................................................... 10, 14

*Schneider v. Verizon Internet Services, Inc.*,
  400 F. App'x 136 (9th Cir. 2010) ............................................................................ 18

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ......................................................................... 5, 7, 9

*Strawflower Elecs., Inc. v. RadioShack Corp.*,
  No. C-05-0747 MMC, 2005 WL 2290314 (N.D. Cal. Sept. 20, 2005) ................................... 11

*Tanaka v. Univ. of S. California*,
  252 F.3d 1059 (9th Cir. 2001) .........................................................................*passim*

v

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) ............................................................................ 15, 16

**State Cases**

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
    973 P.2d 527 (Cal. 1999) .......................................................................................... 21

*Chavez v. Whirlpool Corp.*,
    93 Cal. App. 4th 363 (2001) ...................................................................................... 21

*Drum v. San Fernando Valley Bar Assn.*,
    182 Cal. App. 4th 247 (2010) .................................................................................... 22

*People's Choice Wireless, Inc. v. Verizon Wireless*,
    131 Cal. App. 4th 656 (2005) .................................................................................... 21

*Weber, Lipshie & Co. v. Christian*,
    52 Cal. App. 4th 645 (Cal. Ct. App. 1997) ................................................................ 18

**Federal Statutes**

Sherman Act ....................................................................................................... *passim*

**State Statutes**

Cal. Bus. & Prof. Code § 17200 *et seq.* ............................................................. *passim*

California Civil Code § 1671(b) ................................................................................. 19

Cartwright Act .................................................................................................... *passim*

MOUNTAIN WEST CONFERENCE'S MOTION TO DISMISS COMPLAINT
Case No. 5:24-CV-06685-SVK

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The Pac-12 Conference (the "Pac-12") is a historically dominant, "Power 5" NCAA Division 1 collegiate athletic conference. Faced with the defection of all but two of its member schools, in late 2023, the Pac-12 pursued, negotiated, and executed a Scheduling Agreement (the "Scheduling Agreement") with the Mountain West Conference (the "MWC") to "form a working relationship to create opportunities for competition in college athletics among student athletes," which required "mutual cooperation and exchanges of confidential information" subject to certain safeguards, including a commitment to preserve the respective integrity of both the MWC and Pac-12. (Ex. 1, Preamble.)[1] The Scheduling Agreement was a boon for the Pac-12, the MWC, student athletes, and consumers, resulting in a new variety of college matchups that would not have otherwise taken place.

The Pac-12 brings this action to renege on the Scheduling Agreement, purporting to assert *per se* antitrust claims under the Sherman and Cartwright Acts (Counts I and II) on the basis of an output-enhancing arrangement. These claims fail. As a preliminary matter, the Pac-12 has no antitrust standing: it fails to allege any harm to competition or to itself. To the contrary, the Scheduling Agreement benefitted both the Pac-12 and competition. Left alone in the Pac-12, "it would be difficult or impossible" for the conference's two remaining schools, Oregon State University ("OSU") and Washington State University ("WSU"), to "provide competitive opportunities for their student athletes" for the 2024–25 season. (Ex. 1, Preamble.) The MWC solved that problem for the Pac-12 by allowing OSU and WSU to play against the MWC's member schools pursuant to the Scheduling Agreement.

The arrangement also provided the Pac-12 with options to solve a second problem: meeting the eight-team minimum for Football Bowl Subdivision conferences. The Scheduling Agreement gave the Pac-12 three potential strategic options: (1) merge with the MWC under the "Pac-12" banner; (2) offer membership in the Pac-12 to some, but not all, of the MWC's schools; or (3) dissolve the

---

[1] References to exhibits are to the exhibits attached to Plaintiff's Complaint. The Scheduling Agreement is attached to the Complaint as Exhibit 1.

MOUNTAIN WEST CONFERENCE'S MOTION TO DISMISS COMPLAINT
Case No. 5:24-cv-06685-SVK

Pac-12 and allow its members to join any other conference.  The Pac-12 chose the second option, and now complains that the fees it unconditionally guaranteed to pay the MWC for damaging the integrity of the MWC by cherry-picking select MWC schools violate the law.

The Pac-12 baldly alleges the imposition of these fees is a *per se* violation of the Sherman Act, but it is a well-established tenet of antitrust law that terms ancillary to legitimate procompetitive arrangements must be judged under the rule of reason, which requires a plaintiff to carry the initial burden of showing that the "challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market."  *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1111 (9th Cir. 2021).  The Pac-12 does not even attempt to meet that standard:

- The Pac-12 does not allege the existence of any defined market;

- The Pac-12 has not alleged that the MWC exerts any power over any market; and

- The Pac-12 admits that Section 7.01 of the Scheduling Agreement is ancillary to a legitimate, procompetitive purpose.

Counts III and IV—asserting claims under California law—fare no better.  Plaintiff's claim under California's Unfair Competition Law (Count III) is derivative of Counts I and II and therefore fails for the same reasons.  And the assertion that certain terms in the Scheduling Agreement are unenforceable liquidated damages "penalties" (Count IV) misconstrues the unambiguous language of the Scheduling Agreement, which specifies that amounts are not damages for a breach but rather an alternative to merging both conferences.  As a result, the Complaint fails to plead plausible claims under any theory and should be dismissed with prejudice and without leave to amend.

## BACKGROUND[2]

### A.    Rival Conferences Compete for Pac-12 Schools.

The Pac-12, a California unincorporated association, is a "Power 5" conference—"one of the preeminent NCAA Division 1 collegiate athletic conferences" that "boasts a storied history spanning over a century."  (Dkt. 1, Compl. ¶ 2.)  Between June 2022 and August 2023, ten schools announced their departures from the Pac-12 to join "competing conferences" for the 2024–25 academic year.  (*Id.*

---

[2] The MWC accepts as true the allegations in the Complaint solely for purposes of this Motion.

¶¶ 2, 28.)  The departing member schools "[were] recruited away . . . by rival conference[s]" across the country, including the Big Ten Conference, the Big 12 Conference, and the Atlantic Coast Conference.  (*Id.* ¶ 28.)

These departures meant the Pac-12 would consist of only two schools for the 2024–25 academic year: OSU and WSU.  (*Id.* ¶¶ 2, 30, 31.)  This left the Pac-12 with a pressing problem with "only months" to resolve, for which it needed a partner: scheduling games for the 2024–25 season to "create opportunities for its one thousand student-athletes to compete with other schools."  (*Id.* ¶ 2.)

This was not the Pac-12's only problem.  The NCAA requires Division I multisport conferences to have at least seven active members and eight total members for participation in Football Bowl Subdivision ("FBS") football.  (*Id.* ¶ 32 (citing NCAA Bylaws, Article 20).)  Without other conference opponents, OSU and WSU faced "a significant gap in scheduling athletic competitions" not only in the 2024–25 season but also beyond, particularly for football "where schedules are often set . . . years in advance."  (*Id.* ¶ 31.)  With only months left until the 2024–25 season began, "the Pac-12 and its remaining members, OSU and WSU, immediately began exploring scheduling options."  (*Id.* ¶ 39.)

