1  KEKER, VAN NEST & PETERS LLP
   ERIC H. MACMICHAEL - # 231967
2  emacmichael@keker.com
   NICHOLAS S. GOLDBERG - # 273614
3  ngoldberg@keker.com
   ANJALI SRINIVASAN - # 304413
4  asrinivasan@keker.com
   KELLY S. KAUFMAN - # 328827
5  kkaufman@keker.com
   PAUL VON AUTENRIED - # 335917
6  pvonautenried@keker.com
   CHARLOTTE KAMAI - # 344786
7  ckamai@keker.com
   633 Battery Street
8  San Francisco, CA 94111-1809
   Telephone:    415 391 5400
9  Facsimile:    415 397 7188

10  Attorneys for Plaintiff THE PAC-12 CONFERENCE

11

12                  UNITED STATES DISTRICT COURT

13                NORTHERN DISTRICT OF CALIFORNIA

14  THE PAC-12 CONFERENCE,                    Case No. 5:24-cv-6685-SVK

15                  Plaintiff,                **THE PAC-12 CONFERENCE'S
                                              OPPOSITION TO THE MOUNTAIN
16          v.                                WEST CONFERENCE'S MOTION TO
                                              DISMISS**
17  THE MOUNTAIN WEST CONFERENCE,
                                              Date:        March 25, 2025
18                  Defendant.                Time:        10:00 A.M.
                                              Dept:        Courtroom 6, 4th Floor
19                                            Judge:       Hon. Susan van Keulen

20                                            Date Filed:  September 24, 2024
                                              Trial Date:  None Set
21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND ..................................................................................2

        A.      The Pac-12 and MWC compete for member schools. .................................2

        B.      The MWC forces an anticompetitive Poaching Penalty on the Pac-12. .................3

        C.      The Poaching Penalty is unrelated to the 2024-25 Scheduling Agreement. ...........4

        D.      The MWC attempts to enforce the anticompetitive Poaching Penalty. ..................5

III.    THE MWC IMPROPERLY DISPUTES THE PAC-12'S WELL-PLEADED
        FACTS. ...................................................................................................................5

IV.     THE PAC-12 SUFFICIENTLY STATES ANTITRUST CLAIMS. ......................7

        A.      The Poaching Penalty is a *per se* violation of antitrust laws. ................8

                1.      Poaching restrictions are generally *per se* illegal. ......................8

                2.      The Poaching Penalty is *per se* illegal. ....................................10

        B.      The MWC's "ancillary restraint" defense is meritless. ..........................12

                1.      The MWC's "ancillary restraint" defense is not appropriate for
                        resolution on a Rule 12(b)(6) motion. ..........................................12

                2.      The Poaching Penalty is not an "ancillary restraint." ...............13

        C.      The Pac-12 has antitrust standing. ...........................................................16

                1.      The Pac-12 sufficiently alleges harm to competition. ...............17

                2.      The Pac-12 alleges non-speculative harms. ................................20

V.      THE PAC-12 SUFFICIENTLY STATES A CLAIM UNDER CALIFORNIA'S
        UNFAIR COMPETITION LAW ...........................................................................21

VI.     THE PAC-12 SUFFICIENTLY STATES A CLAIM THAT THE POACHING
        PENALTY IS UNENFORCEABLE UNDER CONTRACT LAW .......................23

VII.    CONCLUSION......................................................................................................25

THE PAC-12'S OPPOSITION TO THE MOUNTAIN WEST CONFERENCE'S MOTION TO DISMISS
Case No. 5:24-cv-6685-SVK

2841579

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Actimmune Mktg. Litig.*,
2009 WL 3740648 (N.D. Cal. 2009), *aff'd*, 464 F. App'x 651 (9th Cir. 2011) .....................22

*In re Animation Workers Antitrust Litig.*,
123 F. Supp. 3d 1175 (N.D. Cal. 2015) .................................................................10

*Arcell v. Google*,
2024 WL 3738422 (N.D. Cal. 2024) ......................................................................20

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
9 F.4th 1102 (9th Cir. 2021) ..........................................................................15, 16

*Aya Healthcare v. AMN Healthcare, Inc.*,
2018 WL 3032552 (S.D. Cal. 2018) ................................................................ *passim*

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................................................6, 7

*Blackburn v. Sweeney*,
53 F.3d 825 (7th Cir. 1995) ...........................................................................14, 15

*Blanton v. Domino's Pizza Franchising LLC*,
2019 WL 2247731 (E.D. Mich. 2019) ....................................................................10

*Borozny v. Raytheon Techs. Corp.*,
2023 WL 348323 (D. Conn. 2023) ........................................................................12

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) ............................................................................20

*Broadcast Music, Inc. v. CBS*,
441 U.S. 1 (1979) ...........................................................................................8

*Chabner v. United of Omaha Life Ins. Co.*,
225 F.3d 1042 (9th Cir. 2000) ............................................................................21

*Chicago Professional Sports Limited Partnership v. National Basketball
Association*,
95 F.3d 593 (7th Cir. 1996) ..............................................................................20

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) .............................................................................20

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
479 F.3d 1099 (9th Cir. 2007) ...........................................................................21

ii

*Deslandes v. McDonald's USA, LLC*,
  81 F.4th 699 (7th Cir. 2023) ......................................................................... *passim*

*Diva Limousine, Ltd. v. Uber Techs. Inc.*,
  392 F. Supp. 3d 1074 (N.D. Cal. 2019) ...........................................................22

*E.W. French & Sons, Inc. v. General Portland Inc.*,
  885 F.2d 1392 (9th Cir. 1989) ...........................................................................7

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ...........................................................18, 21, 22, 23

*Federal Trade Commission v. Microsoft*,
  681 F. Supp. 3d 1069 (N.D. Cal. 2023) ...........................................................19

*Fonseca v. Hewlett-Packard Co.*,
  2021 WL 4796540 (9th Cir. 2021) ...................................................................16

*Frost v. LG Elecs. Inc.*,
  2018 WL 6256790 (N.D. Cal. 2018) .................................................................16

*In re Geisinger Health & Evangelical Cmty. Hosp. Healthcare Workers Antitrust
  Litig.*,
  2021 WL 5330783 (M.D. Pa. 2021) ...................................................10, 17, 18

*GSI Tech. v. United Memories, Inc.*,
  2014 WL 1572358 (N.D. Cal. 2014) .................................................................20

*Hadley v. Kellogg Sales Co.*,
  243 F. Supp. 3d 1074 (N.D. Cal. 2017) ...........................................................22

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ....................................................................23, 25

*In re High-Tech Emp. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ........................................................ *passim*

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ........................................................................14, 15

*In re Juul Labs, Inc., Antitrust Litig.*,
  555 F. Supp. 3d 932 (N.D. Cal. 2021) .............................................................12

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) .............................................................................7

*Korea Kumho Petrochemical Co. v. Flexsys Am. LP*,
  370 Fed. App'x 875 (9th Cir. 2010) .................................................................19

*Lambrix v. Tesla, Inc.*,
  2023 WL 8265916 (N.D. Cal. 2023) ....................................................................22

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
  884 F.2d 504 (9th Cir. 1989) ..............................................................................16

*Lozano v. AT&T Wireless Servs., Inc.*,
  504 F.3d 718 (9th Cir. 2007) ..............................................................................21

*Mahlum v. Adobe Sys. Inc.*,
  2015 WL 124663 (N.D. Cal. 2015), *aff'd*, 690 F. App'x 474 (9th Cir. 2017) .................24, 25

*Memorex Corp. v. Int'l Bus. Machs. Corp.*,
  555 F.2d 1379 (9th Cir. 1977) ............................................................................18

*Munguia-Brown v. Equity Residential*,
  2019 WL 3779523 (N.D. Cal. Aug. 12, 2019) ....................................................25

*N. Pac. Ry. Co. v. United States*,
  356 U.S. 1 (1958)...................................................................................................8

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
  933 F.3d 1136 (9th Cir. 2019) ..............................................................................5

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984)...................................................................................10, 14, 15

*Obesity Rsch. Inst. LLC v. Fiber Rsch., Int'l, LLC*,
  165 F. Supp. 3d 937 (S.D. Cal. 2016)..................................................................22

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ..................................................................................8

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.*,
  630 F. Supp. 3d 968 (N.D. Ill. 2022) ....................................................8, 9, 10, 11

*Paladin Assocs., Inc. v. Mont. Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) ............................................................................20

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
  392 U.S. 134 (1968), *overruled on other grounds by Copperweld Corp. v.
  Indep. Tube Corp.*, 467 U.S. 752 (1984) .............................................................18

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
  776 F.2d 185 (7th Cir. 1985) ..............................................................................16

*Pool Water Prods. v. Olin Corp.*,
  258 F.3d 1024 (9th Cir. 2001) ............................................................................20

*Produce Pay, Inc. v. Izguerra Produce, Inc.*,
    39 F.4th 1158 (9th Cir. 2022) ................................................................6, 7, 19, 25

*Punian v. Gillette Co.*,
    2016 WL 1029607 (N.D. Cal. 2016) .......................................................................22

*Reveal Chat Holdco LLC v. Facebook Inc.*,
    471 F. Supp. 3d 981 (N.D. Cal. 2020) ...................................................................20

*Robinson v. Jackson Hewitt, Inc.*,
    2019 WL 5617512 (D.N.J. 2019) .................................................................8, 9, 11, 12

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ...............................................................................16

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
    395 F. Supp. 3d 464 (W.D. Pa. 2019) ....................................................9, 10, 11, 16

*SCFC ILC, Inc. v. Visa USA, Inc.*,
    36 F.3d 958 (10th Cir. 1994) ..................................................................................16

