1

**WILLKIE FARR & GALLAGHER LLP**
SIMONA AGNOLUCCI (SBN 246943)

2

sagnolucci@willkie.com
EDUARDO E. SANTACANA (SBN 281668)

3

esantacana@willkie.com
333 Bush Street, 34th Floor

4

San Francisco, CA  94104
Tel: 415 858 7400

5

Fax: 415 858 7599

6

WESLEY R. POWELL (SBN 230430)
wpowell@willkie.com

7

787 Seventh Avenue
New York, NY  10019

8

Tel: 212 728 8000
Fax: 212 728 8111

9

MATT D. BASIL (*pro hac vice* pending)

10

mbasil@willkie.com
300 N. LaSalle Street

11

Chicago, IL  60654
Tel: 312 728 9000

12

Fax: 312 728 9199

13

*Attorneys for Defendant*
*THE MOUNTAIN WEST CONFERENCE*

14

15

**UNITED STATES DISTRICT COURT**

16

**NORTHERN DISTRICT OF CALIFORNIA**

17

**SAN JOSE DIVISION**

18

19

THE PAC-12 CONFERENCE,

20

                    Plaintiff,

21

        v.

22

THE MOUNTAIN WEST CONFERENCE,

23

                    Defendant.

24

25

26

27

28

Case No. 5:24-CV-06685-SVK

**DEFENDANT THE MOUNTAIN WEST CONFERENCE'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT**

Date:          March 25, 2025
Time:          10:00 AM
Courtroom:  Courtroom 6, 4th Floor
Judge:        Magistrate Judge Susan van Keulen

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................1

INTRODUCTION ...................................................................................................................1

ARGUMENT ...........................................................................................................................2

    A.    Conclusory Allegations and Fact Characterization Are Not Presumed True. ..............2

    B.    The Complaint Fails to State *Per Se* Antitrust Claims (Counts I and II)......................3

        1.    The Scheduling Agreement Is Not A *Per Se* Illegal Agreement. ....................4

            a)    Plaintiff's Reliance on "No Poach" Cases Misses the Mark. ...............5

            b)    Sections 7.01 and 7.02 Are Ancillary to a Procompetitive Agreement. ......................................................................................8

                i.    The Termination Fees Are Subordinate and Collateral. ...........9

                ii.    The Provisions Were Reasonably Necessary When Adopted.......................................................................10

        2.    The Pac-12 Lacks Antitrust Standing. ...........................................................11

    C.    The Pac-12 Fails to State a Plausible UCL Claim (Count III)...................................13

    D.    The Termination Fees Are Enforceable Under Contract Law (Count IV). .................15

CONCLUSION.......................................................................................................................15

1

2

# **TABLE OF AUTHORITIES**

3

**Page(s)**

4

**Federal Cases**

5

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
6
    683 F.3d 328 (7th Cir. 2012) .......................................................................................4, 8

7

*In re Animation Workers Antitrust Litig.,*
    123 F. Supp. 3d 1175 (N.D. Cal. 2015) ...................................................................7

8

*Arcell v. Google LLC,*
9
    No. 22-cv-02499-RFL, 2024 WL 3738422 (N.D. Cal. Aug. 9, 2024) ......................2

10

*Ashcroft v. Iqbal,*
11
    556 U.S. 662 (2009)...................................................................................................2

12

*Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting,*
    No. 22-cv-02363-MEH, 2023 WL 7277313 (D. Colo. Sept. 29, 2023), *aff'd*, No.
13
    23-1344, 2025 WL 249387 (10th Cir. Jan. 21, 2025)..............................................3

14

*Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting,*
    No. 23-1344, 2025 WL 249387 (10th Cir. Jan. 21, 2025)......................................12

15

*Atl. Richfield Co. v. USA Petroleum Co.,*
16
    495 U.S. 328 (1990).................................................................................................13

17

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
18
    613 F. Supp. 3d 1308 (S.D. Cal. 2020)..................................................................6, 7

19

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
    9 F.4th 1102 (9th Cir. 2021) ............................................................................6, 9, 10
20

21

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
    No. 17cv205-MMA (MDD), 2017 WL 6059145 (S.D. Cal. Dec. 6, 2017)...............7

22

*Bell Atl. Corp. v. Twombly,*
23
    550 U.S. 544 (2007).................................................................................................8

24

*Blackburn v. Sweeney,*
    53 F.3d 825 (7th Cir. 1995) .....................................................................................9
25

26

*Blanton v. Domino's Pizza Franchising LLC,*
    No. 18-13207, 2019 WL 2247731 (E.D. Mich. May 24, 2019) ...............................7

27

*Brantley v. NBC Universal, Inc.,*
28
    675 F.3d 1192 (9th Cir. 2012) ...............................................................................12

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
    441 U.S. 1 (1979) ........................................................................................................5, 6

*Brodsky v. Apple Inc.*,
    445 F. Supp. 3d 110 (N.D. Cal. 2020) ...................................................................3

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
    479 U.S. 104 (1986) ................................................................................................12

*In re Cellphone Termination Fee Cases*,
    193 Cal. App. 4th 298, 328–29 (2011) .................................................................15

*City of Oakland v. Oakland Raiders*,
    20 F.4th 441 (9th Cir. 2021) ...............................................................11, 12, 13

*City of Oakland v. Oakland Raiders*,
    445 F. Supp. 3d 587 (N.D. Cal. 2020) ............................................................4, 13

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010) ...................................................................................3

*Deslandes v. McDonald's USA, LLC*,
    81 F.4th 699 (7th Cir. 2023) ....................................................................................6

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
    610 F.3d 820 (3d Cir. 2010)......................................................................................4

*Diva Limousine, Ltd. v. Uber Techs. Inc.*,
    392 F. Supp. 3d 1074 (N.D. Cal. 2019) ...............................................................14

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ..................................................................................14

*Farhat v. Wells Fargo Bank, N.A.*,
    No. 18-cv-02273-HSG, 2018 WL 5733657 (N.D. Cal. Oct. 30, 2018)...................3

*Flaa v. Hollywood Foreign Press Ass'n*,
    55 F.4th 680 (9th Cir. 2022) .....................................................................................8

*Foreign Trade Corp. v. Otter Prods., LLC*,
    No. 14-cv-03133-RPM, 2017 WL 11686317 (D. Colo. Feb. 15, 2017)................10

*Fraser v. Major League Soccer, L.L.C.*,
    7 F. Supp. 2d 73 (D. Mass. 1998) .............................................................................4

*GDHI Mktg. LLC v. Antsel Mktg. LLC*,
    416 F. Supp. 3d 1189 (D. Colo. 2019) ...................................................................12

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT
Case No. 5:24-CV-06685-SVK

*In re Geisinger Health & Evangelical Cmty. Hosp. Healthcare Workers Antitrust Litig.*,
 No. 4:21-CV-00196, 2021 WL 5330783 (M.D. Pa. Nov. 16, 2021) .........................7

*Giordano v. Saks Inc.*,
 654 F. Supp. 3d 174 (E.D.N.Y. 2023) ........................................................ *passim*

*GSI Tech. v. United Memories, Inc.*,
 No. 5:13-cv-01081-PSG, 2014 WL 1572358 (N.D. Cal. Apr. 18, 2014) ..........................12, 13

