UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAC-12 CONFERENCE,<br><br>Plaintiff,<br><br>v.<br><br>MOUNTAIN WEST CONFERENCE,<br><br>Defendant. | Case No. 24-cv-06685-SVK<br><br>**ORDER ON DEFENDANT THE MOUNTAIN WEST CONFERENCE'S MOTION TO DISMISS COMPLAINT**<br><br>Re: Dkt. No. 25 |

This antitrust lawsuit is a product of the rapidly-changing landscape of college athletics. Both Parties—Plaintiff Pac-12 Conference (Pac-12) and Defendant Mountain West Conference (MWC)— are athletic conferences within Division 1 of the National Collegiate Athletic Association (NCAA). After the Pac-12 lost 10 of its 12 member schools to rival athletic conferences in 2022 and 2023, it entered into a Scheduling Agreement with the MWC to secure a complete football schedule for its two remaining member schools during the 2024-2025 football season. The Parties' Scheduling Agreement contains a clause that requires the Pac-12 to pay the MWC a termination fee for any school that departs the MWC to join the Pac-12. After five MWC schools decided to move to the Pac-12, the MWC demanded that the Pac-12 pay tens of millions of dollars in termination fees. The Pac-12 responded by filing this lawsuit, which challenges the termination fee provision under the federal Sherman Antitrust Act and under California's Cartwright Act, Unfair Competition Law, and common law. All Parties have consented to the jurisdiction of a magistrate judge. Dkt. 13, 23.

Now before the Court is the MWC's motion to dismiss the Complaint. Dkt. 25. The Court held a hearing on September 9, 2025. For the reasons that follow, the motion to dismiss is **DENIED.**

### I. BACKGROUND[1]

Between June 2022 and August 2023, the Pac-12 lost 10 of its 12 member schools to rival collegiate athletic conferences. Dkt. 1 (Complaint) ¶ 28. As a result, in late 2023, the Pac-12 faced a variety of pressing issues, including the prospect of a 2024-25 football season without a full schedule of games for its two remaining schools, Oregon State University (OSU) and Washington State University (WSU). *Id.* ¶ 31. Under NCAA bylaws, the Pac-12 also faced possible ouster from the top-tier of college football, the Football Bowl Series (FBS), if it did not have at least eight active member schools within a two-year grace period beginning with the 2024-25 season. *Id.* ¶ 32.

In December 2023, the Pac-12 and the MWC entered into a Scheduling Agreement under which Pac-12 members OSU and WSU would each compete in six football games against MWC's 12 member schools during the 2024-25 season. *Id.* ¶ 40; Dkt. 1-1 (Scheduling Agreement) § 2.01, Schedule 1.[2] Among the terms of the Scheduling Agreement is a provision that the Pac-12 and MWC would "negotiate in good faith the consummation, as promptly as reasonably practicable, of a definitive transaction pursuant to which all MWC Member Institutions join Pac-12 as Pac-12 member institutions" with no exit fee payable by any MWC Member Institution to the MWC. Dkt. 1-1 § 8.01. This provision called for the invitations, if made, to be effective as of the 2025--2026 NCAA season or the 2026-2027 NCAA season. *Id.*

The Scheduling Agreement required the Pac-12 to pay the MWC certain fees, including a one-time fee of $2 million for "scheduling and related administrative services" and over $12 million in "Participation Fees." *Id.* §§ 2.02, 3.01(b), 3.01(d). The Scheduling Agreement also contains the following provisions, which are the subject of this lawsuit and which require the Pac-12 to pay termination fees if some but not all MWC teams depart the MWC for the Pac-12:

---

[1] This factual background is taken primarily from the allegations of the Complaint, which are assumed to be true for purposes of the present motion to dismiss.

[2] The Court may consider the Scheduling Agreement in evaluating the motion to dismiss because the agreement is attached to the Complaint. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014).