**B.     The Pac-12 Engages With the MWC, and the MWC Agrees to Help.**

In October and November 2023, the Pac-12 participated in discussions with the MWC, a "Group of Five" conference, regarding a potential alliance that could resolve its dilemma.  On December 1, 2023, the Pac-12, OSU, WSU, and the MWC, executed the Scheduling Agreement.  (*Id.* ¶ 40.)  The "fundamental purpose" of the resulting Scheduling Agreement "was to arrange a full season of college football games for the Pac-12's two remaining member institutions."  (*Id.* ¶ 41.)  The Scheduling Agreement also provided a pathway for scheduling men's and women's basketball games.  (Ex. 1, § 2.01.)  The Scheduling Agreement was therefore mutually beneficial: the remaining Pac-12 member institutions would play full football schedules, the MWC teams could play against talent from a premier conference, both conferences could receive substantial media revenue, and fans could enjoy new, exciting matchups they otherwise would not view.

The Scheduling Agreement also offered certain solutions to the Pac-12's FBS problem: adding members before the NCAA's two-year grace period expired.  (*Id.* ¶ 40; Ex. 1, §§ 7.01, 8.01.)  That is,

1  the Scheduling Agreement allowed for the Pac-12 and the MWC to engage in good-faith negotiations

2  to add MWC member institutions to the Pac-12 "after the conclusion of the 2024-25 season."

3  (Compl. ¶ 48.)  Specifically, the Scheduling Agreement, which was the result of joint negotiation and

4  drafting by the Pac-12, OSU, WSU, and the MWC, provided that the Pac-12 could absorb all MWC

5  member institutions into the Pac-12 at no cost.  (Ex. 1, §§ 1.03, 8.01.)

6       The Scheduling Agreement also contemplated, in Section 7.01, that the Pac-12 could admit

7  fewer than all of the MWC's member institutions.  (*Id.* § 7.01.)  In that scenario, the Pac-12 expressly

8  agreed that, as a result of damaging the integrity of the MWC's conference, the "MWC would suffer

9  unique economic damages and losses which would be impracticable or extremely difficult to

10  quantify." (*Id.*)  As a result, "as a material inducement to MWC's willingness to enter into and perform

11  its obligations under [the Scheduling] Agreement[,]" the Pac-12 "absolutely, irrevocably and

12  unconditionally guarantee[d]" that it would pay certain fees (the "Termination Fees") corresponding

13  to the number of MWC member institutions it absorbed.  (*Id.* §§ 7.01, 10.11, Schedule 7.)  And under

14  Section 7.02, the parties also agreed that the fees that were due and payable to the MWC "are not

15  penalties and are instead fair, reasonable and appropriate approximations of the losses that [the] MWC

16  may incur" as a result of the Pac-12's choice.  (*Id.* § 7.02.)

17       **C.    The Pac-12 Admits Five MWC Schools, Refuses to Compensate the MWC as**

18            **Agreed, and Sues the MWC.**

19       On September 12, 2024, the Pac-12 admitted four current members of the MWC: Boise State

20  University; California State University, Fresno; Colorado State University; and San Diego State

21  University for the 2026–27 academic year.  (Compl. ¶ 56.)  On the same day, MWC Commissioner

22  Gloria Nevarez sent a letter to the Pac-12 reminding the Pac-12 that the Termination Fees would be

23  due on October 12, 2024.  (*Id.* ¶ 57; Ex. 2.)  The Pac-12 responded by admitting a fifth school,

24  Utah State University, on September 23, 2024.  (Compl. ¶ 9.)

25       The Pac-12 filed this lawsuit a day later, on September 24, 2024.  (*See generally id.*)  Despite

26  agreeing—less than a year ago—that the terms of the Scheduling Agreement "do not and will not . . .

27  violate or conflict with any [l]aw," the Complaint alleges that the Termination Fees that the Pac-12

28  unconditionally guaranteed to pay the MWC are unenforceable under federal and state law.  (Ex. 1,

§ 5.01(c)(ii).)    In Count I, the Pac-12 seeks a declaration that Section 7.01 of the Scheduling Agreement is *per se* unlawful under Section 1 of the Sherman Act or, in the alternative, unreasonable under the same statute.  (Compl. ¶¶ 78–89.)  In Count II, the Pac-12 seeks a declaration that Section 7.01 of the Scheduling Agreement is illegal *per se* or unreasonable under the Cartwright Act.  (*Id.* ¶¶ 93–100.)  In Count III, the Pac-12 seeks a declaration that the MWC engaged in "unfair competition and unlawful business acts and practices" under California's Unfair Competition Law.  (*Id.* ¶¶ 102–106).  Lastly, in Count IV, the Pac-12 seeks a declaration that the Termination Fees in the Scheduling Agreement are "unenforceable penalties."  (*Id.* ¶¶ 108–119.)

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "[F]ormulaic recitation of the elements of a cause of action" is not sufficient.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (dismissing Sherman Act claim for failure to state a cause of action).  Factual allegations are presumed true, but "legal conclusion[s] couched as a factual allegation" are not.  *Id.* (internal marks omitted).  Particularly in the antitrust context, mere "bare assertion[s]" that stop "short of the line between possibility and plausibility" cannot overcome a motion to dismiss.  *Id.* at 556-57; *see also Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013) (dismissal is required "when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory").

Dismissal without leave to amend is appropriate if "amendment would be futile."  *Carrico v. City & Cnty. of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011).  An amendment is futile when "no set of facts can be proved . . . that would constitute a valid and sufficient claim[.]"  *Nemcik v. Stevens*, No. 16-cv-00322-BLF, 2017 WL 2834120, at \*9 (N.D. Cal. June 30, 2017) (citation omitted).

## ARGUMENT

The Pac-12 fails to state a claim under any of its counts.  Counts I and II are backed by little more than conclusory allegations and naked assertions, none of which amounts to a cognizable

1    antitrust claim.   Not only does the Pac-12 lack antitrust standing, it fails to demonstrate that the

2    Scheduling Agreement restrained trade.   Count IV, the Pac-12's claim that the Termination Fees are

3    "unenforceable contract penalties," shares the same fate.   Not only does it mischaracterize California

4    law, it mischaracterizes the contract language itself, attempting to twist a presumptively legal

5    contractual provision into a penalty.   Because Counts I and II fail to state a claim, Count III under

6    California's Unfair Competition Law also fails.   The Pac-12's claims are little more than an attempt

7    to avoid paying the "unconditionally guaranteed" compensation it agreed to pay the MWC less than a

8    year ago—a proposition the Court should squarely reject.