*Schneider v. Verizon Internet Servs., Inc.*,
    400 F. App'x 136 (9th Cir. 2010) ...........................................................................24

*SmileDirectClub, LLC v. Tippins*,
    31 F.4th 1110 (9th Cir. 2022) ..................................................................................6

*Snow v. Align Techs., Inc.*,
    586 F. Supp. 3d 972 (N.D. Cal. 2022) ........................................................... *passim*

*Somers v. Apple*,
    729 F.3d 953 (9th Cir. 2013) ..................................................................................19

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ..................................................................................7

*Strawflower Elecs., Inc. v. Radioshack Corp.*,
    2005 WL 2290314 (N.D. Cal. 2005) .......................................................................20

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ...........................................................................16, 19

*Turner v. McDonald's USA, LLC*,
    2020 WL 3044086 (N.D. Ill. 2020) .....................................................................9, 10

*United States v. DaVita Inc.*,
    2022 WL 266759 (D. Colo. 2022) ...........................................................................10

*United States v. eBay*,
    968 F. Supp. 2d 1030 (N.D. Cal. 2013) ......................................................... *passim*

*United States v. Topco Assocs., Inc.*,
   405 U.S. 596 (1972)...........................................................................................................8

*White Motor Co. v. United States*,
   372 U.S. 253 (1963).........................................................................................................13

**State Cases**

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) .....................................................................................................22

*In re Cellphone Termination Fee Cases*,
   193 Cal. App. 4th 298 (2011) ..........................................................................................24

*Chavez v. Whirlpool Corp.*,
   93 Cal. App. 4th 363 (2001) ............................................................................................23

*Graylee v. Castro*,
   52 Cal. App. 5th 1107 (2020) ..........................................................................................24

*People's Choice Wireless, Inc. v. Verizon Wireless*,
   131 Cal. App. 4th 656 (2005) ..........................................................................................22

*Purcell v. Schweitzer*,
   224 Cal. App. 4th 969 (2014) ....................................................................................23, 25

*Ridgley v. Topa Thrift & Loan Assn.*,
   17 Cal. 4th 970 (1988) .....................................................................................................25

*Sybron Corp. v. Clark Hosp. Supply Corp.*,
   76 Cal. App. 3d 896 (1978) .............................................................................................25

*Vitatech Int'l, Inc. v. Sporn*,
   16 Cal. App. 5th 796 (2017) ...........................................................................................24

**Federal Statutes**

15 U.S.C. § 1 ............................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 6, 12

**State Statutes**

Cal. Bus. & Prof. Code § 16720 *et seq.* .............................................................7, 8, 21

Cal. Bus. & Prof. Code § 17200 *et seq.* ......................................................21, 22, 23

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
   Principles & Their Application* ¶ 1908b (4th ed. 2022) ...........................................14

vi

## I.    INTRODUCTION

The Pac-12 Conference (Pac-12) filed this lawsuit to prevent the Mountain West Conference (MWC) from enforcing an unlawful "Poaching Penalty" that the MWC imposed on the Pac-12 with the express purpose of restraining competition for MWC member schools. The Poaching Penalty saddles the Pac-12 with exorbitant monetary penalties simply for accepting MWC schools into the Pac-12. The MWC insisted on inserting the Poaching Penalty into a wholly unrelated Scheduling Agreement, at a time when the Pac-12 was desperate to schedule football games for its two remaining members and had no leverage to reject the restriction. But that does not make the Poaching Penalty any less illegal. After the Pac-12 accepted applications from five current MWC members to join the Pac-12 beginning in 2026, the MWC sought to enforce this illegal Poaching Penalty by demanding $55 million from the Pac-12—an amount the MWC knows will cripple the Pac-12 moving forward and thwart further competition for member schools. Now, the MWC asks the Court to close its eyes while the MWC runs roughshod over basic legal principles promoting fair competition. The Court should reject the MWC's effort and deny the motion to dismiss.

There is no reason for the Court to dismiss this case. First, the MWC's motion violates the golden rule of Rule 12(b)(6). Rather than accept as true the Pac-12's well-pleaded factual allegations, the MWC disregards them, relies on its preferred alternative disputed facts, resolves those factual disputes in the MWC's favor, and then argues that the Pac-12's complaint should be dismissed for failing to state a claim. But contesting well-pleaded factual allegations is inappropriate on a motion to dismiss. It is even less appropriate to advance arguments on a motion to dismiss that rely entirely on an alternative version of facts that appear nowhere in the complaint. For this reason alone, the motion to dismiss must be denied.

Second, the MWC's motion is based on the false premise that the Poaching Penalty is "ancillary" to the Scheduling Agreement's purpose of scheduling football games and, therefore, should be judged under the antitrust rule of reason. But as the complaint alleges, the Poaching Penalty is "wholly unrelated to scheduling football games" and "was designed by the MWC to stifle . . . competition by imposing an artificial barrier to entry for members of the MWC to join

THE PAC-12'S OPPOSITION TO THE MOUNTAIN WEST CONFERENCE'S MOTION TO DISMISS
Case No. 5:24-cv-6685-SVK

the Pac-12." Compl. ¶¶ 4, 6. Therefore, the Poaching Penalty is a naked restraint of trade that is a *per se* antitrust violation, just like the poaching restrictions that courts in this circuit and beyond have held are *per se* illegal. And courts around the country routinely reject motions to dismiss based on similar arguments that the rule of reason is the proper mode of analysis.

Third, the MWC is also wrong to suggest that the Pac-12 lacks antitrust standing when the complaint is full of facts establishing (a) the harm to competition flowing from the MWC's unlawful Poaching Penalty and (b) concrete harm to the Pac-12. The complaint details how the Poaching Penalty weakens the Pac-12 as a competitor, diminishes the compensation available for schools interested in joining the Pac-12, and reduces MWC member schools' options for mobility. These are precisely the sorts of injuries that numerous courts have held are sufficient to establish antitrust standing in cases challenging poaching restrictions. And there is nothing speculative about these harms given the MWC's ongoing efforts to enforce the Poaching Penalty.

Finally, the complaint also sufficiently alleges that the Poaching Penalty violates California's Unfair Competition Law (UCL) and is an unenforceable liquidated damages provision. The MWC's arguments to the contrary misconstrue controlling precedent and once again depend on factual disputes that cannot be resolved on a motion to dismiss. Accordingly, the Court should deny the MWC's motion to dismiss and proceed to the merits.

## II.    FACTUAL BACKGROUND

### A.    The Pac-12 and MWC compete for member schools.

The Pac-12 is a National Collegiate Athletics Association (NCAA) Division I conference that boasts a storied history and reputation. Compl. ¶ 26. The MWC is a competitor NCAA Division I conference. *Id*. ¶¶ 26, 33. Both conferences' football teams participate in the Football Bowl Subdivision (FBS). *Id*. ¶ 12. As rival conferences, the Pac-12 and the MWC compete to recruit schools to become members, and both have historically included member schools from the Western United States. *Id*. ¶ 21. Both conferences have successfully recruited schools—"poached" them—from other conferences. *Id*. ¶¶ 35, 56. Indeed, the MWC's very existence is predicated on poaching: its ***very first members*** were eight schools who departed from the Western Athletic Conference. *Id*. ¶ 35.

1

**B.      The MWC forces an anticompetitive Poaching Penalty on the Pac-12.**

2

Between summer 2022 and fall 2023, ten Pac-12 member schools announced they would

3

leave for other conferences, putting the conference on the brink of collapse. *Id*. ¶ 28. In the wake

4

of those departures, the Pac-12 and its two remaining schools, Oregon State University (OSU)

5

and Washington State University (WSU), were left with a significant gap in scheduling athletic

6

competitions and limited time to fill their schedules. *Id*. ¶ 31. To fill that gap, the Pac-12 reached

7

a "Scheduling Agreement" with the MWC, which provided "dates and matchups" in the 2024-25

8

season for OSU and WSU to play football against MWC members. *Id*. ¶¶ 2, 40. The Pac-12 paid

9

the MWC a steep price for those games: a one-time fee of $2 million for "scheduling and related

10

administrative services" and an annual fee, beginning at $12 million, for "participation" in games.

11

*Id*. ¶ 42. No school in the nation has paid more per game to play football this season. *Id*. ¶ 43.

12

With the Pac-12 under extraordinary pressure to secure a 2024-25 football schedule only

13

months before the season was set to begin, the MWC forced an unrelated "Poaching Penalty" into

14

the 2024-25 Scheduling Agreement—over the Pac-12's objection—to prevent the Pac-12 from

15

recruiting MWC member schools to join the Pac-12 in future seasons. *Id.* ¶ 50. The MWC's

16

Poaching Penalty is entirely unrelated to scheduling football games and designed to limit the Pac-

17

12's ability to compete with the MWC for ***years into the future***, even after the Scheduling

18

Agreement has expired. *Id*. ¶¶ 4–7, 50–55. It provides that if any MWC member joins the Pac-12,

19

the Pac-12 "shall pay liquidated damages to MWC in the form of [a] termination fee." *Id*. ¶ 4 &

20

Ex. 1 § 7.01. The Poaching Penalty ranges from $10 million to $137.5 million, depending on the

21

number of schools that join the Pac-12. *Id.* ¶ 4. The MWC Commissioner has admitted that the

22

MWC's purpose in imposing the Poaching Penalty was to "protect ourselves against what we

23

knew could potentially break us apart"—namely, competition for MWC members. *Id.* ¶ 54.