*Hadley v. Kellogg Sales Co.*,
 243 F. Supp. 3d 1074 (N.D. Cal. 2017) ..............................................................14

*Hairston v. Pac. 10 Conf.*,
 101 F.3d 1315 (9th Cir. 1996) ............................................................................4

*Hanger v. Berkley Grp., Inc.*,
 No. 5:13-cv-113, 2015 WL 3439255 (W.D. Va. May 28, 2015)................................2, 7, 8, 10

*In re High-Tech Emp. Antitrust Litig.*,
 856 F. Supp. 2d 1103 (N.D. Cal. 2012) ..............................................................7

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
 32 F.4th 242 (3d Cir. 2022) .........................................................................12, 13

*Hubbard v. Google LLC*,
 No. 19-CV-07016-SVK, 2024 WL 3302066 (N.D. Cal. July 1, 2024) (Van Keulen, Mag.) .................................................................................................9

*Hundal v. Eagle Vista Equities LLC*,
 No. 16-cv-01287, 2016 WL 4585772 (N.D. Cal. Sept. 2, 2016)................................3

*Johnson v. Fed. Home Loan Mortg. Corp.*,
 793 F.3d 1005 (9th Cir. 2015) ...........................................................................2

*Kelsey K. v. NFL Enters. LLC*,
 No. C 17-00496 WHA, 2017 WL 3115169 (N.D. Cal. July 21, 2017), *aff'd*, 757 F. App'x 524 (9th Cir. 2018) .......................................................................2, 8, 9

*Kingray, Inc. v. NBA, Inc.*,
 188 F. Supp. 2d 1177 (S.D. Cal. 2002).................................................................8

*Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*,
 No. 12-CV-3012-WJM-NYW, 2016 WL 8416760 (D. Colo. July 13, 2016) ........................12

*Lambrix v. Tesla, Inc.*,
 No. 23-cv-01145-TLT, 2023 WL 8265916 (N.D. Cal. Nov. 17, 2023) ...............................14

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
 884 F.2d 504 (9th Cir. 1989) ...........................................................................11

iv

*Little v. Pac. Seafood Procurement, LLC*,
  No. 23-CV-01098-AGT, 2024 WL 2305603 (N.D. Cal. May 21, 2024) ..............................14

*Mahlum v. Adobe Sys. Inc.*,
  No. 14-CV-124663, 2015 WL 124663 (N.D. Cal. Jan. 8, 2015)............................................15

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.* (*NASL*),
  883 F.3d 32 (2d Cir. 2018)................................................................................................4, 5

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
  933 F.3d 1136 (9th Cir. 2019) ...............................................................................................4

*Nat'l Hockey League Players Ass'n (NHLPA) v. Plymouth Whalers Hockey Club*,
  419 F.3d 462 (6th Cir. 2005) ...........................................................................................4, 13

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984)....................................................................................................4, 5, 6

*Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*,
  165 F. Supp. 3d 937 (S.D. Cal. 2016)...................................................................................14

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.*,
  630 F. Supp. 3d 968 (N.D. Ill. 2022) ..................................................................................7, 9

*Pampena v. Musk*,
  705 F. Supp. 3d 1018 (N.D. Cal. 2023) ..................................................................................3

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
  776 F.2d 185 (7th Cir. 1985) .......................................................................................6, 9, 10

*Pool Water Prods. v. Olin Corp.*,
  258 F.3d 1024 (9th Cir. 2001) .............................................................................................11

*Punian v. Gillette Co.*,
  No. 14-cv-05028-LHK, 2016 WL 1029607 (N.D. Cal. Mar. 15, 2016)..................................14

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
  614 F.3d 57 (3d Cir. 2010)............................................................................................12, 13

*Ramachandran v. City of Los Altos*,
  No. 23-cv-02928-SVK, 2024 WL 1745037 (N.D. Cal. Apr. 22, 2024) (Van
  Keulen, Mag.) .....................................................................................................................3

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Illinois, Inc.*,
  412 F. Supp. 3d 941 (N.D. Ill. 2019) .....................................................................................4

*Reilly v. Apple Inc.*,
  578 F. Supp. 3d 1098 (N.D. Cal. 2022) ..................................................................................2

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT
Case No. 5:24-CV-06685-SVK

*Robinson v. Jackson Hewitt, Inc.*,
    No. 19-9066 (SDW) (LDW), 2019 WL 5617512 (D.N.J. Oct. 31, 2019) ...............................7

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ................................................................................6

*Rutman Wine Co. v. E. & J. Gallo Winery*,
    829 F.2d 729 (9th Cir. 1987) ...............................................................................12

*Schneider v. Verizon Internet Sers., Inc.*,
    400 F. App'x 136 (9th Cir. 2010) ........................................................................15

*Sharp v. United Airlines, Inc.*,
    967 F.2d 404 (10th Cir. 1992) .............................................................................13

*Snow v. Align Tech., Inc.*,
    586 F. Supp. 3d 972 (N.D. Cal. 2022) .................................................................10

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ...............................................................................12

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ...............................................................................2

*Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*,
    No. CV14-05604-BRO (SSX), 2017 WL 5973279 (C.D. Cal. Mar. 7, 2017), *aff'd*,
    780 F. App'x 467 (9th Cir. 2019) ..........................................................................8

*Synopsys, Inc. v. ATopTech, Inc.*,
    No. C 13-2965, 2015 WL 4719048 (N.D. Cal. Aug. 7, 2015)…………………………11

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ....................................................................4, 6, 11

*THI-Hawaii, Inc. v. First Commerce Fin. Corp.*,
    627 F.2d 991 (9th Cir. 1980) ..................................................................................8

*U.S. v. Addyston Pipe & Steel Co.*,
    85 F. 271 (6th Cir. 1898) ......................................................................................11

*U.S. v. eBay*,
    968 F. Supp. 2d 1030 (N.D. Cal. 2013) ...............................................................11

*U.S. v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972) ...............................................................................................6

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ..................................................................................3

*Universal Grading Serv. v. eBay, Inc.*,
    No. C-09-2755 RMW, 2011 WL 846060 (N.D. Cal. Mar. 8, 2011) .......................7

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT
Case No. 5:24-CV-06685-SVK

*Verisign, Inc. v. Internet Corp.*,
  No. CV 04-1292(CTX), 2004 WL 1945561 (C.D. Cal. May 18, 2004)................................11

*In re Webkinz Antitrust Litig.*,
  695 F. Supp. 2d 987 (N.D. Cal. 2010) ..............................................................................11, 13

**State Cases**

*Blank v. Borden*,
  11 Cal.3d 963 (1974) ........................................................................................................15

*G.H.I.I. v. MTS, Inc.*,
  147 Cal. App. 3d 256 (1983) ............................................................................................11

*JJD-HOV Elk Grove, LLC v. Jo-Ann Stores, LLC*,
  560 P.3d 297 (Cal. 2024) ..................................................................................................15

*People's Choice Wireless, Inc. v. Verizon Wireless*,
  131 Cal. App. 4th 656 (2005) ..........................................................................................14

**State Statutes**

Cal. Civ. Code § 1638........................................................................................................15