2

**Section 7.01 Termination Fees**. The Parties acknowledge and agree that, as a result of the transactions contemplated by this Agreement (including the negotiation of a Definitive Transaction pursuant to Article VIII), (a) the Pac-12 Parties will be Recipients of valuable Confidential Information of MWC and will be afforded unique access to MWC Member Institutions that, in each case, the Pac-12 Parties would not otherwise be entitled, (b) were (x) the Pac-12 Parties to make an offer to less than all MWC Member Institutions to join Pac-12 as a Pac-12 member institution or (y) any Pac-12 Member Institution to join a conference other than the MWC or a Power Five Conference, in each case, in lieu of consummating the Definitive Transaction pursuant to Article VIII, MWC would suffer unique economic damages and losses which would be impracticable or extremely difficult to quantify. Accordingly, as a material inducement to MWC's willingness to enter into and perform its obligations under this Agreement, the Pac-12 covenants and agrees that, if (A) at any time prior to the two year anniversary of the expiration or termination of this Agreement pursuant to Article IV (the "Withdrawal Fee Period"), the Pac-12 makes an offer to any MWC Member Institution (other than an offer to all MWC Member Institutions to join Pac-12 as Pac-12 member institutions in accordance with the terms of Section 8.01) to join the Pac-12 as a Pac-12 member institution or affiliate member, which any such MWC Member Institution accepts, or announces that it will accept, during the Withdrawal Fee Period (each such MWC Member Institution, an "Accepting MWC Member Institution"), the Pac-12 shall pay liquidated damages to MWC in the form of the a termination fee as set forth on Schedule 7 (the "Withdrawal Fee") or (B) at any time prior to the expiration or termination of this Agreement pursuant to Article IV, a Pac-12 Member Institution joins, or announces that it will join (in each case, as a member institution or affiliate member for a sport scheduled pursuant to this Agreement), a conference (including any newly formed conference) other than MWC or a Power Five Conference, such departing Pac-12 Party will pay MWC liquidated damages in the form of a termination fee equal to $5,500,000 (the "Departure Fee" and, together with the Withdrawal Fee, the "Termination Fees"). No Termination Fee shall be payable, however, if the MWC has dissolved, or a sufficient number of members have voted to cause it to dissolve, prior to the date of the offer (under subsection (A) of this paragraph) or the date of the acceptance or announced acceptance (under subsection (B) of this paragraph).

**Section 7.02 Liquidated Damages; Not a Penalty**. The Parties acknowledge and agree that the Termination Fees are not penalties and are instead fair, reasonable and appropriate approximations of the losses that MWC may incur as a result of MWC's loss of any MWC Member Institution to Pac-12 and the failure to consummate the Definitive Transaction pursuant to Article VIII. The Termination Fees shall be MWC's sole and exclusive remedy in respect of the matters described in Section 7.01. Any Withdrawal Fee which becomes payable by the Pac-12 pursuant to clause (A) of Section 7.01 shall be due and payable to MWC in full in accordance with the terms of Section 2.03 no later than 30 days following the date each such Accepting MWC Member Institution accepts, or announces that it will accept, such offer. Any Departure Fee which becomes payable by the departing Pac-12 Party pursuant to clause (B) of Section 7.01 shall be due and payable to MWC in full in accordance with the terms of Section 2.03 no later than 30 days of

the earlier of the date such departing Pac-12 Party accepts, or announces that it will accept, such offer to join a conference other than the MWC or a Power Five Conference.

*Id.* §§ 7.01, 7.02.

Schedule 7 to the Scheduling Agreement contains the following Withdrawal Fee table:

## SCHEDULE 7

## WITHDRAWAL FEE

The Pac-12 Parties shall pay MWC a Withdrawal Fee in accordance with this Schedule 7 for each Accepting MWC Member Institution during the Withdrawal Fee Period.  For purposes of illustration, and not limitation, the "Aggregate Withdrawal Fee" column represents the aggregate Withdrawal Fee payable by the Pac-12 Parties to MWC relative to the total number of Accepting MWC Member Institutions during the Withdrawal Fee Period.

| **Accepting MWC Member Institutions** | **Withdrawal Fee** | **Aggregate Withdrawal Fees** |
|---|---|---|
| Accepting MWC Member Institution #1 | $10,000,000 | $10,000,000 |
| Accepting MWC Member Institution #2 | $10,500,000 | $20,500,000 |
| Accepting MWC Member Institution #3 | $11,000,000 | $31,500,000 |
| Accepting MWC Member Institution #4 | $11,500,000 | $43,000,000 |
| Accepting MWC Member Institution #5 | $12,000,000 | $55,000,000 |
| Accepting MWC Member Institution #6 | $12,500,000 | $67,500,000 |
| Accepting MWC Member Institution #7 | $13,000,000 | $80,500,000 |
| Accepting MWC Member Institution #8 | $13,500,000 | $94,000,000 |
| Accepting MWC Member Institution #9 | $14,000,000 | $108,000,000 |
| Accepting MWC Member Institution #10 | $14,500,000 | $122,500,000 |
| Accepting MWC Member Institution #11 | $15,000,000 | $137,500,000 |

Dkt. 1-1 at Schedule 7.