9        **A.    Counts I and II Fail to State a Claim Because the Pac-12 Lacks Antitrust Standing.**

10           To establish a Section 1 claim, a plaintiff must demonstrate the existence of "(1) an agreement,

11   conspiracy, or combination among two or more persons or distinct business entities; (2) which is

12   intended to harm or unreasonably restrain competition; and (3) which actually causes injury to

13   competition, beyond the impact on the claimant, within a field of commerce in which the claimant is

14   engaged (i.e., 'antitrust injury')."   *Banks v. Cnty. of San Mateo*, No. 16-CV-04455-YGR, 2017 WL

15   3434113, at *9 n.10 (N.D. Cal. Aug. 10, 2017) (*citing McGlinchy v. Shell Chem. Co.*, 845 F.2d 802,

16   811 (9th Cir. 1988)).   "Because the analysis under the Cartwright Act mirrors the analysis under the

17   Sherman Act, we consider both claims together."   *Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th

18   680, 688 (9th Cir. 2022).

19           The Pac-12 fails to establish antitrust standing.   Although it pleads the existence of an

20   agreement, the Complaint fails to allege an injury to competition and appears to advance a theory that

21   would render the Pac-12 an equally culpable co-conspirator in any alleged restraint of trade.

22   (*See* Compl. ¶¶ 81, 82, 96.)   Indeed, the Pac-12 fails to allege any injury to competition beyond

23   potential harm to itself, and does not consistently define a relevant market to be harmed, offering little

24   more than "'naked assertion[s]' devoid of 'further factual enhancement.'"   *Iqbal*, 556 U.S. at 662

25   (quoting *Twombly*, 550 U.S. at 557); (Compl. ¶¶ 2, 3, 21, 25, 36, 37, 83, 91).   Any injury the Pac-12

26   attempts to allege is purely speculative.

27           To plead antitrust standing, a plaintiff must plausibly allege that it suffered a direct injury of

28   the type the antitrust laws were intended to forestall—that is, a nonspeculative, concrete economic

harm to competition that is fairly traceable to a defendant's anticompetitive conduct. *See City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455 (9th Cir. 2021). The Pac-12 has failed to allege a cognizable injury to competition or a market for such injury, let alone any nonspeculative harm to itself. It therefore fails to establish antitrust standing. *See id*.; *Sabol v. PayPal Holdings, Inc*., No. 23-CV-05100-JSW, 2024 WL 3924686, at *4 (N.D. Cal. Aug. 23, 2024) (holding that a plaintiff without antitrust standing under the Sherman Act also lacks standing under the Cartwright Act).

### 1.    The Pac-12 Fails to Allege any Antitrust Injury.

"Injury to competition is a requisite of claims under §§ 1 and 2 of the Sherman Act and . . . claims under California Antitrust law" like the Cartwright Act. *Korea Kumho Petrochemical Co. v. Flexsys Am. LP*, 370 F. App'x 875, 876 (9th Cir. 2010) (citations omitted). Likewise, an antitrust plaintiff must allege it has been harmed by that injury to competition to establish antitrust standing. *Somers*, 729 F.3d at 964 n.5, 967. To demonstrate such an injury, the Pac-12 must allege "specific facts" that raise an antitrust claim "above the speculative level" showing "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Twombly*, 550 U.S. at 555; *City of Oakland*, 20 F.4th at 456. To be sure, even a "credible" and "plausible" antitrust injury is "not always sufficient to establish antirust standing." *Arcell v. Google LLC*, No. 22-CV-02499-RFL, 2024 WL 3738422, at *4 (N.D. Cal. Aug. 9, 2024); *Cargill, Inc. v. Monfort of Colo. Inc.*, 479 U.S. 104, 110 n.5 (1986). Because the Pac-12 cannot demonstrate an antitrust injury, it fails to plausibly allege any antitrust violations in Counts I and II. *See Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1064 (9th Cir. 2001) (holding that "failure to allege injury to competition is a proper ground for dismissal").

The Pac-12's conclusory assertion that Section 7.01 "is designed solely to stifle competition by imposing an artificial barrier to entry for members of the MWC to join the Pac-12, and in turn, to weaken the Pac-12's standing as a competing conference" (Compl. ¶¶ 8, 88, 106) is neither plausible nor sufficient to meet its burden. Section 7.01 *specifically allows* MWC members to join the Pac-12 at no cost, via a merger of the two conferences, which would increase, not stifle, output and competition. (Ex. 1, § 7.01.) The Scheduling Agreement also authorizes the Pac-12 to cherry-pick individual MWC schools, an option that the Complaint concedes the Pac-12 has already exercised five

times.  (Compl. ¶¶ 9, 56.)  While it is true that, pursuant to Section 7.01 of the Scheduling Agreement, the Pac-12 agreed to compensate the MWC for recruiting only select schools and thereby diminishing the remaining MWC's members' options for scheduling games, this guaranteed compensation did not impede the Pac-12's recruitment of five MWC schools.  (*Id.*)  And nothing in the Scheduling Agreement prevents the Pac-12 from recruiting non-MWC colleges to its conference.

Where the alleged antitrust injury "flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal *per se*."  *Pool Water Prod. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001) (citation omitted).  Here, the Pac-12 has utterly failed to allege that Section 7.01 injures competition.  Nor could it.  By its own terms, Section 7.01 specifically incentivized a procompetitive merger of the two conferences, or, OSU and WSU were free to join any Power Five Conference.  (Ex. 1, §§ 7.01, 8.01.)  These options ensured an increase, not a stifling, of competition and matchup diversity, and the Scheduling Agreement incentivized these options.  (*See* Compl. ¶ 43 n.7) ("[T]he scheduling agreement incentivized the Pac-12 to add all MW[C] members at no cost.").  Moreover, the outcome the Pac-12 alleges it sought—freedom to cherry-pick MWC schools without cost—would harm competition, by leaving holes in the remaining MWC schools' schedules and thereby decreasing output of MWC conference games.  *See Fed. Trade Comm'n v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1098 (N.D. Cal. 2023); *Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) ("Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem.").  The Termination Fees thus enhance, not constrain, competition.

Allegations that the Termination Fees "impose[] an artificial barrier to entry for members of the MWC" are also insufficient to establish any antitrust injury.  (Compl. ¶ 88); *Reveal Chat Holdco, LLC v. Facebook, Inc*., 471 F. Supp. 3d 981, 998 (N.D. Cal. 2020) (rejecting allegations that plaintiffs were "prevented from entry or reentry into the relevant markets because of [defendant's] exclusionary conduct" as "nothing more than conclusory").  No MWC members joined the Pac-12 before the Scheduling Agreement's ratification despite their alleged "interest," whereas five MWC members joined after.  If the provision were a true restraint—and the MWC disputes that it is—it was an ineffective one.  (Compl. ¶¶ 36, 56, 58.)