24

The Poaching Penalty is a naked restraint on competition for MWC members. It is:

25

- ***Exorbitant:***  It is a huge financial hurdle that limits the competitive offers the Pac-12 can make to MWC members, *id*. ¶¶ 6, 54, and depletes the Pac-12's resources to rebuild by recruiting other schools, *id*. ¶ 61;

26

27

- ***Duplicative:***  It is duplicative of the more than $80 million in "exit fees" the MWC is seeking from the schools that have announced their departure to the Pac-12, *id*. ¶¶ 7, 9, 38, 68–70;

28

- **One-sided:** It punishes the Pac-12 only—there is no similar provision or penalty if the MWC poaches a Pac-12 (or any other conference's) school, *id*. ¶ 51; and

- **Exhaustive:** It applies every time the Pac-12 makes an offer to any MWC school without accepting the entire MWC membership along with it; no exceptions, *id*. ¶ 51.

In sum, the Poaching Penalty is an unlawful horizontal restraint on competition. *Id.* ¶ 5.

### C.    The Poaching Penalty is unrelated to the 2024-25 Scheduling Agreement.

The purpose of the 2024-25 Scheduling Agreement is to arrange football games for the 2024-25 season. *Id*. ¶ 62. The Poaching Penalty's purpose, in contrast, is to prevent MWC members from joining a competitor (the Pac-12). *Id*. ¶ 63. Indeed, as the chart below shows, the Poaching Penalty is completely unrelated to scheduling football games:

| 2024-25 Scheduling Agreement | The Poaching Penalty |
|---|---|
| Sets number of football games and opponents that OSU and WSU will play, Compl. ¶ 41, Ex. 1 at Schedule 1 | No effect on scheduling, *see id*. ¶ 62 |
| Sets location (*i.e.*, home or away) and logistics (*e.g.*, referees and replays) of football games, *id*. ¶ 42, Schedule 1 | No effect on game play, *see id*. ¶ 62 |
| Sets total fees for "scheduling and related administrative services" and "[p]articipation" at $14 million, *id*. ¶ 42 | No effect on game fees, *see id*. ¶ 62 |
| Sets branding requirements, *id*. Ex. 1 at Ex. C | No effect on branding, *see id*. ¶ 62 |
| Applies for the 2024-25 season only, *id*. ¶ 40 | Applies for **at least** the 2024-25, 2025-26, **and** 2026-27 seasons, *id*. ¶ 52 |
| Allows the MWC and the Pac-12 to agree to a one-year extension,[1] *id*. ¶ 47 | Automatically extends two years **after** the Scheduling Agreement expires, *id*. ¶ 52 |
| Protects the use of confidential information, *id*. Ex. 1 § 6.02 | Applies **regardless** of whether confidential information is exchanged, *id*. ¶ 66 |
| Contemplates that the MWC and the Pac-12 may "negotiate" a future "[D]efinitive [T]ransaction" in which all MWC members join the Pac-12, *id*. ¶ 48, Ex. 1 § 8.01 | Applies **regardless** of whether any such Definitive Transaction eventually occurs, *id*. ¶¶ 48–49. |

Although the Poaching Penalty cites some of the 2024-25 Scheduling Agreement's other provisions as purported justifications, those justifications are plainly pretextual and designed to conceal the Poaching Penalty's anticompetitive purpose. *Id.* ¶¶ 64–73. The Poaching Penalty

---

[1] The parties did not agree to a one-year extension. The negotiations broke down after the MWC demanded more than double what the Pac-12 paid for the 2024-25 season. Compl. ¶ 47.

states that the parties "acknowledge" that the Pac-12 will receive "confidential information" and "unique access" to MWC members. *Id.* ¶¶ 66–67 & Ex 1. Not true. No MWC confidential information was ever provided to the Pac-12, and the Poaching Penalty applies irrespective of any provision of confidential information. *Id.* The 2024-25 Scheduling Agreement also provided no "unique access" to MWC members; the Pac-12 had the same access to MWC schools after it signed the Scheduling Agreement as it did before. *Id.* ¶ 67. The MWC's Poaching Penalty also purports to approximate the "losses that MWC may incur as a result of any MWC [member school] to the Pac-12" and the "failure to consummate the Definitive Transaction." *Id.* ¶ 68. But any such losses are wholly unrelated to scheduling football games for one season, and the exit fees that the MWC seeks to impose on its member schools already more than compensate the MWC for any loss of departing member schools. *Id.* ¶¶ 69–70. Further, the Scheduling Agreement does not require that the parties enter into a future Definitive Transaction, so any purported "failure" to reach such an agreement cannot justify one-sided Poaching Penalties against the Pac-12. *Id.* ¶ 71.

### D. The MWC attempts to enforce the anticompetitive Poaching Penalty.

In September 2024, the Pac-12 admitted five current members of the MWC that had long been interested in joining the Pac-12, beginning with the 2026-27 season. *Id.* ¶¶ 56–58. Those schools are Boise State University, California State University, Fresno, Colorado State University, San Diego State University, and Utah State University. *Id.* Just days after the Pac-12 announced the admission of these schools, the MWC demanded that the Pac-12 pay the MWC $55 million pursuant to the Poaching Penalty. *Id.* ¶¶ 57, 61.[2] The Pac-12 filed this lawsuit to declare the Poaching Penalty invalid and unenforceable and to restore fair competition.

## III. THE MWC IMPROPERLY DISPUTES THE PAC-12'S WELL-PLEADED FACTS.

In reviewing a motion to dismiss, the court must "take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019). Factual allegations

---

[2] The MWC first demanded $43 million under the Poaching Penalty. *Id.* Ex. 2. Two days **after** the Pac-12 filed the complaint in this action, the MWC sent the Pac-12 another letter demanding payment of $55 million.

1   need only "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550

2   U.S. 544, 555 (2007). "Dismissal is improper where the complaint alleges enough facts to state a

3   claim to relief that is plausible on its face." *Produce Pay, Inc. v. Izguerra Produce, Inc.*, 39 F.4th

4   1158, 1161 (9th Cir. 2022). The court does not consider the movant's "competing facts," and

5   "Rule 12 does not require [the non-moving party] to exclude the possibility of lawful conduct."

6   *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1121 (9th Cir. 2022).

7           The MWC's motion contravenes these fundamental tenets of Rule 12(b)(6). Rather than

8   accept the Pac-12's well-pleaded factual allegations, the MWC ignores them, asserts the MWC's

9   own view of the facts, and asks the Court to resolve factual disputes in favor of the MWC to

10  justify dismissal. For example, the thrust of the MWC's defense to the Pac-12's antitrust claims is

11  to proclaim as a factual matter that the Poaching Penalty "is ancillary to the Scheduling

12  Agreement." Mot. 12. But the Pac-12 alleged the exact opposite in the complaint: "The Poaching

13  Penalty is ***not an ancillary restraint*** that is reasonably necessary to achieving the pro-competitive

14  purpose of the Scheduling Agreement," Compl. ¶ 86,[3] because it "does nothing to . . . increase the

15  amount of college football played" and is "designed solely to stifle competition," *id.* ¶ 88. The

16  complaint includes an entire section of factual allegations explaining why the same purported

17  "justifications" for the Poaching Penalty that the MWC recycles in its motion are "pretextual,

18  illusory, and designed by the MWC solely to conceal [the Poaching Penalty's] anticompetitive

19  purpose." *Id.* ¶¶ 64–73. The MWC disregards these factual allegations and improperly insists that

20  this Court should accept its "competing facts" instead. *See SmileDirectClub*, 31 F.4th at 1121.

21          The MWC's motion is replete with similar factual mischaracterizations and omissions.

22  The MWC argues, without citation or support, that the Poaching Penalty "enhance[s], not

23  constrain[s], competition." Mot. 8. But the very first paragraph of the complaint alleges that the

24  Poaching Penalty "inhibit[s] competition for member schools" because it "saddles the Pac-12

25  with exorbitant and punitive monetary fees" if the Pac-12 accepts MWC member schools. Compl.

26  ¶ 1. The MWC asserts that the Poaching Penalty is a "fair, reasonable and appropriate

27

28  [3] Unless otherwise noted, internal brackets, alterations, quotation marks, and citations have been
    omitted, and emphasis has been added throughout this Opposition.

approximation[]" of harm to the MWC. Mot. 19. Yet again, the Pac-12 alleges the opposite: "the MWC already seeks to impose tens of millions of dollars in 'exit fees' on MWC schools that depart from the conference. To the extent the MWC would suffer any harm from the departures of its member schools, these exit fees provide more than sufficient compensation to the MWC." Compl. ¶ 7. Astonishingly, the MWC's motion does not *once* mention the MWC's exit fees, even though the Pac-12's complaint includes thirteen separate paragraphs explaining why the Poaching Penalty is "duplicative of the 'Exit Fees' the MWC already stands to collect" and is "unmoored from any rational estimate of damages." *Id.* ¶ 119; *see also id.* ¶¶ 7, 9, 38, 59, 68, 69, 70, 72, 113, 114, 115, 116. The MWC also suggests that the Poaching Penalty is "an alternative to merging both conferences." Mot. 18. But, again, as the Pac-12 alleged in detail, the 2024-25 Scheduling Agreement contains *no* commitment by either party to merge. Compl. ¶ 48. These are just a few of the factual falsifications, among many, that form the basis of the MWC's arguments.