Cal. Civ. Code § 1639........................................................................................................15

Cal. Civ. Code § 1671(b)................................................................................................2, 15

**Federal Statutes**

Sherman Act........................................................................................................................7

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT
Case No. 5:24-CV-06685-SVK

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## **INTRODUCTION**

The Pac-12 Conference's (the "Pac-12") opposition brief ("Opposition") confirms that The Mountain West Conference's (the "MWC") Motion to Dismiss should be granted.  The Pac-12 stakes its Opposition on the proposition that its antitrust claims should be judged under a *per se* standard because Section 7.01 of the Scheduling Agreement purportedly has a "pernicious effect on competition and lack of any redeeming virtue."  But this fact-bare, conclusory broadside—like many others that infect the Opposition—ignores the Complaint's multiple admissions that this is—at best—a rule of reason case: after "exploring scheduling options" the Pac-12 and its remaining members, Oregon State University ("OSU") and Washington State University ("WSU"), struck a bargain with the MWC to secure more football games for the Pac-12's last two schools and that agreement undeniably increased the quality and output of football for the Pac-12, the MWC, and their fans.  Plaintiff cites no case that applies the *per se* standard to such an output-enhancing agreement; to the contrary, courts consistently apply the rule of reason to sports league agreements and activity.  Plaintiff attempts to end-run this authority by contending that Section 7.01 must be viewed as a standalone agreement barring Pac-12 from recruiting MWC teams.  Leaving aside that the Complaint pleads the Pac-12 already successfully recruited several MWC teams, enjoyed the benefit of the bargain and unconditionally guaranteed payment at signing, governing law establishes that provisions that are reasonably necessary to secure an agreement's output-enhancing effects are subject to rule of reason review.

The Pac-12 also claims the Motion improperly disputes the Complaint's factual allegations, but the Opposition points not to fact allegations but to a series of naked legal conclusions (*e.g.*, "the Poaching Penalty is not an ancillary restraint"), which the Court need not accept as true.  Elsewhere, the Pac-12 complains the Motion disputes Complaint allegations regarding the content of the Scheduling Agreement.  But the Complaint incorporated the Scheduling Agreement as Exhibit 1, so the Court need not accept as true the Pac-12's characterization (or mischaracterization) of its terms.

The Pac-12 argues that even if its antitrust claims fail, its "unfairness" claim under the Unfair Competition Law ("UCL") can survive, resting that theory on two sentences in a single Complaint paragraph.  But California law is clear that it does not support such a claim where it overlaps entirely

1   with other failed claims.  Likewise, the Pac-12's argument that the Termination Fees constitute an

2   unenforceable contract penalty because the fees are "liquidated damages" cites no actual breach of the

3   Scheduling Agreement.  In any event, controlling California authority, Cal. Civ. Code § 1671(b),

4   presumptively enforces liquidated damages provisions.  In sum, the Opposition fails to salvage the

5   deficiencies in the Pac-12 Complaint, and the Motion should be granted.

6                                    **ARGUMENT**

7   **A.    Conclusory Allegations and Fact Characterization Are Not Presumed True.**

8           The Pac-12 contends the Motion improperly disputes "well-pleaded factual allegations" and

9   the Court should not "accept the MWC's 'characterization' of the facts that is at odds with [Complaint]

10  allegations."  (Opp., 1, 7, ECF No. 29.)  But the so-called "factual allegations" are instead a

11  hodgepodge of legal conclusions and characterizations of the Scheduling Agreement, and neither the

12  Court nor the MWC must accept them as true for purposes of the Motion.

13          For example, the Pac-12 asserts the MWC cannot argue the Termination Fees are ancillary to

14  the Scheduling Agreement because the Pac-12 has "alleged the exact opposite in the complaint."

15  (Opp. 6.)  But this is not an allegation of ***fact*** that must be accepted as true; it is a conclusion of law.

16  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the

17  allegations contained in a complaint is inapplicable to legal conclusions"); *see Johnson v. Fed. Home

18  Loan Mortg. Corp.*, 793 F.3d 1005, 1008 (9th Cir. 2015).[1] Despite the Pac-12's claim, courts can find

19  restraints ancillary on motions to dismiss.  *Hanger v. Berkley Grp., Inc.*, No. 5:13-cv-113, 2015 WL

20  3439255, at *5, *12 (W.D. Va. May 28, 2015); *Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 201, 204

21  (E.D.N.Y. 2023); *Kelsey K. v. NFL Enters. LLC*, No. C 17-00496 WHA, 2017 WL 3115169, at *4

22  (N.D. Cal. July 21, 2017), *aff'd*, 757 F. App'x 524 (9th Cir. 2018).  Similarly, the Pac-12's bare

23  assertions that the MWC's rationale for the Termination Fees is "pretextual" or "illusory," or that the

24  Termination Fees were "designed solely to stifle competition," are insufficient to survive a motion to

25  dismiss.  (Opp. at 4, 6); *see Arcell v. Google LLC*, No. 22-cv-02499-RFL, 2024 WL 3738422, at *4

26  (N.D. Cal. Aug. 9, 2024); *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1110 (N.D. Cal. 2022).

27

28  _____

[1] The Pac-12's cases are far afield from the fact-bare allegations here. *See e.g.*, *Starr v. Baca*, 652 F.3d 1202, 1209–12 (9th Cir. 2011) ("tedious[ly]" recounting the detailed allegations in the complaint).

1      The Pac-12 argues certain provisions of the Scheduling Agreement are unenforceable, but

2 interpreting it is ultimately "a question of law for the Court to decide[.]" *Farhat v. Wells Fargo Bank,*

3 *N.A.*, No. 18-cv-02273-HSG, 2018 WL 5733657, at *2 (N.D. Cal. Oct. 30, 2018); *see also*

4 *Ramachandran v. City of Los Altos*, No. 23-cv-02928-SVK, 2024 WL 1745037, at *9 (N.D. Cal. Apr.

5 22, 2024) (Van Keulen, Mag.).  Nor does selective characterization of contract terms bar the MWC

6 from seeking dismissal based on other terms.  A party cannot "select[] only portions of documents that

7 support their claims, while omitting portions of those very documents that weaken—or doom—their

8 claims." *Pampena v. Musk*, 705 F. Supp. 3d 1018, 1037–38 (N.D. Cal. 2023) (internal citations

9 omitted).  Because the Complaint attached the Scheduling Agreement, the Court and the MWC may

10 "treat [it] as part of the complaint, and thus may assume that its contents are true for purposes of a

11 motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

12 The Court is not "required to accept as true allegations that contradict exhibits attached to the

13 Complaint . . . or allegations that are merely conclusory, unwarranted deductions of fact, or

14 unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

15     **B.**    **The Complaint Fails to State *Per Se* Antitrust Claims (Counts I and II).**

16      The Pac-12 stakes its Opposition entirely on the argument that Sections 7.01 and 7.02 are *per*

17 *se* illegal.  The Opposition does not dispute that the Pac-12's antitrust claims fail if the rule of reason

18 applies.  Rather, the Pac-12 hides its rule of reason theory in a footnote, asserting "the Court need not

19 address" rule of reason because the Pac-12 is not obligated to plead it.  (Opp. 16 n.8.)  This alone is a

20 sufficient basis to dismiss the Pac-12's claims under the rule of reason.  *Brodsky v. Apple Inc.*, 445 F.