In September 2024, five MWC schools announced that they were leaving the MWC to join the Pac-12.  Dkt. 1 ¶¶ 56, 58.  MWC thereafter demanded payment of $43 million in termination fees from the Pac-12 under the Scheduling Agreement for the first four MWC teams to announce their departure.  *Id.* ¶ 57 and Ex. 2.[3]  At the time the Complaint in this case was filed, the Parties had not consummated a definitive transaction, as discussed in the Scheduling Agreement, where

---

[3] As mentioned, a total of five MWC teams have departed for the Pac-12.  The Pac-12 states in its opposition to the motion to dismiss that the MWC increased its demand for termination fees to $55 million two days after the Complaint was filed.  Dkt. 29 at 5 n.2.

4

the two conferences would merge in their entirety. Dkt. 1 ¶ 49.

On September 24, 2024, the Pac-12 filed this action. Dkt. 1.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes a district court to dismiss a complaint if it fails to state a claim upon which relief can be granted. In ruling on a motion to dismiss, a court may consider only "the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). In deciding whether the plaintiff has stated a claim, the court must accept the plaintiff's allegations as true and draw all reasonable inferences in the plaintiff's favor. *Id.* However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted).

To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009).

If a motion to dismiss is granted, the court must grant leave to amend unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

## III.   DISCUSSION

The Complaint asserts four causes of action for declaratory relief: (1) violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) violation of California's Cartwright Act, Cal. Bus. & Prof. C. § 16720 *et seq.*; (3) violation of California's Unfair Competition Act, Cal. Bus. & Prof. C. § 17200 *et seq.*; and (4) invalid contract for unenforceable penalties. Dkt. 1.

### A.   First and Second Causes of Action:  Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and California's Cartwright Act, Cal. Bus. & Prof. C. § 16720 *et seq.*

The MWC argues that the first (Sherman Act § 1) and second (Cartwright Act) causes of action should be dismissed for two reasons: (1) lack of antitrust standing, and (2) failure to plead

plausible antitrust claims.  Dkt. 25 at 6-17.

### 1. **Antitrust standing**

To establish a violation of Section 1 of the Sherman Act, a plaintiff must establish:  "(1) an agreement, conspiracy, or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged (i.e., 'antitrust injury')." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988).  The Parties address the first and second causes of action together for purposes of the motion to dismiss, and the Court will do the same. *See* Dkt. 25 at 6; Dkt. 29 at 7-8; *see also Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 688 (9th Cir. 2022) ("Because the analysis under the Cartwright Act mirrors the analysis under the Sherman Act, we consider both claims together"); *McGlinchy,* 845 F.2d at 811 n.4 ("Cartwright Act claims raise basically the same issues as Sherman Act claims").

The MWC concedes that the Pac-12 has satisfied the first prong by pleading an agreement. Dkt. 25 at 6.  Nevertheless, the MWC argues that the Pac-12 has not established antitrust standing because it "has failed to allege a cognizable injury to competition or a market for such injury, let alone any nonspeculative harm to itself." *Id.* at 7; *see also id.* at 6-11.  The MWC asserts that to adequately allege standing, the Pac-12 must allege "specific facts" that raise its antitrust claims "above the speculative level" showing:  "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Id.* at 7 (quoting *Twombly*, 550 U.S. at 555 and *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 456 (9th Cir. 2021)).

The MWC's argument that the Pac-12 lacks standing is premised on the assertion that section 7.01 of the Scheduling Agreement does not injure competition because the Scheduling Agreement specifically allows MWC member schools to join the Pac-12 at no cost (in the case of a merger of the conferences) and also authorizes the Pac-12 to "cherry-pick individual MWC schools" by paying termination fees.  Dkt. 25 at 7-8.  The MWC also emphasizes that the termination fees requirement "did not impede the Pac-12's recruitment of five MWC schools" and

argues that "nothing in Scheduling Agreement prevents the Pac-12 from recruiting non-MWC colleges to its conference." *Id.* at 8. In arguing that the Pac-12 has failed to establish standing, the MWC emphasizes events following execution of the Scheduling Agreement—specifically, that the Pac-12 did in fact recruit several MWC schools to change conferences. *Id.* In its briefs and at the hearing, the MWC also suggested that the Pac-12 may not assert that terms of the Scheduling Agreement injured competition because such an argument "would render the Pac-12 an equally culpable co-conspirator in any alleged restraint of trade" (Dkt. 25 at 6) or would impermissibly rest on "harm to the Mountain West schools" rather than harm to the Pac-12 (Dkt. 47 (9/9/25 Hrg. Tr.) at 10).

       The MWC's arguments do not provide a basis for the Court to disregard the Complaint's allegations of antitrust injury. Although the Pac-12 agreed to the terms of the Scheduling Agreement, it has alleged that it was "desperate" and "had little leverage" at the time it entered into the agreement. Dkt. 1 ¶ 1. "To hold that a contract is exempt from antitrust scrutiny simply because one party 'reluctant[ly]' accepted its terms" would be to misread section 1 of the Sherman Act, which reaches "every contract" that unreasonably restrains trade. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 982 (9th Cir. 2023) (citation omitted).