Tellingly, the Pac-12 does not allege how any "limitation of [its] personal choice inhibits [MWC's] competitors" from recruiting MWC schools, or how the Scheduling Agreement barred the Pac-12 from approaching the over one hundred schools outside the MWC for potential Pac-12 membership. *See Somers*, 729 F.3d at 967; *Korea Kumho*, 370 F. App'x at 877. Rather, the Pac-12 alleges that interconference competition is "open," "fierce" and "robust" while lamenting that "other conferences are not subject to any [Termination Fees]." (Compl. ¶¶ 2, 21, 25, 34, 36, 37, 83, 91.) Indeed, the Pac-12 complains that "[n]othing in the Scheduling Agreement prevents or otherwise penalizes other conferences from soliciting MWC member schools; only the Pac-12 is penalized." (*Id.* ¶ 83.) But allegations that competition is not restricted *enough* do not constitute an antitrust injury. *See Tanaka*, 252 F.3d at 1064 (affirming dismissal where plaintiff alleged no other student-athlete suffered transfer sanctions and transfers to other conferences were not sanctioned, which showed "nothing more than a personal injury to herself, not an injury to a definable market").

The Pac-12's allegations amount to little more than a gripe that only it has suffered an injury, not competition as a whole. (Compl. ¶ 83.) But even assuming the Pac-12 had suffered some sort of injury from an agreement that unquestionably incentivizes procompetitive, output-enhancing conduct, that is not the type of injury the antitrust laws were intended to prevent, so the Complaint fails to establish antitrust standing. *Pool Water Prod.*, 258 F.3d at 1036; *Tanaka*, 252 F.3d at 1064; *Somers*, 729 F.3d at 967.

To be sure, the Sherman Act protects "competition, not competitors." *Korea Kumho*, 370 F. App'x at 877 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962)). For that reason, alleging that "parties have entered into a contract that limits some freedom of action (in this case by circumscribing the [Pac-12's] ability to offer [certain] packages) . . . is not sufficient to allege an injury to competition," because where "conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012) (parenthetical original); *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003). The Complaint offers nothing more. *Compare Brantley*, 675 F.3d at 1202 *with* (Compl. ¶ 84) (Section 7.01 "prevents the Pac-12 from being able to offer competitive, attractive membership offers to schools"). In other words, accepting the Pac-12's allegations as true, "weaken[ing] the

1   strength of [only] the Pac-12's standing as a competing conference" is not an injury to competition.

2   (Compl. ¶ 88); *see GSI Tech. v. United Memories, Inc.*, No. 5:13-CV-01081-PSG, 2014 WL 1572358,

3   at *3 (N.D. Cal. Apr. 18, 2014) (dismissing market allocation claim for lack of antitrust standing);

4   *compare Pool Water Prod.*, 258 F.3d at 1036 (finding no antitrust injury because "[a] decrease in one

5   competitor's market share . . . affects competitors, not competition.") *with* (Compl. ¶ 8) ("If the Pac-

6   12 is forced to pay . . . it will have diminished resources to . . . maintain its longstanding status as a

7   leading conference.").

8        To be sure, even if the Pac-12 were "completely shut out of the [market]," unlike the facts here,

9   (*see* Compl. ¶¶ 36, 56, 58), it would "still lack[] antitrust standing because the 'elimination of a single

10  competitor . . . does not prove anticompetitive effect.'" *GSI*, 2014 WL 1572358, at *3 (citation

11  omitted). Rather, "[i]mpact upon the *market* must be proven," and the Pac-12 pleads the opposite.

12  *See id.* (emphasis added); (e.g., Compl. ¶¶ 83, 91). That remains true even if a party *intended* to harm

13  the Pac-12—which the MWC most certainly did not—because "intent to harm a rival [or] protect and

14  maximize profits . . . is neither actionable nor sanctioned by the antitrust laws." *SCFC ILC, Inc. v.

15  Visa USA, Inc.*, 36 F.3d 958, 969 (10th Cir. 1994). Ultimately, the Pac-12 alleges little more.

16  (Compl. ¶ 54 ("By all accounts, [Section 7.01] was intended to insulate the MWC from competition

17  by the Pac-12 and weaken the Pac-12 as a competitor.").)

18       For these reasons, the Pac-12 fails to adequately allege any antitrust injury. Counts I and II

19  should therefore be dismissed. *See Korea Kumho*, 370 F. App'x at 877.

20             **2.      The Pac-12's Alleged Harms Are Speculative.**

21       Even if the Pac-12 alleged an adequate antitrust injury, its alleged harms are speculative.

22  Without any specific allegations about potential members the Pac-12 would have admitted but for the

23  existence of the Termination Fees, or how the fees kept it from competing for MWC schools, it cannot

24  establish antitrust standing. *See Arcell*, 2024 WL 3738422, at *4–5; *City of Oakland*, 20 F.4th at 460

25  ("Nonpurchasers who are priced out of the market . . . present a special problem, due to the speculative

26  nature of the harm. We require a reasonable level of certainty before we will confer antitrust standing

27  on such consumers.") (citing Areeda & Hovenkamp ¶ 391b1). Because, "[w]ithout such facts . . . the

28  Court 'is only left to speculate' whether" a market would be as the Pac-12 posits, and the Pac-12 fails

1    to allege sufficient factual content to nudge its claim from conceivable to plausible.  *Arcell*, 2024 WL

2    3738422, at *5 (quoting *Somers*, 729 F.3d at 965); *Strawflower Elecs., Inc. v. RadioShack Corp.*,

3    No. C-05-0747 MMC, 2005 WL 2290314, at *10 (N.D. Cal. Sept. 20, 2005).

4        *City of Oakland* is instructive.  There, the Ninth Circuit affirmed dismissal of a Section 1 claim

5    where the plaintiff, the City of Oakland, alleged that the defendants, the National Football League and

6    its thirty-two member-teams, engaged in conduct that amounted to a "horizontal price-fixing" scheme

7    to prevent the City of Oakland from retaining or luring a replacement member-team.  20 F.4th at 451,

8    460-61.  The court found the alleged harm too speculative, and its reasoning applies equally well here.

9    "We do not know whether the [Pac-12] would have [recruited] [a] [Division 1] team, whether that

10   team would have been [from the MWC] or another [conference], where that team would have played,

11   or what price the [Pac-12] would have paid for the privilege of having a[nother] team.  Because we do

12   not know whether the [Pac-12] would have [recruited] the [other schools], we cannot know whether it

13   would have avoided the harm it alleges."  *See id*.

14       Because the Pac-12 fails to plausibly plead antitrust standing, its Sherman Act and Cartwright

15   Act claims fail and should be dismissed with prejudice and without leave to amend.

16       **B.    The Pac-12 Also Fails to Plead Plausible Antitrust Claims.**

17       Even if the Pac-12 had adequately alleged standing, Counts I and II fail for the additional

18   reason that the Pac-12 has failed to plead plausible *per se* antitrust claims.

19       The Pac-12 purports to plead a *per se* claim under the Sherman and Cartwright Acts.  But the

20   *per se* standard does not apply to terms that are ancillary to a legitimate procompetitive agreement, as

21   is the case here.  *See Aya*, 9 F.4th at 1109 (quoting *Rothery Storage & Van Co. v. Atlas Van Lines,*

22   *Inc*., 792 F.2d 210, 224 (D.C. Cir. 1986)).  Significantly, the Pac-12 concedes that the parties entered

23   into the Scheduling Agreement for the purpose of creating *more* "opportunities for competition in

24   college athletics" (Ex. 1, Preamble), an unquestionably procompetitive purpose.  *See Microsoft*, 681

25   F. Supp. 3d at 1098.

26       The Pac-12's conclusory allegation that these "purported justifications" are "pretextual" is

27   little more than a disagreement with the explicit justifications set forth in the Scheduling Agreement.