It is improper at the pleading stage for the Court to accept the MWC's "characterization" of the facts that is "at odds with [the Pac-12's] allegations." *Produce Pay*, 39 F.4th at 1162–63 (reversing dismissal order). The Ninth Circuit has rejected any misinterpretation of *Twombly* that would allow district courts to weigh competing "alternative explanations." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The MWC's attempt to "present [its] own version of the facts at the pleading stage" undermines "the usual pleading burdens" and would make it "near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

## IV.    THE PAC-12 SUFFICIENTLY STATES ANTITRUST CLAIMS.

Counts 1 and 2 of the complaint allege violations of Section 1 of the Sherman Act and California's Cartwright Act, respectively. Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy[] in restraint of trade or commerce among the several States." 15 U.S.C. § 1. To state a Section 1 claim, a plaintiff must allege (1) an agreement between two or more entities that (2) "unreasonably restrains trade" and (3) affects interstate commerce. *E.W. French & Sons, Inc. v. General Portland Inc.*, 885 F.2d 1392, 1397 (9th Cir. 1989); *see also United States v. eBay*, 968 F. Supp. 2d 1030, 1035 (N.D. Cal. 2013). The analysis

1  under California's Cartwright Act mirrors that under section 1 of the Sherman Act, so the two

2  claims are commonly considered together, as here. *See Olean Wholesale Grocery Coop., Inc. v.*

3  *Bumble Bee Foods LLC*, 31 F.4th 651, 666 n.8 (9th Cir. 2022).

4      The MWC does not dispute that the Pac-12 sufficiently alleges the first and third

5  elements. Mot. 4. For good reason: The Poaching Penalty is a contractual agreement between two

6  separate entities, Compl. ¶¶ 13–14, 79, that plainly affects interstate commerce, *id*. ¶¶ 56, 58. For

7  the reasons below, the Pac-12 also sufficiently alleges the second element—that the Poaching

8  Penalty is a naked "restraint of trade" that is *per se* unreasonable. *Id.* ¶¶ 10–81.

9      **A.    The Poaching Penalty is a *per se* violation of antitrust laws.**

10         **1.    Poaching restrictions are generally *per se* illegal.**

11      Under the *per se* rule, certain agreements are "conclusively presumed to be unreasonable"

12  due to their "pernicious effect on competition and lack of any redeeming virtue." *N. Pac. Ry. Co.*

13  *v. United States*, 356 U.S. 1, 5 (1958). It is a bedrock principle of antitrust law that agreements

14  among competitors to allocate markets "always or almost always tend to restrict competition and

15  decrease output," *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19–20 (1979), making them "classic

16  examples" of *per se* antitrust violations, *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608

17  (1972). As such, courts routinely hold that agreements among competitors to restrict poaching—

18  *i.e.*, deem a certain portion of the market off-limits—can be *per se* antitrust violations because

19  they are forms of "horizontal market allocation." *See In re Outpatient Med. Ctr. Emp. Antitrust*

20  *Litig.*, 630 F. Supp. 3d 968, 987–88 (N.D. Ill. 2022) (holding that agreement to "divide the market

21  for senior-level outpatient medical care employees" was plausibly *per se* unlawful).

22      Poaching restrictions generally "have no purpose but to stifle competition," *id.*, so they

23  "do not require any elaborate industry analysis," *eBay*, 968 F. Supp. 2d at 1037. The

24  anticompetitive effect of poaching restrictions is straightforward: If Conference A restricts

25  Conference B from attempting to recruit Conference A's members, Conference A has removed or

26  restricted a competitor for those members. *See Robinson v. Jackson Hewitt, Inc.*, 2019 WL

27  5617512, at *2, *7 (D.N.J. 2019) ("No-Poach Penalty" equal to "300% of the annual salary of the

28  employee recruited or hired" plausibly limits "competition within the market [for workers]").

Free and fair competition among conferences provides "significant benefits to the" members for whom the conferences are competing, but poaching restrictions inhibit such competition. *See In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 475 (W.D. Pa. 2019) ("*Railway*"). In labor markets, for example, "[o]ne way [for employees] to obtain a higher salary" is to take the skills built in one's current position and "seek employment at another similar business where those skills can be put to use at the market wage." *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 704 (7th Cir. 2023). The same is true here. When a competitor is removed due to poaching restrictions, conferences have "less reason to fear losing [their] [members] and thus less incentive to take preemptive measures to retain them," such as by offering higher payments or incentives to conference members. *See Outpatient*, 630 F. Supp. 3d at 980; *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1121 (N.D. Cal. 2012) (competitors "forfend prospective poaching . . . by preemptively increasing the compensation of its current employees"). And when fewer conferences compete for the same members, the payments offered by the remaining conferences "will be lower." *See Turner v. McDonald's USA, LLC*, 2020 WL 3044086, at *2 (N.D. Ill. 2020). Poaching restrictions cause conference members to lose not only alternative "options" but also "bargaining power." *See Robinson*, 2019 WL 5617512, at *4.

For these reasons, courts routinely deny motions to dismiss *per se* claims where, as here, the plaintiff alleges that a "no-poach" agreement between competitors suppresses competition. In *Deslandes*, the Seventh Circuit held that a no-poach clause in McDonalds' franchise agreements was plausibly a *per se* violation of Section 1. 81 F.4th at 703–704. Reversing the district court's dismissal order, the appellate court reasoned that if the no-poach agreement "block[s]" employees from "seek[ing] employment" in similar businesses, as alleged, then it "does not promote output," so the plaintiff was entitled to "discovery, economic analysis, and potentially a trial." *Id.* at 704–705. Likewise, in *Aya Healthcare v. AMN Healthcare, Inc.*—the MWC's lead case—the district court denied the defendant's motion to dismiss, holding that the plaintiffs' no-poach allegations were plausibly "subject to *per se* treatment." 2018 WL 3032552, at *12 (S.D. Cal. 2018).[4]

---

[4] The decision the MWC cites was an appeal from **summary judgment**. Mot. 2, 11–14 (citing *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1111 (9th Cir. 2021)).

Similarly, in *eBay*, the court held that an alleged no-poach agreement between competitors for engineering employees was plausibly a *per se* violation as "horizontal market allocation" that "affected [the] employees' mobility and compensation." 968 F. Supp. 2d at 1039–40. And in *High-Tech*, the court upheld *per se* claims where it was "plausible to infer" that a series of alleged no-poach agreements among movie studios "would have the ripple effect of depressing [employees'] mobility and compensation." 856 F. Supp. 2d at 1122–23.[5]

### 2.    The Poaching Penalty is *per se* illegal.

Just like poaching restrictions in labor markets, the Poaching Penalty is *per se* unlawful. On the "employer" side, conferences compete for member schools, and on the "employee" side, member schools apply to conferences for membership. Compl. ¶¶ 22, 24, 25. It is no different from the poaching restrictions that the courts in *Deslandes, Turner, Aya Healthcare, eBay, High-Tech*, and other cases held may be subject to *per se* treatment.

As an initial matter, the Poaching Penalty is indisputably a horizontal agreement between competitors. The MWC and the Pac-12 are "competitor conferences," *id.* ¶ 21, at the "same level of the market" because both vie for member schools, *Railway*, 395 F. Supp. 3d at 481. The Poaching Penalty is an agreement "among [those] competitors" that addresses "the way in which they will compete with one another." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984). The Poaching Penalty poses a "huge financial hurdle[]" to the Pac-12's ability to compete with the MWC in recruiting the MWC's current member schools by placing an "exorbitant tax" on any offers the Pac-12 could make to those schools. Compl. ¶¶ 54, 60.

The Poaching Penalty is textbook market allocation. It allocates the market for member schools by "prevent[ing] the Pac-12 from freely soliciting" MWC schools for membership. *Id.* ¶ 81. In other words, a portion of the schools that could join the Pac-12, "namely, those currently [members of] another" competitor conference (the MWC), are subject to poaching restrictions. *Outpatient*, 630 F. Supp. 3d at 988. Like the poaching restrictions courts have condemned, the

---

[5] *See also, e.g.*, *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1213–14 (N.D. Cal. 2015); *Snow*, 586 F. Supp. 3d at 978; *Railway*, 395 F. Supp. 3d at 481; *In re Geisinger Health & Evangelical Cmty. Hosp. Healthcare Workers Antitrust Litig.*, 2021 WL 5330783, at *2 (M.D. Pa. 2021); *United States v. DaVita Inc.*, 2022 WL 266759, at *4 (D. Colo. 2022); *Blanton v. Domino's Pizza Franchising LLC*, 2019 WL 2247731, at *4–*5 (E.D. Mich. 2019).

1   Poaching Penalty "divide[s] the market" for member schools. *Railway*, 395 F. Supp. 3d at 494.

2       The Poaching Penalty also plainly reduces competition in the recruitment of member

3   schools. Without the Poaching Penalty, all conferences would be on level footing to recruit the

4   MWC's current member schools. Compl. ¶ 61. But the Poaching Penalty "nakedly restricts

5   competition for MWC member schools for one particular competitor: the Pac-12. Not

6   coincidentally, the Pac-12 is the most logical competitor conference for members of the MWC to

7   join, given the geographic proximity and makeup of the universities." *Id.* ¶ 5. The Poaching

8   Penalty "interferes with the Pac-12's ability to present its most competitive offer[s]" to those

9   schools. *Id*. ¶¶ 5, 36, 60. Thus, the Poaching Penalty not only "weaken[s] the Pac-12 as a

10  competitor" but also harms the schools that wish to leave the MWC, *id.* ¶¶ 106, 54, who are

11  "lock[ed] up," *see Robinson*, 2019 WL 5617512, at *4.

12      The MWC suggests that the Poaching Penalty gives the Pac-12 a "choice" to poach

13  individual schools, whereby it can "elect[]" to pay tens or hundreds of millions of dollars to do so.