21 Supp. 3d 110, 129 (N.D. Cal. 2020) (failure to respond to argument to dismiss is an abandonment of

22 the claim, meriting dismissal with prejudice); *Hundal v. Eagle Vista Equities LLC*, No. 16-cv-01287,

23 2016 WL 4585772, at *8 (N.D. Cal. Sept. 2, 2016) (failure to respond to argument to dismiss is

24 "implicit concession" that the claim was defectively pleaded and should be dismissed).

25      The Pac-12's *per se* argument fares no better—"antitrust 'buzz words' do[] not supply the

26 factual circumstances necessary to support . . . conclusory allegations." *Ass'n of Surgical Assistants*

27 *v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, No. 22-cv-02363-MEH, 2023 WL 7277313, at *4

28 (D. Colo. Sept. 29, 2023), *aff'd*, No. 23-1344, 2025 WL 249387 (10th Cir. Jan. 21, 2025).  For the

reasons below, the Court should dismiss Counts I and II with prejudice and without leave to replead.

**1.     The Scheduling Agreement Is Not A *Per Se* Illegal Agreement.**

Notably, the Pac-12 ignores a long line of Ninth Circuit and Supreme Court cases holding that agreements involving league sports are subject to the rule of reason, not the *per se* standard.  The Pac-12's own authority confirms.  *E.g.*, *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019) (horizontal and vertical agreements "are analyzed under the rule of reason in cases involving league sports"); *see also id.* at 1150 n.5 (citing *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 103 (1984)).  Where an agreement (like the Scheduling Agreement) involves league sports, "the Supreme Court has concluded that the *per se* rule does not apply."  *Id.*

The Pac-12 has long enjoyed the rule of reason treatment but now seeks to deny MWC the same.  *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001) ("agree[ing]" with plaintiff's "conce[ssion] that [the alleged restraint] is subject to rule of reason analysis"); *Hairston v. Pac. 10 Conf.*, 101 F.3d 1315, 1318-19 (9th Cir. 1996).  Indeed, "courts consistently have analyzed challenged conduct under the rule of reason when dealing with an *industry* in which some horizontal restraints are necessary for the availability of a product such as sports leagues," and "[a] certain amount of collusion in college football is permitted because it is necessary for the product to exist."  *Nat'l Hockey League Players Ass'n (NHLPA) v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 469 (6th Cir. 2005) (emphasis added) (affirming dismissal); *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 342 (7th Cir. 2012) (same); *City of Oakland v. Oakland Raiders*, 445 F. Supp. 3d 587, 596-97 (N.D. Cal. 2020) (dismissing); *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 831-32 (3d Cir. 2010) (finding *per se* rule inapplicable); *Fraser v. Major League Soccer, L.L.C.*, 7 F. Supp. 2d 73, 78-79 (D. Mass. 1998) (*per se* treatment inapplicable where club paid fees to other club after player signing, even if contract expired and teams in different leagues).

Even ignoring this overwhelming body of authority, *per se* treatment is inappropriate because the Scheduling Agreement is procompetitive, a fact the Pac-12 does not and cannot dispute.  *See NHLPA*, 419 F.3d at 469; *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Illinois, Inc.*, 412 F. Supp. 3d 941, 954 (N.D. Ill. 2019); (Opp. 3, 8.)  In a similar context, the Second Circuit rejected *per se* treatment for these very reasons.  *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*

1    (*NASL*), 883 F.3d 32, 43-44 (2d Cir. 2018).   In an industry where realignment "has become

2    increasingly common," (Compl. ¶¶ 2, 22), Sections 7.01 and 7.02 serve to protect the MWC's network

3    effects, avoid free-riding of brand development and investments, and force the Pac-12 to internalize

4    negative externalities associated with its choices.   Those provisions do not protect the MWC as an

5    entity—because they incentivize a no-cost merger dissolving it—but instead protect the efficiencies

6    of its members staying together, which are lost when its *members* are "fractur[ed]" or "br[oken] . . .

7    apart." (Ex. 1, Preamble; Opp. 3); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,* 441 U.S. 1, 21–

8    22 (1979) (applying rule of reason where a blanket license offered a "substantial lowering of costs,"

9    compared to single-artist licenses and there, as here, "the whole is truly greater than the sum of its

10   parts"). In an industry "historically prone to [conferences] collaps[ing]," maintaining a consistent bloc

11   of teams encourages rivalries and deeper fan investment in them, more lucrative media deals, and

12   schools and student-athletes to invest in their programs; such "stability justifications do not rationalize

13   anticompetitive effects—they evince procompetitive ones."  *See NASL,* 883 F.3d at 44; *NCAA*, 468

14   U.S. at 117; (Compl. ¶¶ 2, 22–24); (Opp. 3:3.)  Because Sections 7.01 and 7.02 "increase[] output

15   through sustained fan interest and provide[] stability because larger leagues are less likely to collapse,"

16   they are decidedly procompetitive.  *NASL*, 883 F.3d at 43. The rule of reason therefore applies.  *Id.* at

17   42 (provisions "designed to avoid . . . implosion of leagues" merit "the full rule-of-reason analysis").

Any assertion that the Scheduling Agreement has a "pernicious effect on competition and

18-19   lack[s] of any redeeming value" is thus betrayed by its very terms.   The Scheduling Agreement

20   indisputably increased the output of Pac-12 games, offered the opportunity to arrange additional games

21   across multiple sports, and increased matchup diversity for teams, fans, and broadcasters.[2]

22                  a)        **Plaintiff's Reliance on "No Poach" Cases Misses the Mark.**

23   The Pac-12 ignores controlling authority in favor of cases finding "no poach" agreements

24   among competitors subject to the *per se* rule.  But "no poach" labor agreements are notably different:

25   the entire agreement between competitors exists to suppress wages. Here, the Scheduling Agreement

---

[2] The Scheduling Agreement also provided OSU and WSU with a pathway to play postseason games, eligibility for which requires a set number of wins and winning percentage during regular season play. *See* NCAA Bylaws, Art. 18, 18.7.2.1.3, 18.7.2; NCAA Postseason Handbook, 2 ("Eligible Teams").

1    has a procompetitive "fundamental purpose." (Opp. 13); *see Giordano*, 654 F. Supp. 3d at 201

2    (explaining that "no-poach" cases are inapplicable where agreement is collaborative venture).  Here,

3    the Pac-12 could "poach" any school it desired.  The restraint is self-imposed, not secretly set by a

4    third party, and any restraint is ancillary to the agreement's indisputably procompetitive purpose.