       Moreover, the Complaint's allegations of harm caused by the required termination fees are not limited to harm to the ability of MWC schools to join the Pac-12 but also include harm to the Pac-12 in depleting the conference's resources to compete for additional schools. *See, e.g.,* Dkt. 1 ¶¶ 10, 54, 60, 61, 91, 100. Such harms are not speculative; indeed, the Complaint alleges that the MWC has already demanded tens of millions of dollars in termination fees from the Pac-12 in connection with MWC schools' departures for the Pac-12. *Id.* ¶¶ 9, 57 and Ex. 2; *see also* Dkt. 29 at 5 n.2. The Complaint further alleges harm to competition as a whole because it alleges that reducing the Pac-12's resources by the imposition of termination fees limits the conference as a destination for other schools (whether in the MWC or other conferences). *See, e.g., id.* ¶ 10 ("The Poaching Penalty weakens the Pac-12 in *competition with other conferences* for MWC member schools, diminishes the compensation available for *schools interested in joining the Pac-12*, and *reduces MWC member schools' options for mobility*" (emphasis added)); *id.* ¶ 61 ("if enforced, the

7

1   Poaching Penalty threatens the Pac-12's ability to compete against the MWC and other
2   conferences" and "[p]aying $55 million to the MWC as a penalty for recruiting five of its member
3   schools—conduct in which athletic conferences, including the MWC, regularly and fairly
4   engage—would significantly deplete the Pac-12's resources to recruit additional schools and
5   rebuild"); *see also id.* ¶¶ 60, 63, 88, 91, 100.

For these reasons, the Complaint adequately pleads that the Pac-12 has antitrust standing.

### 2. Sufficiency of pleading

The MWC argues that even if the Pac-12 has adequately alleged standing, the first and second causes of action should be dismissed because the Pac-12 has failed to plead plausible antitrust claims under either a *per se* or rule of reason standard. Dkt. 25 at 11-17.

"There are two general categories of liability standards for Sherman Act claims." *Epic Games*, 67 F.4th at 974. Most restraints are evaluated under the rule of reason, which the Ninth Circuit has described as "a multi-step, burden-shifting framework that 'requires courts to conduct a fact-specific assessment' to determine a restraint's 'actual effect' on competition." *Id.* (quoting *Ohio v. Am. Express Co.* ("*Amex*"), 585 U.S. 529, 540-41 (2018)). In most rule of reason cases, "a threshold step is defining the relevant market in which the alleged restraint occurs." *Epic Games*, 67 F.4th at 474 (internal quotation marks and citations omitted). A small group of restraints, however, are deemed *per se* unlawful "without any elaborate study of the industry" in which they occur "because they always or almost always tend to restrict competition and decrease output.'" *Id.* (citations omitted).[4]

The Pac-12's Complaint, as well as its opposition to the MWC's motion to dismiss, are premised primarily on a *per se* theory of liability. *See, e.g.,* Dkt. 1 ¶¶ 10, 64, 78, 93; Dkt. 27 at 10-16. However, the Complaint also contains several allegations that advance an alternative rule

---

[4] A third rule of analysis, the "quick look" approach, falls "between the rule of reason and per se condemnation." *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037 (N.D. Cal. 2013). "[T]he 'quick look' analysis is an abbreviated form of the rule of reason that may be used when an observer with even a rudimentary understanding of economics could conclude that the arrangements in question could have an anticompetitive effect on customers and markets." *Id.* (internal quotation marks and citations omitted). An antitrust plaintiff "is not obliged to plead under each possible rule." *Id.* In this case, the Complaint does not include any allegations under the "quick look" theory, and the Parties' briefs on the motion to dismiss do not address it.

8

of reason theory. *See, e.g.,* Dkt. 1 ¶¶ 65, 89, 98. The MWC argues in its motion to dismiss that the Pac-12 has failed to plead plausible antitrust claims under either theory. Dkt. 25 at 11-17.

**a.   *Per se* violation**

"Typically only 'horizontal' restraints—restraints imposed by agreement between competitors—qualify as unreasonable *per se*." *Amex*, 585 U.S. at 540–41 (internal quotation marks and citation omitted). For example, "[a] market allocation agreement between two companies at the same market level is a classic per se antitrust violation." *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991); *see also United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1038 (N.D. Cal. 2013) ("A horizontal market allocation typically constitutes a per se violation of section 1"). On the other hand, *per se* treatment is not appropriate (and a restraint is instead analyzed under the rule of reason) where the restraint at issue is (1) "subordinate and collateral to a separate, legitimate transaction," and (2) "reasonably necessary to achiev[e] that transaction's pro-competitive purpose." *Aya Healthcare Servs. v. AMN Healthcare, Inc.,* 9 F.4th 1102, 1109 (9th Cir. 2021) (internal quotation marks and citations omitted).