28   (Compl. ¶ 65); *see Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023) (affirming

dismissal of Sherman Act claims where allegations of anticompetitive conduct amounted to little more than disapproval of explicit contractual justifications). Further, the parties explicitly agreed that those opportunities would not have been created without the existence of certain safeguards to "preserve the integrity of the MWC and Pac-12," including Section 7.01 of the Scheduling Agreement. (Ex. 1, Preamble.) The Scheduling Agreement increases competitiveness in college athletics—via a greater diversity of college matchups that benefit the athletes, colleges, and fans—while protecting each institution's resources, investments, and brand value.

Accordingly, there can be little dispute that Section 7.01 qualifies as an ancillary restraint, which triggers a rule of reason analysis. *See, e.g., Polk Bros., Inc., v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985) ("A restraint is ancillary when it may contribute to the success of a cooperative venture that promises greater productivity and output."); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100–102 (1984) (recognizing that the rule of reason applies to antitrust claims involving league sports because "horizontal restraints on competition are essential if the product is to be available at all."). Section 7.01 is subject to—and survives—the rule of reason analysis, and joins a long list of similar Ninth Circuit cases that have been dismissed. *E.g., Fonseca v. Hewlett-Packard Co*., No. 20-56161, 2021 WL 4796540, at *1 (9th Cir. Oct. 14, 2021) (affirming dismissal of "no poach" antitrust case); *Frost v. LG Elecs. Inc*., No. 16-cv-05296, 2018 WL 6256790, *7 (N.D. Cal. June 22, 2018) (same); *see also Tanaka v. University of Southern California*, 252 F.3d 1059, 1065 (9th Cir. 2001) (affirming dismissal of certain Pac-10 student athlete transfer restrictions for failure to define a cognizable market or allege antitrust injury); *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 509 (9th Cir. 1989) (affirming dismissal, on rule of reason grounds, for failure to sufficiently allege an unreasonable restraint or injury to competition).

### 1. The Pac-12 Has Agreed That Section 7.01 Is Ancillary to the Scheduling Agreement.

*Per se* treatment is not appropriate where the restraint is (1) "subordinate and collateral to a separate, legitimate transaction," and (2) "'reasonably necessary' to achiev[e] that transaction's pro-competitive purpose." *Aya Healthcare Servs.*, 9 F.4th at 1109 (internal citations omitted). That is precisely the case here for multiple reasons. First, the Pac-12 concedes that Section 7.01 is part of a

1    legitimate transaction.   (Compl. ¶ 41.)    Second, as the Scheduling Agreement makes clear,

2    Section 7.01 was reasonably necessary to achieve the agreement's procompetitive purpose: "MWC

3    and its members would not enter into this Agreement, and mutual cooperation and exchanges of

4    confidential information would not be feasible . . . without safeguards, including certain fees, which

5    protect against misuse of information, protect the MWC from fracturing, and preserve the integrity of

6    [both] the MWC and Pac-12."  (Ex. 1, Preamble.)   The Termination Fees were thus "essential to

7    promote the competitive opportunities being made available to the student-athletes of OSU, WSU, and

8    the MWC."  (*Id.*)  Without Section 7.01, the Scheduling Agreement's procompetitive benefits—e.g.,

9    additional games, new matchups, and more consumer choice—would not exist.  (*Id.*)   To promote

10   those competitive opportunities, the Pac-12 "absolutely, irrevocably and unconditionally guarantee[d],

11   for the benefit of MWC, if and when due, full and complete payment of any amounts owed by any

12   Pac-12 Party to MWC under [the Scheduling] Agreement," as a "material inducement to the MWC's

13   entry into and performance of its obligations."  (*Id.* § 10.11.)

14        Because Section 7.01 "promoted enterprise and productivity at the time it was adopted," it

15   constitutes an ancillary restraint, rather than a "naked" one.  *See Aya Healthcare Servs.*, 9 F.4th at

16   1111; *Polk Bros.*, 776 F.2d at 189.  The ancillary restraint doctrine recognizes that "some activities

17   can only be carried out jointly.  Perhaps the leading example is league sports."  *Nat'l Collegiate*

18   *Athletic Ass'n*, 468 U.S. at 101 (quoting R. Bork, The Antitrust Paradox 278 (1978)).  "What the

19   [MWC] and its member institutions market in this case is competition itself—contests between

20   competing institutions.  Of course, this would be completely ineffective if there were no rules on which

21   the competitors agreed to create and define the competition to be marketed."  *Id.*  Indeed, the college

22   football market is one "in which horizontal restraints on competition are essential if the product is to

23   be available at all."  *Id.*

24        The same is true decades later, and Section 7.01 thus cannot be ruled illegal *per se*.  *See also*

25   *Tanaka*, 252 F.3d at 1062–63 (collecting sports antitrust cases involving restraints that were reviewed

26   under the rule of reason).  "That understanding properly values the proprietary rights and incentives

27   for innovation embodied by the joint venture as well as concerns about . . . the diversion of value from

28   a business rival's efforts," like the Pac-12 free-riding off of MWC's brand development, infrastructure,

1   and years of marketing of its teams, "without payment."  *E.g.*, *SCFC*, 36 F.3d at 964 (finding horizontal

2   restraint ancillary); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 228 (D.C. Cir.

3   1986) ("[E]limination of the free ride is an efficiency justification available to horizontal restraints

4   that are ancillary to a contract integration.").  Section 7.01 serves to address that issue and ensures the

5   survival of at least one of the two conferences, leading to increased output downstream and protecting

6   the value each conference spent years building.  (Ex. 1, Preamble) (deeming the Termination Fees

7   essential to "preserv[ing] the integrity" of the MWC and Pac-12 by allowing the Pac-12 to choose

8   which members it would like to invite).  The Termination Fees incentivize the Pac-12 to avoid

9   unilaterally risking the existence (and output) of both conferences by only recruiting some MWC

10  schools, rather than merging.  The Pac-12 successfully recruited five MWC teams, triggering its

11  "unconditional guarantee" to pay the Termination Fees that the Pac-12 agreed were "fair, reasonable

12  and appropriate approximations of the losses that [the] MWC may incur" as a result of the MWC's

13  loss of fewer than all member institutions.  (Ex. 1, §§ 7.01, 7.02, 10.11.)

14          Section 7.01 therefore allows the MWC to collaborate with the Pac-12 without endangering its

15  "established network" of schools and media—i.e., "without cutting [its] own throat."  *Aya*, 9 F.4th at

16  1110 (quoting *Polk Bros.*, 776 F.2d at 189).  Because Section 7.01 was an "essential" component to

17  the Scheduling Agreement's increased output—games that would not have otherwise existed—and

18  consumer welfare downstream, it is ancillary to a lawful agreement and subject to the rule of reason.