14  Mot. 7, 18. But a party who is subject to a poaching restriction can always "elect" to poach and

15  face a claim for damages (or sue to invalidate the provision). That does not make the poaching

16  restriction any less illegal. The fact that the Poaching Penalty reads "if you poach, pay us," rather

17  than "thou shalt not poach," is a distinction without a legal difference. Indeed, courts recognize

18  that imposing conditions on or punishments for poaching are subject to *per se* treatment, even if

19  they do not explicitly ban poaching.[6]

20      For example, in *eBay*, the complaint alleged that a "handshake agreement struck and

21  occasionally refined" by two competitors "restricted [the companies'] ability to recruit or hire

22  candidates from one another." 968 F. Supp. 2d at 1032. At times, the companies allegedly insisted

23  on not hiring employees "without first notifying" the other (*i.e.*, "if you poach, tell us first"), and

24  at other times, the companies "agreed that [they] would not hire from [each other], period" (*i.e.*,

25  "thou shalt not poach"). *Id.* at 1033. In both situations, the *eBay* court concluded the "allegations

26

27  _____
    [6] *See Outpatient*, 630 F. Supp. 3d at 977 (allowing Section 1 claim regarding agreement to not
    poach "if [an] employee [did not] t[ell] her manager" about interest in moving to the competitor
28  first); *High-Tech*, 856 F. Supp. 2d at 1114 (same, regarding agreement to not "cold call"
    employees if they "h[ad] not otherwise applied for a job opening" with the competitor).

concerning the agreement between eBay and Intuit, taken as true, suffice to state a horizontal

market allocation agreement." *Id.* at 1039. Similarly, the *Robinson* court held the plaintiffs

plausibly alleged a Section 1 violation where a "No-Poach Penalty" equal to "300% of the annual

salary of the employee recruited or hired" unlawfully "limited [their] job mobility and suppressed

their compensation." 2019 WL 5617512, at *2. Like the *Robinson* penalty, the Poaching Penalty's

"exorbitant and punitive" fees are simply the MWC's mechanism for enforcing the objective the

MWC intended all along: to prevent the Pac-12 from recruiting MWC schools. Compl. ¶¶ 1, 54.

Accepting the MWC's characterization of the Poaching Penalty as presenting a "choice" would

immunize ***any*** anticompetitive agreement so long as the perpetrator uses conditional language

like "if." This Court should reject that characterization, particularly at the pleading stage, given

that the MWC "designed" the Poaching Penalty to stifle competition. *Id.* ¶ 6.

### B.    The MWC's "ancillary restraint" defense is meritless.

#### 1.    The MWC's "ancillary restraint" defense is not appropriate for resolution on a Rule 12(b)(6) motion.

The MWC ignores the Pac-12's factual allegations and invites the Court to engage in

premature fact-finding to hold as a matter of law, at the pleading stage, that the Poaching Penalty

is an "ancillary restraint" that must be judged under the rule of reason. Mot. 12. Whether the

Poaching Penalty is a "naked *per se* restraint" or "merely an ancillary restraint . . . cannot be

determined at this juncture." *See In re Juul Labs, Inc., Antitrust Litig.*, 555 F. Supp. 3d 932, 959

(N.D. Cal. 2021). That is because whether a restraint is naked or ancillary is an "inherently fact-

specific inquiry that is difficult to determine with certainty at the motion to dismiss stage." *Snow*

*v. Align Techs., Inc.*, 586 F. Supp. 3d 972, 979 (N.D. Cal. 2022). That decision is "more

appropriate on a motion for summary judgment," *High-Tech*, 856 F. Supp. 2d at 1122, with the

"benefit of discovery," *Borozny v. Raytheon Techs. Corp.*, 2023 WL 348323, at *9 (D. Conn.

2023). Moreover, "the classification of a restraint as ancillary is a defense, and complaints need

not anticipate and plead around defenses." *Deslandes*, 81 F.4th at 705. Accordingly, the Court

should reject the MWC's "ancillary restraint" argument on this ground alone.

2841579

1          **2.      The Poaching Penalty is not an "ancillary restraint."**

2          The MWC's "ancillary restraint" defense also fails because, as the Pac-12 alleged, the

3   Poaching Penalty is a naked restraint on competition that has nothing to do with the 2024-25

4   Scheduling Agreement. Compl. ¶¶ 1, 5, 10. A challenged restraint "does not qualify as ancillary

5   merely because it accompanies some *other* agreement that is itself lawful." *Deslandes*, 81 F.4th at

6   704. To be "ancillary," a restraint must be not only "subordinate and collateral" to a separate

7   transaction but also "reasonably necessary to achieving [that] transaction's pro-competitive

8   purpose." *Snow*, 586 F. Supp. 3d at 978. The Poaching Penalty does not meet either requirement.

9          **a.      The Poaching Penalty is not "subordinate and collateral."**

10          The Poaching Penalty is not subordinate and collateral to the 2024-25 Scheduling

11   Agreement because it has no purpose but to "reduce competition by the Pac-12 for member

12   schools." Compl. ¶ 7; *see White Motor Co. v. United States*, 372 U.S. 253, 263 (1963) (a restraint

13   is "naked" and illegal *per se* if it has "no purpose except stifling of competition.").

14          The fundamental purpose of the 2024-25 Scheduling Agreement is to schedule "football

15   games for the Pac-12's two member schools to play the MWC's twelve member schools" in the

16   2024-25 season. Compl. ¶¶ 41, 50. The Poaching Penalty has *no* effect on the number, location,

17   and logistics of the football games that will be played under the 2024-25 Scheduling Agreement.

18   *Id.* ¶¶ 41–42. It has *no* effect on the amount of money that the Pac-12 pays for those football

19   games. *Id.* ¶ 42. In fact, the Pac-12 already paid the MWC $14 million in compensation for those

20   football games under the 2024-25 Scheduling Agreement—an amount that "far exceeded the

21   market value." *Id.* ¶ 43. Thus, even if the 2024-25 Scheduling Agreement "increased output" of

22   football games as the MWC contends, Mot. 14—an unsubstantiated factual proposition that is

23   supported only by the MWC's *ipse dixit*—the Poaching Penalty that "appear[s]" in the

24   Scheduling Agreement has "nothing to do with the output." *Deslandes*, 81 F.4th at 704.

25          Moreover, if the Poaching Penalty did *anything* to facilitate football games, there would

26   be no need for it to remain in effect for *two more years after the Scheduling Agreement*

27   *terminates*. Compl. ¶ 52; *id.* Ex. 1 § 7.01. Indeed, after the 2024-25 season, when there will be no

28   "Scheduling Agreement" that arranges football games between the two conferences, *id.* ¶ 47, the

1   "only effect of [the Poaching Penalty] [will be] to limit the potential competition between" the

2   conferences, *Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995) (holding no-poach

3   agreement is "naked, not ancillary, and *per se* illegal to boot" where it extends beyond the

4   duration of the agreement in which it appeared). This asymmetry reveals the Poaching Penalty's

5   true purpose: to impede competition for MWC schools and harm the Pac-12 as a competitor.

6           **b.    The Poaching Penalty is not "reasonably necessary" to schedule
7                   football games for one season.**

8           Nothing in the complaint supports the MWC's argument that the Poaching Penalty was

9   reasonably necessary to schedule football games, either. The "reasonably necessary" test asks

10  whether the increased output "would have been possible absent the challenged restraint." *Snow*,

11  586 F. Supp. 3d at 979. In other words, the question is whether the Poaching Penalty is an

12  "inherent feature of the joint venture at all, or simply an unnecessary, output-limiting appendage."

13  *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles*

14  *& Their Application* ¶ 1908b (4th ed. 2022), at 253. The MWC offers no reason why any

15  procompetitive benefit of the Scheduling Agreement would have been impossible without the

16  Poaching Penalty. The MWC forced the Pac-12 to accept the Poaching Penalty because the Pac-

17  12 was "running out of time and short on leverage" given the departure of ten Pac-12 conference

18  members—not because it was necessary to schedule football games. Compl. ¶¶ 4, 55. Indeed, the

19  Poaching Penalty cannot be "necessary" to scheduling when other conferences regularly schedule

20  "nonconference" games *without* being forced into similar poaching restrictions. *Id.* ¶¶ 43, 36; *In*

21  *re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 345–46 (3d Cir. 2010) (denying motion to

22  dismiss *per se* claims where "other . . . agreements well illustrate" that their "benefits" do not

23  depend on "such a horizontal restraint of trade"). The Poaching Penalty is an "output-limiting

24  appendage," not a requirement for scheduling football games.

25          None of the MWC's arguments establish its necessity. ***First***, the MWC's argument that

26  the "college football market is one in which horizontal restraints on competition are essential"

27  does not mean that ***this*** horizontal restraint is necessary. Mot. 13 (citing *NCAA*, 468 U.S. 85). The

28  sorts of "horizontal restraints" that *NCAA* suggested "must be agreed upon" primarily related to

2841579

1    ensuring competitive balance in on-field competition, such as "the size of the field [and] the

2    number of players on a team." *NCAA*, 468 U.S. at 102. The fact that the MWC forced the

3    Poaching Penalty into an agreement about scheduling football games does not insulate it from

4    antitrust scrutiny or mean that it is automatically shielded from *per se* treatment.

5        **Second**, the MWC's conjecture that, without the Poaching Penalty, the MWC would not

6    have agreed to the Scheduling Agreement does not support dismissal. Mot. 13, 19. Again, that is a

7    factual argument that is not appropriate for resolution on a motion to dismiss. In any event, the

8    MWC's say-so, in a preamble or its moving papers, does not transform the Poaching Penalty into

9    an ancillary restraint. A restraint is not ancillary "simply because [the defendant] posits that it is."