5         Knowing the Scheduling Agreement contained, at most, an ancillary restraint, the Pac-12

6    contends Sections 7.01 and 7.02 are "no different" from the alleged restraint in *Aya*, without which

7    the defendant was "unwilling to deal," that "ensure[d] [the defendant] w[ould] not lose its personnel

8    during the collaboration," and the court found ancillary because it "promoted enterprise and

9    productivity at the time it was adopted."  (Opp. 10, 15); *Aya Healthcare Servs., Inc. v. AMN

10   Healthcare, Inc.*, 9 F.4th 1102, 1100–11 (9th Cir. 2021) (quoting *Polk Bros., Inc. v. Forest City

11   Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985)).  The inquiry should end there.  The Pac-12's other

12   cases are even more objectionable; *Aya* itself deemed citations to *High-Tech* and *eBay* "erroneous[],"

13   so if they are not even *internally* consistent, they cannot all be "no different from" this case.  *Aya

14   Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1330 n.8 (S.D. Cal. 2020);

15   (Opp. 10).  Unlike *Topco*, where expansion was permitted only with members' consent, 405 U.S. 596,

16   602 (1972), the Pac-12 neither sought nor required the MWC's consent to recruit its members; the

17   MWC consented to recruiting *them all* via merger.  (Ex. 1, § 8.01.)  The "[Pac-12] in short, had a real

18   choice."  *BMI*, 441 U.S. at 24.  And "to the extent that *Topco* . . . stand[s] for the proposition that all

19   horizontal restraints are illegal *per se*, [it] must be regarded as effectively overruled."  *Rothery Storage

20   & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 226 (D.C. Cir. 1986) (citing *NCAA*, 468 U.S. 85).

21        The Pac-12's reliance on *Turner, Deslandes*, *Animation, Geisinger, Davita, Blanton,

22   Outpatient, eBay*, *Robinson*, *Railway*, and *High-Tech* is equally misguided.  The cases featured explicit

23   "no-hire" agreements, none binding, and none featured the Scheduling Agreement's optionality.

24   *Deslandes* affirmed the plaintiff forfeited its opportunity to allege market power—like the Pac-12

25   here—finding "the Rule of Reason is out of this suit."  81 F.4th 699, 703 (7th Cir. 2023).  Though it

26   found a *per se* claim, the clause at issue had a "national scope . . . when the market for restaurant jobs

27   is local."  *Id.* at 704.  Here, the Complaint is explicit that the challenged term applies only to the Pac-

28   12, not to other conferences or areas.  (Compl. ¶¶ 36, 37); *see Tanaka*, 252 F.3d at 1063–64.

6

The Pac-12 relies on *Outpatient* and *High-Tech* to assert that "If you poach, pay us" is the same as "Thou shalt not poach" (Opp. 11 n.6), but *Outpatient* illustrates a key difference. The former is *ex post* and permissive, while the latter is a *preemptive,* blanket ban. *Outpatient* and *High-Tech* featured *preemptive* measures that forbid poaching until the poacher clears a barrier over which it had no control (*e.g.*, waiting for employee to tell manager they wish to leave). *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 976 (N.D. Ill. 2022); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1111 (N.D. Cal. 2012). The Scheduling Agreement places no preemptive barrier and the Pac-12 controls the trigger or severity of any restraint. *See Hanger*, 2015 WL 3439255 at *7.

The Pac-12's other authorities cement the distinction. *Animation* and *Geisinger* involved no procompetitive arrangements. *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1211–14 (N.D. Cal. 2015); *In re Geisinger Health & Evangelical Cmty. Hosp. Healthcare Workers Antitrust Litig.*, No. 4:21-CV-00196, 2021 WL 5330783, at *2-3 (M.D. Pa. Nov. 16, 2021). The *Railway* and *eBay* pleadings revealed no procompetitive relationship. *Giordano*, 654 F. Supp. 3d at 201 ("no-poach" cases are inapplicable where agreement is collaborative). *eBay*, *Robinson*, *High-Tech*, and *Blanton* "deferred ruling on whether the *per se* rule applies," making any citation "for the proposition that 'a naked agreement among employers not to solicit one another's employees is a *per se* violation of Section 1'"—the argument the Pac-12 makes—"erroneous[]." *See id.* at 211 n.23; *Aya*, 613 F. Supp. 3d at 1330 n.8 (distinguishing *eBay* and *High-Tech*); *Robinson v. Jackson Hewitt, Inc.*, No. 19-9066 (SDW) (LDW), 2019 WL 5617512, at *7 (D.N.J. Oct. 31, 2019); *Blanton v. Domino's Pizza Franchising LLC*, No. 18-13207, 2019 WL 2247731, at *4 (E.D. Mich. May 24, 2019); (Opp. 10, 11 n.6, 12). No case the Pac-12 cites requires application of a *per se* rule.[3]

Additionally, the Pac-12's market allocation theory is nonsensical, alleging the Pac-12 is strong enough to conspire with the MWC to allocate a nationwide market, but is too weak to be responsible for its own choices. *See Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755 RMW, 2011 WL 846060, at *6 (N.D. Cal. Mar. 8, 2011) (dismissing where antitrust theory made no sense);

---

[3] If the Court heeds the Pac-12's claim that its interpretation of *Aya* guides the inquiry, then these non-solicitation cases cannot. Notably, the Ninth Circuit's decision in *Aya* came after the district court previously dismissed Sherman Act claims once before. *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17cv205-MMA (MDD), 2017 WL 6059145, at *7 (S.D. Cal. Dec. 6, 2017).

1    (Opp. 17).  The Pac-12's theory assumes the MWC "forced" Sections 7.01 and 7.02 on the Pac-12

2    (Opp. 4:1, 15; Compl. ¶¶ 1, 51, 82; Compl. Ex. 3), but "unilateral conduct is not illegal" under Section

3    1.  *Kingray, Inc. v. NBA, Inc*., 188 F. Supp. 2d 1177, 1187 (S.D. Cal. 2002).  The Complaint is clear:

4    the Scheduling Agreement "would not have been formed but for [the Pac-12's] participation." *See*

5    *THI-Hawaii, Inc. v. First Commerce Fin. Corp.*, 627 F.2d 991, 995 (9th Cir. 1980).

6          The Pac-12 claims it alleged "textbook market allocation," but refuses to define a market or

7    accept its role in allegedly dividing a market where it was supposedly "effectively required . . . not to

8    compete."  (Opp. 10; Compl. ¶ 81); *but see Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 692

9    (9th Cir. 2022) (when "members are unable to compete in the same market, they are unable to agree

10   to divide the market.").  While the Complaint focused on MWC schools, the Pac-12 now asserts the

11   Scheduling Agreement allocates a market for "additional schools, [which merely] includ[es] . . . other

12   MWC schools."  (Opp. 20.)  One cannot defend against allocation claims where a plaintiff will not

13   define the market supposedly divided, and the Pac-12's "attempt[] to hedge their bets by keeping their

14   market allegations vague" cannot survive a motion to dismiss.  *Agnew*, 683 F.3d at 337, 345–46.