The MWC argues that under "a long line of Ninth Circuit and Supreme Court cases," agreements involving league sports are subject to the rule of reason, not the *per se* standard. Dkt. 30 at 4 and cases cited therein. The MWC also argues that section 7.01 of the Scheduling Agreement qualifies as an ancillary restraint that is not subject to *per se* treatment. Dkt. 25 at 11-14. The MWC's bases this argument primarily on language in the Preamble in the Scheduling Agreement that recites the agreement's pro-competitive purposes. *Id.* at 11-12 (citing Preamble). Specifically, the Preamble states that:

> the Parties desire to form a working relationship to create opportunities for competition in college athletics among student athletes in the Pac-12 and MWC. Ten of the twelve current member schools of the Pac-12 have publicly announced they will join conferences other than the Pac-12 effective after August 1, 2024. Without an arrangement of the type provided under this Agreement, it would be difficult or impossible for OSU and WSU to provide competitive opportunities for their student-athletes. This arrangement also provides opportunities for MWC members and their student-athletes to compete against first-class opponents at WSU and OSU. The MWC and its members would not enter into this Agreement, and mutual cooperation and exchanges of confidential information would not be feasible, however, without safeguards, including certain fees, which protect against

> misuse of information, protect the MWC from fracturing, and preserve the integrity of the MWC and Pac-12. Accordingly, such safeguards are essential to promote the competitive opportunities being made available to student-athletes of OSU, WSU, and the MWC Member Institutions hereunder.

Dkt. 1-1 at p. 2. The MWC concludes that section 7.01 "was an 'essential' component to the Scheduling Agreement's increased output—games that would not have otherwise existed—and consumer welfare downstream" and is therefore "ancillary to a lawful agreement and subject to the rule of reason." Dkt. 25 at 14 (citing Dkt. 1-1 at Preamble; *Aya Healthcare*, 9 F.4th at 1110).

In response, the Pac-12 argues that the termination fees provision is subject to *per se* treatment because "courts routinely hold that arguments among competitors to restrict poaching—*i.e.,* deem a certain portion of the market off-limits—can be *per se* antitrust violations because they are forms of horizontal market allocation." Dkt. 29 at 8 (internal quotation marks and citation omitted); *see also id.* at 8-10. The Pac-12 also offers several responses to the MWC's argument that the termination fees are an ancillary restraint. First, the Pac-12 argues that whether a restraint is a naked *per se* restraint or an ancillary restraint cannot or should not be decided at the pleading stage because it is an inherently fact-specific inquiry. Dkt. 29 at 12 (quoting *In re Juul Labs, Inc. Antitrust Litig.*, 555 F. Supp. 3d 932, 959 (N.D. Cal. 2021) and *Snow v. Align Techs., Inc.*, 586 F. Supp. 3d 972, 979 (N.D. Cal. 2022)). Second, the Pac-12 argues that "the classification of a restraint as ancillary is a defense, and complaints need not anticipate and plead around defenses." Dkt. 29 at 12 (quoting *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 705 (7th Cir. 2023). Third, the Pac-12 argues that the termination fee provision is not an ancillary restraint because it is not subordinate and collateral to the Scheduling Agreement and it is not reasonably necessary to achieve the procompetitive benefits of the Scheduling Agreement. Dkt. 29 at 13-16.

In making such arguments, both sides invite the Court to decide now, on a motion to dismiss, whether the termination fees provision in the Scheduling Agreement is subject to *per se* or rule of reason analysis. Analogizing to poaching cases in the employment context, the Pac-12 argues that the termination fee provision is *per se* unlawful because it is "undisputably a horizontal agreement between competitors," "is textbook market allocation," and "plainly reduces competition in the recruitment of member schools." Dkt. 29 at 10-11. Meanwhile, the MWC