19  (Ex. 1, Preamble); *see also Aya Healthcare Servs.*, 9 F.4th at 1110.

20                      **a)**     **The Pac-12 Does Not Allege a Rule of Reason Violation.**

21          The Pac-12 does not come close to pleading a violation of the antitrust laws under the rule of

22  reason standard.  To plead a rule of reason violation, a plaintiff must allege an agreement or contract

23  that has an anticompetitive effect on a given market within a given geographic area—the Pac-12 has

24  not even attempted to plead a relevant market, let alone allege "both that a 'relevant market' exists

25  and that the defendant has power within that market" such that the MWC has "the power to control

26  prices or exclude competition."  *Flaa*, 55 F.4th at 693 (citations omitted); *see also Oracle America,*

27  *Inc. v. CedarCrestone, Inc.*, 938 F. Supp. 2d 895, 901 (N.D. Cal. 2013) ("In order to state a valid claim

28  under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant

1    market.'") (citation omitted); *see also Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369,

2    1373 (9th Cir. 1989) ("[P]roving injury to competition ordinarily requires the claimant to prove the

3    relevant geographic and product markets and to demonstrate the effects of the restraint within those

4    markets."). Because the Complaint fails to allege any cognizable market, the Pac-12's antitrust claims

5    should be dismissed. *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (affirming

6    dismissal of a Sherman Act claim because the "relevant market definition is facially unsustainable").

7         Market definition is "essential" to an antitrust case. *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th

8    948, 955 (9th Cir. 2023). "[W]ithout a definition of [the] market, there is no way to measure [the

9    defendant's] ability to lessen or destroy competition." *Id*. (citation omitted); *Reilly v. Apple Inc.*, 578

10   F. Supp. 3d 1098, 1106 (N.D. Cal. 2022) (holding the same applies to the Cartwright Act) (citation

11   omitted). It follows that dismissal is appropriate under state and federal law where a complaint "fails

12   to define its proposed relevant market with reference to the rule of reasonable interchangeability and

13   cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all

14   interchangeable substitute products even when all factual inferences are granted in plaintiff's favor."

15   *Flaa v. Hollywood Foreign Press Ass'n*, No. 220CV06974SBEX, 2021 WL 1399297, at *6 (C.D. Cal.

16   Mar. 23, 2021) (citation omitted). The relevant market must also include "any 'producers who have

17   actual or potential ability to deprive each other of significant levels of business.'" *In re German Auto.*

18   *Manufacturers Antitrust Litig.*, 497 F. Supp. 3d 745, 756 (N.D. Cal. 2020), *aff'd*, No. 20-17139, 2021

19   WL 4958987 (9th Cir. Oct. 26, 2021) (quoting *Thurman*, 875 F.2d at 1374).

20        Here, the Complaint never offers a comprehensible market definition, let alone one that meets

21   the requirements to plead an antitrust claim. At times, the Complaint references a market for "member

22   schools," untethered to geography (Compl. ¶¶ 22, 90, 91 99, 100), but elsewhere references markets

23   for "schools from the Western United States" (Compl. ¶¶ 3, 12), and the "MWC's schools." (Compl.

24   ¶¶ 81, 82.) As for products, the Complaint does not allege cross-elasticities of demand showing that

25   the MWC schools, FBS schools, or even schools in the "Western United States," are unique or

26   otherwise not interchangeable with schools competing at various levels of college football across the

27   country. (Compl. ¶¶ 3, 12); *see High Tek USA, Inc. v. Heat & Control, Inc*., No. 12-CV-00805 YGR,

28   2012 WL 2979051, at *4 (N.D. Cal. July 18, 2012). These pleading deficiencies warrant dismissal.

1    *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir. 1997) (collecting

2    cases, finding such failures render a market definition "legally insufficient").  Because the Complaint

3    is so "hopelessly muddled as to what product market (or markets) are at issue," it is facially

4    unsustainable.  *Flaa*, 2021 WL 1399297, at *7 (dismissing matter where plaintiff vacillated between

5    geographic and product market definitions).

6          Even assuming the Pac-12's proposed market definition included solely the MWC's schools,

7    or even FBS schools in the "Western United States," the Complaint fails to allege facts supporting

8    either geographic market.  Although the Pac-12 alleges it "historically competed for member schools"

9    in the "Western United States," it also alleges that "rival" conferences "fierce[ly]" recruit nationwide,

10   including from the MWC.  (Compl. ¶¶ 2, 28, 36); *see Thurman*, 875 F.2d at 1374; *Tanaka*, 252 F.3d

11   at 1063–64.  Indeed, Stanford University and the University of California, Berkeley left the *Pacific*-

12   12 to join the *Atlantic Coast* Conference.  (Compl. ¶¶ 2, 28.)  Plaintiff's localized market definitions

13   are too narrow and fail to account for other conferences and teams.  *See Tanaka*, 252 F.3d at 1063–64

14   (finding dismissal appropriate because single-school and single-conference market definitions are

15   insufficient when the plaintiff was recruited nationwide and restraint applied only to plaintiff); *Hicks*,

16   897 F.3d at 1121 (affirming dismissal because proposed markets were "not natural," "artificial," and

17   "contorted to meet [plaintiff's] litigation needs").

18         Even if the Pac-12 alleged a cognizable geographic market, the Complaint fails for lack of a

19   plausible product market definition.  The Pac-12's apparent preference for MWC schools (or, for that

20   matter, FBS schools) is not supported with cross-elasticities or evidence demonstrating a lack of

21   substitutes.  *See id.*; *German Auto. Manufacturers*, 497 F. Supp. 3d at 756-59.  The Pac-12 therefore

22   fails to distinguish MWC schools from other FBS schools, FBS schools from other football programs,

23   and football from other collegiate athletic programs, as the Scheduling Agreement explicitly

24   contemplated scheduling competitions for additional sports.  *See MLW Media LLC v. World Wrestling

25   Ent., Inc.*, 655 F. Supp. 3d 946, 950-52 (N.D. Cal. 2023) (dismissing complaint because plaintiff failed

26   to show lack of substitutes or support assertion that single sport constituted the relevant market);

27   (Ex. 1, § 2.01.)

28

MOUNTAIN WEST CONFERENCE'S MOTION TO DISMISS COMPLAINT
Case No. 5:24-cv-06685-SVK

1     The Pac-12's preferences cannot overcome the rule that "[t]he relevant market is one that

2  reflects the total market demand for [a] product, not just [the Pac-12's] demand . . . . When there are

3  numerous sources of interchangeable demand, the plaintiff cannot circumscribe the market to a few

4  [competitors] in an effort to manipulate those [competitors'] market share." *Campfield v. State Farm*

5  *Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118–19 (10th Cir. 2008); *Tanaka*, 252 F.3d at 1063–65.  In sum,

6  the Pac-12's "failure to allege a product market consisting of reasonably interchangeable goods

7  renders [its complaint] 'facially unsustainable' and appropriate for dismissal." *Golden Gate Pharmacy*

8  *Servs., Inc. v. Pfizer, Inc.*, 433 F. App'x 598, 599 (9th Cir. 2011) (citation omitted).