10   *eBay*, 968 F. Supp. 2d at 1039. Nor is it ancillary "simply because it facilitates a procompetitive

11   arrangement." *Brokerage*, 618 F.3d at 346. Thus, even if the MWC was only subjectively willing

12   to enter into the Scheduling Agreement if it included the Poaching Penalty, that does not mean

13   that the Poaching Penalty was **essential** to achieving a procompetitive effect of that deal.

14   *Blackburn*, 5 F.3d at 828; *Snow*, 586 F. Supp. 3d at 979. If that were the law, any party with

15   superior leverage could insist on including an unrelated, anticompetitive restriction in a larger

16   agreement and then justify that unlawful provision by pointing to efficiencies in the larger

17   agreement and claiming, self-servingly, that they would not have entered into the larger

18   agreement without the illegal restriction. Thankfully, that is not the law.

19       **Third**, the Poaching Penalty does not operate like the industry-specific restriction in *Aya*,

20   a case the MWC repeatedly cites. Mot. 14. In addition to being a summary judgment decision,

21   *Aya* depended heavily on undisputed evidence that there was such a "chronic shortage" of nurses

22   at "understaffed hospitals" that cooperation between staffing agencies, who agreed to a non-

23   solicitation clause, was sorely needed to provide "spillover" staffing. 9 F.4th at 1112–13. In that

24   case, the plaintiff "admitted in its declarations" that the challenged provision was "'part of a

25   collaboration agreement to fulfill the demand of hospitals for travel nurses,' which constitutes a

26   procompetitive purpose." *Id.* at 1109. But here, the Pac-12 has alleged the opposite: "the

27   Poaching Penalty does nothing to increase the amount of college football played, which was the

28   purpose of the Scheduling Agreement." Compl. ¶ 10. Therefore, the Poaching Penalty "is a

15

naked, horizontal agreement in restraint of trade." *Id. Aya* thus counsels in favor of applying the *per se* rule where, as here, the complaint alleges a naked horizontal no-poach restraint. *See Aya*, 9 F.4th at 1109 ("[N]aked horizontal restraints are always analyzed under the *per se* standard.").[7]

**Finally**, the MWC's remaining arguments about the "rule of reason standard" are all premised on the MWC's meritless defense that the Poaching Penalty is an "ancillary restraint" that should be evaluated under the rule of reason. Mot. 14–17. But, as discussed above, the Poaching Penalty is a naked restraint on competition that is *per se* illegal. Thus, the rule of reason does not apply, and the Pac-12 was not required to plead a rule-of-reason claim.[8] *See Deslandes*, 81 F.4th at 704 (reversing dismissal based on rule of reason analysis where "the district judge jettisoned the *per se* rule too early"); *eBay*, 968 F. Supp. 2d at 1037 (*per se* claims "do not require any elaborate industry analysis otherwise required under the rule of reason.").

### C.    The Pac-12 has antitrust standing.

The complaint is filled with facts demonstrating the Pac-12's antitrust standing, setting forth the harm to competition flowing from the MWC's unlawful Poaching Penalty, as well as concrete, non-speculative harm to the Pac-12 as a result. Compl. ¶¶ 1, 5–8, 10, 54, 60–63, 82–84. In arguing otherwise, the MWC simply ignores the complaint's allegations and instead offers unrelated speculative theories and relies on competing "facts" found nowhere in the complaint.

---

[7] The MWC's other authorities are likewise easily distinguishable. *Fonseca* and *Frost* both premised dismissal on the plaintiffs' failure to plausibly allege that the parties *actually entered* a no-poach agreement at all; here, by contrast, the MWC imposed the Poaching Penalty in a written agreement. *See Fonseca v. Hewlett-Packard Co.*, 2021 WL 4796540, at *1 (9th Cir. 2021); *Frost v. LG Elecs. Inc.*, 2018 WL 6256790, at *7 (N.D. Cal. 2018). And in both *Tanaka* and *Les Shockley*, the plaintiffs did not pursue *per se* claims at all. *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059 (9th Cir. 2001); *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 509 (9th Cir. 1989). The MWC's remaining cases are distinguishable for an additional reason: none was decided on a motion to dismiss, and each relied on extensive factual evidence beyond the pleadings. *See Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185 (7th Cir. 1985) (reversing grant of permanent injunction after "a full trial"); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958 (10th Cir. 1994) (appeal from jury verdict); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 228 (D.C. Cir. 1986) (appeal from summary judgment).

[8] Although the Pac-12 alleges "in the alternative" that the Poaching Penalty is unlawful under the rule of reason, Compl. ¶¶ 89, 98, the Court need not address that alternative theory here because the Pac-12 stated *per se* claims. *See eBay*, 968 F. Supp. 2d at 1037 (an antitrust plaintiff "is not obliged to plead under each possible rule"); *Railway*, 395 F. Supp. 3d at 481 (plaintiffs "are not required to plead the requirements of a rule of reason analysis" alongside plausible *per se* claims).

THE PAC-12'S OPPOSITION TO THE MOUNTAIN WEST CONFERENCE'S MOTION TO DISMISS
Case No. 5:24-cv-6685-SVK

2841579

1          **1.      The Pac-12 sufficiently alleges harm to competition.**

2          The complaint makes clear that the imposition of the Poaching Penalty weakens the Pac-

3    12's ability to compete for MWC schools and harms competition. Compl. ¶¶ 1, 5, 6–10, 54, 60,

4    61, 63, 76, 82–85, 88, 90–91, 99–100. This is because the Pac-12 is forced to pay exorbitant sums

5    to recruit these schools—sums that no other competitor conference must pay. *Id.* ¶¶ 1, 5, 7, 9, 37,

6    57, 61, 75. Not coincidentally, the Pac-12 is the most logical option for MWC member schools

7    looking for a new conference, given its geographic proximity and the makeup of the universities

8    in the conference. *Id.* ¶¶ 5, 6, 60. But because of the Poaching Penalty, MWC member schools

9    face steep barriers to join the Pac-12 and in turn have diminished options for mobility. *Id.* ¶¶ 10,

10   54, 60, 63, 88. Further still, by requiring the Pac-12 to pay these exorbitant penalties, the

11   Poaching Penalty depletes the resources available to the Pac-12 to compete for additional schools.

12   *Id.* ¶¶ 10, 32, 60, 61, 91, 100. And without sufficient member schools, the Pac-12 itself could fail

13   to maintain its conference status, even further harming competition by eliminating a strong and

14   storied conference option and limiting opportunities for thousands of student-athletes. *Id.* ¶¶ 8,

15   32, 61, 78. These allegations are plainly sufficient to establish antitrust standing. *See Geisinger*,

16   2021 WL 5330783, at *4 (antitrust injury established where plaintiff pleaded that absent poaching

17   restriction, rival firms would compete for employees, thereby increasing pay and mobility); *see*

18   *also Aya*, 2018 WL 3032552, at *6 (plaintiff had standing where it alleged that poaching restraint

19   prevented plaintiff from competing with defendant in offering nursing services); *High-Tech*, 856

20   F. Supp. 2d at 1123 (antitrust injury exists where plaintiffs alleged that defendants' agreements

21   not to cold call other defendants' employees "were entered into to suppress competition for

22   skilled labor").

23          Rather than grappling with these well-pleaded allegations, the MWC instead offers a

24   series of scattershot arguments, none of which diminishes the Pac-12's antitrust standing.

25          The MWC first contends that the Pac-12 "fails to allege an injury to competition" because

26   the Pac-12 is an "equally culpable co-conspirator." Mot. 6. But that argument is foreclosed by

27   binding Supreme Court precedent holding that "the doctrine of in pari delicto" is not "a defense to

28

2841579

an antitrust action." *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968)[9]; *see also Memorex Corp. v. Int'l Bus. Machs. Corp.*, 555 F.2d 1379, 1381 (9th Cir. 1977) (unclean hands "has not been recognized as a defense to an antitrust action for many years"). Indeed, the MWC's argument contravenes the plain language of the Sherman Act, which reaches "***every contract***, combination …, or conspiracy" that unreasonably restrains trade. 15 U.S.C. § 1. "[T]o hold that a contract is exempt from antitrust scrutiny simply because one party reluctantly accepted its terms would be to read the word 'contract' out of the statute." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 982–83 (9th Cir. 2023) (cleaned up).

The MWC next suggests that the Pac-12 has not been harmed because MWC members could join the Pac-12 at no cost if the two conferences just merged. Mot. 7, 8. But, again, the Scheduling Agreement "does not involve any commitment to actually enter into a definitive transaction," Compl. ¶ 48, and "neither side has made a proposal" for any such transaction, let alone a merger, *id.* ¶ 49. Nor does the potential option to merge render enforcement of the Poaching Penalty any less harmful. Thus, the MWC's argument is entirely beside the point. *See also supra* IV.A.2 (illusory "choice" to poach does not avoid antitrust liability).

The MWC contends that because five MWC members ultimately joined the Pac-12, the Poaching Penalty is not a true restraint that "injured" the Pac-12 or competition. Mot. 8–9. But the complaint alleges how the Poaching Penalty "limit[ed] the competitive offers" the Pac-12 could make to MWC schools, limited the number of schools the Pac-12 could accept, and imposed "huge financial hurdles" that will severely weaken the Pac-12 moving forward. Compl. ¶¶ 6, 54; *see also Aya*, 2018 WL 3032552, at *6; *Geisinger*, 2021 WL 5330783, at *4. The Poaching Penalty remains in effect to this day (and, absent the relief sought by the Pac-12 in this lawsuit, for years beyond the expiration of the Scheduling Agreement), meaning that it continues to harm competition by restricting the Pac-12's ability to recruit MWC members and impairing MWC schools' abilities to join a competing conference. And, of course, if the Pac-12 is forced to pay the exorbitant Poaching Penalty, it will be further injured and have diminished resources to recruit any additional schools. Compl. ¶¶ 8, 61, 76.