15         **b)**     **Sections 7.01 and 7.02 Are Ancillary to a Procompetitive Agreement.**

16         Rather than addressing the Scheduling Agreement's plain language, the Pac-12 repackages its

17   core "allegation" that the "Poaching Penalty is not an ancillary restraint that is reasonably necessary

18   to achieve the pro-competitive purpose of the scheduling."  (Compl. ¶ 86.)  But that is a legal

19   conclusion.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007).  And courts can determine

20   "[w]hether the Poaching Penalty" is a naked or ancillary restraint on a motion to dismiss.  (Opp. 12);

21   *see, e.g.*, *Hanger*, 2015 WL 3439255 at *7; *Giordano*, 654 F. Supp. 3d at 201, 204 (finding alleged

22   restraint ancillary); *Kelsey*, 2017 WL 3115169, at *4, *7 (denying leave to amend after dismissal);

23   *Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*, No. CV14-05604-BRO (SSX), 2017 WL

24   5973279, at *6, *12 (C.D. Cal. Mar. 7, 2017), *aff'd*, 780 F. App'x 467 (9th Cir. 2019) (dismissing and

25   rejecting *per se* rule after considering procompetitive justifications).  Courts allow Section 1 cases to

26   proceed to discovery so plaintiffs may obtain facts they are unlikely to possess.  Here, the Pac-12

27   *already has* the facts.  The Pac-12 alone knows what schools it would or would not have approached

28   but for the fees, the type and location of schools it hopes to recruit, and which MWC school it could

1    not recruit because of the fees.  But the Pac-12 failed to plead *anything* on those topics.  Courts demand

2    "more than a sheer possibility that a defendant has acted unlawfully."  *Hubbard v. Google LLC*, No.

3    19-CV-07016-SVK, 2024 WL 3302066, at *3 (N.D. Cal. July 1, 2024) (Van Keulen, Mag.).

### i.    The Termination Fees Are Subordinate and Collateral.

5    The Pac-12 argues that "[t]he Poaching Penalty is not subordinate and collateral to the 2024-

6    25 Scheduling Agreement because it has no purpose but to 'reduce competition by the Pac-12 for

7    member schools.'"  (Opp. 13 (citing Compl. ¶ 7).)  Setting aside that conclusory allegations do not

8    support a claim, there is no "2024-2025 Scheduling Agreement."  *Id.*  The Scheduling Agreement

9    remains in effect.  The very case the Pac-12 cites on duration found no antitrust injury, and the restraint

10   appeared *after* the joint venture concluded.  *Blackburn v. Sweeney*, 53 F.3d 825, 829-30 (7th Cir.

11   1995); *compare id. with Aya*, 9 F.4th at 1111 (finding perpetual, unilateral no-hire restraint ancillary

12   because "whether there is nothing left but the restraint after the joint venture ends is the wrong focus")

13   (quotation omitted).  A "policy that permits poaching on an annual basis but bars it [in certain periods]

14   is not a 'naked' no-poaching agreement."  *Kelsey*, 2017 WL 3115169, at *4.  Here, the fees are "*in*

15   *lieu of*" a merger. (Ex. 1, § 7.01.) (emphasis added).  If the obligation to pay such fees did not extend

16   beyond the parties' agreement to negotiate a merger, the Pac-12 would have a perverse incentive not

17   to negotiate, so that it could cherry-pick MWC teams immediately after the window closed.

18   The Pac-12 argues the "fundamental purpose" of the Scheduling Agreement is to "schedule

19   football games" between the Pac-12 and the MWC.  (Opp. 13; Ex. 1, § 2.01.)  A restraint is naked

20   only when "the restriction on competition is unaccompanied by new production or products," like the

21   non-solicitation cases the Pac-12 cites.  *Outpatient*, 630 F. Supp. 3d at 987 (citation omitted).  In

22   contrast, a "restraint is ancillary when it *may* contribute to the success of a cooperative venture that

23   promises greater productivity and output," and if it arguably did, courts *must* apply the rule of reason.

24   *Id.* at 987 (quoting *Polk Bros.*, 776 F.2d at 189) (emphasis added).  Here, the Pac-12 concedes the

25   Scheduling Agreement filled gaps in its schedule.  (Compl. ¶¶ 2, 40.)  "[A]bsent the . . . agreement,

26   there would be a continual risk that the [Pac-12] would use their ['unique access to MWC [m]ember

27   [i]nstitutions'] to recruit" members.  *Giordano*, 654 F. Supp. 3d at 201; (Ex. 1, § 7.01).  Though the

28   Pac-12 alleges that such risk existed "for many years" (Compl. ¶ 36), and that "unique access to MWC

9

1    members" did not materialize after signing (Compl. ¶ 67), the alleged restraint is judged "*at the time*

2    *it was adopted.*"  *See Aya*, 9 F.4th at 1111 (emphasis added); *Polk Bros.*, 776 F.2d at 189.  As such,

3    this Court can safely apply the rule of reason at the pleading stage.  *E.g., Giordano,* 654 F. Supp. 3d

4    at 201; *Hanger*, 2015 WL 3439255 at *7; *Foreign Trade Corp. v. Otter Prods., LLC*, No. 14-cv-03133-

5    RPM, 2017 WL 11686317, at *4 (D. Colo. Feb. 15, 2017).

6                **ii.    The Provisions Were Reasonably Necessary When Adopted.**

7            The Pac-12's argument that the Termination Fees are not reasonably necessary to schedule

8    football games for one season misstates the standard, which evaluates ancillary restraints based on

9    whether the restraint "promoted enterprise and productivity at the time it was adopted."  *Aya*, 9 F.4th

10   at 1111.  The Scheduling Agreement incentivized a procompetitive merger and was reasonably

11   necessary: "MWC and its members would not enter into this Agreement, and mutual cooperation and

12   exchanges of confidential information would not be feasible . . . without safeguards, including certain

13   fees which protect against misuse of information, protect the MWC from fracturing, and preserve the

14   integrity of [both] the MWC and Pac-12."  (Ex. 1, Preamble.)  Just as the *Aya* and *Giordano* courts

15   found horizontal restraints ancillary, the terms here are ancillary because the MWC "would likely be

16   less willing or unwilling to deal with" the Pac-12 absent protection for its investments and "established

17   network" from "proactive[] raiding."  *See Aya*, 9 F.4th at 1110-11; *Giordano*, 654 F. Supp. 3d at 201.

18   Sections 7.01 and 7.02 were thus "essential to promote the competitive opportunities being made

19   available to the student-athletes of OSU, WSU, and the MWC."  (Ex. 1, Preamble.)

20           Though the Pac-12 claims an agreement is not ancillary "if the MWC was only subjectively

21   willing to enter into the Scheduling Agreement," with those terms, "the question is whether the

22   plaintiffs have plausibly alleged that *the parties* would have entered into the cooperative agreement

23   absent this restriction."  *Snow v. Align Tech., Inc*., 586 F. Supp. 3d 972, 979 (N.D. Cal. 2022)

24   (emphasis added).  Nowhere does the Pac-12 allege that the MWC would have entered into the

25   Agreement without the safeguards the Pac-12 agreed were "essential to promote the competitive

26   opportunities being made available."  (Ex. 1, Preamble.)  "[A]ntitrust laws do not preclude [one] from

27   unilaterally determining . . . terms on which it will transact business," and after agreeing to give the

28   Pac-12 unique access, "[t]his was not reducing competition, but was only securing the [MWC] against

1    an increase of competition of [its] own creating." *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 267

2    (1983); *U.S. v. Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir. 1898) (citation omitted). Whether

3    "other conferences regularly schedule 'nonconference' games without being forced into similar

4    poaching restrictions" thus carries no weight, and the Complaint includes no such allegations. (Opp.