10

1    argues that there is a general rule that agreements in the context of league sports are subject to the
2    rule of reason and that in any event, "there can be little dispute that Section 7.01 qualifies as an
3    ancillary restraint, which triggers a rule of reason analysis." Dkt. 25 at 12.
4        The Court declines to determine at this early pleading stage whether the termination fees
5    provision in this case is subject to *per se* treatment or the rule of reason. *See Juul*, 555 F. Supp. 3d
6    at 961; *see also eBay*, 968 F. Supp. 2d at 1039 (declining in ruling on a motion to dismiss to
7    determine as a matter of law that *per se* treatment would be inappropriate because the partes lack
8    "sufficient factual evidence to support their contentions" and "[a]t this stage in the proceedings,
9    the court simply cannot determine with certainty the nature of the restraint, and by extension, the
10   level of analysis to apply"). Although the MWC argues that the recitations in the Scheduling
11   Agreement attesting to the pro-competitive nature of the agreement should establish that the
12   termination fees are an ancillary restraint subject to the rule of reason analysis, that argument
13   overlooks the Pac-12's characterizations in the Complaint to the effect that the MWC imposed
14   such recitations as a result of its superior bargaining position, which are supported by factual
15   allegations elsewhere in the Complaint regarding the timing and circumstances of the Parties'
16   contract negotiations. *See, e.g.,* Dkt. 1 ¶ 3 ("Exploiting the Pac-12's weakened position, the MWC
17   extracted a heavy price"); *id.* ¶ 4 ("Knowing that the Pac-12 was running out of time and short on
18   leverage, the MWC ... forced the Pac-12 to accept an unprecedented Poaching Penalty provision
19   …"); *id.* ¶ 55 ("With the Pac-12 under considerable pressure to secure a 2024-2025 football
20   schedule only months before the season was set to begin, the MWC forced the Poaching Penalty
21   provision on the Pac-12 …").
22       Both sides try to fit this case into existing categories (sports league or employee poaching
23   cases), but the termination fees provision and Scheduling Agreement have unique attributes that
24   do not precisely align with the cases cited by the Parties. Accordingly, a decision on whether the
25   termination fees provision is ancillary to the Scheduling Agreement and thus subject to the rule of
26   reason instead of *per se* treatment should await further development of the factual record. *See*
27   *Snow*, 586 F. Supp. 3d at 979-80; *eBay*, 968 F. Supp. 2d at 1039-40. As the MWC conceded at
28   oral argument, "it's rare, but it's not unheard of for courts to grant at the motion to dismiss stage

and determine that something is either ancillary or procompetitive." Dkt. 47 (9/9/25 Hrg. Tr. at 45). Here, the Complaint adequately pleads a plausible case for application of the *per se* rule. Whether the Pac-12's position on this issue ultimately prevails should be determined on the basis of a more fully-developed record.

### b. Rule of Reason

As noted above, although the Pac-12's first and second causes of action are premised primarily on the theory that the termination fees are a *per se* antitrust violation, the Complaint also contains allegations that the termination fees fail under a rule of reason analysis. *See, e.g.,* Dkt. 1 ¶¶ 65, 89, 98. The MWC argues that the Complaint fails to adequately plead a violation of the antitrust laws under the rule of reason standard because, among other things, it does not plead a relevant market. Dkt. 25 at 14-17. The Pac-12 asserts that "although [it] alleges 'in the alternative' that the Poaching Penalty is unlawful under the rule of reason … the Court need not address that alternative theory here because the Pac-12 stated *per se* claims." Dkt. 29 at 16 n. 8.

In support of its position, the Pac-12 cites several cases in which courts have held that an antitrust plaintiff is not required to plead both rule of reason and *per se* claims. *See* Dkt. 29 at 16 n.2. But those cases do not address the situation here, where the plaintiff (the Pac-12) has attempted to plead both theories but the defendant argues that the pleading of the rule of reason alternative is inadequate.

As the Court noted at the hearing, the Pac-12's *per se* and rule of reason allegations both appear as part of the same antitrust causes of action. Dkt. 47 (9/9/25 Hrg. Tr.) at 15. The Pac-12 explained at the hearing that it included rule of reason allegations in anticipation of the MWC's ancillary restraint defense. *Id.* at 29. In the posture and circumstances of this case, including the fact that the Court has found that the Pac-12 has adequately pleaded a *per se* violation of the antitrust laws, the Court finds it neither appropriate nor necessary to dismiss the antitrust claims in whole or in part based on the arguably inadequate pleading of an alternative and primarily defensive rule of reason theory. *See generally eBay*, 968 F. Supp. 2d at 1040 (finding that where plaintiff has sufficiently plead the existence of a restraint that is subject to per se treatment, it has also sufficiently pled the existence of the type of restraint that may fall under the ambit of the

12

quick look rule).

Accordingly, the MWC's motion to dismiss the first and second causes of action is **DENIED**.