9     The Pac-12 therefore fails to allege a cognizable geographic or product market and thus cannot

10  show an injury to competition.  *See Coronavirus*, 85 F.4th at 957.  Even if it could allege a relevant

11  market, the Pac-12 fails to allege that the MWC has market power over it.  The phrase "market power"

12  does not even appear in the Complaint—a fatal error.  *See Flaa*, 55 F.4th at 693 ("A failure to allege

13  power in the relevant market is a sufficient ground to dismiss an antitrust complaint.").  In fact, the

14  Pac-12 alleges that the MWC lacks "the power to . . . exclude" outside competition, undermining any

15  assertion of market power.  (Compl. ¶¶ 36, 37).  Moreover, the Complaint does not plausibly allege

16  any facts showing concrete, "significant anticompetitive effects" in any relevant market; simply

17  asserting that competition was not restricted enough for its liking is not sufficient, concluding the rule

18  of reason analysis.  (*See id.* ¶¶ 2, 21, 25, 36, 37, 83, 91); *see Tanaka*, 252 F.3d at 1064.

19     Because the Pac-12 fails to plead plausible claims under the rule of reason, the Court should

20  dismiss Counts I and II with prejudice and without leave to amend.

21     **C.**   **Count IV Fails to State a Claim Because the Termination Fees Are Not**

22            **"Unenforceable Penalties."**

23     In Count IV, the Pac-12 alleges that the Termination Fees in Section 7.01 and Schedule 7 of

24  the Scheduling Agreement constitute an "invalid contract for unenforceable penalties."  (Compl.

25  ¶¶ 107–119; Ex. 1, § 7.01.)   More specifically, the Pac-12 alleges that the Termination Fees

26  contemplated are unenforceable because they "fix[] unreasonably large liquidated damages" that

27  "bear[] no reasonable relationship to the range of actual damages that the parties could have anticipated

28  would flow from a breach of the relevant obligation."  (Compl. ¶ 110.)  But the Termination Fees that

1   the Pac-12 suddenly contends are unenforceable are not, as a matter of California law, unenforceable

2   liquidated damages because they do not flow from any breach of the Scheduling Agreement; they are

3   instead the result of the Pac-12 electing to pursue an alternative means of performance by choosing to

4   absorb fewer than all of the MWC member institutions.  And even if the Termination Fees did

5   constitute "liquidated damages," by statute, California law presumptively enforces such clauses.

6       As a threshold matter, the Termination Fees are not unenforceable "liquidated damages

7   penalties" because the Pac-12's obligation to pay the Termination Fees does not flow from any breach

8   of the Scheduling Agreement, as the Pac-12 appears to freely acknowledge.  (*Id.* ¶ 111); *see also*

9   *Mahlum v. Adobe Sys. Inc.*, No. 14-CV-124663, 2015 WL 124663, at *3 (N.D. Cal. 2015) *aff'd*, 690

10  F. App'x 474, 476 (9th Cir. 2017) ("California courts define liquidated damages as an amount of

11  compensation to be paid in the event of a breach of contract, the sum of which is fixed and certain by

12  agreement.") (internal quotation omitted).  To be sure, it does not matter whether the contract itself,

13  or the parties to the contract, label the disputed amount a "liquidated damages" provision because "[a]

14  court will interpret a liquidated damages clause according to its substance, and if it is otherwise valid,

15  will uphold it" regardless of how the parties have referred to it.  *See Weber, Lipshie & Co. v. Christian*,

16  52 Cal. App. 4th 645, 656 (Cal. Ct. App. 1997).

17      Notably, where a contract provision provides a party with a choice to pay certain termination

18  fees as an alternative means of performance, as is the case here, "such a clause is not a penalty

19  provision."  *Schneider v. Verizon Internet Services, Inc.*, 400 F. App'x 136, 138 (9th Cir. 2010)

20  (affirming dismissal, with prejudice, of claim that a termination fee provision in a contract was an

21  unenforceable liquidated damages "penalty"); *see also Mahlum*, 2015 WL 124663, *3–8 (granting

22  motion to dismiss because early termination fee was an alternative means of performance rather than

23  an unenforceable liquidated damages penalty).  The same is true of a provision that "encourage[s] a

24  party to perform" in a certain way.  *Weber*, 52 Cal. App. 4th at 656.  Here, the Pac-12's "unconditional

25  guarantee" to pay the Termination Fees was only triggered when the Pac-12 decided to absorb fewer

26  than all of the MWC's member institutions—i.e., an alternative to merging both conferences.  (Ex. 1,

27  §§ 7.01, 8.01.)  The Pac-12 freely chose a course of action that was permitted by the Scheduling

28  Agreement and cannot now contend that the Termination Fees are unenforceable penalties as a result.

1      Even if this Court were to find that the Termination Fees constitute "liquidated damages," the

2      Pac-12 fails to allege facts to pursue a viable claim under California law, which presumptively enforces

3      liquidated damages provisions.  Under California Civil Code § 1671(b), "a provision in a contract

4      liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate

5      the provision establishes that the provision was unreasonable under the circumstances existing at the

6      time the contract was made."  Here, dismissal is appropriate even if the Court determines that the

7      Termination Fees constitute "liquidated damages" because the Pac-12 fails to allege sufficient facts

8      overcoming the presumption of enforceability.  The Pac-12 seemingly now complains that the

9      Termination Fees are unenforceable, but the test under § 1671(b) requires inquiry into the

10     reasonableness of the fees *at the time of contracting*.  Cal. Civ. Code § 1671(b) (emphasis added).

11     Despite the Pac-12's conclusory assertions in the Complaint that the Termination Fees are

12     "unreasonable," the very terms of the Scheduling Agreement conclusively demonstrate that the parties

13     agreed that the Termination Fees were "not penalties and are instead fair, reasonable and appropriate

14     approximations of the losses that [the] MWC may incur as a result of [the] MWC's loss of any MWC

15     Member Institution to [the] Pac-12[.]"  (Ex. 1, § 7.02); *see also Langan v. United Services Auto. Ass'n*,

16     69 F. Supp. 3d 965, 981 (N.D. Cal. 2014) (dismissing claim that certain fees were unenforceable

17     liquidated damages under § 1671(b) because, in part, the challenging party failed to adequately allege

18     why they were unreasonable).

19     The Pac-12 also agreed that the payment of such fees was a material inducement to MWC

20     entering into the Scheduling Agreement and that the Pac-12 "absolutely, irrevocably and

21     unconditionally guarantee[d] . . . full and complete payment[.]"  (Ex. 1, § 10.11.)  Indeed, the Pac-

22     12's allegation that the Termination Fees "bear no reasonable relationship to any loss the MWC would

23     incur from losing member institutions" is directly contradicted by the parties' agreement that such fees

24     were "fair, reasonable, and appropriate approximations of the losses that [the] MWC may incur as a

25     result of MWC's loss of any MWC member[.]"  (Compl. ¶ 113; Ex. 1, § 7.01.)