---

[9] *Overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).

1    Also misplaced is the MWC's argument that the Pac-12 could have recruited non-MWC

2    schools. Mot. 8. That the MWC's conduct failed to completely foreclose **all** competition does not

3    permit the MWC to evade antitrust laws, much less defeat the Pac-12's standing. The MWC's

4    cited cases do not support such an argument. For example, in *Somers v. Apple*, 729 F.3d 953, 966

5    (9th Cir. 2013), the court held that plaintiff's allegations that there were only a few options for

6    playing digital music did not satisfy antitrust injury, absent some allegations about how

7    competitors were inhibited from entering the market. That case has no bearing here, where the

8    Pac-12 has detailed the many ways the competition for MWC schools has been inhibited by the

9    *per se* illegal Poaching Penalty. *See* Compl. ¶¶ 1, 5, 6, 10, 54, 60, 61, 63, 76, 82–85, 88, 90–91,

10   99–100. The MWC's other cited cases are also inapposite. *See Korea Kumho Petrochemical Co.*

11   *v. Flexsys Am. LP*, 370 Fed. App'x 875, 876 (9th Cir. 2010) (allegation that marketplace involves

12   few players is insufficient on its own to allege antitrust injury); *Tanaka*, 252 F.3d at 1064

13   (analyzing market definition and sufficiency of injury claim under rule of reason, not *per se* rule).

14   The MWC's remaining standing arguments ignore the complaint's allegations and instead

15   seek to rewrite the facts. For example, the MWC asserts that "[t]he Pac-12's allegations amount

16   to little more than a gripe that only it has suffered an injury, not competition as a whole." Mot. 8–

17   9. But the complaint describes how the Poaching Penalty "limits the mobility of MWC

18   member[s]," and limits their ability "to benefit from competition among athletic conferences."

19   Compl. ¶¶ 6, 61. The MWC also—contrary to the complaint—casts the Poaching Penalty as pro-

20   competitive and claims that the *absence* of the Poaching Penalty "would harm competition, by

21   leaving holes in the remaining MWC schools' schedules and thereby decreasing output of MWC

22   conference games," Mot. 8; *compare* Compl. ¶¶ 82–85, 88, 90, 91, 97, 99, 100. Not only is this

23   pure speculation, and the Pac-12 strongly disputes the MWC's position,[10] but the MWC's

24   characterization also cannot defeat the facts as pleaded. *See Produce Pay*, 39 F.4th at 1162–63.

25   The MWC's cited cases are entirely inapposite. *Federal Trade Commission v. Microsoft*,

26   _____

27   [10] In fact, the MWC has already announced that it will admit at least five new members starting in
     2026. *See* Chris Vannini, Northern Illinois football to join Mountain West; league to 'pause' on
     adding new members (Jan 7, 2025), available at
     https://www.nytimes.com/athletic/6044708/2025/01/07/northern-illinois-mountain-west-
28   realignment/.

2841579

1  681 F. Supp. 3d 1069, 1076 (N.D. Cal. 2023), for example, involved a potential merger and did

2  not even discuss antitrust standing. Likewise, in *Chicago Professional Sports Limited Partnership*

3  *v. National Basketball Association*, 95 F.3d 593, 597 (7th Cir. 1996), the court did not evaluate

4  antitrust injury. The MWC's remaining cases are all distinguishable.[11]

5  ## 2.    The Pac-12 alleges non-speculative harms.

6  The MWC's argument that the Pac-12's alleged harms are speculative similarly fails. ***The***

7  ***MWC has already demanded $55 million in Poaching Penalties*** from the Pac-12 after the Pac-

8  12 accepted applications from MWC members. Compl. ¶¶ 57–58, 61. That harm exists now, is

9  clearly defined, and is not speculative. None of the MWC's cited cases suggest otherwise, and

10  none involve poaching restrictions.[12] The MWC cites *Arcell v. Google*, 2024 WL 3738422, at *6

11  (N.D. Cal. 2024), for the proposition that the Pac-12 ought to have provided "specific allegations

12  about potential members the Pac-12 would have admitted but for the existence of the [Poaching

13  Penalty], or how the fees kept it from competing for MWC schools." Mot. 10. But *Arcell*

14  involved allegations of monopolization, not a poaching restraint, thus the facts demonstrating

15  harm are necessarily distinct. In any event, the Pac-12's complaint alleges that if the Pac-12 is

16  forced to pay the Poaching Penalty, it will have diminished resources available to recruit

17  additional schools, including of course other MWC schools. Compl. ¶¶ 8, 10, 60, 61.

18  While the MWC says that *City of Oakland v. Oakland Raiders* is instructive, that case

19  evaluated whether the City had standing to address an alleged horizontal price-fixing scheme that

20  allegedly prevented it from retaining an NFL team. 20 F.4th 441, 457 (9th Cir. 2021). There, the

21  plaintiff City was a "non-purchaser," because it alleged that it was priced out of the market for

22  NFL teams due to the scheme's supracompetitive prices. *Id.* at 458. In such situations, the court

---

24  [11] *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) (plaintiff alleged
a *per se* illegal poaching restriction); *Reveal Chat Holdco LLC v. Facebook Inc.*, 471 F.

25  Supp. 3d 981, 998 (N.D. Cal. 2020) (plaintiff failed to allege how or even whether it was
excluded from competition); *GSI Tech. v. United Memories, Inc.*, 2014 WL 1572358, at *3 (N.D.

26  Cal. 2014) (existence of alleged illegal agreement pleaded in conclusory fashion); *Paladin
Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) (summary judgment

27  decision); *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001) (same).

28  [12] *See, e.g.*, *Strawflower Elecs., Inc. v. Radioshack Corp.*, 2005 WL 2290314, at *8 (N.D. Cal.
2005) (involving tying allegations, not a no-poach).

explained, the harm is too speculative to establish standing—as "[a]nyone could claim that he or she would have purchased . . . but was priced out"—and there is too much uncertainty as to what would have actually happened if the market was competitive. *Id.* at 458–60. Here, by contrast, the Pac-12 is the **direct purchaser** of MWC members, and **no** speculation is required to assess the harm because the Pac-12 has already accepted five MWC members, and the MWC has demanded payment from the Pac-12. Compl. ¶¶ 57, 61 & Ex. 2. There is nothing speculative about the Pac-12's injury or the fact that it flows directly from the anti-competitive Poaching Penalty.

## V.    THE PAC-12 SUFFICIENTLY STATES A CLAIM UNDER CALIFORNIA'S UNFAIR COMPETITION LAW

Count 3 of the complaint alleges a violation of California's Unfair Competition Law (UCL). California's UCL broadly prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each prong of the UCL provides a distinct theory of liability. *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007).

The UCL's "unlawful" prong "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000) (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163 (1999)). Because the Pac-12 has stated claims under the Sherman Act and Cartwright Act, it has stated an independent claim under the UCL's unlawful prong. *See id.*; *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1107 (9th Cir. 2007).

The UCL's "unfairness" prong is even broader. "As the UCL's three-prong structure makes clear, a business practice may be 'unfair,' and therefore illegal under the UCL, 'even if not specifically proscribed by some other law.'" *Epic Games*, 67 F.4th at 1000 (quoting *Cel-Tech*, 20 Cal. 4th at 180). "The unfair prong is intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive." *Id.* The unfairness prong broadly targets business conduct that "threatens an incipient violation of an antitrust law, or violates the policy or spirit of any one of those laws . . . or otherwise significantly threatens or harms competition," while the conduct

1    need not be "specifically proscribed by some other law." *Cel-Tech*, 20 Cal. 4th at 180, 187.

2         Here, the Pac-12 alleges that, "whether or not in violation of the Sherman Act or

3    Cartwright Act," the Poaching Penalty "violates the UCL as an unfair business practice." Compl.

4    ¶ 104. The Poaching Penalty is unlawful as described above, but it is also independently

5    actionable as unfair under the UCL because it "threatens an incipient violation of an antitrust

6    law," "violates the policy or spirit of any one of those laws," and "otherwise significantly

7    threatens or harms competition." *Cel-Tech*, 20 Cal.4th at 180, 187.

8         The MWC argues that the UCL unfairness theory rises and falls with the Pac-12's

9    antitrust claims. Mot. 20–21. But the Ninth Circuit, the California Supreme Court, and courts in

10   this district have all rejected such a rule. *See Epic Games*, 67 F.4th at 1001; *Cel-Tech*, 20 Cal. 4th

11   at 189; *Diva Limousine, Ltd. v. Uber Techs. Inc.*, 392 F. Supp. 3d 1074, 1090 (N.D. Cal. 2019).

12   Without mentioning the controlling authority, the MWC instead relies on cases that involved

13   unfairness claims that overlapped entirely with the plaintiff's predicate fraud or misrepresentation

14   claims.[13] By contrast, here, the Pac-12's unfairness theory exists independently from its antitrust

15   claims. *See* Compl. ¶ 104. The complaint details how the Poaching Penalty amounts to a

16   horizontal market allocation agreement that reduces competition. Compl. ¶¶ 81, 85; *cf. Obesity*

17   *Rsch. Inst. LLC v. Fiber Rsch., Int'l, LLC*, 165 F. Supp. 3d 937, 953 (S.D. Cal. 2016). And the

18   complaint also describes how the provision targets a single competitor with enormous and

19   unreasonable penalties and unfairly limits MWC members' ability to join a conference that may

20   best suits their needs. Compl. ¶¶ 7, 10, 25, 36–37, 52, 60; *cf. Diva Limousine*, 392 F. Supp. 3d at

21   1090. The Pac-12 also alleges that the Poaching Penalty is unfair because of the inherently

22   coercive circumstances under which the MWC forced the Pac-12 to accept it, knowing the Pac-12

23   needed to act quickly to protect its student-athletes. Compl. ¶¶ 4, 43–44, 55; *cf. Cel-Tech*, 20 Cal.