5    14.) "[T]he fact that the [Pac-12] labeled the agreement a naked one does not make it so." *U.S. v.

6    eBay*, 968 F. Supp. 2d 1030, 1039 (N.D. Cal. 2013). The Complaint is clear: the Scheduling

7    Agreement filled "significant gap[s]" (Compl. ¶ 31) and would not have existed absent the fees. It is

8    ancillary to a procompetitive venture and subject to the rule of reason.

9                       **2.    The Pac-12 Lacks Antitrust Standing.**

10              Regardless of standard, a plaintiff must plead it suffered a direct, nonspeculative antitrust

11   injury to establish antitrust standing. *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455-56 (9th

12   Cir. 2021). There is thus no antitrust standing without harm to competition. *In re Webkinz Antitrust

13   Litig.*, 695 F. Supp. 2d 987, 997 (N.D. Cal. 2010). Although the Pac-12 "insist[s] that [its] allegation

14   of market exclusion" suffices, it falls short because it pleads only "harm to [its] business interests,"

15   not "injury to competition in the market as a whole." *Les Shockley Racing, Inc. v. Nat'l Hot Rod

16   Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989). The Complaint admits conferences "regularly and fairly

17   engage" in "open," "fierce," and "robust" competition for members. (Compl. ¶¶ 2, 22, 34, 61.) The

18   Pac-12 is simply unhappy with *where* those schools moved, but "a decrease in one competitor's market

19   share . . . affects competitors, not competition" and cannot confer antitrust standing. *Pool Water

20   Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001). Its lament that "[n]othing" "prevents or

21   otherwise penalizes other conferences from soliciting MWC member schools; only the Pac-12 is

22   penalized," fares no better, and the Pac-12 alleges no contractual barrier to approaching non-MWC

23   schools. (Compl. ¶ 83); *see Tanaka*, 252 F.3d at 1064; *Surf*, 2017 WL 5973279, at *11; *Synopsys,

24   Inc. v. ATopTech, Inc.*, No. C 13-2965, 2015 WL 4719048, at *6 (N.D. Cal. Aug. 7, 2015). Indeed,

25   its theory "depends on and arises out of the fact that it has vigorous competitors who will be able to

26   compete more vigorously." *Verisign, Inc. v. Internet Corp.*, No. CV 04-1292(CTX), 2004 WL

27   1945561, at *5-6 (C.D. Cal. May 18, 2004). Accordingly, it did not suffer a harm the antitrust laws

28   were intended to prevent. *Pool Water Prods*, 258 F.3d at 1036.

---

11

1      In this light, the Pac-12 "fail[ing]" does not establish antitrust standing. (Opp. 17); *Rutman*

2  *Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987) ("[T]here is a sense in which

3  eliminating even a single competitor reduces competition.  But it is not the sense that is relevant" to

4  antitrust.) (citation omitted); *GSI Tech. v. United Memories, Inc*., No. 5:13-cv-01081-PSG, 2014 WL

5  1572358, at *3-4 (N.D. Cal. Apr. 18, 2014) (dismissing market allocation claim); *Somers v. Apple,*

6  *Inc*., 729 F.3d 953, 966 (9th Cir. 2013) (loss of consumer choice is not an antitrust injury). Moreover,

7  "the injury to the [Pac-12] and the injury to competition must be one and the same," so "despite

8  references of potential harm to others," the Pac-12 ultimately "seeks remedy for its injury alone, and

9  that injury is its [supposed] exclusion" from the MWC. *GDHI Mktg. LLC v. Antsel Mktg. LLC*, 416 F.

10  Supp. 3d 1189, 1203 (D. Colo. 2019); *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 251

11  (3d Cir. 2022); *City of Oakland*, 20 F.4th at 459; *see GSI*, 2014 WL 1572358, at *3-4. But the

12  Complaint shows the Pac-12 "has had the clear opportunity to compete and did compete, sometimes

13  successfully." (Compl. ¶¶ 56-58); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp*., 614 F.3d 57, 84

14  (3d Cir. 2010) (finding no antitrust injury); *GSI*, 2014 WL 1572358, at *3 n.46 (citation omitted).

15  Thus, any injury it suffered does not flow from any anticompetitive aspect of Section 7.01 or 7.02 but

16  from its own actions. The alleged "injury" is self-imposed; it could have added teams for free.  *See*

17  *Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*, No. 12-CV-3012-WJM-NYW, 2016 WL

18  8416760, at *6 (D. Colo. July 13, 2016) ("self-inflicted" harm not antitrust injury).

19      The antitrust laws do not protect against the Pac-12's diminution of resources to compete for

20  schools, either, especially when in *other* conferences. (Compl. ¶ 61; Opp. 20:16-17); *see Surf*, 2017

21  WL 5973279, at *11; *Cargill, Inc. v. Monfort of Colorado, Inc*., 479 U.S. 104, 114 (1986) (no antitrust

22  injury where plaintiff alleged "an impairment of plaintiff's ability to compete"); *Ass'n of Surgical*

23  *Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, No. 23-1344, 2025 WL 249387, at *8

24  (10th Cir. Jan. 21, 2025). Accordingly, the Pac-12's alleged injury—$55 million in fees it contends

25  hampered its pursuit of schools in and outside the MWC—does not confer antitrust standing. First, the

26  mere fact that the Scheduling Agreement "circumscribe[es] the [Pac-12's] ability to offer [certain]

27  packages . . . is not sufficient," *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012),

28  and "[a]n objectionable term in a commercial agreement, without more, is not an antitrust violation."

1    *Host*, 32 F.4th 242, 250.  Second, the cause of the alleged inability to compete is the *amount* of fees,

2    not the alleged market allocation or term.  *See Atl. Richfield Co. v. USA Petroleum Co*., 495 U.S. 328,

3    340 (1990); *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 408-09 (10th Cir. 1992).  But a high price or

4    objectionable term is not an antitrust issue *per se*.  *Host*, 32 F.4th at 250. The alleged harm—lacking

5    resources to compete for non-MWC members—thus does not flow from that which makes the restraint

6    allegedly unlawful: the supposed walling off the MWC.[4]  *Atl. Richfield Co.*, 495 U.S. at 340; *Webkinz*,

7    695 F. Supp. 2d at 997.  Any inability to bid—especially the incapacity to compete for *non-MWC*

8    teams due to the cost of *successfully competing for MWC teams*—is merely a "consequen[ce]" or

9    "secondary" effect of any restraint, which does not confer antitrust standing.  *See NHLPA*, 419 F.3d

10   at 474.  Moreover, even if Plaintiff's lack of resources "completely shut [it] out of the market," and

11   "[Plaintiff] could plead facts demonstrating harm to competition," the Pac-12 still lacks antitrust

12   standing because a school's intervening decision to join a competitor "precludes a finding that [the

13   Pac-12's] injury flows from" the MWC's conduct, illegal or not.  *GSI*, 2014 WL 1572358, at *4.

14   The only harm that could flow from the alleged restraint is an inability to compete for MWC

15   schools.  But such alleged harms are speculative no matter which schools (MWC or not) are pursued.