### B. Third Cause of Action: Violation of California Unfair Competition Law, Cal. Bus. & Prof. C. § 17200 *et seq.*

In the third cause of action, the Pac-12 alleges that the MWC's actions to suppress competition through the termination fee provision in the Scheduling Agreement violate California Business and Professions Code § 17200 *et seq.* (the "Unfair Competition Law" or "UCL"). Dkt. 1 ¶¶ 101-106. The UCL prohibits unlawful, unfair, or fraudulent business acts or practices, and each of the three prongs provides "a separate and distinct theory of liability." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007). The Pac-12's UCL claim is based on the "unlawful" and "unfair" prongs; it does not allege that the MWC has engaged in fraudulent conduct. Dkt. 1 ¶¶ 102-104.

"Unlawful" practices are those forbidden by law. *Diaz v. Intuit*, No. 5:15-cv-01778-EJD, 2017 WL 4386451, at *5 (N.D. Cal. Sep. 29, 2017) (citation omitted). The "unlawful" prong of the UCL prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel–Tech Communications, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999) (internal quotation marks and citation omitted). By proscribing "any unlawful" business practice, the UCL permits injured consumers to "borrow" violations of other laws and treat them as unlawful competition that is independently actionable. *Id.*

The explicit basis of the Pac-12's claim that the MWC engaged in unlawful business practices in violation of the UCL is the allegation that the MWC violated the Sherman Act and the Cartwright Act. Dkt. 1 ¶ 103. The MWC's sole argument for dismissal of UCL claim under "unlawful" prong is premised on its argument that the Pac-12 has failed to state an antitrust claim upon which the UCL "unlawful" claim could be predicated. *See* Dkt. 25 at 20. The Pac-12 agrees with the MWC that the issue of whether it adequately states a claim under the UCL's "unlawful" prong stands and falls with whether it has adequately alleged an underlying antitrust violation. Dkt. 29 at 21. Because, as discussed above, the Pac-12 has adequately pleaded antitrust claims,

the MWC's attempt to dismiss the claim for a Section 17200 violation under the "unlawful" prong fails.

As to the claim for "unfair" business practices, the MWC argues that dismissal is warranted either because the "unfair" claim overlaps with the claim for "unlawful" business practices or because "there are no antitrust violations here, incipient or otherwise" and "no violation of the 'policy or spirit' of antitrust laws" to form the basis for a claim of unfair business practices. Dkt. 25 at 20-22. As discussed above, however, the Court finds that the Pac-12 has stated claims both for antitrust violations and for violation of the UCL under the "unlawful" prong. Accordingly, the Pac-12 has also stated a claim for "unfair" business practices under the UCL. In light of the Court's holding, the Court does not reach the Pac-12's alternative argument that it has stated an "unfairness theory [that] exists independently from its antitrust claims." Dkt. 29 at 22.

For these reasons, the MWC's motion to dismiss the third cause of action is **DENIED.**

### C.     Fourth Cause of Action:  Invalid Contract for Unenforceable Penalties

The fourth cause of action alleges that although Section 7.01 and 7.02 of the Scheduling Agreement characterize the termination fees as "liquidated damages," in fact "[t]he termination fees due under the Scheduling Agreement are unenforceable penalties as a matter of contract law." Dkt. 1 ¶¶ 108-109.

The MWC's motion to dismiss attacks the fourth cause of action on two main grounds. First, the MWC argues that "even if the Termination Fees did constitute 'liquidated damages,' by statute, California law presumptively enforces such clauses" under Civil Code § 1671(b). *Id*. at 18-19. That statute provides in relevant part that "a provision in a contract liquidating the damages for the breach of a contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." Cal. Civ. C. § 1671(b). "A liquidated damages clause will generally be considered unreasonable, and hence unenforceable under section 1671(b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach." *McGuire v. More-Gas Invs., LLC*, 220 Cal. App. 4th 512, 522 (2013) (citations

14

omitted). Absent a relationship between the amount set as liquidated damages and an estimate of "a fair average compensation for any loss that may be sustained," a contractual clause purported to set liquidated damages must be construed as an unenforceable penalty. *Id.* (internal quotation marks and citation omitted); *see also Ridgley v. Topa Thrift & Loan Assn.,* 17 Cal.4th 970, 977-978 (1998).

The MWC asserts that the Complaint fails to allege sufficient facts to overcome the presumption of enforceability, which "requires inquiry into the reasonableness of the fees *at the time of contracting*." *Id.* at 19 (emphasis in original). In particular, the MWC points to statements in the Scheduling Agreement concerning the nature of the termination fees, including a statement that the fees are "not penalties and are instead fair, reasonable and appropriate approximations of the losses that [the] MWC may incur as a result of [the] MWC's loss of any MWC Member Institution to [the] Pac-12." *Id.* (quoting Scheduling Agreement § 7.02 (alterations in original)). In response, the Pac-12 argues that the Complaint adequately alleges facts concerning the reasonableness of the fees at the time of contracting to support its claim that the termination fees constitute unenforceable penalties, including allegations that language to the contrary in the Scheduling Agreement was pretextual. Dkt. 29 at 23-24 (citing Dkt. 1 ¶¶ 2-4, 54-55, 64-73, 107-119).