26     For the foregoing reasons, the Court should dismiss Count IV with prejudice and without leave

27     to amend.

28

1

**D.    Count III Fails to State a Claim Because the Pac-12's Other Claims Fail.**

2    California's Unfair Competition Law ("UCL") prohibits "unfair competition," which is

3    broadly defined as including "three varieties of unfair competition—acts or practices which are

4    unlawful, or unfair, or fraudulent." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir.

5    2012) (citations omitted).  In Count III, the Pac-12 alleges five paragraphs of allegations that the

6    MWC's "actions to suppress competition . . . constitute unfair competition and unfair and unlawful

7    business acts and practices in violation" of the UCL.  (*See* Compl. ¶¶ 102–106); Cal. Bus. & Prof.

8    Code § 17200 *et seq*.  Because the Pac-12 does not allege any fraudulent acts or practices, its UCL

9    claim hinges on the first two categories of "unfair" competition – whether the alleged acts or practices

10   are unlawful or unfair.  (Compl. ¶¶ 103, 104.)  Since the Termination Fees are neither unlawful nor

11   unfair, Count III should be dismissed accordingly.

12   "To be 'unlawful' under the UCL, the [Termination Fees] must violate another 'borrowed'

13   law." *See Davis*, 691 F.3d at 1168–69 (affirming dismissal of UCL claim that was not independently

14   unlawful).  Where a plaintiff fails to allege a violation of the underlying law at issue, "the viability of

15   [an] unlawful UCL claim . . . falls with the underlying claim." *Cascades Computer Innovation LLC

16   v. RPX Corp.*, No. 12-CV-01143 YGR, 2013 WL 316023, at *15 (N.D. Cal. Jan. 24, 2013) (dismissing

17   UCL and Cartwright Act claims because the underlying Sherman Act claim was not plausible).  Here,

18   the Pac-12 alleges that the Termination Fees are an unlawful business practice under the UCL

19   "because" the Termination Fees contemplated by Sections 7.01 and 7.02 "violate[] the Sherman Act

20   and the Cartwright Act."  (Compl. ¶ 103.)  Accordingly, for the reasons explained in Sections A and

21   B above, the UCL claim fails alongside Counts I and II.  *See Cascades*, 2013 WL 316023, at *15

22   ("[B]ecause [plaintiff's] UCL claim is not materially different than its federal and state antitrust

23   claims, its UCL claim necessarily fails as well.").

24   Next, in a single, two-sentence paragraph in support of Count III, the Pac-12 alternatively

25   alleges that the Termination Fees violate the UCL as an unfair business practice "whether or not in

26   violation of the Sherman Act or Cartwright Act."  (Compl. ¶ 104.)  These conclusory allegations do

27   not plausibly demonstrate any "unfair" business practice under the UCL.  As a preliminary matter, the

28   Pac-12's claims under the unfairness prong of the UCL "cannot survive" if (1) they "overlap entirely

20

with the business practices addressed in the [other] prongs of the UCL" and (2) "the claims under the [other] prongs of the UCL do not survive." *Lambrix v. Tesla, Inc.*, No. 23-CV-01145-TLT, 2023 WL 8265916, at *9 (N.D. Cal. Nov. 17, 2023) (dismissing UCL claim under unfair prong because plaintiff failed to adequately allege unlawful prong); *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1105 (N.D. Cal. 2017) (same); *see also Punian v. Gillette Co.*, No. 14-CV-05028-LHK, 2016 WL 1029607, at *17 (N.D. Cal. Mar. 15, 2016) (holding that cause of action under the unfair prong of the UCL did not survive where "the cause of action under the unfair prong of the UCL overlaps entirely with [p]laintiff's claims" under the unlawful and fraudulent prongs of the UCL); *In re Actimmune Mktg. Litig.*, No. C 08-02376 MHP, 2009 WL 3740648, at *14 (N.D. Cal. Nov. 6, 2009), *aff'd*, 464 F. App'x 651 (9th Cir. 2011) (dismissing cause of action under "unfair prong" of the UCL where it overlapped "entirely with their claims of fraud"). Here, the Pac-12's allegations that the MWC's actions are unfair mirror their allegations that its actions are unlawful. (*See* Compl. ¶¶ 257–58.) Thus, any claim for "unfair" conduct also fails under the UCL.

But even if the Court finds that the Pac-12 adequately alleges unlawful behavior under the "unlawfulness" prong, Count III still fails because the alleged conduct is not unfair. In the context of the UCL, "unfair" means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 544 (Cal. 1999).

For the reasons discussed above, there are no antitrust violations here, incipient or otherwise. There is no UCL violation where "the conduct is deemed reasonable and condoned under the antitrust laws." *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375, 113 Cal. Rptr. 2d 175 (2001); *see also People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 668–672, 31 Cal. Rptr. 3d 819 (2005); *Hicks*, 897 F.3d at 1124 (holding PGA's requirement that caddies wear bibs during tour events did not amount to unfair competition, absent allegation that any of association's conduct was unlawful or unfair).

Further, it is evident that there has been no violation of the "policy or spirit" of antitrust laws here. "[U]nless there is an exception, the right to refuse to deal remains sacrosanct" and "the mere

refusal to deal does not violate the spirit or policy of antitrust law." *Drum v. San Fernando Valley Bar Assn.*, 182 Cal. App. 4th 247, 254, 106 Cal. Rptr. 3d 46, 51 (2010). In *Drum*, the court affirmed dismissal of an "unfair" UCL claim where a bar association refused to sell its membership lists to a mediator in order to "protect some of its members from price competition" over the mediator's contention that the practice "hindered his ability to compete." *Id.* at 253. As in *Drum*, the MWC is not prohibited from protecting its integrity by including Termination Fees, an action that is "fair" under the UCL even if the Pac-12's ability to compete has allegedly been hindered. (Ex. 1, §§ 7.01, 7.02.) And unlike in *Drum*, the Termination Fees are not a "refusal to deal." *See Drum*, 182 Cal. App. 4th at 254. Instead, the Termination Fees represent a "fair" contractual provision, negotiated at arms'-length, that provides contours on how "dealing" would be conducted between the parties to the contract. (Ex. 1, §§ 7.01, 7.02.) Because the Pac-12's allegations in support of Count III fail to allege facts sufficient to show that the Termination Fees are either unlawful or unfair, Count III should be dismissed with prejudice and without leave to amend.

## CONCLUSION

For these reasons, the Court should dismiss the Complaint with prejudice and without leave to amend.

Dated: November 25, 2024                    **WILLKIE FARR & GALLAGHER LLP**


                                            By:  */s/* Eduardo E. Santacana
                                                Eduardo E. Santacana (SBN 281668)
                                                Simona Agnolucci (SBN 246943)
                                                Wesley R. Powell (SBN 230430)
                                                Matt D. Basil (*pro hac vice* pending)


                                                *Attorneys for Defendant*
                                                *THE MOUNTAIN WEST CONFERENCE*