24

25   _____

     [13] *See Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1105 (N.D. Cal. 2017) (pre-*Epic* case
     dismissing "unfair" allegations premised on alleged false advertising); *In re Actimmune Mktg.*

26   *Litig.*, 2009 WL 3740648, at *14 (N.D. Cal. 2009), *aff'd*, 464 F. App'x 651 (9th Cir. 2011)
     (same); *Punian v. Gillette Co.*, 2016 WL 1029607, at *17 (N.D. Cal. 2016) (same); *see also*

27   *Lambrix v. Tesla, Inc.*, 2023 WL 8265916, at *9 (N.D. Cal. 2023) (same); *People's Choice*
     *Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 668–72 (2005) (dismissing unfairness

28   claim due to insufficiency of the pleading but reiterating that UCL can be violated "even if a
     defendant has not violated the antitrust laws").

2841579

4th at 187. Accordingly, the Pac-12's unfairness theory is adequately pleaded.

The MWC's other two arguments also fail. First, the MWC cites to *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375–76 (2001), for the proposition that where conduct is "deemed reasonable . . . under the antitrust laws" there can be no UCL claim. *See* Mot. 21–22; *see also Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1124 (9th Cir. 2018) (quoting *Chavez* for a similar proposition). But that case relies on the UCL "safe harbor" provision which "bars a UCL action where California or federal statutory law . . . clearly permits the defendant's conduct." *Epic Games*, 67 F.4th at 1001. As the court explained in *Epic Games*, that safe harbor applies only where a "***categorical*** antitrust rule" explicitly deems the conduct lawful. *Id.* (listing the baseball exemption and the *Colgate* doctrine, both at issue in *Chavez*, as examples of such rules and rejecting defendant's argument that a proof deficiency in an antitrust claim precludes a UCL unfairness claim). The safe harbor has no applicability here, and the MWC does not point to any law or doctrine that expressly allows the Poaching Penalty to stand. Second, the MWC confusingly claims that refusing to deal does not violate antitrust law, *see* Mot. 21–22, but there is no refusal to deal alleged here, thus the refusal to deal doctrine has no application to this case.

## VI.    THE PAC-12 SUFFICIENTLY STATES A CLAIM THAT THE POACHING PENALTY IS UNENFORCEABLE UNDER CONTRACT LAW

Count 4 of the complaint alleges that the Poaching Penalty is an unenforceable penalty masquerading as a liquidated damages provision. *See* Compl. ¶¶ 107–119. Under California law, "a liquidated damages clause becomes an unenforceable penalty 'if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach.'" *Purcell v. Schweitzer*, 224 Cal. App. 4th 969, 974–75 (2014) (quoting *Ridgley v. Topa Thrift & Loan Assn.*, 17 Cal. 4th 970, 977 (1988)). "Absent a relationship between the liquidated damages and the damages the parties anticipated would result from a breach, a liquidated damages clause will be construed as an unenforceable penalty." *Id.* at 974.

As alleged in the complaint, the sums owed under the Poaching Penalty bear no reasonable relationship to any damage the MWC is likely to suffer. Compl. ¶¶ 109–118. The Poaching Penalty is not reasonably related to any harm to the MWC from the departure of

THE PAC-12'S OPPOSITION TO THE MOUNTAIN WEST CONFERENCE'S MOTION TO DISMISS
Case No. 5:24-cv-6685-SVK

member schools because the MWC is already seeking to recover steep exit fees from departing members for the same purported injury. *Id.* ¶¶ 9, 112–116. Nor can there be any purported harm to the MWC from a failure to merge the two conferences because, as discussed above, the Scheduling Agreement does not require any such merger. *Id.* ¶ 117. The Poaching Penalty is also excessive, unreasonable, and one-sided, reflecting that the MWC unfairly and unlawfully wielded its leverage at the time of negotiation, when the Pac-12 was desperate to schedule football games for its student-athletes. Compl. ¶¶ 2–4, 53–55, 118. Where, as here, a contractual liquidated damages amount bears no reasonable relationship to any actual damage, courts routinely invalidate such clauses as unenforceable penalties. *See Graylee v. Castro*, 52 Cal. App. 5th 1107, 1113 (2020); *Vitatech Int'l, Inc. v. Sporn*, 16 Cal. App. 5th 796, 808 (2017).

The MWC claims that the Poaching Penalty need not satisfy California's requirement that liquidated damages amounts relate to actual harm suffered because the Poaching Penalty is not a liquidated damages clause at all, but an "alternative means of performance." *See* Mot. 18. Not so. To support this argument, the MWC relies on a narrow line of inapposite cases involving early termination fees in consumer contracts. *See Mahlum v. Adobe Sys. Inc.*, 2015 WL 124663, at *4 (N.D. Cal. 2015), *aff'd*, 690 F. App'x 474 (9th Cir. 2017); *Schneider v. Verizon Internet Servs., Inc.*, 400 F. App'x 136, 137 (9th Cir. 2010). In those cases, the fee was not triggered by a breach of the agreement, but rather presented as an option to end an agreement early (like a software subscription or cell phone plan), so the fee "provided a true option or alternative" to continuing to pay monthly subscription fees and thus was not penalty. *Mahlum,* 2015 WL 124663, at *4 (reiterating that alternative to performance fees are ***not*** triggered by a breach of agreement); *cf. In re Cellphone Termination Fee Cases*, 193 Cal. App. 4th 298, 328 (2011) (holding that early termination fee in cellphone contract was not means of "alternative performance" as users lacked a "rational choice" between ending contract and paying fee). Those cases have no bearing here because the Poaching Penalty is not an early termination fee and does not present any "alternative to performance." Compl. Ex. 1 § 7.01 ("[Pac-12] shall pay liquidated damages to MWC in the form of [a] termination fee"). Rather, the Poaching Penalty is triggered any time a MWC member accepts an offer to join the Pac-12, thereby "breaching" the MWC's objective of preventing

1   poaching. Compl. ¶ 4. Thus, the Poaching Penalty functions as a liquidated damages provision
2   and is not an alternative to performance. *See Mahlum*, 2015 WL 124663, at *4; *see also Sybron*
3   *Corp. v. Clark Hosp. Supply Corp.*, 76 Cal. App. 3d 896, 901–03 (1978) (not alternative where
4   clause serves to penalize action rather than provide choice).

5       Next, the MWC argues that because the Scheduling Agreement states that the Poaching
6   Penalty is a "fair, reasonable, and appropriate approximation[] of the losses that [the] MWC may
7   incur," the Poaching Penalty must be enforced. Mot 19. But that is wrong as a matter of fact and
8   law. On the facts, the Pac-12 alleges throughout its complaint that the Poaching Penalty is neither
9   fair nor reasonable, bears no relationship to any supposed harm suffered by the MWC, and that
10  language to the contrary in the Agreement was pretextual. *See* Compl. ¶¶ 64–73, 107–119. The
11  MWC cannot defeat the Pac-12's claim by disputing these well-pleaded facts. *See Produce Pay*,
12  39 F.4th at 1161. On the law, the self-serving statements the MWC included in the Scheduling
13  Agreement in a blatant attempt to justify the Poaching Penalty's usurious sums cannot save it. A
14  party's "[a]greement to an invalid liquidated damages clause does not insulate it from attack."
15  *Munguia-Brown v. Equity Residential*, 2019 WL 3779523, at *3 (N.D. Cal. Aug. 12, 2019). It is
16  black letter law that the "words used in a contract" are not determinative of whether the liquidated
17  damages provision operates as a penalty, and the Court must independently assess whether the
18  sum bears a reasonable relationship to the damage. *Purcell*, 224 Cal. App. 4th at 974–75
19  (rejecting argument that stipulation between the parties that the liquidated damages sum
20  accurately approximated loss at issue renders clause enforceable). A contrary result would mean
21  *any* liquidated damages provision is valid so long as the contract includes boilerplate language
22  stating that it is a reasonable approximation of harm. That is not the law. *See id.*; *Ridgley*, 17 Cal.
23  4th at 979–81; *Mungia-Brown*, 2019 WL 3779523, at *3.

24  **VII.    CONCLUSION**

25      For the reasons discussed herein, the Court should deny the MWC's motion to dismiss. In
26  the alternative, should the Court conclude that any aspect of the complaint is deficient, the Pac-12
27  respectfully requests leave to amend. This is the Pac-12's initial pleading, and amendment is not
28  futile and would not prejudice the MWC. *See Hicks*, 897 F.3d at 1124.

1

Dated:  January 13, 2025

KEKER, VAN NEST & PETERS LLP

2

3

By:    /s/ Eric H. MacMichael

ERIC H. MACMICHAEL
NICHOLAS S. GOLDBERG
ANJALI SRINIVASAN
KELLY S. KAUFMAN
PAUL VON AUTENRIED
CHARLOTTE KAMAI

Attorneys for Plaintiff THE PAC-12
CONFERENCE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE PAC-12'S OPPOSITION TO THE MOUNTAIN WEST CONFERENCE'S MOTION TO DISMISS
Case No. 5:24-cv-6685-SVK

2841579