16   The Complaint fails to allege which schools the Pac-12 is prevented from successfully recruiting but

17   for the fees and makes no allegations as to what contractual restraint prevents it from recruiting

18   elsewhere.  Because the Complaint fails to allege what price the Pac-12 should have paid, what teams

19   it cannot approach, or what teams it already rejected because of the fees, its alleged injuries are too

20   speculative to confer standing.  *See City of Oakland*, 20 F.4th at 460–61; *Host*, 32 F.4th at 251-52.

21   The fees are a consequence of market participation—a price—not a barrier to it, and thus cannot

22   establish standing for future alleged harms.  *See Race Tires*, 614 F.3d at 83-84; *City of Oakland*,

23   20 F.4th at 458 (antitrust injury cannot be "consequential").[5]

24   **C.    The Pac-12 Fails to State a Plausible UCL Claim (Count III).**

25   As a preliminary matter, the Pac-12 concedes that its "unlawful" UCL claim rises and falls

26

27   [4] The Pac-12 argues the MWC seeking to recover "exit fees" from departing members is "duplicative," (Opp. 24), but fails to explain how that renders the Termination Fees unenforceable.

28   [5] The Pac-12 is only a direct purchaser of the schools it has already "won," so the associated fees cannot show an injury to competition or ability to compete.  *See City of Oakland*, 20 F.4th at 460.

with Counts I and II. (Opp. 21; *see* Mot. to Dismiss §§ A, B.)  For its "unfair" UCL claim, the Pac-12 couches its argument on *two conclusory sentences* in the Complaint.  But the Pac-12's allegations— the "suppress[ion] [of] competition through the Poaching Penalty" (Compl. ¶ 102)—"overlap entirely with the business practices addressed in the [other] prongs of the UCL," and thus should be dismissed. *Lambrix v. Tesla, Inc.*, No. 23-cv-01145-TLT, 2023 WL 8265916, at *9 (N.D. Cal. Nov. 17, 2023) (dismissing "unfair" UCL claim where plaintiff failed to adequately allege unlawful prong); *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1105 (N.D. Cal. 2017) (same); *see also Punian v. Gillette Co.*, No. 14-cv-05028-LHK, 2016 WL 1029607, at *17 (N.D. Cal. Mar. 15, 2016) (same).  The same holds true post-*Epic Games*.  *See Little v. Pac. Seafood Procurement, LLC*, No. 23-CV-01098-AGT, 2024 WL 2305603, at *5 (N.D. Cal. May 21, 2024) ("[W]hen, as here, the plaintiff grounds his [federal antitrust claims] and UCL claims on the same conduct, and when that conduct isn't well pled, the claims fall together."); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023).

The Pac-12 alleges that its "unfairness theory exists independently from its antitrust claims" under *Epic Games*, (Opp. 22).[6] The Pac-12 argues the Complaint details "how the provision targets a single competitor [the Pac-12] with enormous and unreasonable penalties."  (Opp. 22.)  But "[i]njury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws."  *Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 165 F. Supp. 3d 937, 953 (S.D. Cal. 2016) (citation omitted).

In *Obesity*, cited by the Pac-12, an "unfair" UCL claim was dismissed where a "[p]laintiff only alleges harm to its own commercial interests, rather than harm to competition."  *Id.* Absent allegations demonstrating harm to competition or "[a]cts that violate the spirit of the antitrust laws includ[ing] 'horizontal price fixing, exclusive dealing, or monopolization,'" the Pac-12 complains only of injury to itself.  *Id.* (citation omitted); (Opp. 22.)  Thus, the Complaint's "unfair" UCL claim should be dismissed.  *Cf. Diva Limousine, Ltd. v. Uber Techs. Inc.*, 392 F. Supp. 3d 1074, 1091 (N.D. Cal. 2019).

---

[6] The Pac-12 cites *People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 668-72 (2005) for the proposition that the UCL can be violated "even if a defendant has not violated the antitrust laws," but the question is whether the Pac-12 has sufficiently alleged an independent unfair UCL claim, not whether it is *theoretically* possible.

14

1

**D.      The Termination Fees Are Enforceable Under Contract Law (Count IV).**

2

The Termination Fees are not "liquidated damages penalties" because the Pac-12's obligation

3

to pay does not flow from any breach of the Scheduling Agreement.   Provisions that provide

4

alternatives to performance are not liquidated damages provisions. *Schneider v. Verizon Internet Sers.,*

5

*Inc.*, 400 F. App'x 136, 138 (9th Cir. 2010); *Mahlum v. Adobe Sys. Inc.*, No. 14-CV-124663, 2015

6

WL 124663, at *3-4 (N.D. Cal. Jan. 8, 2015).   The Pac-12's contention that *Mahlum* and *Schneider*

7

are inapposite because the Termination Fees are not an "early termination fee and [do] not present any

8

'alternative to performance'" ignores the crux of the analysis: whether a party had a "rational choice."

9

*See Blank v. Borden*, 11 Cal. 3d 963, 970–71 (1974).   The Pac-12 cites one case, *In re Cellphone*

10

*Termination Fee Cases*, but there, the service provider could involuntarily impose a fee on customers.

11

193 Cal. App. 4th 298, 328–29 (2011).   The Scheduling Agreement presented several "rational

12

choices" and the Pac-12 chose the only option requiring payment of the Termination Fees.

13

Even if the Termination Fees are liquidated damages, the Opposition ignores that such

14

provisions are presumptively enforced under California Civil Code § 1671(b). The Termination Fees

15

were a reasonable approximation of losses the MWC could incur if the Pac-12 poached its schools.

16

(Ex. 1, § 7.02.)  The Pac-12 relies primarily on inapposite cases where a party seeks to recover the full

17

amount under a prior obligation or lawsuit, after the other party breached an unrelated condition of a

18

later stipulation or settlement.  (Opp. 23–24.)  Conclusory allegations that the Termination Fees are

19

"neither fair nor reasonable" cannot override the contractual language the Pac-12 freely agreed to.

20

The nature and operation of a contractual provision determines its characterization as either a

21

liquidated damages provision or a penalty, and contract language may be evidence of the parties' intent

22

and understanding.  Cal. Civ. Code § 1638; Cal. Civ. Code § 1639; *JJD-HOV Elk Grove, LLC v. Jo-*

23

*Ann Stores, LLC*, 560 P.3d 297, 307 (Cal. 2024).  The Pac-12 cannot now distance itself from its own

24

representations under the Scheduling Agreement that the Termination Fees are a "fair, reasonable, and

25

appropriate approximation" of the MWC's losses.  (Ex. 1, § 7.02.)

26

**CONCLUSION**

27

For the reasons stated above and in the MWC's Motion to Dismiss, the Complaint should be

28

dismissed in its entirety with prejudice.

15

1   Dated: February 10, 2025                    **WILLKIE FARR & GALLAGHER LLP**

2

3

4                                              By:  _/s/_ Eduardo E. Santacana
                                                    Eduardo E. Santacana (SBN 281668)
5                                                   Simona Agnolucci (SBN 246943)
                                                    Wesley R. Powell (SBN 230430)
6                                                   Matt D. Basil (*pro hac vice* pending)

7
                                                    *Attorneys for Defendant*
8                                                   *THE MOUNTAIN WEST CONFERENCE*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT
Case No. 5:24-CV-06685-SVK