Whether a contractual provision is an unenforceable liquidated damages provision is a question for the court. *Ruwe v. Cellco P'ship*, 613 F. Supp. 2d 1192, 1196 (N.D. Cal. 2009) (citations omitted). However, a determination of whether the termination fees provision at issue in this case is an enforceable liquidated damages provision or an unenforceable penalty based on a partial factual record would be premature, "especially if (like here) plaintiff[] sufficiently allege[s] that the contract disproportionately penalized breach." *Dekker v. Vivint Solar, Inc.*, 542 F. Supp. 3d 959, 963 (N.D. Cal. 2021). Although the MWC emphasizes recitations in the Scheduling Agreement to the effect that the termination fees are fair and reasonable, in determining whether a liquidated damages provision is in fact an unenforceable penalty focus on the substance of the agreement rather than its form. *See Garrett v. Coast & S. Fed. Sav. & Loan Ass'n,* 9 Cal. 3d 731, 737 (1973).

15

Second, the MWC argues that the termination fees in the Scheduling Agreement are not in fact liquidated damages at all "because they do not flow from any breach of the Scheduling Agreement; they are instead the result of the Pac-12 electing to pursue an alternative means of performing by choosing to absorb fewer than all of the MWC member institutions." Dkt. 25 at 17-18. In response, the Pac-12 argues that the cases cited by the MWC on the issue of alternative means of performance "involved early termination fees in consumer contracts" and are distinguishable from the type of termination fees at issue here. Dkt. 29 at 24-25.

"[A] provision in a contract that appears at first glance to be either a liquidated damages clause or an unenforceable penalty provision may instead merely be a provision that permissibly calls for alternative performance by the obligor," in which case the provision "does not impose damages and is not subject to section 1671 limitations." *McGuire*, 220 Cal. App. 4th at 522-23 (citation omitted); *see also Blank v. Borden,* 11 Cal.3d 963, 971 (1974) (where the contract "clearly reserves to the owner the power to make a realistic and rational choice in the future with respect to the subject matter of the contract," a valid alternative performance provision will be found, but where the "arrangement, viewed from the time of making the contract, realistically contemplates no element of free rational choice on the part of the obligor insofar as his performance is concerned ...," the provision will be deemed to provide for a penalty). Again, in evaluating how to categorize a particular contract term, a court must look past the form of the provision and discern its "true function and operation." *See Garrett,* 9 Cal.3d at 735.

The MWC's argument that termination fees under the Scheduling Agreement are triggered not by breach but by the Pac-12's alternative performance appears inconsistent with language in the agreement referring to the fees as "liquidated damages" and attempting to correlate the fees to the "unique economic damages and losses" that would result from the non-consummation of the Definitive Transaction discussed in the agreement. Dkt. 1-1 ¶¶ 7.02, 7.03. At the same time, the Scheduling Agreement does not refer to the Pac-12's recruitment of fewer than all MWC members as a "breach," and in both the Complaint and the Pac-12's opposition to the motion to dismiss, the Pac-12 uses careful language in discussing the event that would trigger the termination fees. *See* Dkt. 1 ¶ 73 ("Indeed, the description of the Poaching Penalty's required sums as 'liquidated

16

damages' reveals the MWC's true intent—to prevent the Pac-12 from accepting offers from MWC schools entirely, with a liquidated damages provision designed to deter any such 'breach'—notwithstanding the lack of an explicit contractual commitment by the Pac-12 not to accept MWC members into the Pac-12"); Dkt. 29 at 24-25 ("the Poaching Penalty is triggered any time a MWC member accepts an offer to join the Pac-12, thereby 'breaching' the MWC's objective of preventing poaching). Given this record, "this Court finds the most prudent approach is to ascertain the substance of the parties' arrangements" based on a more complete factual record. *See Ruwe*, 613 F. Supp. 2d at 1197.

Accordingly, the MWC's motion to dismiss the fourth cause of action is **DENIED.**

## IV.    CONCLUSION

For the foregoing reasons, the MWC's motion to dismiss is **DENIED**. An Initial Case Management Conference will be held on **November 18, 2025 at 9:30 a.m.** A Joint Case Management Statement is due **November 10, 2025.**

**SO ORDERED.**

Dated: September 30, 2025

SUSAN VAN KEULEN
United States Magistrate Judge

17