**WILLKIE FARR & GALLAGHER LLP**
Krista S. Schwartz (Bar No. 303604)
kschwartz@willkie.com
Alexander L. Cheney (Bar No. 302157)
acheney@willkie.com
333 Bush Street, 34th Floor
San Francisco, CA 94104
Tel: (415) 858-7400

**WILLKIE FARR & GALLAGHER LLP**
WESLEY R. POWELL (Bar No. 230430)
wpowell@willkie.com
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8000

**WILLKIE FARR & GALLAGHER LLP**
MATT D. BASIL (Admitted *Pro Hac Vice*)
mbasil@willkie.com
300 North LaSalle Drive
Chicago, IL 60654
Tel: (312) 728-9000

*Attorneys for Defendant*
*THE MOUNTAIN WEST CONFERENCE*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| THE PAC-12 CONFERENCE,<br><br>    Plaintiff,<br><br>  v.<br><br>THE MOUNTAIN WEST CONFERENCE,<br><br>    Defendant. | Case No.: 5:24-CV-6685-SVK<br><br>**DEFENDANT THE MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO PLAINTIFF'S COMPLAINT**<br><br>Judge: Hon. Susan van Keulen<br><br>Date Filed:  October 23, 2025<br><br>Trial Date:  Not yet set |
| THE MOUNTAIN WEST CONFERENCE,<br><br>    Counter-Claimant,<br><br>  v.<br><br>THE PAC-12 CONFERENCE,<br><br>    Counter-Defendant. | |

Defendant, the Mountain West Conference ("Defendant" or the "MWC"), by and through the undersigned counsel, hereby answers the Complaint filed by Plaintiff, the Pac-12 Conference ("Plaintiff" or the "Pac-12"). Except as expressly admitted herein, the MWC denies each and every allegation of the Complaint—including each and every heading, footnote, and caption—not specifically admitted or to which the MWC has not otherwise responded in this Answer. Any admission is limited to the express language of the response and is not an implied admission of any additional fact(s). Further, in accordance with Fed. R. Civ. P. 8(b), any averment that Defendant lacks knowledge or information sufficient to form a belief about the truth of an allegation has the effect of a denial.

## I.    INTRODUCTION

1.    This action challenges an anticompetitive and unlawful "Poaching Penalty" that the MWC imposed on the Pac-12 to inhibit competition for member schools in collegiate athletics. The Poaching Penalty saddles the Pac-12 with exorbitant and punitive monetary fees for engaging in competition by accepting MWC member schools into the Pac-12. The MWC imposed this Poaching Penalty at a time when the Pac-12 was desperate to schedule football games for its two remaining members and had little leverage to reject this naked restraint on competition. But that does not make the Poaching Penalty any less illegal, and the Pac-12 is asking the Court to declare this provision invalid and unenforceable.

**ANSWER.**    Defendant admits that the Pac-12 asks the Court to declare Sections 7.01 and 7.02 (the "Termination Fees" provisions) of a scheduling agreement between the MWC and the Pac-12, dated December 1, 2023 (the "Scheduling Agreement"), as anticompetitive and unlawful. Defendant denies that any provision of the Scheduling Agreement is anticompetitive, invalid or unenforceable, and denies that the Pac-12 is entitled to any of the relief requested in the Complaint. Defendant further states that the Scheduling Agreement, which provided the Pac-12 with an unprecedented full season of twelve games from the MWC's schedule and unique access to the MWC's members, speaks for itself, and denies any allegations or characterizations contrary thereto contained in Paragraph 1. Defendant denies the remaining allegations in Paragraph 1.

2.    The Pac-12 is one of the preeminent NCAA Division 1 collegiate athletic conferences and boasts a storied history spanning over a century. Last year, the Pac-12 found itself

on the verge of collapse after ten member schools precipitously announced their departures and intent to join rival collegiate athletics conferences. Schools departing conferences to join other conferences is nothing new to collegiate athletics; it has happened for decades. Those departures left the Pac-12 with only two remaining members, OSU and WSU, for the 2024-2025 athletic season. In the wake of this mass exodus from the Pac-12 caused by fierce competition from rival conferences, the Pac-12 had only months to salvage the 2024-2025 season and create opportunities for its one thousand student-athletes to compete with other schools.

**ANSWER.** Defendant admits that the Pac-12 is an NCAA Division I collegiate athletic conference. Defendant further admits that, by mid-2023, ten schools who were previously members of the Pac-12 departed from the Pac-12 for the 2024-2025 athletic season, leaving the Pac-12 a year to determine its 2024-2025 athletic season. Defendant further admits that Washington State University ("WSU") and Oregon State University ("OSU") remained in the Pac-12 conference for the 2024-2025 athletic season. Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 2 and, on that basis, denies them.

3.     The MWC is a competitor college athletics conference that includes member schools from the same Western United States region in which the Pac-12 has historically competed for member schools. In December 2023, the MWC reached an agreement with the Pac-12 to schedule football games against OSU and WSU for the 2024-2025 season (the "Scheduling Agreement"). Exploiting the Pac-12's weakened position, the MWC extracted a heavy price.

**ANSWER.** Defendant admits that the MWC is a Division I collegiate athletic conference formed in 1999 by the United States Air Force Academy ("Air Force Academy"), Colorado State University ("Colorado State"), Brigham Young University ("BYU"), San Diego State University ("San Diego State"), the University of New Mexico ("New Mexico"), the University of Nevada, Las Vegas ("UNLV"), the University of Utah ("Utah"), and the University of Wyoming ("Wyoming"). Defendant admits that its current members for 2025-2026 include: the Air Force Academy, Boise State University ("Boise State"), Colorado State, Colorado College (women's soccer only), California State University, Fresno ("Fresno State"), the University of Hawai'i ("Hawai'i") (football only), the University of Nevada, Reno ("Nevada"), the University of New Mexico ("New Mexico"), San Diego State, San Jose State University ("San Jose State"), UNLV, Utah State University ("Utah State"), and Wyoming, and that WSU became

a MWC affiliate member for baseball and women's swimming as of July 1, 2024. Defendant further admits that all collegiate athletic conferences, which include the MWC and the Pac-12, compete for member schools. Defendant admits that in December 2023, it signed the Scheduling Agreement with the Pac-12, WSU, and OSU, which, among other components, resulted in scheduled football games involving OSU, WSU, and MWC member institutions for the 2024-2025 athletic season. Defendant further admits that, in negotiating and executing the Scheduling Agreement, all parties were represented by independent and experienced legal counsel. Defendant denies the remaining allegations in Paragraph 3.

4.      Knowing that the Pac-12 was running out of time and short on leverage, the MWC not only charged the Pac-12 supra-competitive prices to schedule football games—over $14 million for OSU and WSU to play just six games each—but it also forced the Pac-12 to accept an unprecedented Poaching Penalty provision wholly unrelated to scheduling football games and designed to limit the Pac-12's ability to compete with the MWC for *years into the future*, even after the Scheduling Agreement will expire:

> [I]f . . . at any time prior to the two year anniversary of the expiration or termination of this Agreement . . . the Pac-12 makes an offer to any MWC Member Institution (other than an offer to all MWC Member Institutions . . .) to join the Pac-12 as a Pac-12 member institution or affiliate member, which any such MWC Member Institution accepts, or announces that it will accept . . . the Pac-12 *shall pay liquidated damages to MWC in the form of . . . a termination fee* as set forth on Schedule 7.

*See* **Exhibit 1** (Scheduling Agreement) at Section 7.01. Schedule 7, in turn, sets forth a series of escalating "termination fees" ranging from $10 million to $137.5 million, depending on the number of MWC member schools that join the Pac-12.

**ANSWER.**      Defendant states that Exhibit 1 is a copy of the Scheduling Agreement that provided the Pac-12 with an unprecedented full season of twelve games from the MWC's schedule and unique access to the MWC's members. Defendant further states that the Scheduling Agreement speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 4, and refers to the full text of the Scheduling Agreement for its true meaning and effect. Defendant denies the remaining allegations in Paragraph 4.

5.      The Poaching Penalty is an unlawful horizontal restraint on competition. It nakedly restricts competition for MWC member schools for one particular competitor: the Pac-12. Not

coincidentally, the Pac-12 is the most logical competitor conference for members of the MWC to join, given the geographic proximity and makeup of the universities. Indeed, for years **_prior_** to the imposition of the Poaching Penalty, MWC member schools had approached the Pac-12 about joining the Conference.

**ANSWER.** This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant denies the allegations in the first three sentences of Paragraph 5. With respect to the fourth sentence of Paragraph 5, Defendant admits that in 2023, San Diego State notified the MWC that it might join the Pac-12. Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in sentence four of Paragraph 5 and, on that basis, denies them.

6. The Poaching Penalty was designed by the MWC to stifle this competition by imposing an artificial barrier to entry for members of the MWC to join the Pac-12. The Poaching Penalty improperly restricts and limits the competitive offers the Pac-12 can make to MWC members because it places an exorbitant tax on any such offers. In this way, the Poaching Penalty limits the ability of MWC member schools to benefit from competition among athletic conferences—placing one of their most logical options at a severe competitive disadvantage. The Poaching Penalty thus functions in the same manner as no-poach, no-hire, and non-solicitation agreements that have been declared unlawful in this District and around the country because they suppress competition.

**ANSWER.** Denied.

7. There is no legitimate justification for the Poaching Penalty. In fact, the MWC already seeks to impose tens of millions of dollars in "exit fees" on MWC schools that depart from the conference. To the extent the MWC would suffer any harm from the departures of its member schools, these exit fees provide more than sufficient compensation to the MWC. There is no reason why the schools' new conference should be responsible for compensating the MWC further, or why such penalties should apply to only one competitor conference: the Pac-12. The MWC's purpose in imposing the Poaching Penalty was to reduce competition by the Pac-12 for member schools and weaken the Pac-12 financially. The Poaching Penalty is duplicative, unnecessary, and entirely punitive.

**ANSWER.** Denied.

8. Enforcing the Poaching Penalty also threatens the Pac-12's ability to remain a viable competitor. Under NCAA bylaws, top-tier collegiate athletic conferences are required to have at least eight member schools. When ten Pac-12 schools departed the conference earlier this year, the NCAA afforded the Pac-12 a two-year grace period to operate below the eight-school minimum that will expire in fall 2026. If the Pac-12 is forced to pay the Poaching Penalty, it will

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

have diminished resources to rebuild and maintain its longstanding status as a leading conference. Enforcing the Poaching Penalty would also weaken the Pac-12 as a competitor in numerous other ways by depleting vital resources needed by Pac-12 member institutions to compete at the highest levels of collegiate athletics.

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant admits that the Pac-12 asks the Court to declare the Termination Fees in the Scheduling Agreement invalid and unenforceable, but denies that the Pac-12 is entitled to any of the relief requested in the Complaint.  Defendant further states that the NCAA bylaws speak for themselves and denies any allegations or characterizations contrary thereto contained in Paragraph 8.  Defendant further states that it lacks sufficient information or knowledge to admit or deny the remaining allegations of Paragraph 8 and, on that basis, denies them.

9.    Notwithstanding the MWC's draconian and unlawful Poaching Penalty, the Pac-12 remains steadfast in its commitment to re-grow in a fair and competitive manner, to best serve its member schools and student-athletes.  To that end, on September 12, 2024, the Pac-12 accepted applications from four current members of the MWC to join the Pac-12 beginning with the 2026-2027 season, which is when the MWC's current media rights agreement will expire.  The same day, the MWC demanded that the Pac-12 pay $43 million in "liquidated damages," citing the Poaching Penalty.  *See* **Exhibit 2** (Letter from MWC Commissioner Gloria Nevarez to Pac-12 Chief Legal Officer Scott Petersmeyer).  On September 23, 2024, the Pac-12 admitted a fifth MWC member, Utah State University, beginning with the 2026-2027 season.  The MWC has signaled that it intends to collect (or withhold from distributions) exit fees from its departing members.

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant lacks sufficient information or knowledge to admit or deny the allegations in the first sentence of Paragraph 9 and, on that basis, denies them.  With respect to the second sentence of Paragraph 9, Defendant admits that on September 12, 2024, the Pac-12 admitted four current members of the MWC—San Diego State, Colorado State, Fresno State, and Boise State—to the Pac-12 for the 2026-2027 athletic season.  With respect to the third and fourth sentences of Paragraph 9, Defendant states that Exhibit 2 is a letter MWC Commissioner Gloria Nevarez sent to Pac-12 Chief Legal Officer Scott Petersmeyer on September 12, 2024, requesting payment of fees the Pac-12 had freely agreed to in the Scheduling Agreement.

Defendant further states that Exhibit 2 speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 9. Defendant further states that Exhibit 2 contains the language quoted in Paragraph 9, and refers to the full text of Exhibit 2 for its true meaning and effect. With respect to the fifth sentence of Paragraph 9, Defendant admits that the Pac-12 admitted a fifth current member of the MWC, Utah State, on September 23, 2024. With respect to the last sentence of Paragraph 9, Defendant further admits that it has informed Boise State, Colorado State, San Diego State, Fresno State, and Utah State (collectively, the "Departing Members"), that it intends to retain and collect the fees due pursuant to MWC Bylaw § 1.04, (the "Exit Fees"), which all MWC members, including the Departing Members, approved in April 2021, and which speaks for itself. Defendant denies the remaining allegations in Paragraph 9.

10.    The MWC's excessive and punitive Poaching Penalty violates federal and state antitrust law, California's Unfair Competition Law (UCL), and basic principles of contract law. *First*, the Poaching Penalty is a *per se* violation of antitrust law because it is a naked, horizontal agreement in restraint of trade. The Poaching Penalty weakens the Pac-12 in competition with other conferences for MWC member schools, diminishes the compensation available for schools interested in joining the Pac-12, and reduces MWC member schools' options for mobility. On the flip side of the coin, the Poaching Penalty does nothing to increase the amount of college football played, which was the purpose of the Scheduling Agreement. *Second*, the Poaching Penalty is unfair and unlawful under the UCL because its only purpose is to distort competition by locking up MWC member schools and preventing them from leaving for a competitor (the Pac-12). *Third*, the Poaching Penalty is an unenforceable penalty because the "liquidated damages" it threatens are excessive and bear no reasonable relationship to the amount the MWC may be harmed from the loss of its member schools. Nor could it, since the MWC is already seeking tens of millions in exit fees from the departing schools that more than compensate for any such harm.

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

11.    The Pac-12 therefore seeks a declaratory judgment that the Poaching Penalty is invalid and unenforceable, and any other relief the Court deems proper to redress these violations.

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant admits that the Pac-12 asks the Court to declare the

Termination Fees in the Scheduling Agreement invalid and unenforceable, but denies that the Pac-12 is entitled to any of the relief requested in the Complaint.  Defendant denies the remaining allegations in Paragraph 11.

## II.    PARTIES

12.    The parties are both NCAA Division 1 collegiate athletics conferences whose football teams compete in the Football Bowl Subdivision ("FBS"), the country's highest level of college football.  Both conferences currently include, and have historically included, member schools from the Western United States.

**ANSWER.**    With respect to the first sentence of Paragraph 12, Defendant admits that the parties are both NCAA Division I collegiate athletic conferences whose football-playing member institutions generally compete in the Football Bowl Subdivision ("FBS"). Defendant denies the remaining allegations in Paragraph 12.

13.    The plaintiff, the Pac-12, is a California unincorporated nonprofit association that has its headquarters and principal place of business in San Ramon, California.

**ANSWER.**    Admitted.

14.    The defendant, the MWC, is a Colorado nonprofit corporation that has its headquarters and principal place of business in Colorado Springs, Colorado.

**ANSWER.**    Admitted.

## III.    JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

15.    The Pac-12 brings one cause of action for violation of the Sherman Act, 15 U.S.C. § 1, a federal statute, as well as three causes of action under state law, all concerning the Poaching Penalty.

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant admits that Plaintiff brings one cause of action for violation of the Sherman Act, 15 U.S.C. § 1, a federal statute, as well as three causes of action under state law.  Defendant denies the remaining allegations in Paragraph 15.

16.    The Court has subject matter jurisdiction over the Pac-12's federal antitrust cause of action under (a) Section 4 of the Sherman Act, 15 U.S.C. § 4; (b) 28 U.S.C. § 1337; and (c) 28

7

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

1    U.S.C. § 1331 (federal question).  The Court has supplemental jurisdiction over the state law

2    causes of action, which arise from the same case or controversy, under 28 U.S.C. § 1337.

3         **ANSWER.**    This paragraph contains legal conclusions to which no answer is required.

4    To the extent an answer is required, Defendant states that it does not challenge the Court's exercise

5    of subject matter jurisdiction over this action.  Defendant denies the remaining allegations in

6    Paragraph 16.

7         17.    The Court has personal jurisdiction over the MWC under Section 12 of the Clayton
     Act, 15 U.S.C. § 22, because the MWC has sufficient minimum contacts with California, and its
8    California contacts give rise to the causes of action here.  The MWC has three member schools
     located in California.  The MWC contracted with the Pac-12, which is headquartered in California,
9    to arrange a football schedule that includes games to be played in California.  Further, the MWC
     seeks to recover money from the California-headquartered Pac-12 pursuant to that contract (the
10   Scheduling Agreement).  The MWC therefore transacts business in California and purposefully
     avails itself of the forum state.
11

12        **ANSWER.**    This paragraph contains legal conclusions to which no answer is required.

13   To the extent an answer is required, Defendant states that it does not challenge the Court's exercise

14   of personal jurisdiction over it.  Defendant denies the remaining allegations in Paragraph 17.

15        18.    Venue is proper in this judicial district under Sections 4 and 12 of the Clayton Act,
16   15 U.S.C. §§ 15, 22, because the MWC both is an inhabitant of the Northern District of California
     (as one of its member schools is San Jose State University) and transacts business in the Northern
17   District of California, including but not limited to by directing commerce to this District.

18        **ANSWER.**    This paragraph contains legal conclusions to which no answer is required.

19   To the extent an answer is required, Defendant states that it does not challenge that venue is proper

20   in this judicial district.  Defendant denies the remaining allegations in Paragraph 18.

21        19.    Venue is also proper under 28 U.S.C. § 1391(b)(2), as a substantial part of the acts
22   or omissions giving rise to the Pac-12's claims occurred in Contra Costa County.  The headquarters
     of the Pac-12, with whom the MWC signed the Scheduling Agreement that contains the Poaching
23   Penalty at issue, is located in San Ramon, California.

24        **ANSWER.**    This paragraph contains legal conclusions to which no answer is required.

25   To the extent an answer is required, Defendant does not challenge that venue is proper pursuant to

26   28 U.S.C. § 1391(b)(2).  Defendant denies the remaining allegations in Paragraph 19.

27

28

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

20.     Under the Northern District of California's General Order No. 44, Section D.3, venue for this antitrust case is proper in any courthouse in this district.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant states that it does not challenge that venue is proper pursuant to General Order No. 44, Section D.3.  Defendant denies the remaining allegations in Paragraph 20.

## IV.    FACTUAL ALLEGATIONS

### A.     The Pac-12 and MWC are Competitors for Member Schools

21.     Collegiate athletics conferences compete with one another to recruit schools to become members.  The Pac-12 and the MWC are two competitor conferences that compete for member schools.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant admits that all collegiate athletic conferences, which include the Pac-12 and the MWC, compete for member schools.  Defendant denies the remaining allegations in Paragraph 21.

22.     Competition among conferences for member schools is robust, and schools moving from one conference to another ("realignment") has become increasingly common.  Since 1978, when the modern era of the NCAA's Division 1 competition began, hundreds of schools have moved from one conference to another, many moving multiple times.[1] For the 2024-2025 season alone, 23 schools joined a new conference from the one they had participated in the year before.[2]

**ANSWER.**     Defendant admits that schools have moved some or all of their athletic programs from one conference to another, opted against joining any conference, and entered and exited various levels of athletic competition since 1978.  Defendant states that the articles cited in Paragraph 22 speak for themselves and denies any allegations or characterizations contrary thereto

---

[1] *See* Kaleb Henry, *A History of Conference Realignment*, KLIN News (Aug. 13, 2023), *available at* https://klin.com/2023/08/13/a-history-of-conference-realignment/ ("Conference realignment is not a new concept.").

[2] *See* Lawrence Price, *College football conference realignment breakdown for 2024-25: Teams in new conferences*, NCAA (Sept. 8, 2024), available at https://www.ncaa.com/news/ncaa/article/2024-08-22/college-football-conference-realignmentbreakdown-2024-25-teams-new-conferences.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

contained in Paragraph 22. Defendant further states that it refers to the full text of those articles for their true meaning and effect. Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 22 and, on that basis, denies them.

23. Schools benefit from membership in an athletics conference in a variety of ways. A conference enables its member schools to share resources, exert greater leverage in media rights negotiations, and schedule games for the schools' student-athletes to compete against one another.

**ANSWER.** Defendant states that while membership in athletics conferences may be beneficial for certain schools, other schools benefit by opting against joining a conference or attempting to form their own. Defendant denies the remaining allegations in Paragraph 23.

24. Student-athletes likewise benefit from their schools' membership in an athletics conference, and competition for member schools among conferences, as well. Being part of a conference—or moving from one conference to another—can promote student-athletes' professional prospects by matching them with well-suited competitors, increase the value of their name-image-likeness ("NIL") rights, and expose them to new geographic markets and media opportunities.

**ANSWER.** Defendant states that while membership in athletics conferences may be beneficial for certain student-athletes, other student-athletes benefit from their school's decision against joining a conference or attempting to form its own conference. Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 24 and, on that basis, denies them.

25. Given this robust competition among conferences, it is common for conferences to approach schools with offers (or vice versa), even while a school is currently part of a different conference.

**ANSWER.** Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 25 concerning what is common practice for athletic conferences other than its own and, on that basis, denies them.

### 1.    The Pac-12

26. The Pac-12 is a NCAA Division 1 collegiate athletics conference that boasts a storied history and reputation. Founded in 1915, the Pac-12 is dedicated to developing the next

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

generation of leaders by championing excellence in academics, athletics, and the well-being of student athletes.  Since its establishment more than a century ago, the Pac-12 has earned more team sport national championships than any other conference in history.

**ANSWER.**     With respect to the first sentence of Paragraph 26, Defendant admits that the Pac-12 is an NCAA Division I collegiate athletics conference.  Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 26 and, on that basis, denies them.

27.     Oregon State University (then known as Oregon Agricultural College) was one of the four founding members of the Pac-12 in 1915.  Washington State University joined the Pac-12 just one year later, in 1916.  For over 100 years, OSU and WSU have dedicated themselves to promoting the conference and its mission.

**ANSWER.**     Defendant admits that the Pac-12's website states that WSU and OSU joined what would become the Pac-12 in 1962 and 1964, respectively.[3] Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 27 and, on that basis, denies them.

28.     Collegiate athletics, and the Pac-12 specifically, underwent a major realignment in 2022 and 2023.  Between June 2022 and August 2023, ten schools announced their departure from the Pac-12 to join competing conferences for the 2024-2025 academic year.  Each school was recruited away from the Pac-12 by a rival conference, as part of competition among conferences for members: (a) the University of California, Los Angeles (UCLA), the University of Southern California (USC), the University of Oregon, and the University of Washington joined the Big Ten Conference; (b) the University of Colorado, the University of Arizona, Arizona State University (ASU), and the University of Utah joined the Big 12 Conference; and (c) the University of California, Berkeley and Stanford University joined the Atlantic Coast Conference.

**ANSWER.**     Admitted.

29.     Unlike other conferences, including the MWC, the Pac-12's bylaws did not impose "exit fees" on the departing member schools.

---

[3] *History of the Pac-12*, Pac-12  https://archive.is/BFODN (last visited Oct. 21, 2025) ("The original AAWU membership included California, Stanford, USC, UCLA, and Washington. Washington State joined the membership in 1962, while Oregon and Oregon State joined in 1964.").

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

**ANSWER.**     Defendant states that the MWC's bylaws ("MWC Bylaws") and the Pac-12's bylaws speak for themselves and denies any allegations or characterizations contrary thereto contained in Paragraph 29.  Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 29 and, on that basis, denies them.

30.     The ten departures from the Pac-12 left the conference with multiple pressing issues in late 2023.

**ANSWER.**     Defendant admits that ten schools departed from the Pac-12 before the 2024-2025 athletic year.  Defendant denies the remaining allegations in Paragraph 30.

31.     First, the Pac-12 and its two remaining schools, OSU and WSU, faced the prospect of a 2024-2025 season without a full schedule of football games for their student athletes and only months to arrange a new one.  That is because conference members typically schedule most football games against fellow conference members each season, and only a few games against non-conference opponents.  The departure of ten schools left the Pac-12 with a significant gap in scheduling athletic competitions for OSU and WSU, particularly for those schools' football programs where schedules are often set in years in advance.

**ANSWER.**     Defendant admits that ten schools departed from the Pac-12 before the 2024-2025 athletic year.  Defendant further admits that the Pac-12 and its remaining schools, OSU and WSU, were left with a 2024-2025 athletic season without a full schedule of football games, and the Pac-12 had a year to determine its 2024-2025 athletic season.  Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 31 and, on that basis, denies them.

32.     Second, the NCAA's bylaws afford the Pac-12 only a two-year grace period, beginning with the 2024-2025 season, to participate in the FBS without the requisite eight active member schools.[4] If the Pac-12 is unable to rebuild to eight schools, it forfeits participation in the top-flight of college football, the FBS.  The Pac-12 thus has limited time to recruit new members and remain eligible to participate as a conference in the NCAA FBS.

**ANSWER.**     Defendant states that the NCAA's bylaws speak for themselves and denies any allegations or characterizations contrary thereto contained in Paragraph 32.  Defendant further

---

[4] *See* NCAA Bylaws, Article 20 ("Division Membership") at Sections 20.02.9 (minimum membership), 20.02.9.2 (grace period).

refers to the full text of the NCAA bylaws for their true meaning and effect.  Defendant denies the second and third sentences of Paragraph 32 and states that, since filing this lawsuit, the Pac-12 secured eight football playing members effective as of the 2026-2027 athletic season.  Defendant denies the remaining allegations in Paragraph 32.

### 2. The MWC

33.    The MWC is an NCAA Division 1 collegiate athletic conference and a competitor of the Pac-12.

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant admits that it is an NCAA Division I collegiate athletics conference, and that all collegiate athletic conferences, which include the Pac-12 and the MWC, compete for member schools.  Defendant denies the remaining allegations in Paragraph 33.

34.    Like many conferences, the MWC has benefited from recent conference realignment and grown because of open competition for member schools.

**ANSWER.**    The MWC admits that it has benefitted from competition with other conferences.  Answering further, Defendant states that five member schools are departing to the Pac-12 for the 2026-2027 athletic season, which the Pac-12 announced in September 2024.

35.    The MWC was formed in 1999 by eight schools that defected from the Western Athletic Conference (WAC).[5]  In 2005, the MWC successfully recruited Texas Christian University away from Conference USA.  Between 2011 and 2013, the MWC successfully recruited six more WAC members to join the MWC: Boise State University; California State University, Fresno; the University of Hawaii; the University of Nevada, Reno; San Jose State University; and Utah State University.  In none of these instances did the MWC pay any "poaching penalties" to the conferences from which it recruited members.

**ANSWER.**    Defendant admits the first three sentences in Paragraph 35. Defendant further states that the Scheduling Agreement, which provided the Pac-12 with an

---

[5] *See Mountain West Chronology*, Mountain West https://themw.com/mountain-west-chronology/ (listing founding members United States Air Force Academy; Brigham Young University; Colorado State University; the University of New Mexico; San Diego State University; the University of Nevada, Las Vegas; the University of Utah; and the University of Wyoming).

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

unprecedented full season of twelve games from the MWC's schedule and unique access to MWC members, speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 35. Defendant further admits that, in negotiating and executing the Scheduling Agreement, all parties, including the Pac-12, were represented by independent and experienced legal counsel. Defendant further admits that it did not enter into a scheduling agreement with another conference that would have similarly provided the MWC with an unprecedented full season of twelve games from another conference's schedule and unique access to another conference's members, and under which, the MWC agreed to pay fees for successfully offering membership to some but not all member schools of another conference. Defendant denies the remaining allegations in Paragraph 35.

36.    MWC member schools have also discussed joining other conferences, including the Pac-12, for years prior to the Scheduling Agreement. San Diego State University ("SDSU") had entertained discussions about potentially joining the Pac-12 or the Big 12 Conference for many years before the Scheduling Agreement was executed.[6] And it has been reported that the Air Force Academy has discussed joining the American Athletic Conference.[7] Those other conferences are not subject to any "poaching penalties."

**ANSWER.**    Defendant admits that in 2023, San Diego State notified the MWC that it might join the Pac-12. Defendant also admits that published reports indicated that the Air Force Academy discussed joining the American Athletic Conference. Defendant further states that the articles cited in Paragraph 36 speak for themselves and denies any allegations or characterizations contrary thereto contained in Paragraph 36. Defendant further states that it refers to the full text of those articles for their true meaning and effect. Defendant further states that the Scheduling

---

[6] *See* Alex Kirshner, *Here's what San Diego State's Big 12 pitch looked like*, SB Nation (Vox) (Oct. 14, 2016), available at https://www.sbnation.com/collegefootball/2016/10/14/13291382/sdsu-big-12-expansion-pitch; Derek Togerson, *San Diego State to the Big 12? Aztecs Still a Wild Card as Realignment Drama Continues*, NBC San Diego (Aug. 7, 2023), *available at* https://www.nbcsandiego.com/news/local/san-diego-state-to-the-big-12-aztecs-still-a-wild-card-as-realignment-drama-continues/3279837/.

[7] *See* Pete Thamel, *Sources: Air Force emerges as serious target for AAC, ESPN* (Sept. 16, 2024), *available at* https://www.espn.com/college-sports/story/_/id/41291626/air-force-emergesserious-.

1   Agreement speaks for itself and denies any allegations or characterizations contrary thereto

2   contained in Paragraph 36.   Defendant further admits that, in negotiating and executing the

3   Scheduling Agreement, all parties, including the Pac-12, were represented by independent and

4   experienced legal counsel.   Defendant further admits that it did not enter into a scheduling

5   agreement with a conference other than the Pac-12 that similarly provided that conference with an

6   unprecedented full season of twelve games from the MWC's schedule and unique access to MWC

7   members, and under which, another conference agreed to pay fees for taking some but not all

8   MWC schools.  Defendant denies the remaining allegations in Paragraph  36.

9       37.    Schools have departed from the MWC for other conferences in recent years.  In

10  none of those instances did the new conference pay the MWC "poaching penalties."

11      **ANSWER.**    Defendant states that certain MWC member institutions have departed from

12  the MWC over the last twenty years.  Defendant further states that the Scheduling Agreement

13  speaks for itself and denies any allegations or characterizations contrary thereto contained in

14  Paragraph 37.   Defendant further admits that, in negotiating and executing the Scheduling

15  Agreement, all parties, including the Pac-12, were represented by independent and experienced

16  legal counsel.  Defendant further admits that it did not enter into a scheduling agreement with a

17  conference other than the Pac-12 that similarly provided that conference with an unprecedented

18  full season of twelve games from the MWC's schedule and unique access to MWC members, and

19  under which, another conference agreed to pay fees for taking some but not all MWC schools.

20  Defendant denies the remaining allegations in Paragraph 37.

21      38.    The MWC imposes "exit fees" on member schools that resign from the MWC and

22  seek to join competing conferences.   Specifically, the MWC bylaws require departing member

23  schools to pay "an amount equal to three (3) times the average per Member Institution Conference

24  distribution payment for the year preceding" if notice of departure is provided more than a year in

25  advance.  If notice is provided less than a year in advance, this prohibitive "exit fee" is doubled.

    The MWC is reportedly seeking to recover as much as a combined *$80 million* in exit fees from

    just four MWC schools that have announced they will join the Pac-12 for the 2026-2027 season.

26

27

28

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant states that the MWC bylaws speak for themselves and denies any allegations or characterizations contrary thereto contained in Paragraph 38. Defendant admits that all MWC members, including the Departing Members, approved MWC Bylaw § 1.04 in April 2021, and that the current version of MWC Bylaw § 1.04 contains the language quoted in Paragraph 38, which all MWC members approved, including the Departing Members (except San Diego State, which abstained) in December 2023.  Defendant refers to the full text of MWC Bylaw § 1.04 for its true meaning and effect.  Defendant further states that the Exit Fees pursuant to MWC Bylaw § 1.04 apply when a member school seeks to withdraw from the MWC for any reason, including to go independent.  Defendant further admits that it has informed the Departing Members that it intends to retain and collect the Exit Fees pursuant to MWC Bylaw § 1.04, which all MWC members, including the Departing Members, approved in April 2021, and which speaks for itself.  Defendant denies the remaining allegations in Paragraph 38.

**B.**    **The Pac-12 and MWC Reach a One-Year Scheduling Agreement for Football Games**

39.    Following the ten departures from the Pac-12, and with only months until the 2024-2025 season was set to begin, the Pac-12 and its remaining members, OSU and WSU, immediately began exploring scheduling options.

**ANSWER.**    Defendant admits that, by mid-2023, ten schools who were previously members of the Pac-12 departed from the Pac-12 for the 2024-2025 athletic season, leaving the Pac-12 a year to determine its 2024-2025 athletic season.  Defendant further admits that WSU and OSU remained in the Pac-12 conference for the 2024-2025 athletic season.  Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 39 and, on that basis, denies them.

40.    The Pac-12 ultimately reached a Scheduling Agreement with the MWC, providing dates and matchups for OSU and WSU to compete against MWC schools in football for the 2024-

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

2025 season.  The Scheduling Agreement became effective December 1, 2023.  *See* **Exhibit 1** at 2 (preamble).

        **ANSWER.**    Admitted.

      41.    The fundamental purpose of the Scheduling Agreement was to arrange a full season of college football games for the Pac-12's two member schools to play the MWC's twelve member schools.  To do so, the parties agreed that OSU and WSU would each participate in six football games against MWC opponents, comprised of three home games and three away games.  *See* **Exhibit 1** at Section 2.01; Schedule 1 ("Football Event Scheduling").

        **ANSWER.**    Defendant states that the Scheduling Agreement, which provided the Pac-12 with an unprecedented full season of twelve games from the MWC's schedule and unique access to the MWC's members, speaks for itself, and denies any allegations or characterizations contrary thereto contained in Paragraph 41.  Defendant further states that it refers to the full text of the Scheduling Agreement for its true meaning and effect.  Defendant further admits that the preamble of the Scheduling Agreement sets forth that "the MWC and its members would not enter into [the Scheduling Agreement], and mutual cooperation and exchanges of confidential information would not be feasible, however, without safeguards, including certain fees, which protect against the misuse of information, protect the MWC from fracturing, and preserve the integrity of the MWC and Pac-12."  Exhibit 1, Preamble.  "Accordingly, such safeguards are essential to promote the competitive opportunities being made available to student-athletes of OSU, WSU, and the MWC Member Institutions hereunder."  *Id.*  Defendant denies the remaining allegations in Paragraph 41.

      42.    The MWC received more than $14 million in compensation from Pac-12 member schools for one season of football games under the Scheduling Agreement.  In exchange for "scheduling and related administrative services" associated with arranging the 2024-2025 season, the Pac-12 member schools collectively paid the MWC a one-time fee of $2 million.  *See* **Exhibit 1** at Section 2.02. On top of the one-time fee, the Pac-12 member schools also paid the MWC over $12 million in "Participation Fees."  *See* **Exhibit 1** at Section 3.01(b), (d).  Under the Scheduling Agreement, each conference is still responsible for providing referees, replays, and other "necessary services" for home games hosted by their respective member schools.  *See id.*

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

1  **ANSWER.**  Defendant states that the Scheduling Agreement, which provided the Pac-

2  12 with an unprecedented full season of twelve games from the MWC's schedule and unique

3  access to the MWC's members, speaks for itself, and denies any allegations or characterizations

4  contrary thereto contained in Paragraph 42.  Answering further, Defendant states that the

5  Scheduling Agreement contains the language quoted in Paragraph 42, and refers to the full text of

6  the Scheduling Agreement for its true meaning and effect.  Defendant denies the remaining

7  allegations in Paragraph 42.

8  43.  The fees the Pac-12 paid the MWC far exceeded the market value of integrating

9  OSU and WSU into the MWC's schedule.  As multiple news outlets reported, these fees were

10  exorbitant: "The $14 million this year comes out to $2.3 million per home game, which is above
the going rate for a nonconference home game."[8] Indeed, the per-game price the Pac-12 is paying

11  the MWC under the Scheduling Agreement appears to be more than ***any*** school will pay for
football games this season.[9] The Scheduling Agreement extracted an extraordinarily high price for

12  OSU and WSU to play football.

13  **ANSWER.**  Defendant states that the referenced articles contain the language quoted in

14  Paragraph 43.  Answering further, Defendant states that the Scheduling Agreement, which

15  provided the Pac-12 with an unprecedented full season of twelve games from the MWC's schedule

16  and unique access to the MWC's members, speaks for itself, and denies any allegations or

17  characterizations contrary thereto contained in Paragraph 43.  Defendant further admits that, in

18

19  [8] *See* Chris Vannini, *Pac-12, Mountain West Conference miss deadline for 2025 football

20  schedules: What's next?*, The Athletic (The New York Times) (Sept. 2, 2024), *available at*
https://www.nytimes.com/athletic/5740549/2024/09/02/pac-12-mountain-west-2025-

21  scheduleagreement/?partner=slack&smid=sl-share; *see also* Chris Murray, *What's next for the
Mountain West after football scheduling alliance with Pac-2 not extended*, Nevada Sports Net

22  (Sept. 3, 2024), available at https://nevadasportsnet.com/news/reporters/whats-next-for-mountain-
westafter-football-scheduling-alliance-with-pac-2-not-extended ("well above the going rate").

23  [9] *See* David Rumsey, *College Football's Guarantee Games: High Risks and Higher Payouts*, Front

24  Office Sports (Aug. 30, 2024), *available at* https://frontofficesports.com/college-
footballsguarantee-games-high-risks-and-

25  higherpayouts/?utm_medium=email&utm_campaign=FOS%20AM%20Aug%2030%202024&ut

26  m_content=FOS%20AM%20Aug%2030%202024+Version+A+CID_ac10afed1d32c3a9bafe30e
f3761a405&utm_source=FOS%20Daily%20Newsletter&utm_term=College%20Footballs%20G

27  uarantee%20Games%20High%20Risks%20and%20Higher%20Payouts ("Nobody, to my
knowledge, has crossed the $2 million threshold yet [for a single game].").

28

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

negotiating and executing the Scheduling Agreement, all parties, including the Pac-12, were represented by independent and experienced legal counsel. Defendant denies the remaining allegations in Paragraph 43.

44.    The MWC benefited from the inclusion of Pac-12 member schools OSU and WSU in the MWC football schedule. The MWC Commissioner admitted that OSU and WSU have "really added a pump to our football strength of schedule and we look forward to meeting them on the gridiron this year."[10] Nevertheless, it was the Pac-12 that paid the MWC for the ability to participate, not the other way around, because the MWC "[felt] it ha[d] the leverage" over the Pac-12, which lacked a full schedule.[11]

**ANSWER.**    Defendant states that the articles cited in Paragraph 44 speak for themselves and denies any allegations or characterizations contrary thereto contained in Paragraph 44. Defendant further states that the referenced articles contain the language quoted in Paragraph 44, and refers to the full text of those articles for their true meaning and effect. Defendant further admits that the referenced New York Times article quoted in Paragraph 44 states the Pac-12 had "other options to create good home games, more exposure and improve its strength of schedule." Defendant denies the remaining allegations in Paragraph 44.

45.    Beyond the scheduling of games for the 2024-2025 season, the Scheduling Agreement also contemplates the possibility of future transactions between the Pac-12 and the MWC, none of which have materialized, and none of which require the inclusion of the Penalty Provision.

**ANSWER.**    Defendant states that the Scheduling Agreement speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 45, and refers to the full text of the Scheduling Agreement for its true meaning and effect. Defendant denies the remaining allegations in Paragraph 45.

---

[10] *See* Jason Walker, *Mountain West Commissioner Gloria Nevarez touts conference successes at Media Days*, Cache Valley Daily (July 11, 2024), *available at* https://www.cachevalleydaily.com/sports/mountain-west-commissioner-gloria-nevarez-toutsconference-successes-at-media-days/article_9079dbb0-3ed5-11ef-9485-0bfe9d760a78.html.

[11] *See* Chris Vannini, *Pac-12, Mountain West Conference miss deadline for 2025 football schedules: What's next?*, The Athletic (The New York Times), *available at* https://www.nytimes.com/athletic/5740549/2024/09/02/pac-12-mountain-west-2025-scheduleagreement/?partner=slack&smid=sl-share.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

1
2

46.    First, the conferences can "mutually agree," by September 1, 2024, to a one-year extension of the Scheduling Agreement, which would provide a second year of football games at an undetermined price.  *See* **Exhibit 1** at Section 4.01(b).

3
4
5
6
7

**ANSWER.**    Defendant states that the Scheduling Agreement speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 46. Answering further, Defendant states that the Scheduling Agreement contains the language quoted in Paragraph 46, and refers to the full text of the Scheduling Agreement for its true meaning and effect.  Defendant denies the remaining allegations in Paragraph 46.

8
9
10
11
12

47.    After the Scheduling Agreement was signed, the conferences discussed the possibility of a one-year extension but were unable to reach an agreement.  The conferences' negotiations broke down after the MWC demanded $30 million from the Pac-12 for the 2025-2026 season, more than ***double*** the already exorbitant price the MWC charged the Pac-12 for games during the 2024-2025 season.  After the parties were unable to reach agreement in the face of the MWC's financial demands, the MWC Commissioner broke off further discussions, stating, "I think we have to move on."[12]

13
14
15
16
17
18
19
20
21
22

**ANSWER.**    Defendant admits that the parties were unable to reach an agreement regarding a one-year extension of the Scheduling Agreement for the 2025-2026 season.  Defendant further states that the conferences' negotiations broke down after the Pac-12, for the 2025-2026 season, offered an amount that was less than half the value the Pac-12 agreed to for games during the 2024-2025 season.  Defendant further states that the Scheduling Agreement, which provided the Pac-12 with an unprecedented full season of twelve games from the MWC's schedule and unique access to the MWC's members, speaks for itself, and denies any allegations or characterizations contrary thereto contained in Paragraph 47.  Defendant further admits that, in negotiating and executing the Scheduling Agreement, all parties, including the Pac-12, were represented by independent and experienced legal counsel.  Defendant further states that the article

23
24
25
26
27

---

[12] *See* Mark Zeigler, *Does San Diego State, Mountain West fit into Pac-2's plans?*, The San Diego Union-Tribune (Sept. 11, 2024), available at https://www.sandiegouniontribune.com/2024/09/09/does-san-diego-state-mountain-west-fit-intopac-2s-plans/; *see also* Kyle Bonagura, *Sources: Pac-12, Mountain West football don't reach deal for '25*, ESPN (Sept. 2, 2024), available at https://www.espn.com/collegefootball/story/_/id/41100415/sources-pac-12-mountain-west-football-reach-deal-25 ("There's too big a gap [between the parties].").

28

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

cited in Paragraph 47 speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 47. Defendant further admits that the referenced article contains the language quoted in sentence three of Paragraph 47, and refers to the full text of that article for its true meaning and effect. Defendant denies the remaining allegations in Paragraph 47.

48.     Second, the Scheduling Agreement contemplates that the two conferences will "negotiate in good faith the consummation, as promptly as reasonably practicable, of a [D]efinitive [T]ransaction" in which all MWC member schools would join the Pac-12 after the conclusion of the 2024-2025 season. *See* **Exhibit 1** at Section 8.01. Section 8.01 does not involve any commitment to actually enter into a definitive transaction, nor does it identify any terms that would be relevant to reaching such an agreement. The agreement to negotiate in good faith regarding such a possibility was not a primary purpose of the Scheduling Agreement or a material inducement for entering into the Scheduling Agreement.

**ANSWER.**     Defendant states that the Scheduling Agreement speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 48. Answering further, Defendant states that the Scheduling Agreement contains the language quoted in the first sentence of Paragraph 48, and refers to the full text of the Scheduling Agreement for its true meaning and effect. Defendant denies the remaining allegations in Paragraph 48.

49.     The parties have had preliminary discussions but neither side has made a proposal for a Definitive Transaction. As of the time of filing this complaint, the parties have not entered into any such Definitive Transaction.

**ANSWER.**     The MWC denies that the parties had preliminary discussions for a Definitive Transaction. The MWC admits that neither side made a proposal for a Definitive Transaction, and further admits the second sentence in Paragraph 49.

**C.     The MWC Imposes an Anticompetitive Poaching Penalty on the Pac-12**

50.     Unrelated to the Scheduling Agreement's purpose of scheduling football games for the 2024-2025 season, the MWC insisted on including an anticompetitive and unlawful provision to prevent the Pac-12 from recruiting MWC member schools to join the Pac-12 in future seasons.

**ANSWER.**     Denied.

51.     Specifically, the MWC proposed a one-sided Poaching Penalty that punishes the Pac-12 if it recruits some (but not all) MWC member schools to join the Pac-12. The Poaching

Penalty provides that if any MWC school accepts an offer from the Pac-12 to join the conference, the Pac-12 "shall pay liquidated damages to MWC in the form of [a] termination fee." *See* **Exhibit 1** at Section 7.01. There is no similar provision or penalty if the MWC successfully recruits a Pac-12 school.

**ANSWER.**     Defendant denies the allegations of the first sentence of Paragraph 51. As for the second and third sentences of Paragraph 51, Defendant states that the Scheduling Agreement contains the language quoted in Paragraph 51, and refers to the full text of Section 7.01 for its true meaning and effect.  Defendant denies the remaining allegations in Paragraph 51.

52.     The MWC-imposed Poaching Penalty does not end at the conclusion of the 2024-2025 season; instead, the Poaching Penalty extends for an additional two years ***after*** the Scheduling Agreement's expiration date.  As a result, the Poaching Penalty handcuffs the Pac-12 until at least August 1, 2027, which is the year ***after*** the Pac-12's NCAA grace period expires.  In other words, the Pac-12 must re-build to the minimum eight member schools required under the bylaws, while hampered ***at all times*** by the Poaching Penalty.

**ANSWER.**     Defendant states that the Scheduling Agreement and the NCAA bylaws speak for themselves and denies any allegations or characterizations contrary thereto contained in Paragraph 52, and refers to the full text of the Scheduling Agreement and the NCAA bylaws for their true meaning and effect.  Defendant further states that the Pac-12 was not prevented from recruiting member schools until August 1, 2027; the Pac-12 recruited five current MWC member schools to join the Pac-12, which the Pac-12 announced in September 2024.  Defendant further states that the Pac-12 could have reached the NCAA eight-member threshold without incurring any fee under the Scheduling Agreement by inviting all members of the MWC to join the Pac-12. Defendant denies the remaining allegations in Paragraph 52.

53.     The "termination fees" threatened in the Poaching Penalty are severe monetary penalties.  If a single MWC school accepts an offer to join the Pac-12, the Pac-12 would owe the MWC $10 million.  Each additional school would cost even more: If two schools depart, the Pac-12 would owe $20.5 million; if three schools depart, it owes $31.5 million; if four schools depart, $43 million; if five schools depart, $55 million; and so on.  *See* **Exhibit 1** at Schedule 7.

**ANSWER.**     Defendant denies the allegations of the first sentence of Paragraph 53. With regards to the second and third sentences of Paragraph 53, Defendant admits that, in

negotiating and executing the Scheduling Agreement, all parties, including the Pac-12, were represented by independent and experienced legal counsel.  Defendant further states that the Scheduling Agreement speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 53, and refers to the full text of the Scheduling Agreement and Schedule 7 for its true meaning and effect.  Defendant denies the remaining allegations in Paragraph 53.

54.     By all accounts, the Poaching Penalty was intended to insulate the MWC from competition by the Pac-12 and weaken the Pac-12 as a competitor.  The MWC Commissioner has admitted that the MWC's express purpose in imposing the Poaching Penalty was to "***protect ourselves against what we knew could potentially break us apart***"—*i.e.*, competition for MWC member schools.  As one journalist put it, the Poaching Penalty effectively "safeguard[s] [MWC] against potential poaching" because even though it does not "completely rule out" agreements between the Pac-12 and some MWC member schools, "it puts in place huge financial hurdles."[13]

**ANSWER.**     Defendant denies the allegations in the first sentence of Paragraph 54. Defendant states that the referenced article contains the language quoted in Paragraph 54. Answering further, Defendant states that the Scheduling Agreement speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 54.  Defendant further admits that, in negotiating and executing the Scheduling Agreement, all parties, including the Pac-12, were represented by independent and experienced legal counsel.  Defendant denies the remaining allegations in Paragraph 54.

55.     With the Pac-12 under considerable pressure to secure a 2024-2025 football schedule only months before the season was set to begin, the MWC forced the Poaching Penalty provision on the Pac-12 as a condition of the scheduling deal, even though it bears no relationship to scheduling.[14]

---

[13] *See* Chris Murray, *Inside the Mountain West, Pac-12 contract: Why it could cost Oregon State, Washington State nearly $140M to poach MW*, Nevada Sports Net (Jan. 10, 2024), *available at* https://nevadasportsnet.com/news/reporters/inside-the-mountain-west-pac-12-contract-why-itcould-cost-oregon-state-washington-state-nearly-140m-to-poach-mw.

[14] *See also* Mark Zeigler, *Does San Diego State, Mountain West fit into Pac-2's plans?*, The San Diego          Union-Tribune          (Sept.          11,          2024),          *available          at* https://www.sandiegouniontribune.com/2024/09/09/does-san-diego-state-mountain-west-fit-intopac-2s-plans/ ("[T]he Mountain West scheduling agreement . . . includes, for lack of a better

23

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

1

**ANSWER.**    Denied.

2

**D.    Five MWC Member Schools Agree to Join the Pac-12**

3

56.    On September 12, 2024, the Pac-12 admitted four current members of the MWC

4

that had long been interested in joining the Pac-12—Boise State University, California State

5

University, Fresno, Colorado State University, and SDSU—beginning with the 2026-2027 season.

The Pac-12's decision came after receipt and review of formal written applications for admission

6

submitted by these schools.

7

**ANSWER.**    With respect to the first sentence of Paragraph 56, Defendant admits that on

8

September 12, 2024, the Pac-12 admitted four current members of the MWC—Boise State, Fresno

9

State, Colorado State, and San Diego State—for the 2026-2027 athletic season.  Defendant lacks

10

sufficient knowledge to admit or deny the allegations in the second sentence of Paragraph 56

11

regarding the Pac-12's internal decision-making and, on that basis, denies the allegations in the

12

second sentence of Paragraph 56.  Defendant denies the remaining allegations in Paragraph 56.

13

57.    The same day, the MWC demanded the Pac-12 pay $43 million pursuant to the

14

Poaching Penalty.  *See* **Exhibit 2** (Letter from MWC Commissioner Gloria Nevarez to Pac-12

Chief Legal Officer Scott Petersmeyer); *see also* **Exhibit 1** at Section 7.01; Schedule 7 (listing an

15

aggregate fee of $43 million for the four schools).

16

**ANSWER.**    Defendant states that Exhibit 2 is a letter MWC Commissioner Nevarez sent

17

to the Pac-12's Chief Legal Officer Petersmeyer on September 12, 2024.  Defendant further states

18

that Exhibits 1 and 2 speak for themselves and denies any allegations or characterizations contrary

19

thereto contained in Paragraph 57.  Answering further, Defendant states that Exhibits 1 and 2

20

reference the fees characterized in Paragraph 57, and refers to the full text of Exhibits 1 and 2 for

21

their true meaning and effect.  Defendant denies the remaining allegations in Paragraph 57.

22

58.    On September 23, 2024, the Pac-12 admitted a fifth MWC member, Utah State

23

University, beginning with the 2026-2027 season.

24

**ANSWER.**    Admitted.

25

26

27

term, "poaching penalties" . . . [that were] a non-negotiable part of the deal for the Mountain West.
OSU and WSU, desperate for a 2024 football schedule, swallowed and signed it.").

28

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

59.    The MWC has stated that it intends to collect (or withhold from distributions) exit fees from its departing members.

**ANSWER.**    Defendant admits that it has informed the Departing Members that it intends to retain and collect the Exit Fees pursuant to MWC Bylaw § 1.04, which all MWC members, including the Departing Members, approved in April 2021, and which speaks for itself.  Defendant denies the remaining allegations in Paragraph 59.

### E.    Anticompetitive Harm

60.    The Poaching Penalty stifles competition by imposing an artificial barrier to entry for members of the MWC to join the Pac-12.  The Poaching Penalty puts an exorbitant tax on the Pac-12's recruitment of MWC member schools, each of whom would otherwise be logical candidates to join a reconstituted Pac-12 given their geographic location.  By forcing the Pac-12 to pay tens of millions of dollars in "termination fees," the Poaching Penalty improperly interferes with the Pac-12's ability to present its most competitive offer to members of the MWC.  In this way, the Poaching Penalty limits the mobility of MWC member schools—placing the Pac-12, one of their most logical conference options, at a severe competitive disadvantage and suppressing the offers the Pac-12 can make to them.

**ANSWER.**    Denied.

61.    Additionally, if enforced, the Poaching Penalty threatens the Pac-12's ability to compete against the MWC and other conferences.  If the Pac-12 does not have at least eight member schools before the 2026-2027 season (*i.e.*, within the grace period offered by the NCAA bylaws), it will lose the ability to compete in the FBS, depriving its student-athletes the opportunity to compete in the highest tier of college football.  Paying $55 million to the MWC as a penalty for recruiting five of its member schools—conduct in which athletic conferences, including the MWC, regularly and fairly engage—would significantly deplete the Pac-12's resources to recruit additional schools and rebuild.

**ANSWER.**    Denied.    Answering further, Defendant states that the Pac-12 has successfully retained eight football-playing members for the 2026-2027 athletic season.  Defendant further states that OSU and WSU each took distributions of approximately $46.6 million, respectively, from the Pac-12 for FY 2024,[15] and that the Pac-12 had "roughly $222

---

[15] Jamey Vinnick, *WSU and OSU Collected Millions More in FY 2024, But There's A Catch*, 247Sports (May 19, 2025), *available at* https://archive.is/coekY.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

million" at its disposal to rebuild leading up to negotiation of the Scheduling Agreement.[16] Defendant further states that the Pac-12 could have reached the NCAA eight-member threshold without incurring any fee under the Scheduling Agreement by inviting all members of the MWC to join the Pac-12.

62.     The Poaching Penalty bears no rational relationship to the purpose of the Scheduling Agreement, which is to arrange football games during the 2024-2025 season.  It extends beyond the Scheduling Agreement's term, it does not affect the schedule in any respect, and it does not in any way impact the amount of football played, games scheduled, or anything else relating to the 2024-2025 scheduling of games.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

63.     Instead, the Poaching Penalty serves only to increase the MWC's profits by locking up its member schools and preventing them from leaving for a competitor (the Pac-12).

**ANSWER.**     Denied.

### F.     There are No Legitimate Justifications for the Poaching Penalty

64.     Because the Poaching Penalty is *per se* unlawful, it is inherently illegal, and no justifications are available; the analysis should end there.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

65.     But even if the rule of reason is applied, the purported justifications for the Poaching Penalty set forth in Scheduling Agreement are pretextual, illusory, and designed by the MWC solely to conceal its anticompetitive purpose.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

66.     Section 7.01 recites that the MWC insisted on the Poaching Penalty because it planned to share "confidential information" with the Pac-12.  But no such confidential information

---

[16] Jon Wilner, *Pac-12 Survival: Tallying the Cash Available to Washington State and Oregon State for Rebuilding the Conference*, Sports360AZ (Mar. 30, 2024), *available at* https://archive.is/s65Tb.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

has been shared with the Pac-12, nor is it clear how any such information would be relevant to MWC member schools in deciding they want to join the Pac-12 or why such information would necessarily justify tens of millions in fees.

**ANSWER.**    Defendant admits that, in negotiating and executing the Scheduling Agreement, all parties, including the Pac-12, were represented by independent and experienced legal counsel, and the Pac-12 agreed to the language in Section 7.01, as evidenced by the Pac-12's execution of the Scheduling Agreement.  Defendant states that the Scheduling Agreement speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 66.  Answering further, Defendant states that Section 7.01 of the Scheduling Agreement contains the language quoted in Paragraph 66, and refers to the full text of the Scheduling Agreement for its true meaning and effect.  Defendant denies the remaining allegations in Paragraph 66.

67.    Section 7.01 also posits that the Poaching Penalty is justified because the MWC will share with the Pac-12 "unique access to MWC Member Institutions" to which the Pac-12 "would not otherwise be entitled." *See* __Exhibit 1__ at Section 7.01. Again, no such "unique access" has been provided to the Pac-12.  The Pac-12 had the same "access" to the MWC members after it signed the Scheduling Agreement as it did before.  Indeed, the Pac-12 had discussions with several members of the MWC about joining the conference well before the Scheduling Agreement was ever contemplated.  And Pac-12 member schools have competed in football games against MWC schools for decades prior to the Scheduling Agreement.

**ANSWER.**    Defendant admits that, in negotiating and executing the Scheduling Agreement, all parties, including the Pac-12, were represented by independent and experienced legal counsel, and the Pac-12 agreed to the language in Section 7.01, as evidenced by the Pac-12's execution of the Scheduling Agreement.  Defendant states that the Scheduling Agreement speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 67.  Answering further, Defendant states that the Scheduling Agreement contains the language quoted in Paragraph 67, and refers to the full text of the Scheduling Agreement for its true meaning and effect.  Defendant denies the allegations in the second sentence of Paragraph 67.  Defendant lacks sufficient information or knowledge to admit or deny the allegations in the third through fourth textual sentences of Paragraph 67 and, on that basis, denies them.  Defendant admits the

fifth textual sentence of Paragraph 67.  Defendant denies the remaining allegations in Paragraph 67.

68.    Finally, Section 7.02 of the Scheduling Agreement claims that the $10 million-plus-per-school "termination fees" in the Poaching Penalty are "fair, reasonable, and appropriate approximations of the losses that MWC may incur as a result of MWC's loss of any MWC Member Institution to [the] Pac-12 and the failure to consummate the Definitive Transaction." *See* **Exhibit 1** at Section 7.02. But the severe exit fees that the MWC imposes on its member schools already more than compensate the MWC for any loss of departing member schools.

**ANSWER.**    Defendant admits that, in negotiating and executing the Scheduling Agreement, all parties, including the Pac-12, were represented by independent and experienced legal counsel, and the Pac-12 agreed to the language in Section 7.02, as evidenced by the Pac-12's execution of the Scheduling Agreement.  Defendant states that the Scheduling Agreement speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 68.  Answering further, Defendant states that Section 7.02 of the Scheduling Agreement contains the language quoted in Paragraph 68, and refers to the full text of Section 7.02 for its true meaning and effect.  Defendant denies the remaining allegations in Paragraph 68.

69.    As explained above, the MWC's bylaws provide that departing member schools will pay "Exit Fees" to the conference, separate and apart from any Poaching Penalty in the Scheduling Agreement.[17]  The MWC's bylaws require departing member schools to pay "an amount equal to three times the average per Member Conference distribution payment for the preceding year" if notice of departure is provided more than a year in advance.[18]  This "prohibitive exit fee[]" is doubled if a member's notice is late.[19]

---

[17] *See also* Mark Zeigler, *Does San Diego State, Mountain West fit into Pac-2's plans?*, The San Diego Union-Tribune (Sept. 11, 2024), *available at* https://www.sandiegouniontribune.com/2024/09/09/does-san-diego-state-mountain-west-fit-intopac-2s-plans/ (noting termination fees are "separate from what Mountain West defectors would owe in exit fees, which will approach $20 million with more than a year's notice and $40 million inside that").

[18] *See* Bylaws of Mountain West Conference at Section 1.04 ("Resignation"), *available at* https://s3.amazonaws.com/sidearm.sites.mountainwest.sidearmsports.com/documents/2020/8/5/Appendix_A_Bylaws_.pdf.

[19] *See* Chris Murray, *Inside the Mountain West, Pac-12 contract: Why it could cost Oregon State, Washington State nearly $140M to poach MW*, Nevada Sports Net (Jan. 10, 2024), *available at* https://nevadasportsnet.com/news/reporters/inside-the-mountain-west-pac-12-contract-why-itcould-cost-oregon-state-washington-state-nearly-140m-to-poach-mw.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

**ANSWER.** This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant states that the MWC Bylaws speak for themselves and denies any allegations or characterizations contrary thereto contained in Paragraph 69. Answering further, Defendant states that the MWC Bylaws contain the language quoted in Paragraph 69, and refers to the full text of the MWC Bylaws for their true meaning and effect. Defendant denies the remaining allegations in Paragraph 69.

70. In other words, the MWC has *already* accounted for any losses from the departures of member schools. With the Poaching Penalty in place, the MWC gets compensated for "poaching" two times over. The MWC seeks to recover exit fees under the bylaws if a member leaves for a rival conference. There is no reason the MWC should get paid *even more* if that rival conference happens to be the Pac-12.

**ANSWER.** Denied. Answering further, Defendant states that the Exit Fees pursuant to MWC Bylaw § 1.04 apply when a member school seeks to withdraw from the MWC for any reason, including to go independent. Defendant further states that the Termination Fees compensate the MWC for separate harms inflicted by the Pac-12, as the Pac-12 acknowledged in the Scheduling Agreement: the Termination Fees are "fair, reasonable and appropriate approximations of the losses that [the] MWC may incur as a result of [the] MWC's loss of any MWC Member Institution to [the] Pac-12 and the failure to consummate the Definitive Transaction pursuant to Article VIII." *See* Exhibit 1, § 7.02.

71. Further, the Poaching Penalty, which increases based on the number of schools involved, bears no relationship to any purported "failure to consummate the Definitive Transaction." The Scheduling Agreement does not require that the parties enter into any such transaction; it requires only that they negotiate in good faith. Any failure to consummate such a transaction cannot justify one-sided penalties against the Pac-12. Nor would it make sense for any penalty for a "failure to consummate the Definitive Transaction," which would involve every MWC member school, to vary based on the number of schools who later actually depart from MWC to the Pac-12, as the "termination fees" do here.

**ANSWER.** Defendant states that the Scheduling Agreement speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 71. Answering further, Defendant states that the Scheduling Agreement contains the language quoted

in Paragraph 71, and refers to the full text of the Scheduling Agreement for its true meaning and effect. Defendant denies the remaining allegations in Paragraph 71.

72.     The MWC's stated rationale in Section 7.02 for the Poaching Penalty is disingenuous: the exorbitant penalties it imposes purport to remedy either (a) a harm the MWC has already more than insured itself against via exit fees, or (b) a hypothetical harm (a failure to enter into a hypothetical future transaction) that is unrelated to the Scheduling Agreement and cannot conceivably be compensated by variable "termination fees."

**ANSWER.**     Denied.

73.     Indeed, the description of the Poaching Penalty's required sums as "liquidated damages" reveals the MWC's true intent—to prevent the Pac-12 from accepting offers from MWC schools entirely, with a liquidated damages provision designed to deter any such "breach"—notwithstanding the lack of an explicit contractual commitment by the Pac-12 not to accept MWC members into the Pac-12.

**ANSWER.**     Denied.

**G.     There Is an Actual and Concrete Controversy**

74.     The MWC's attempt to enforce the Poaching Penalty, and thereby harm competition and the Pac-12 specifically, gives rise to an actual and concrete controversy warranting declaratory judgment.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

75.     On September 12, 2024, after four new Pac-12 members were announced, the MWC Commissioner sent a letter to the Pac-12 seeking to enforce the anticompetitive and unlawful Poaching Penalty, stating the Pac-12 is "obligated to pay the MWC $43,000,000 (forty-three million dollars) in 'Aggregate Withdrawal Fees' within 30 (thirty) days of the date of this letter." *See* **Exhibit 2** at 2.

**ANSWER.**     Defendant states that Exhibit 2 is a letter Commissioner Nevarez sent to the Pac-12's Chief Legal Officer Petersmeyer on September 12, 2024, which speaks for itself, and denies any allegations or characterizations contrary thereto contained in Paragraph 75. Answering further, Defendant states that Exhibit 2 contains the language quoted in Paragraph 75, and refers

to the full text of Exhibit 2 for its true meaning and effect.  Defendant denies the remaining allegations in Paragraph 75.

76.      On September 24, 2024, the Pac-12 Commissioner responded to the MWC's letter and explained that the Pac-12 disagreed with the MWC's position because the Poaching Penalty is "unlawful and unenforceable." *See* **Exhibit 3** (Letter from Pac-12 Commissioner Teresa Gould to MWC Commissioner Gloria Nevarez).  As the Pac-12 Commissioner explained, the Poaching Penalty seeks to "inhibit competition by placing exorbitant and punitive monetary fees on the Pac-12 simply for engaging in competition by accepting MWC member schools into the Pac-12." *See id*.

**ANSWER.**      Defendant admits that Exhibit 3 is a letter Commissioner Gould sent MWC Commissioner Nevarez on September 24, 2024, which speaks for itself, and denies any and all allegations or characterizations contrary thereto contained in Paragraph 76.  Answering further, Defendant states that Exhibit 3 contains the language quoted in Paragraph 76, and refers to the full text of Exhibit 3 for its true meaning and effect.  Defendant denies the remaining allegations in Paragraph 76.

## V.    CAUSES OF ACTION FOR DECLARATORY JUDGMENT

### Count One

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

77.      The Pac-12 hereby incorporates paragraphs 1 through 76.

**ANSWER.**      Defendant incorporates its responses to the foregoing paragraphs as though fully set forth therein.

78.      The Poaching Penalty is per se unlawful under Section 1 of the Sherman Act, 15 11 U.S.C. § 1.  No complex analysis is required to demonstrate the anticompetitive character of this agreement.

**ANSWER.**      This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, denied.

79.      The Pac-12 and the MWC are separate entities.

**ANSWER.**      Admitted.

80.    The Pac-12 and the MWC are direct competitors for member schools.

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant admits that all collegiate athletic conferences, which include the Pac-12 and the MWC, compete for member schools.  Defendant denies the remaining allegations in Paragraph 80.

81.    The Poaching Penalty is a horizontal agreement between direct competitors in restraint of trade.  The Poaching Penalty is a form of market allocation, whereby the MWC has prevented the Pac-12 from freely soliciting the MWC's schools for membership.  By insisting on the Poaching Penalty, the MWC effectively required the Pac-12 to agree not to compete for particular member schools.

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

82.    The Poaching Penalty suppresses competition between the Pac-12 and the MWC by imposing an artificial barrier, in the form of a one-sided penalty, on the Pac-12's efforts to recruit MWC's member schools.

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

83.    The Poaching Penalty unfairly disadvantages the Pac-12 compared to other competitor conferences.  Nothing in the Scheduling Agreement prevents or otherwise penalizes other conferences from soliciting MWC member schools; only the Pac-12 is penalized.

**ANSWER.**    Defendant states that the Scheduling Agreement speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 83.  Defendant further states that it refers to the full text of the Scheduling Agreement for its true meaning and effect. Defendant denies the remaining allegations in Paragraph 83.

84.    The Poaching Penalty prevents the Pac-12 from being able to offer competitive, attractive membership offers to schools as it attempts to rebuild the conference.  See supra ¶¶ 60-61.

**ANSWER.**    Denied.

85.     The Poaching Penalty is a naked, horizontal restraint that has no purpose except to stifle competition.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

86.     The Poaching Penalty is not an ancillary restraint that is reasonably necessary to achieving the pro-competitive purpose of the Scheduling Agreement.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant states that the Scheduling Agreement speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 86. Defendant further states that it refers to the full text of the Scheduling Agreement for its true meaning and effect.  Defendant denies the remaining allegations in Paragraph 86.

87.     The Poaching Penalty cannot qualify as ancillary merely because it accompanies the Scheduling Agreement, which is otherwise lawful.

**ANSWER**. This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant states that the Scheduling Agreement speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 87. Defendant further states that it refers to the full text of the Scheduling Agreement for its true meaning and effect.  Defendant further states that the Scheduling Agreement, including the Termination Fees provisions, is lawful.  Defendant denies the remaining allegations in Paragraph 87.

88.     Although the Scheduling Agreement has the pro-competitive purpose of facilitating scheduling of football games, the Poaching Penalty does not further that purpose and is not necessary to achieving it.  The Poaching Penalty does nothing to facilitate the scheduling of football games or to increase the amount of college football played.  Rather, the Poaching Penalty is designed solely to stifle competition by imposing an artificial barrier to entry for members of the MWC to join the Pac-12, and in turn, to weaken the Pac-12's standing as a competing conference.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant admits that the Scheduling Agreement, including

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

the Termination Fees provisions, is pro-competitive and that one of its pro-competitive purposes is facilitating scheduling football games.  Defendant denies the remaining allegations in Paragraph 88.

89.     In the alternative, the Poaching Penalty is also an unreasonable restraint of trade that is unlawful under the rule of reason.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

90.     The Poaching Penalty has no legitimate pro-competitive justification, and its entire effect is anticompetitive: it prevents the Pac-12 from being able to freely compete for schools, while delivering the MWC a windfall.  See supra ¶¶ 64-73.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

91.     As a direct and proximate result of the Poaching Penalty, the Pac-12 has and will continue to suffer competitive harm because of the inability to freely compete with other conferences for schools.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

**Count Two**

**Violation of California's Cartwright Act, Cal. Bus. & Prof. Code § 16720 *et seq.***

92.     The Pac-12 hereby incorporates paragraphs 1 through 91.

**ANSWER.**     Defendant incorporates its responses to the foregoing paragraphs as though fully set forth therein.

93.     The Poaching Penalty is a *per se* unlawful trust that restricts trade in violation of California Business and Professions Code, Section 16720 *et seq*. (the "Cartwright Act"), and is therefore unenforceable, *see* Cal. Bus. & Prof. Code § 16722.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

94.     The Pac-12 is a "person" for purposes of the Cartwright Act as an association authorized by the laws of California.  *See* Cal. Bus. & Prof. Code § 16702.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

95.     The MWC is a "person" for purposes of the Cartwright Act as a corporation authorized by the laws of Colorado.  *See id*.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

96.     The Poaching Penalty is a combination between the Pac-12 and the MWC.  *See* Cal. Bus. & Prof. Code § 16720.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

97.     The Poaching Penalty has no purpose or effect that promotes, encourages, or increases competition or furthers trade; instead, its only purpose is to stifle competition.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

98.     In the alternative, the Poaching Penalty is also an unreasonable restraint of trade that is unlawful under the rule of reason.

**ANSWER.**     This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

99.     The Poaching Penalty has no legitimate pro-competitive justification, and its entire effect is anticompetitive: it prevents the Pac-12 from being able to freely compete for schools, while delivering the MWC a windfall.  *See supra* ¶¶ 64-73.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

**ANSWER.**      This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

100.      As a direct and proximate result of the Poaching Penalty, the Pac-12 has and will continue to suffer competitive harm because of the inability to freely compete with other conferences for schools.

**ANSWER.**      This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

### Count Three

### Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*

101.      The Pac-12 hereby incorporates paragraphs 1 through 100.

**ANSWER.**      Defendant incorporates its responses to the foregoing paragraphs as though fully set forth therein.

102.      The MWC's actions to suppress competition through the Poaching Penalty constitute unfair competition and unfair and unlawful business acts and practices in violation of California Business and Professions Code, Sections 17200, *et seq.* (the "UCL").

**ANSWER.**      This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

103.      The Poaching Penalty violates the UCL as an unlawful business practice because it violates the Sherman Act and the Cartwright Act.  *See supra* ¶¶ 77-100.

**ANSWER.**      This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

104.      The Poaching Penalty, whether or not in violation of the Sherman Act or Cartwright Act, otherwise violates the UCL as an unfair business practice.  The harm to competition, and the Pac-12 specifically, is substantial and far outweighs any countervailing benefit to the MWC of locking in its member schools.

**ANSWER.**      This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

1

2

105.    As a direct and proximate result of the Poaching Penalty, the Pac-12 has and will continue to suffer competitive harm because of the inability to freely compete with other conferences for schools.

3

4

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

5

6

7

106.    Unless the Poaching Penalty is declared invalid and unenforceable, the Pac-12 will suffer severe, irreparable harm.  Absent such a declaration, the Pac-12 will be inhibited from engaging in free competition and will be weakened as a competitor.

8

9

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

10

### Count Four

11

### Invalid Contract for Unenforceable Penalties

12

107.    The Pac-12 hereby incorporates paragraphs 1 through 106.

13

14

15

**ANSWER.**    Defendant incorporates its responses to the foregoing paragraphs as though fully set forth therein.

16

17

108.    The "termination fees" due under the Poaching Penalty are unenforceable penalties as a matter of contract law.

18

19

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, denied.

20

21

22

109.    The Poaching Penalty requires the Pac-12 to pay "liquidated damages to MWC in the form of [a] termination fee" that, according to the MWC, "approximat[e] . . . the losses that MWC may incur as a result of MWC's loss of any MWC Member Institution to Pac-12 and the failure to consummate the Definitive Transaction." See **Exhibit 1** at Sections 7.01 & 7.02.

23

24

25

26

27

**ANSWER.**    Defendant states that the Scheduling Agreement speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 109. Answering further, Defendant states that the Scheduling Agreement contains the language quoted in Paragraph 109, and refers to the full text of Sections 7.01 and 7.02 for their true meaning and effect.  Defendant denies the remaining allegations in Paragraph 109.

28

---

37

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

110.    A clause that "fix[es] unreasonably large liquidated damages" is unenforceable on grounds of public policy as a penalty.  Restatement (Second) of Contracts, § 356(1).  A liquidated damages clause becomes an unenforceable penalty if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach of the relevant obligation.  Absent a reasonable relationship, a clause purporting to predetermine damages must be construed as a penalty and declared null and void.  Further, the parties to a contract cannot circumvent the law prohibiting excessive liquidated damages by merely stating that the amount is not a penalty.

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant states that the Restatement (Second) of Contracts, § 356(1) speaks for itself and denies any allegations or characterizations contrary thereto contained in Paragraph 110.  Defendant further states that the Restatement contains the language quoted in the first sentence of Paragraph 110, and refers to the full text of the Restatement for its true meaning and effect.  Defendant denies the remaining allegations in Paragraph 110.

111.    To the extent the "liquidated damages" are intended to estimate the amount of damages that would flow from the Pac-12's breach of some independent contractual provision within the Scheduling Agreement, Section 7.01 does not identify any such provision, nor has the Pac-12 breached any such contractual commitment.  Indeed, the true purpose of the purported "liquidated damages" is merely to forestall competition by penalizing the Pac-12 for recruiting MWC schools.

**ANSWER.**    Denied.

112.    The only identified "losses" the Scheduling Agreement identifies as justifying the "termination fees"—loss of member schools and failing to consummate a Definitive Transaction, *see* **Exhibit 1** at Section 7.02—bear no reasonable relationship to the fees due under the Poaching Penalty, which range from $10 million to $137.5 million.

**ANSWER.**    Denied.

113.    First, the "termination fees" bear no reasonable relationship to any loss the MWC would incur from losing member institutions.  Before the Scheduling Agreement was signed, the MWC had already ensured that it would be more than compensated for the loss of any member schools through the imposition of exit fees for departing members.

**ANSWER.**    Denied.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

114.    The MWC's bylaws require departing member schools to pay hefty "Exit Fees" that are calculated based on a three- or six-times multiple of the average yearly distribution the conference made to its members. *See supra* ¶ 38.

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant incorporates its responses to Paragraph 38 as though fully set forth therein.  Defendant further states that the MWC Bylaws speak for themselves and denies any allegations or characterizations contrary thereto contained in Paragraph 114.  Defendant further states that it refers to the full text of the MWC Bylaws for their true meaning and effect. Defendant denies the remaining allegations in Paragraph 114.

115.    The additional $10-million-plus "termination fees" due under the Poaching Penalty cannot be reasonably related to the damages that would flow from the MWC's loss of member schools because the "Exit Fees" already compensate any purported loss.

**ANSWER.**    Denied.

116.    If the MWC were permitted to recover both "Exit Fees" under its bylaws and the "termination fees" under the Scheduling Agreement, it would receive a double-recovery, constituting a windfall for the same harm.

**ANSWER.**    Denied.

117.    Second, the "termination fees," which increase based on the number of schools that depart for the Pac-12, bear no reasonable relationship to any loss the MWC would incur from the failure to enter a "Definitive Transaction." Even if the Scheduling Agreement required the consummation of an agreement—which it unambiguously does not, *see supra* ¶ 48—any loss to the MWC would be a sum certain, not a sliding-scale penalty like those set forth in Schedule 7.

**ANSWER.**    This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendant incorporates its responses to Paragraph 48 as though fully set forth therein.  Defendant denies the remaining allegations in Paragraph 117.

118.    Moreover, the "termination fees" are excessive and unreasonable in light of the gross imbalance of bargaining power between the parties when the Scheduling Agreement was signed.  Unlike the MWC, which had a full football schedule and "[felt] it ha[d] the leverage," the Pac-12 was in critical need of a schedule for its student-athletes in the upcoming school year, having lost ten of its twelve members.  The Pac-12 had no meaningful alternative but to accede to the MWC's demands.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

1

**ANSWER.**    Denied.

2

119.    Thus, the "termination fees" demanded pursuant to the Poaching Penalty are

3    duplicative of the "Exit Fees" the MWC already stands to collect, unmoored from any rational

4    estimate of damages flowing from any purported violation of the Scheduling Agreement (and there

has been no such independent violation), and excessive given the circumstances surrounding the

5    Scheduling Agreement.

6

**ANSWER.**    Denied.

7

## VI.    PRAYER FOR RELIEF

8

WHEREFORE, the Pac-12 prays for the following relief:

9

1.    A declaratory judgment stating that:

10

a.    The Poaching Penalty is an unlawful and unenforceable agreement in

11    restraint of trade in violation of Section 1 of the Sherman Act and the

Cartwright Act;

12

b.    The Poaching Penalty is an unfair and unlawful business practice in

13    violation of the UCL;

14

c.    The Poaching Penalty's "termination fees" are an unenforceable penalty;

15    and

16

d.    Because the Poaching Penalty violates the Sherman Act, the Cartwright Act,

the UCL, and contract law, it is null and void, and the MWC is barred from

17    enforcing it.

18

**ANSWER.**    These paragraphs set forth a statement of relief requested by Plaintiff,

19    to which no answer is required.  To the extent an answer is required, Defendant admits that the

20    Pac-12 seeks the stated relief, but denies that the Pac-12 is entitled to any of the relief requested in

21    the Complaint.  Defendant requests that the Court enter judgment in Defendant's favor and against

22    Plaintiff on all of Plaintiff's claims, and that the Court award Defendant such other or further relief,

23    including costs and attorneys' fees, as the Court deems appropriate.

24

2.    Such other and further relief as the Court deems just and proper.

25

**ANSWER.**    This paragraph sets forth a statement of relief requested by Plaintiff,

26    to which no answer is required.  To the extent an answer is required, Defendant admits that the

27

28

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

Pac-12 seeks the stated relief, but denies that the Pac-12 is entitled to any of the relief requested in the Complaint. Defendant requests that the Court enter judgment in Defendant's favor and against Plaintiff on all of Plaintiff's claims, and that the Court award Defendant such other or further relief, including costs and attorneys' fees, as the Court deems appropriate.

## VII.    AFFIRMATIVE AND OTHER DEFENSES

Based on information and belief and its investigations to date, the Mountain West Conference (the "MWC" or "Defendant") asserts the following affirmative and other defenses at law and equity to the causes of action alleged in the Complaint by the Pac-12 Conference (the "Pac-12" or "Plaintiff"). The MWC further reserves all additional defenses under Federal Rule of Civil Procedure 8(c) and any other defense that may now exist or that may in the future be available based on further discovery or factual investigation in this action. The MWC denies that the Pac-12 is entitled to any relief whatsoever. By setting forth the defenses asserted below, the MWC does not concede that it bears the burden of proof on any of the issues raised in these defenses. Furthermore, all such defenses are pled in the alternative and do not constitute an admission of liability or an admission that the Pac-12 is entitled to any relief whatsoever.

### FIRST DEFENSE
### (Lack of Antitrust Standing)

The Pac-12's claims under the federal Sherman Act and California's Cartwright Act are barred, in whole or in part, because the Pac-12 lacks antitrust standing. Specifically, the Pac-12's claims fail because it (1) has not suffered an antitrust injury, (2) fails to allege a non-speculative injury to competition beyond injury to itself in any properly defined relevant market, and (3) cannot establish that any alleged harm was proximately caused by the MWC's alleged conduct. The Pac-12 alleges harm to its own interests rather than to competition itself. If the Pac-12 suffered any injury, it is not one the antitrust laws were designed to prevent.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SECOND DEFENSE
### (Commerce Clause)

The Pac-12's Cartwright Act and Unfair Competition Law ("UCL") claims are barred, in whole or in part, because they interfere with interstate commerce and unduly restrict the function of an interstate sports league.  The Pac-12's opposition brief states that the scheduling agreement between the MWC and the Pac-12, dated December 1, 2023 (the "Scheduling Agreement") "plainly affects interstate commerce."  Dkt. 29, Plaintiff's Opp. at 8.  Accordingly, per U.S. Supreme Court, California Supreme Court, and Ninth Circuit precedent, the Commerce Clause precludes the application and enforcement of state antitrust law in this action where such laws interfere with the national uniformity necessary to run an interstate athletic association like the MWC's.  *See, e.g., Flood v. Kuhn*, 407 U.S. 258, 284–85 (1972) (state antitrust law claims place an undue burden on interstate commerce); *Partee v. San Diego Chargers Football Co.*, 34 Cal. 3d 378, 384 (1983); *Nat'l Collegiate Athletic Ass'n v. Miller*, 10 F.3d 633, 640 (9th Cir. 1993). The application of state law in this instance would impermissibly regulate or burden interstate commerce beyond the State of California, barring the Pac-12's claims.

## THIRD DEFENSE
### (Complete Involvement)

The Pac-12's Sherman Act and Cartwright Act claims are barred, in whole or in part, due to its complete involvement in the alleged conspiracy.  The Pac-12 participated in the formation of the alleged conspiracy, and the alleged conspiracy would not have been formed but for the Pac-12's willing participation.  In negotiating and executing the Scheduling Agreement, all parties, including the Pac-12 and the MWC, were represented by independent and experienced legal counsel.  The Pac-12's participation in the alleged conspiracy was, at a minimum, equal to that of the MWC's and a substantial factor in the formation of said conspiracy.  The Pac-12 "seeks not to rescind the entire bargain, but rather to have one offending provision red-penciled out of the [Scheduling Agreement].  To so allow [the Pac-12] to escape a single aspect of the total

42

1  [Scheduling Agreement] would result in a windfall here." *THI-Hawaii, Inc. v. First Com. Fin.*
2  *Corp.*, 627 F.2d 991, 996 (9th Cir. 1980).

### FOURTH DEFENSE
### (Unclean Hands)

The Pac-12's claims challenging provisions of the Scheduling Agreement as an unenforceable penalty and violation of the UCL are barred, in whole or in part, by the doctrine of unclean hands, which demands that a plaintiff act equitably and in good faith in the matter for which it seeks a remedy.  The Scheduling Agreement contained an option for the Pac-12 to admit fewer than all of the MWC's member institutions, and the Pac-12 expressly guaranteed that it would pay amounts due to the MWC, including those that the Pac-12 acknowledged were a "material inducement to [the] MWC's willingness to enter into and perform its obligations under [the Scheduling] Agreement[.]"  Exhibit 1, §§ 7.01, 10.11, Schedule 7.  The Pac-12 elected to admit fewer than all of the MWC's member institutions.  Indeed, upon information and belief, "[t]he idea itself . . . to add Boise State, Colorado State, Fresno State and San Diego State [] was more than a year old" by the time they were added.[20]  In refusing to pay sums it guaranteed, the Pac-12's conduct exhibits bad faith and is inequitable in connection with the subject in controversy.

### FIFTH DEFENSE
### (Equitable Estoppel)

The Pac-12's claims are barred, in whole or in part, by the doctrine of equitable estoppel by reason of the Pac-12's own conduct, actions, omissions, or communications.  The Pac-12 represented that fees due and payable to the MWC if the Pac-12 successfully offered membership

---

[20] Jon Wilner, *Pac-12 expansion: Idea of raiding the Mountain West wasn't new, but this time, it wasn't ignored*, Sports360AZ (Sept. 16, 2024), *available at* https://archive.is/Zi0tL#selection-743.74-743.75.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

to some, but not all, MWC schools (the "Termination Fees")[21] are "fair, reasonable and appropriate approximations of the losses that [the] MWC may incur[,]," which the MWC reasonably relied on. Exhibit 1, § 7.02; *see also id.*, § 7.01. The MWC has been harmed by relying on the Pac-12's representations, conduct, and agreements to its detriment. The Pac-12 is thus estopped from asserting claims or obtaining relief inconsistent with its prior conduct, commitments, and assurances pertaining to the Scheduling Agreement.

## SIXTH DEFENSE
### (Ancillary Restraint to Pro-competitive Agreement)

The Pac-12's antitrust claims are barred, in whole or in part, because the challenged provisions constitute ancillary restraints to a pro-competitive agreement. The challenged provisions are subordinate and collateral to a larger, legitimate, pro-competitive business transaction between the parties. Further, at the time of their adoption, the challenged provisions were reasonably necessary to achieve the agreement's legitimate, pro-competitive objectives, including protecting each party's investments, preserving the integrity of the venture and of each party as conferences, and enabling output-increasing coordination that has proven to be beneficial to not only consumers but competition as a whole.

Further, the challenged provisions are pro-competitive under the rule of reason. The provisions the Pac-12 challenges are an aspect of a legitimate, pro-competitive business arrangement rather than naked restraints on trade. The challenged provisions are reasonably necessary to a legitimate, pro-competitive business collaboration between the parties, and the Pac-12 fails to plead, and cannot prove, a cognizable, relevant market. Even if the Pac-12 were able to demonstrate a cognizable, relevant market and prove the MWC's alleged market power, the Pac-12 cannot demonstrate any substantial anticompetitive effects that outweigh the pro-

---

[21] The Scheduling Agreement sets forth a series of escalating fees ("Termination Fees") ranging from $10 million to $137.5 million based on the number of MWC member institutions that depart from the MWC to join the Pac-12. *See* Exhibit 1, Schedule 7.

competitive justifications of the challenged provisions. The challenged provisions therefore are enforceable when analyzed under the rule of reason.

## SEVENTH DEFENSE
### (Lack of Causation)

The Pac-12's claims are barred, in whole or in part, because its damages, if any, are not attributable to the MWC's alleged conduct. The Pac-12's alleged injury stems from its own contractual choices rather than any alleged anticompetitive effect of the challenged provisions. The Pac-12 was a voluntary party to the Scheduling Agreement and agreed to those provisions after arm's-length negotiation. In negotiating and executing the Scheduling Agreement, all parties, including the Pac-12, were represented by independent and experienced legal counsel. To the extent the Pac-12 suffered any harm, it was the result of its own voluntary choices. Furthermore, a prospective school's independent and unforeseeable decision to decline an invitation to join the Pac-12 severs any causal link between the Pac-12's alleged harm and the MWC's alleged conduct. Accordingly, the Pac-12 cannot establish proximate causation between its alleged harm and the MWC's alleged conduct.

## EIGHTH DEFENSE
### (Lack of Cognizable Injury)

The Pac-12's claims are barred, in whole or in part, because the Pac-12's alleged damages and injury, if any, are purely speculative. The Pac-12 cannot establish that it has suffered a cognizable injury. For example, the Pac-12 fails to allege which potential members it would have admitted but for the existence of the Termination Fees, or how the Termination Fees kept it from competing for MWC schools. The Pac-12 has not alleged whether it would have recruited a certain team, whether that team would have been from the MWC or another conference, where that team would have played, or what price the Pac-12 would have paid for the team to be a member institution in its conference. The Pac-12's alleged damages and injury are rooted in a disagreement over the competitive outcomes of an agreement that it was a willing party to, and the Pac-12 has

45

failed to satisfy the agreement by refusing to pay the fees due and payable to the MWC. Therefore, the Pac-12 is entitled to neither damages nor equitable relief.

### NINTH DEFENSE
### (Enforceable Contract Provisions)

The Pac-12's contract claim is barred, in whole or in part, because the challenged provisions provide an alternative method of performance and are enforceable contract provisions. The challenged provisions presented the Pac-12 with alternative solutions: the Pac-12 could absorb all of the MWC's member institutions at no additional cost, or it could admit fewer than all of the MWC's member institutions and compensate the MWC for its losses. The Pac-12 elected to admit fewer than all of the MWC's member institutions, which was a contractually authorized method of performance. The Pac-12's resulting obligation to pay the Termination Fees due to the MWC for the Pac-12's choice is an alternative performance contemplated by the Scheduling Agreement.

Even if the challenged provisions were found to be a liquidated damages clause, the challenged provisions are valid and enforceable under California law. The Termination Fees are fair and reasonable approximations of the harm suffered by the MWC due to the Pac-12's conduct, and do not flow from any breach of the Scheduling Agreement. In negotiating and executing the Scheduling Agreement, all parties, including the Pac-12 and the MWC, were represented by independent and experienced legal counsel. And at the time of contracting, the MWC and the Pac-12 agreed that the Termination Fees reflect a "fair, reasonable and appropriate approximation[]" of the MWC's potential loss. Exhibit 1, § 7.02. The challenged provisions are valid and enforceable under California law.

### TENTH DEFENSE
### (Non-Duplicative Fees)

The Pac-12's claims are barred, in whole or in part, because the Termination Fees are not duplicative of any other fee or funds collected by the MWC. The Pac-12 points to certain fees due and payable to the MWC under the MWC's bylaws by five departing MWC member institutions

as a result of departing the conference. Those exit fees compensate for a loss from the departure of MWC member schools, including the economic harm of reducing the remaining MWC members' present and future media rights value. The Termination Fees in the Scheduling Agreement compensate for separate harms inflicted by the Pac-12, such as the cost to rebuild the MWC after the loss of five schools, the revenue the remaining MWC member institutions would have received as Pac-12 members, and negative externalities stemming from the Pac-12's choice (like reputational harm and undermining the MWC's integrity as a conference). *See* Exhibit 1, § 7.01. The MWC seeks fair compensation for the unique economic damages and losses it has suffered due to the conduct of the Pac-12.

## ELEVENTH DEFENSE
### (Failure to Join Necessary and Indispensable Parties)

The Pac-12's claims are barred, in whole or in part, because the Pac-12 has failed to join parties necessary and indispensable to this litigation. Washington State University ("WSU") and Oregon State University ("OSU") have not been made parties to the instant action, and are necessary parties under Federal Rule of Civil Procedure 19(a) because their absence may prevent the Court from granting complete relief or may impair their ability to protect their interests as parties to the Scheduling Agreement. The challenged provisions require payment from the "Pac-12 Parties," which include both WSU and OSU. *See* Exhibit 1, Preamble, § 7.01, Schedule 7. Accordingly, the action might detrimentally affect the interests of WSU and OSU. As sovereign entities, they cannot be joined without their consent.

**THE MOUNTAIN WEST CONFERENCE'S COUNTERCLAIMS**

## I.     INTRODUCTION

1.     The Mountain West Conference (the "MWC") brings these counterclaims to enforce critical contractual terms that the Pac-12 Conference (the "Pac-12")—a sophisticated, well-funded enterprise represented by experienced counsel—freely negotiated, executed, and now seeks to dodge.  In late 2023, the MWC and the Pac-12 executed the Scheduling Agreement with eyes wide open.  They knew the market realities of realignment.  The Pac-12 understood that the Pac-12's potential selective recruitment of MWC members posed a foreseeable and material risk to the MWC and its members, including the conference's competitive position and long-term enterprise value.  So the Pac-12 eagerly agreed—as part of an integrated bargain—to narrow, time-limited safeguards designed to price that very risk.

2.     The Pac-12 needed to reach NCAA minimum-membership requirements to regain compliance with NCAA bylaws, including an eight-member minimum to maintain status with the Football Bowl Subdivision ("FBS"), the highest level of college football.  Raiding the MWC was the Pac-12's most convenient fix, and would predictably come at a significant expense to the MWC, leaving the remaining MWC members to absorb the operational, financial, and competitive damage.

3.     The parties expressly allocated that risk in Section 7.01 and Schedule 7 of the Scheduling Agreement.  These provisions permit the Pac-12 to recruit MWC members but require the Pac-12 to compensate the MWC for each school that joins the Pac-12 within two years of expiration (the "Termination Fees").  The parties agreed that these fees reasonably approximate harms the MWC would suffer and that those harms are otherwise impracticable to quantify with precision.

4.     The Termination Fees still permit membership offers, still permit MWC schools to move conferences, and expressly permit a procompetitive full-conference transaction. Moreover, the Pac-12—which at the time had *nearly a quarter of a billion dollars* in its coffers

—knew that paying the Termination Fees would be financially manageable if it elected to recruit MWC teams.

5.      After reaping the benefits of the Scheduling Agreement, the Pac-12 now refuses to pay the Termination Fees that it freely agreed to.  The Pac-12's retreat now—post-benefit—is an attempt to escape the risk it knowingly accepted and was well-equipped to manage.

6.      Permitting the Pac-12 to escape the Termination Fees will reward its illegal and unjust Trojan horse strategy.[22]  Unless the MWC's claims for relief are granted, the Pac-12 will pocket all the financial and reputational benefits of the Scheduling Agreement while being absolved of the obligations to the MWC that it freely committed to.[23]

7.      The Pac-12 agreed to these terms with full knowledge of their purpose, scope, and effects.  It cannot now rewrite the bargain after reaping the benefits of special access to the MWC and its members.  The MWC's counterclaims—breach of contract, promissory fraud, tortious interference of contract, and unjust enrichment—seek to hold the Pac-12 to its agreement and the risk allocation the parties deliberately chose.  The Court should enforce the Termination Fees and the other contractual protections as written, and award appropriate relief to the MWC.

## II.      THE PARTIES

8.      The parties are both NCAA Division I collegiate athletics conferences whose football teams compete in the FBS, the country's highest level of college football.

9.      The plaintiff/counterclaim defendant, the Pac-12, is a California unincorporated nonprofit association that has its headquarters and principal place of business in San Ramon, California.

10.      The defendant/counterclaim plaintiff, the MWC, is a Colorado nonprofit corporation that has its headquarters and principal place of business in Colorado Springs, Colorado.

---

[22] Jon Wilner, *Pac-12 Expansion: Idea of Raiding the Mountain West Wasn't New, But This Time, It Wasn't Ignored*, Sports360AZ (Sept. 16, 2024), https://archive.is/Zi0tL.

[23] Jon Wilner, *Pac-12 Survival: Tallying the Cash Available to Washington State and Oregon State for Rebuilding the Conference*, Sports360AZ (Mar. 30, 2024), https://archive.is/s65Tb.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337(a) (antitrust), and 15 U.S.C. § 15 (antitrust).  The Court has supplemental jurisdiction over the MWC's state law counterclaims under 28 U.S.C. § 1367. The Court has subject matter jurisdiction over the MWC's counterclaims under Federal Rule of Civil Procedure 13(a) because the MWC's claims arose out of the same transaction or occurrence that is the subject matter of the Pac-12's claims.

12.    The Court has personal jurisdiction over the Pac-12.  *First*, the Pac-12 invoked the jurisdiction of this Court by filing its complaint in this District against the MWC.  *Second*, the Pac-12 is a California unincorporated nonprofit association that has its headquarters and principal place of business in San Ramon, California.  *Third*, the Pac-12 has engaged in continuous and systematic business in California, where it has offices, employees, and generates hundreds of millions of dollars of revenue.  The Pac-12 has purposefully availed itself of the privilege of doing business in California through the widespread promotion, sales, marketing, and distribution of its products and services in California.

13.    Venue is proper under 28 U.S.C. § 1391.  The Pac-12 conducts substantial business, including having its principal place of business, in this District, and is currently litigating related claims against the MWC in this District.

### IV.    FACTUAL ALLEGATIONS

#### A.    The Mountain West Conference

14.    The MWC was formed in 1999. From its outset, the MWC coupled on-field ambition with operational experimentation.  A true maverick, the MWC became the first college conference to launch its own dedicated television network, and pioneered the use of a coach's challenge within college football instant replay—an innovation later adopted nationally.[24] The conference has had similar success on the field.  The University of Utah ("Utah") broke the

---

[24] *This is the Mountain West*, Mountain West Conference, https://themw.com/this-is-the-mountain-west/ (last visited Oct. 22, 2025).

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

Bowl Championship Series barrier with its undefeated 2004 season and Fiesta Bowl win, returned to win the Sugar Bowl after the 2008 campaign, and helped cement the conference's national credibility. In 2011, Texas Christian University ("TCU") became the first school from a non-autonomous conference program to claim victory at the Rose Bowl. Boise State University ("Boise State"), which joined the MWC in 2011, later secured the Group of Five's New Year's Six berth in the inaugural College Football Playoff ("CFP") season of 2014 and, after CFP expansion in 2024, earned the No. 3 seed and a quarterfinal bye—a landmark for a non-autonomous conference program.[25]

15.     These signature moments, paired with consistent NCAA postseason participation across sports and national draft prominence in football, basketball, and baseball, cemented the MWC's national prominence.

16.     For the 2024–2025 season, the MWC consisted of: Boise State, University of Nevada, Las Vegas ("UNLV"), Colorado State University ("Colorado State"), California State University, Fresno ("Fresno State"), San José State University (San José State), United States Air Force Academy ("Air Force"), University of Hawai'i ("Hawai'i"), University of New Mexico ("New Mexico"), Utah State University ("Utah State"), San Diego State University ("San Diego State"), University of Wyoming ("Wyoming"), and University of Nevada, Reno ("Nevada").

17.     In September 2024, Boise State, Colorado State, Fresno State, Utah State, and San Diego State (collectively, the "Departing Members") announced acceptance of an invitation to join the Pac-12 and their departure from the MWC, effective July 1, 2026.

**B.     The Pac-12 Conference**

18.     For the 2023–2024 season, the Pac-12 consisted of: University of Arizona ("Arizona"), Arizona State University ("Arizona State"), University of California, Berkeley ("Cal"), University of Colorado, Boulder ("Colorado"), University of Oregon ("Oregon"), Oregon State University ("OSU"), Stanford University ("Stanford"), University of California, Los

---

[25] *Id.*

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

Angeles ("UCLA"), University of Southern California ("USC"), Utah, University of Washington ("Washington"), and Washington State University ("WSU").

19.     For the 2024–2025 season, the Pac-12 consisted of OSU and WSU after ten schools announced departures by mid-2023.  In September 2024, the Pac-12 announced the addition of Boise State, Colorado State, Fresno State, Utah State, and San Diego State, effective July 1, 2026,[26] with those schools reportedly joining the board of directors of the Pac-12 ("Pac-12 Board") immediately.

### C.     Realignment of the Pac-12

20.     College sports are organized into defined divisions and conferences. That landscape is fluid—teams regularly shift within and across those groupings.

21.     The NCAA three-division system has more than a thousand schools. Division I, the highest level, has 365 schools split across 32 conferences.  Division I football features 23 conferences and 265 members.  Schools frequently move between its two subdivisions, the FBS and Football Championship Subdivision ("FCS"), and play across subdivisions.[27]  So long as a conference complies with NCAA rules, it can effectively create FBS programs by extending membership to an FCS school.

22.     In 2021, after the University of Texas at Austin ("Texas") and University of Oklahoma ("Oklahoma") announced their departure from the Big 12 Conference ("Big 12") for the Southeastern Conference ("SEC"), effective 2024, the Big 12 approached the Pac-12 with a proposal for merger: a 20-team coast-to-coast conference playing in every time zone, which was expected to bring more stability, a larger media rights deal for the combined members,

---

[26] *Pac-12 Conference and Utah State University Unite to Advance the New Era of the 100-Year-Old Legacy*, Pac-12 (Sept. 24, 2024), https://pac-12.com/news/2024/9/24/general-pac-12-conference-and-utah-state-university-unite-to-advance-the-new-era-of-the-100-year-old-legacy.aspx.
[27] Stan Becton, *Every FCS vs FBS Game Scheduled for the 2025 College Football Season*, NCAA (Sept. 19, 2025), https://www.ncaa.com/news/football/article/2025-09-19/every-fcs-vs-fbs-game-scheduled-2025.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

and new matchups for fans, all while preserving each conference's internal rivalries.[28]  The Pac-12 declined.[29]

23.     When the next media rights cycle arrived, the Pac-12 was outmaneuvered.  The Big 12 extended its media rights agreement with ESPN and Fox, and soaked up inventory that otherwise may have gone to the Pac-12.  Meanwhile, the Pac-12's media rights negotiations faltered: ESPN reportedly offered roughly $30 million per Pac-12 school but the negotiations cratered after the Pac-12 sought $50 million per team.[30]  As a result, the Pac-12 was left with a late, subscription-dependent streaming proposal with Apple TV tied to subscriber growth, with base payouts below peer leagues.[31]

24.     Left with an expiring media deal and failed network model, the Pac-12 lost its anchor members to stronger Midwest and East Coast conferences.  In June 2022, USC and UCLA announced their move to the Big Ten Conference ("Big Ten"), effective in 2024, which "cut[] the potential value of the upcoming television contract significantly[.]"[32]

25.     After the announcement of USC and UCLA's departure, the Pac-12 began exploring scheduling agreements and mergers with other conferences, including the Atlantic Coast Conference ("ACC") and the Big 12.[33]  The Pac-12 also sought to block UCLA's exit. Its commissioner floated a plan to pay the Big Ten $15,000,000 to get UCLA back.[34]

---

[28] J. Brady McCollough, *Inside the Pac-12 Collapse: Four Surprising Moments that Crushed the Conference*, Los Angeles Times (Aug. 16, 2023), https://www.latimes.com/sports/story/2023-08-16/pac-12-collapse-decisions-realignment-ucla-oregon.
[29] *Id.*
[30] Doug Robinson, *End of an Era – How the Pac-12 Came Undone*, Deseret News (Mar. 13, 2024), https://archive.is/rfY1u.
[31] *Id.*
[32] Pete Thamel, *Sources: Big 12, Pac-12 Won't Partner as Talks Officially End*, ESPN (Jul. 18, 2022), https://archive.is/lv5hP.
[33] *Id.*
[34] J. Brady McCollough, *Inside the Pac-12 Collapse: Four Surprising Moments that Crushed the Conference*, Los Angeles Times (Aug. 16, 2023),  https://www.latimes.com/sports/story/2023-08-16/pac-12-collapse-decisions-realignment-ucla-oregon.

26.     A broader exodus followed.  In July 2023, Colorado defected from the Pac-12 to the Big 12 amidst revenue uncertainty.  On August 4, 2023, Oregon and Washington accepted Big Ten invitations; that same day, Arizona, Arizona State, and Utah announced they would be joining the Big 12.  And in early September 2023, Stanford and Cal received invitations for ACC membership for the following season to secure long-term stability.[35]

27.     Thus, by late summer 2023, ten Pac-12 members had announced departures: USC, UCLA, Oregon and Washington were leaving to the Big Ten; Stanford and Cal to the ACC; and Colorado, Utah, Arizona, and Arizona State to the Big 12.  The Pac-12 thus entered the 2024–2025 athletic season with two member institutions: OSU and WSU.

28.     As the remaining two members of the Pac-12, OSU and WSU had, or eventually would have, access to a substantial war chest for recruiting new teams.  Public documents report that the Pac-12 generated hundreds of millions of dollars in 2023, exceeding the Big 12 in revenue.  On September 8, 2023, shortly after the last of the ten schools announced their departure from the Pac-12, OSU and WSU sued the Pac-12 and its then-commissioner George Kliavkoff in Washington state court for control of the Pac-12 Board and assets.[36]

29.     On November 14, 2023, the Washington state court granted OSU and WSU effective control of the Pac-12 Board and assets.[37]  This gave OSU and WSU substantial leverage over the ten departing schools via control of the Pac-12's current and future assets.  The Washington Supreme Court stayed the ruling.

30.     By December 2023, OSU and WSU had regained control of the Pac-12 Board and the Pac-12's assets, and the parties had reached a $65 million settlement in principle.[38]  The Pac-

---

[35] *Id.*

[36] Nicole Auerbach and Chris Vannini, *Oregon State, Washington State File Complaint against Pac-12 for Control of Conference*, The Athletic (Sept. 8, 2023),  https://archive.is/V7NOZ.

[37] Ross Dellenger, *Washington State, Oregon State Land Court Victory against Pac-12*, Yahoo! Sports (Nov. 1, 2023),  https://sports.yahoo.com/washington-state-oregon-state-land-court-victory-against-pac-12-013039157.html?guccounter=1.

[38] *Washington State, Oregon State Settle With Schools Exiting Pac-12*, ESPN (Mar. 25, 2024), https://www.espn.com/college-sports/story/_/id/39808513/washington-state-oregon-state-settle-schools-exiting-pac-12 (last visited Oct. 13, 2025).

12 departing members were not entitled to any revenue generated after that year and would have no "vote, direction input or other power with the conference's use, allocation of expenditure of the supplemental contribution."[39]  Even without precise figures, it was clear that the Pac-12, OSU, and WSU retained substantial resources to rebuild.

### D. The Pac-12, OSU, WSU, and Mountain West Strike a Mutually Beneficial Bargain

#### 1. The Pac-12's Bargaining Position

31.    In the fall of 2023, the Pac-12 faced shorter-horizon needs and longer-horizon priorities.  The Pac-12 had to solve football scheduling while deploying its resources to chart its future.

32.    The Pac-12's more pressing need was football scheduling.  With only two members left—WSU and OSU—the Pac-12 had to rebuild 2024–2025 athletic schedules in roughly a year.  Post-defection, each of the remaining Pac-12 members had only one conference opponent.

33.    Strategic planning was less pressing.  NCAA bylaws provided the Pac-12 with a two-year grace period to operate below the FBS minimum of eight members; the Pac-12 had "roughly $222 million" to rebuild during that two-year window,[40] giving OSU and WSU until fall 2026 to field an eight-member conference, go independent, or join another conference.

34.    The Pac-12's governance carried on-field consequences.  As a two-team league, the Pac-12 lacked a built-in conference slate.  OSU and WSU needed to retain coaches and players.  To protect competitive integrity and ensure postseason access, each needed 12 games in 2024 and at least six wins for bowl eligibility.[41]  A scheduling arrangement with MWC would replicate a conference slate and satisfy postseason requirements in an unprecedented way, allowing the Pac-12 to avoid the need to individually negotiate and schedule dozens of football games.

---

[39] *Id.*

[40] Jon Wilner, *Pac-12 Survival: Tallying the Cash Available to Washington State and Oregon State for Rebuilding the Conference*, Sports360AZ (Mar. 30, 2024), https://archive.is/s65Tb.

[41] *2024–25 PBA Postseason Bowl Handbook*, NCAA, https://ncaaorg.s3.amazonaws.com/championships/sports/football/d1/PBA/2024-25PBA_PostseasonBowlHandbook.pdf  (last visited Oct. 22, 2025).

35.    Home games drive cash flow—tickets, premium seating, concessions, parking, in-stadium sponsorships—and, in the Pac-12's interim state, OSU and WSU could sell their home media rights.[42]  Bowl games compound value through payouts, exposure, practice time, and recruiting lift.[43]  Those revenues and benefits mattered during transition.  With control of the Pac-12 Board and its war chest in reach, OSU and WSU, moved to schedule credible opponents that could be slotted quickly and televised reliably.

36.    In approximately late October 2023, OSU, WSU and MWC began discussions relating to a nonconference scheduling alliance with the Pac-12.  Over the next several weeks, the parties continued to negotiate—each with its own independent counsel—the terms that would eventually be finalized in the executed Scheduling Agreement, including the Termination Fees.

37.    Because the Pac-12's ten departing members remained on the Pac-12 Board throughout negotiations, the Scheduling Agreement would also need the Pac-12 Board's unanimous approval for the Pac-12 to sign it.

38.    In negotiating and executing the Scheduling Agreement, all parties, including the Pac-12, were represented by independent and experienced legal counsel.  The parties exchanged drafts of the Scheduling Agreement, including discussion of the Termination Fees the Pac-12 agreed to pay if it offered membership to some, but not all, MWC schools, who then accepted those offers.

39.    During the course of the parties' negotiation of the Scheduling Agreement in late 2023, the parties also discussed potential regulatory review, including possible antitrust scrutiny, of the Scheduling Agreement.  At no point during the parties' negotiation of the Scheduling Agreement did the Pac-12 state that it believed the Termination Fees violated federal or state antitrust laws, or were otherwise unenforceable.  Following that discussion, the parties, each represented by experienced antitrust counsel, agreed to move forward with the Termination Fee

---

[42] Shehan Jeyarajah, *Oregon State, Washington State, Mountain West finalize Scheduling Agreement for 2024 College Football Season*, CBS Sports (Dec. 1, 2023),  https://archive.is/42pit.
[43] *Bowl Games Provide Benefits for Stakeholders*, USA Today (Dec. 12, 2018), https://archive.is/zjl5G.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

provisions.  Indeed, the Pac-12 expressly represented in the Scheduling Agreement that it would be contractually bound to pay the Termination Fees should it offer membership to some, but not all, MWC schools, who then accepted those offers.

40.    What's more, on information and belief, OSU and WSU continued parallel talks with other conferences regarding comparable scheduling or mergers before and after the execution of the Scheduling Agreement.    Meanwhile, the Pac-12 pressed the MWC for a public announcement of the Scheduling Agreement before the final terms were finalized.

41.    If a single Pac-12 Board member thought that any aspect of the Scheduling Agreement was improper, the Pac-12 would not have the unanimous approval required to sign the Scheduling Agreement.  None did.  The Pac-12 Board unanimously approved the Scheduling Agreement, and by December 1, 2023, the Pac-12, MWC, OSU, and WSU executed the Scheduling Agreement.

42.    Under the football component of the Scheduling Agreement, each MWC school removed one league game and added OSU or WSU, giving the Pac-12 schools a core FBS slate. The Pac-12 paid an agreed-upon fee for those games.  Giving up one conference game, and in six instances a valuable home game, was a significant concession for each MWC school. The exchange produced competitive matchups, preserved television windows, and maintained the Pac-12's governance and branding.  Pac-12 Commissioner Teresa Gould lauded the agreement and its student-athlete benefits, lauding the positive effect on "fan interest."[44]

43.    OSU's president and athletic director publicly affirmed the Scheduling Agreement's competitive value, CFP eligibility, and importance to preserving the Pac-12's options, stating that the Scheduling Agreement "will position Oregon State and Washington State to continue to compete against some of the nation's top athletic programs while creating new and exciting matchups for OSU student-athletes and fans" and that the "agreement represents an important step in our strategy to preserve options for the future viability of the Pac-12

---

[44] *Exclusive with Pac-12 Commissioner Teresa Gould*, Canzano & Wilner, (Aug. 8, 2024), https://www.youtube.com/watch?v=SsfRWVeZMuA at 26:40.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

conference."[45]   The arrangement also enabled WSU to compete in the Holiday Bowl, driving significant Pac-12 revenue—a net increase in Pac-12 output.

44.    The Scheduling Agreement stabilized the Pac-12's 2024–2025 athletic scheduling, increased the diversity of match-ups, and kept the Pac-12's legal and operational status intact during the grace period while OSU and WSU secured respective football schedules.  In contrast, without a renewal for the following season, the Pac-12's 2025–2026 schedule—built in fall 2024 on the same timetable—forced OSU and WSU into playing against lower-division opponents and even two head-to-head games against each other in a single month.[46]

### E.    The Termination Fees Agreed Upon By The Parties Serve Critical, Procompetitive Functions

45.    Under the Scheduling Agreement, the Pac-12 agreed, *inter alia*, that if it offered membership to some but not all of the MWC's members, and those offers were accepted, the Pac-12 would compensate the MWC pursuant to the fee schedule in Schedule 7 of the Scheduling Agreement.  Specifically, Section 7.01 of the Scheduling Agreement provides:

> Accordingly, as a material inducement to MWC's willingness to enter into and perform its obligations under this Agreement, the Pac-12 covenants and agrees that, if (A) at any time prior to the two year anniversary of the expiration or termination of this Agreement pursuant to Article IV (the "Withdrawal Fee Period"), the Pac-12 makes an offer to any MWC Member Institution (other than an offer to all MWC Member Institutions to join Pac-12 as Pac-12 member institutions in accordance with the terms of Section 8.01) to join the Pac-12 as a Pac-12 member institution or affiliate member, which any such MWC Member Institution accepts, or announces that it will accept, during the Withdrawal Fee Period (each such MWC Member Institution, an "Accepting MWC Member Institution"), the Pac-12 shall pay liquidated damages to MWC in the form of the a termination fee as set forth on Schedule 7 (the "Withdrawal Fee").

---

[45] Jayathi Murthy & Scott Barnes, *2024 Pac-12/Mountain West football scheduling agreement*, (Dec. 1, 2023),  https://archive.is/Qko0z.

[46] Nick Daschel, *Oregon State AD Scott Barnes speaks out about Pac-12 rebuild, its timing, and damaging the Mountain West*, The Oregonian (Sept. 12, 2024), https://archive.is/DQ7pn ("Oregon State and Washington State have six games scheduled for next year.  Barnes said he hopes Oregon State will announce 'in the next several weeks'"); *e.g.*, Oregon State Football (@BeaverFootball), X (Oct. 23, 2024), https://x.com/BeaverFootball/status/1849186820225122689.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

46.    Schedule 7 reads as follows:

**SCHEDULE 7**

**WITHDRAWAL FEE**

The Pac-12 Parties shall pay MWC a Withdrawal Fee in accordance with this Schedule 7 for each Accepting MWC Member Institution during the Withdrawal Fee Period. For purposes of illustration, and not limitation, the "Aggregate Withdrawal Fee" column represents the aggregate Withdrawal Fee payable by the Pac-12 Parties to MWC relative to the total number of Accepting MWC Member Institutions during the Withdrawal Fee Period.

| Accepting MWC Member Institutions | Withdrawal Fee | Aggregate Withdrawal Fees |
|---|---|---|
| Accepting MWC Member Institution #1 | $10,000,000 | $10,000,000 |
| Accepting MWC Member Institution #2 | $10,500,000 | $20,500,000 |
| Accepting MWC Member Institution #3 | $11,000,000 | $31,500,000 |
| Accepting MWC Member Institution #4 | $11,500,000 | $43,000,000 |
| Accepting MWC Member Institution #5 | $12,000,000 | $55,000,000 |
| Accepting MWC Member Institution #6 | $12,500,000 | $67,500,000 |
| Accepting MWC Member Institution #7 | $13,000,000 | $80,500,000 |
| Accepting MWC Member Institution #8 | $13,500,000 | $94,000,000 |
| Accepting MWC Member Institution #9 | $14,000,000 | $108,000,000 |
| Accepting MWC Member Institution #10 | $14,500,000 | $122,500,000 |
| Accepting MWC Member Institution #11 | $15,000,000 | $137,500,000 |

47.    In Section 7.02, the parties memorialized the purpose and nature of these "Termination Fees" as follows:

> The Parties acknowledge and agree that the Termination Fees are not penalties and are instead fair, reasonable and appropriate approximations of the losses that MWC may incur as a result of MWC's loss of any MWC Member Institution to Pac-12 and the failure to consummate the Definitive Transaction pursuant to Article VIII. The Termination Fees shall be MWC's sole and exclusive remedy in respect of the matters described in Section 7.01.

48.    During negotiations, the Pac-12, OSU, WSU, and the MWC each expressly acknowledged the harms posed by selectively recruiting a conference's teams.

49.    Cherry-picking individual schools creates gaps in the schedules of a conference's remaining schools and thus decreases output of a conference's games. Moreover, such cherry-picking erodes the value that a conference spent years cultivating with its established member network. The efficiencies of conference members staying together are lost when its members are broken apart. Fracturing a consistent bloc of teams decreases fan investment, and lessens

59

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

enthusiasm by both schools and their student-athletes to invest in their programs, including by fracturing long-standing rivalries in college football.

50.    This type of conference realignment has become common in college athletics. But the Pac-12 was not seeking to recruit individual MWC teams in the open market.  Rather, it was seeking a scheduling agreement with the MWC that would enable OSU and WSU to offer a full season to their athletes and fans.  And the Pac-12, OSU, and WSU knew that the MWC was willing to extend this offer only on the condition of receiving appropriate, time-limited protection against the certain erosion of MWC's brand and enterprise value, reduction of college athletic contests, and many other harms that would result from selective recruiting of its members. The Pac-12 expressly acknowledged these concerns during negotiations.

51.    Indeed, the Pac-12, OSU, WSU, and the MWC negotiated the Scheduling Agreement to avoid these harms.  They agreed to discuss the possibility of a merger creating a 14-team conference while giving the Pac-12 flexibility to choose alternative paths consistent with its strategic goals.

52.    As OSU's president and athletic director stated, the Scheduling Agreement left open every possible option for the Pac-12, WSU, and OSU to perform under the contract: (i) the Pac-12 and the MWC could agree to merge the two conferences; (ii) the Pac-12 could recruit some, but not all, MWC members to join the Pac-12; or (iii) the Pac-12 could dissolve and allow its members to join any other conference.[47]

53.    The Pac-12 also secured a material concession: the MWC agreed that payments under Sections 7.01 and 7.02 would be the MWC's sole and exclusive remedy ***from the Pac-12*** if the Pac-12 cherry-picked MWC members.  This was an arm's-length risk allocation—not duress.

54.    Sections 7.01 and 7.02 rationally price and allocate the risk borne by the remaining MWC members if a merger failed.  If the Pac-12 took fewer than all MWC schools, any payments made under Sections 7.01 and 7.02 would compensate those institutions remaining in the MWC

---

[47] Jayathi Murthy & Scott Barnes, *2024 Pac-12/Mountain West Football Scheduling Agreement*, (Dec. 1, 2023), https://archive.is/Qko0z.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

for forgone merger value and other negative externalities, and provide funds to stabilize and rebuild the conference.

55.    Losing particular programs can drop a conference below NCAA thresholds in specific sports, shrinking the number of conference-sponsoring entities and forfeiting valuable media rights, bowl games, playoffs, and other revenue.  That is, losing a school to another conference could result in the MWC no longer being able to sponsor a given sport, and, if the new conference is also below the NCAA threshold for that sport, the result is a net loss to the market and diminished competition overall.  The Pac-12 itself canceled its baseball tournament for 2025–2026, illustrating these output effects.

56.    The risk is systemic.  If the Pac-12 successfully recruited five schools from the MWC, *both* conferences could lose FBS status under NCAA rules as both would remain under the required NCAA threshold.  A merger would have avoided these harms by creating a tradition-rich entity better positioned to compete nationally for fans and media partnerships, all at no cost to the Pac-12.  This is one of the many reasons that the Scheduling Agreement is procompetitive and reasonable.  Any speculative injuries to competition or the marketplace are far outweighed by substantial procompetitive benefits.  Sections 7.01 and Section 7.02 were necessary and agreed-upon terms.

57.    In fact, the Pac-12 agreed that the "MWC and its members would not enter into this Agreement, and mutual cooperation and exchanges of confidential information would not be feasible . . . without safeguards, including certain fees which protect against misuse of information, protect the MWC from fracturing, and preserve the integrity of [both] the MWC and Pac-12."[48]

58.    These provisions preserve the traditions, legacies, and rivalries valued by fans, teams, student-athletes, and conferences.  By allowing the Pac-12 to select schools aligning with its vision (rather than mandating a merger), they also preserve the Pac-12's integrity.

---

[48] ECF 1-1 ("Scheduling Agreement") at Preamble.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

59.     As the parties agreed, the Termination Fees are essential to promote competitive opportunities for OSU, WSU, and MWC student-athletes and to maintain consumer choice grounded in college football's distinctive character.

**F.     The Parties Fail to Schedule Games for the 2025–2026 season, and the Pac-12 Raids the MWC, Refusing to Pay the Termination Fees.**

60.     Under the Scheduling Agreement, the parties expressly contemplated a second-year renewal and authorized extending the agreement from August 1, 2025 to August 1, 2026 if the MWC and Pac-12 agreed in writing by September 1, 2024.[49]  The Scheduling Agreement also obligated the parties to negotiate in good faith a merger ("Definitive Transaction") to bring all MWC members into the Pac-12, targeted for the 2025–2026 or 2026–2027 season.[50]

61.     On July 12, 2024, Pac-12 Commissioner Teresa Gould opened renewal talks with MWC Commissioner Gloria Nevarez for the 2025–2026 scheduling year.  Commissioner Gould explained that OSU and WSU wanted to exercise the second-year option, but asserted that the existing fees were above market.  The Pac-12 cited $1 million already paid per school plus $12 million for six 2024–2025 games (which actually amounted to twelve games: six home and six away), called those guarantees unprecedented, and proposed $1 million per 2025–2026 game— $6 million total for six OSU/WSU home contests.

62.     On July 22, 2024, the MWC countered with an offer of $15 million per Pac-12 school ($30 million total) for 2025–2026 as reflecting market value and the unique benefits provided to OSU and WSU.

63.     On August 19, 2024, the Pac-12 asserted that its extension proposal mirrored the 2024 structure.  It also said the parties contemplated paying no more than $9 million per school and proposed confidential, parallel reverse-merger talks for MWC members to join the Pac-12.

---

[49] *See* Scheduling Agreement at § 4.01(b).
[50] Scheduling Agreement at § 8.01.

At no point did the Pac-12 allege that the Scheduling Agreement or potential extension was anticompetitive.

64.    The Pac-12's objection to the MWC's counteroffer was pretextual, as Pac-12 uses the same negotiating strategies when securing its own media rights deals.[51]

65.    On August 27, 2024, the MWC, negotiating in good faith, countered at $27 million after the Pac-12's $9 million proposal, and explained that the arrangement was not comparable to standard non-conference guarantees due to the integrated schedule, efficiencies, and conference imbalance borne by the MWC.    It clarified the 2024 separation of "administrative" and "participation" fees was at the Pac-12's request and did not imply a lower 2025 rate, and said merger talks should follow a finalized scheduling amendment.

66.    On August 30, 2024, the Pac-12 claimed it was evaluating the MWC's proposal but insisted merger talks proceed in parallel.

67.    On September 3, 2024, the MWC explained that in light of the parties' inability to reach an agreement to extend the Scheduling Agreement by the contractual deadline of September 1, 2024, the agreement was set to expire on August 1, 2025.    The MWC needed to finalize its own 2025–2026 schedule to meet its business deadlines.    The MWC reiterated its openness to maintain discussions and requested staff coordinate further meeting dates.

68.    There was no Definitive Transaction.    In fact, "[e]xtending the agreement into 2025 didn't fit smoothly within the Pac-12′s long-haul strategic plan, which leans heavily into remaining

---

[51] A former Pac-12 president acknowledged that similarly using an above-valuation $50 million ESPN figure during the Pac-12's media rights negotiation "was only a potential starting point in negotiations to help get us to the estimated true value." John Canzano, *Truth Behind the Pac-12's Misfire*, Bald Faced Truth (Oct. 6, 2023), https://archive.is/qiNfN.

as flexible as possible—in case of additional realignment—and preserving the cash to act on any opportunities."[52]   The Pac-12 had well over $200 million at its disposal at the time.

69.     Unbeknownst to the MWC, "[i]n the spring of 2023, before the Pac-12 collapsed, Pac-12 Commissioner George Kliavkoff was presented with a backup option in the event Oregon and Washington left for the Big Ten and the Four Corners schools bolted to the Big 12."[53] The plan required the Pac-12 to "[i]nvite the top football schools from the [MWC], [and] pair them with WSU and OSU[.]"[54]

70.     On September 12, 2024, Boise State, Fresno State, Colorado State, and San Diego State independently announced that they had received invitations to join the Pac-12 and their intent to resign from the MWC and join the Pac-12, effective July 1, 2026.   That same day, also on September 12, 2024, the Pac-12 announced those schools would be joining the Pac-12.

71.     Also on September 12, 2024, MWC Commissioner Nevarez sent a letter reminding the Pac-12 that the Termination Fees the Pac-12 freely agreed to, totaling $43,000,000, for the then four departing schools, would be due on October 12, 2024.

72.     Utah State announced its intended departure eleven days later, on September 23, 2024, bringing the Termination Fees under Schedule 7 of the Scheduling Agreement, to $55,000,000.   On September 26, 2024, MWC Commissioner Nevarez similarly sent a letter reminding the Pac-12 that the Termination Fees the Pac-12 had freely agreed to would now total $55,000,000, for the now five departing schools.   The Termination Fees for Utah State would be due by October 24, 2024.

73.     The day after Utah State's departure, the Pac-12 filed the present lawsuit, seeking to evade its contractual promises.

---

[52] Jon Wilner, *Pac-12, Mountain West 'Too Far Apart' as Negotiations Over 2025 Scheduling Partnership Break Down*, The Seattle Times (Sep. 1, 2024), https://archive.is/cKrYw.
[53] Jon Wilner, *Pac-12 Expansion: Idea of Raiding the Mountain West Wasn't New, But This Time, It Wasn't Ignored*, Sports360AZ (Sept. 16, 2024), https://archive.is/Zi0tL.
[54] *Id.*

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

74.     The Pac-12's decision to recruit five MWC schools forced both conferences below the FBS threshold and exposed the seven remaining MWC members to losing their FBS status through no fault of their own.

75.     The Pac-12 has bided its time in building its way back up to the FBS threshold, as reflected in how it has chosen to focus its budget elsewhere.  Based on publicly available tax filings,[55] OSU and WSU each took distributions of $46,611,416 and $46,574,886, respectively, from the Pac-12 in FY 2024; the Pac-12 spent between $25 and $27 million building a studio in FY 2024; and the Pac-12 had "roughly $222 million" at its disposal to rebuild leading up to negotiation of the Scheduling Agreement.[56]  In an August 2024 interview, Pac-12 Commissioner Gould stated, "[t]he priority for that money is. . . support[ing] and fund[ing] [its] programs at the level they are accustomed to," and "distributing back as much as possible" to OSU and WSU, not recruiting or rebuilding the conference.[57]

76.     As the MWC recognized—and shared with the Pac-12 in the Scheduling Agreement—its stakeholders and fans define the MWC through five characteristics:

- OPPORTUNITY: Students and student-athletes have the ability to pursue their dreams in a way not possible elsewhere.

- INTEGRITY: [MWC] athletic programs not only win on and off the field, they win the right way.

- COMPETITION: [MWC] institutions lend themselves to natural in-conference rivalries and provide a platform for being competitive on a national level.

- DESTINATIONS: Universities of the [MWC] are located in some of the nation's top destinations.

---

[55] Jon Wilner, *Pac-12 Survival: Tallying the Cash Available to Washington State and Oregon State for Rebuilding the Conference*, Sports360AZ (Mar. 30, 2024),  https://archive.is/s65Tb.

[56] John Canzano, *Canzano*, *Sins and Ghosts Aside... Pac-12 Shuts Fiscal Door on Past*, Bald Faced Truth by John Canzano (May 16, 2025), https://www.johncanzano.com/p/canzano-sins-and-ghosts-aside-pac., Sports360AZ (Mar. 30, 2024),  https://archive.is/s65Tb.

[57] *Exclusive with Pac-12 Commissioner Teresa Gould*, Canzano & Wilner, (Aug. 8, 2024), https://www.youtube.com/watch?v=SsfRWVeZMuA at 21:50.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

- HERITAGE: Six of the 12 member institutions have been competing in football for more than 100 years.[58]

77.    The Pac-12's decision to selectively recruit individual MWC teams harms all of these characteristics.  For example, the Pac-12's raiding of MWC schools harms "opportunities" for students and student-athletes.  Before the Pac-12's raid, the MWC was previously composed solely of public universities, which is rare among conferences.  Those schools are generally more affordable and accessible to students, and it gives some students (and student-athletes) opportunities to advance their careers on and off the field in ways they may not be able to do otherwise.  Losing five members harms the revenue of each remaining member in a way that will trickle down and hurt opportunities for students—not just student-athletes—and sports may need to be cut as a result.

78.    The Pac-12's choice also harms the "integrity" of the MWC's athletic programs and "competition" of the MWC's schools.  The Pac-12 took with it the games the remaining MWC members would have played with the Departing Members and exposed the remaining MWC schools to losing FBS status.  Moreover, the Pac-12's cherry-picking of MWC schools harms "destinations," decreasing the number of MWC member locations with the departure of five member schools.

79.    Finally, the Pac-12's raid harms "heritage."  The Pac-12 seeks to coopt the MWC's heritage and free-ride off its brand development efforts.  San Diego State and Colorado State were charter members of the MWC.  Losing charter members, as the Pac-12 can attest, is harmful to a conference's identity.  Utah State, Boise State, and San Diego State burnished their reputations in the MWC and the Pac-12 seeks to reap the benefits.

80.    While Sections 7.01 and 7.02 of the Scheduling Agreement disincentivize that free-riding, they also allow the Pac-12 to pay to avoid dilution or bloat.  The Termination Fees

---

[58] Scheduling Agreement at 43.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

not only compensate the remaining MWC members for the cost to rebuild their conference after losing five schools, but also allow the Pac-12 to carve out its identity as it sees fit.

81.    The Pac-12's choices have also significantly impaired the rivalries central to the MWC's brand identity.  For example, the Border War between Colorado State and Wyoming dates back to 1899.  The Pac-12's cherry-picking of schools will lead to the end of a streak of 78 consecutive annual contests in what was the oldest and most-played series in the MWC's history.[59]   Its end is a substantial loss to fans, broadcasters, teams, and the universities themselves, which now must devote precious nonconference slots to the game if it is to be played at all.

82.    Other MWC schools are losing their rivals as well.  In football alone, the Pac-12's choice ends in-conference rivalries like:

  a.  The Golden Screwdriver, between Fresno State and Hawai'i;

  b.  The Ram-Falcon Trophy, between Colorado State and Air Force;

  c.  Bridgers Battle, between Utah State and Wyoming; and

  d.  The Battle for the Valley, between Fresno State and San José State.

83.    The loss of San Diego State to the Pac-12 also jeopardizes its hotly contested basketball rivalry with New Mexico.

84.    These losses harm the history and tradition that define college sports and that fans, universities, student-athletes, conferences, and media partners cherish.

### G.    The Pac-12's Covert Interference is Exposed

85.    Well aware of the Scheduling Agreement's Termination Fees, the Pac-12 approached certain MWC schools to join the Pac-12.  Although the Pac-12 and some of its future members publicly claimed that when "the [membership] conversation really started to escalate was

---

[59] *See* Nick Seeman, *Cowboys and Rams Meet for the 116th Edition of "The Border War"*, One Wyoming (Nov. 11, 2024), https://archive.ph/R9PRV.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

after the negotiations ended with the Mountain West and the Pac-12 in terms of the scheduling alliance" in September of 2024,[60] that narrative is false.

86.     Diana Sabau, then vice president and athletics director of Utah State, admitted that she knew that "the four schools who first departed for the Pac-12 would do so a month before the announcement was made," and suggested that she had been in discussions with the Pac-12 or its agents well before the public timeline.[61]

87.     Sabau further confirmed covert coordination, stating she "was really worried last summer in August [of 2024], when they started talking about the first four that were going to be invited to the [Pac-12].  And I was like, 'Oh my God, I've done 18 presentations, I've talked to all these people.'  And then it started to fall into place.  And people said, 'Well, be patient.  You're not going to be part of the first group, but you're going to be asked.'"[62]  Her remarks demonstrate that the Pac-12's discussions and strategy were in motion long before any public disclosure or the breakdown of negotiations to extend the Scheduling Agreement.

88.     Public reporting confirms that "administrators from the schools that accepted Pac-12 invitations last September have admitted to accepting offers to join the Pac-12 before they counseled Nevarez on sticking firm to a $14 million price tag to extend the Pac-12 scheduling alliance for the 2025 season," raising the specter that "those departing schools were intentionally trying to sow division between the MW[C] and Pac-12 to destabilize [their] conference[.]"[63]

89.     By taking five of the MWC's programs, the Pac-12 inflicted substantial harm on the conference, and its seven remaining members.  Observers have rightly questioned whether OSU and WSU did to the MWC precisely what Oregon and Washington did to the Pac-12.[64]

---

[60] Jon Wilner, *Pac-12 Expansion: Idea of Raiding the Mountain West Wasn't New, But This Time, It Wasn't Ignored*, Sports360AZ (Sept. 16, 2024), https://archive.is/Zi0tL.

[61] Learfield, *D1.Ticker Evening Standard – Friday*, April 18 2025, D1.Ticker (Apr. 18, 2025), https://archive.ph/Ka9kM.

[62] *Id.*

[63] Chris Murray, *Lawsuit Filed by Future Pac-12 Schools Against Mountain West Making Less Sense*, Nevada Sports Net (Aug. 13, 2025), https://archive.is/pL1OF.

[64] Nick Daschel, *Oregon State AD Scott Barnes Speaks Out About Pac-12 Rebuild, its Timing, and Damaging the Mountain West*, The Oregonian (Sept. 12, 2024),  https://archive.is/DQ7pn.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

90.    On information and belief, the Pac-12 and its consultants decided early on to dismantle the MWC from the inside—ultimately hoping to recruit between four and six members, bleed the MWC dry to prompt others to leave, and then force a vote to dissolve the MWC such that the Pac-12 and any departing member could escape their financial commitments to the conference.

91.    Acting on that plan, after the first four departures were set, Utah State President Elizabeth Cantwell attended a special MWC board meeting on September 17, 2024 (only six days before Utah State announced its departure for the Pac-12) regarding the MWC's future—including whether to invite new members to replace those departing—while never disclosing Utah State's obvious conflict while the Pac-12 stood to benefit from inside information.

92.    Meanwhile, without the MWC's knowledge, the four initial defectors had already executed term sheet agreements with the Pac-12 before publicly announcing their resignations. Those term sheets addressed expansion mechanics, expansion consent, a grant of rights, revenue sharing, and governance—and conferred special privileges on WSU and OSU.[65]

93.    Utah State then executed a substantially identical agreement as Boise State, Fresno State, Colorado State, and San Diego State before notifying the MWC of its resignation.[66] After binding Utah State to stringent Pac-12 membership terms, Cantwell departed Utah State to assume the presidency at WSU.[67]

---

[65] Bill Farley, *Boise State's Application and Letter Agreement with the Pac 12*, The Financial Playbook by Bill Farley, PhD. (Oct. 7, 2024), https://www.billfarleyphd.com/p/boise-states-application-and-letter.

[66] Bill Farley, *The New Pac 12 Admission Agreement is One of a Kind*, The Financial Playbook by Bill Farley, PhD. (Oct. 1, 2024), https://www.billfarleyphd.com/p/the-new-pac-12-admission-agreement (providing link to the agreement). The letter agreements are publicly available. The MWC reserves all rights regarding each of these agreements, including but not limited to any beneficial rights created by virtue of the Pac-12's representation that it would "contribut[e] towards [Exit Fee Plaintiffs'] withheld Mountain West Conference ('MWC') distributions or exit fees[.]"

[67] Cimaron Neugebauer, *A $750 Toilet, $184,000 in Furniture and Other Details of Elizabeth Cantwell's Short Tenure at USU*, Cache Valley Daily, (Mar. 15, 2025) https://www.cachevalleydaily.com/news/a-750-toilet-184-000-in-furniture-and-other-details-of-elizabeth-cantwells-short-tenure/article_e0edfb96-fbb6-11ef-ba78-731695a5a02e.html.

94.    The Departing Members' membership agreements with the Pac-12 state that *each future member agreed to pay $40 million to the Pac-12 if it did not become a member of the Pac-12 on July 1, 2026,[68] and the five future members are *entirely prohibited* from leaving the Pac-12 for a non-A4 conference before the 2031 expiration of the Pac-12's grant of rights.[69]

95.    The Pac-12 has continued to publicize the inclusion of the Departing Members in the Pac-12.  For example, the Pac-12 announced on October 1, 2024, that "[t]he Conference's Board of Directors and its *five new member presidents* voted unanimously" to add Gonzaga University to its conference.[70]  The press release confirmed that all five Departing Members have actively participated as voting members of the Pac-12 Board since at least October 1, 2024.

96.    The Pac-12's own pleadings call the departing MWC schools "Pac-12 members."[71]  Yet those same schools continue to attempt to insert themselves into MWC special committee meetings on conflicted subjects, while simultaneously addressing those very issues as Pac-12 decisionmakers—and seeking access to information that postdates their departure, useful only for transmission to the Pac-12.

97.    Indeed, on October 1, 2024, shortly after this lawsuit was filed on September 24, 2024, the Departing Members (schools the Pac-12 considers "Pac-12 members")[72] requested a series of records from the MWC in an apparent attempt to understand what actions the MWC was taking in the wake of the Pac-12's raid.  This was in spite of the clear conflict of interest those Departing Members faced as members who now sat on the Pac-12 Board.

---

[68] Bill Farley, *The New Pac 12 Admission Agreement is One of a Kind*, The Financial Playbook by Bill Farley, PhD. (Oct. 1, 2024), https://www.billfarleyphd.com/p/the-new-pac-12-admission-agreement, at Ex. A, p. 2.

[69] *E.g.*, Chris Murray, *Details from the Pac-12's Heavily Redacted Grant of Media Rights and Membership Agreement*, Nevada Sports Net (July 2, 2025), https://nevadasportsnet.com/news/reporters/details-from-the-pac-12s-heavily-redacted-grant-of-media-rights-and-membership-agreementEx (providing link to the agreement).

[70] The Pac-12 Conference, *Pac-12 Conference and Gonzaga University Unite to Build a Basketball Powerhouse, Advancing the New Era of the Conference's 100-Year Legacy*, The Pac-12 Conference (Oct. 1, 2024), *available at* https://archive.is/rEZpK (emphasis added).

[71] ECF 1, ¶ 75.

[72] *Id.*

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

98.     After receipt of some of the MWC records requested, schools the Pac-12 considers "Pac-12 members" similarly brought a lawsuit against the MWC in parallel to this litigation. On December 16, 2024, Colorado State and Utah State filed a lawsuit against the MWC in Colorado state court, allegedly in part to receive all MWC records it had requested. On December 20, 2024, Boise State joined that litigation as a named plaintiff. Front and center in that lawsuit were the exit fees the Departing Members had all freely agreed to under bylaw 1.04 of MWC's governing bylaws ("MWC Bylaws") should they leave the MWC.[73] Boise State, Colorado State, and Utah State sought to disavow the fees they had freely agreed to under the MWC Bylaws, in tandem with the Pac-12's refusal to pay the fees it had freely agreed to under the Scheduling Agreement. Through the parallel lawsuits, the Pac-12 seeks to bar the MWC from recovering *any* of the fees that the Pac-12 and its "Pac-12 members" agreed to, thus permitting the Pac-12's raid at no cost while inflicting substantial harm on the MWC and its members.[74]

99.     The Departing Members publicly shared their conflicts of interest as "Pac-12 members" on February 16, 2025, when outgoing WSU President Kirk Schulz posted a photo –



---

[73] *Bd. of Governors of the Colo. State Univ. Sys. v. Mountain W. Conf.*, No. 2024CV33874, Doc. No. 1, (Colo. Dist. Ct., Denver Cnty. Dec. 16, 2024).
[74] ECF 1, ¶ 75.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

showing representatives of MWC schools that had announced they would resign from the MWC – at a Pac-12 Board meeting held on or around February 16, 2025. Those representatives of MWC schools were flanked by Pac-12 Commissioner Teresa Gould and representatives from other Pac-12 member institutions. According to Schulz, "the new PAC 12 Presidents met in person and discussed our future as colleagues [.]. . . After all of the drama over the last 2 years - it was satisfying to interact with our new PAC 12 colleagues - and to pass the torch to incoming WSU President Elizabeth Cantwell."[75]

100.    Statements from San Diego State University's athletic director JD Wicker confirmed that the Pac-12 never negotiated a definitive transaction in good faith. Wicker stated that adding San Diego State to the Pac-12 had been "an ongoing discussion for a while …. This summer we started having a few more conversations. In July, athletic directors really started having some conversations, and they picked up steam through August [2024]."[76]

101.    Against this backdrop, MWC members, including UNLV, chose to stay in the MWC. In the words of UNLV's athletic director, "at the end of the day, you're having a conversation and you feel you can trust [the MWC] and what they believe in …. Then you have some people that are shady."[77]

## CLAIMS FOR RELIEF

## <u>COUNT I</u>

### (Declaration That The Termination Fees Are Enforceable)

102.    The MWC incorporates by reference each of the allegations in the preceding paragraphs.

---

[75] Kirk Schulz, LinkedIn (Feb. 16, 2025), https://archive.is/g4T43#selection-375.132-379.3. Starting from the far-right corner, working clockwise: Diana Sabau, Utah State Athletic Director (third far end); Amy Parsons, President of Colorado State; Saúl Jiménez-Sandoval, President of Cal State Fresno; Jayathi Murphy, President of OSU; Teresa Gould, Pac-12 Commissioner; and Elizabeth Cantwell, President of Utah State.
[76] *SDSU President Adela de la Torre & Athletic Director JD Wicker Discuss Joining the Pac-12*, 97.3 The Fan (Sep. 12, 2024), https://www.youtube.com/watch?v=KAGzJnszmas.
[77] Bob Lundeberg, *UNLV Athletic Director Slams Pac-12, Outgoing Mountain West Members*, Sports Illustrated (Jul. 19, 2025), https://archive.ph/Kk1jP.

103.    The Pac-12 seeks a declaratory judgment stating that the Termination Fees are unlawful and unenforceable under Section 1 of the Sherman Act and the Cartwright Act, an unfair and unlawful business practice in violation of the Unfair Competition Law ("UCL"), and an unenforceable liquidated damages penalty.

104.    A dispute exists over whether the Termination Fees provisions of the Scheduling Agreement are unlawful and/or unenforceable under Section 1 of the Sherman Act and the Cartwright Act.

    a.    The Scheduling Agreement and Sections 7.01 and 7.02 thereof concern college sports.

    b.    The Scheduling Agreement is procompetitive because it increased the output of football games played by members of the Pac-12, for the benefit of those schools, their students, athletes and fans.  Specifically, the Scheduling Agreement provided the OSU and WSU football teams with six games each for the 2024–2025 regular season; these games would not have been played absent the Scheduling Agreement. The Scheduling Agreement also made it possible for WSU to play in a post-season bowl game.

    c.    Sections 7.01 and 7.02 of the Scheduling Agreement are procompetitive because, *inter alia*, they seek to facilitate a definitive transaction between the MWC and the Pac-12 for the purpose of creating a stronger conference for their respective teams, while preserving their respective rivalries and traditions, for the benefit of their students, athletes, and fans.

    d.    Sections 7.01 and 7.02 are procompetitive because they were reasonably necessary for the parties to enter into the Scheduling Agreement.  Absent the protections of Sections 7.01 and 7.02, the MWC would not have been willing to facilitate football games and related interactions between its member institutions and the remaining Pac-12 teams.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

e.  Sections 7.01 and 7.02 did not place any restrictions on any conference other than the Pac-12.

f.  Any speculative harm to competition purportedly caused by Sections 7.01 and 7.02 is outweighed by its procompetitive benefits.

g.  A valid case or controversy exists sufficient for this Court to declare the Termination Fees provisions of the Scheduling Agreement are neither unlawful nor unenforceable under Section 1 of the Sherman Act and the Cartwright Act.

105.  A dispute exists over whether the Termination Fees provisions of the Scheduling Agreement are an unfair and/or unlawful business practice in violation of the UCL.

a.  Sections 7.01 and 7.02 are not unlawful because they are not a violation of antitrust laws.

b.  Sections 7.01 and 7.02 are not unfair.  They do not harm competition for college sports programs.

c.  A valid case or controversy exists sufficient for this Court to declare that the Termination Fees provisions of the Scheduling Agreement is neither an unfair nor unlawful business practice in violation of the UCL.

106.  A dispute exists over whether the Termination Fees provisions of the Scheduling Agreement constitute an unenforceable liquidated damages penalty.

a.  The Scheduling Agreement specifically permits the Pac-12 to recruit less than all MWC member institutions.  The Scheduling Agreement also provides that certain Termination Fees are due to the MWC upon acceptance, or announcement of acceptance by an MWC member institution.  The Termination Fees do not flow from any breach of the Scheduling Agreement, and are instead the result of the Pac-12 choosing to pursue an alternative means of performance.  Thus, the fees in Schedule 7 are not an unenforceable penalty for a breach of the Scheduling Agreement.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

b.   The $55,000,000 aggregate fee to be paid by the Pac-12 for the loss of five MWC teams is a reasonable approximation of the loss the MWC and its members will sustain, including the funding required to rebuild the MWC and the harm to the MWC members' programs.

c.   A valid case or controversy exists sufficient for this Court to declare that the Termination Fees provisions of the Scheduling Agreement are not an unenforceable liquidated damages penalties.

107.   The MWC seeks a declaratory judgment stating that Termination Fees are lawful and enforceable under Section 1 of the Sherman Act and the Cartwright Act; a fair and lawful business practice under the UCL; and lawful and enforceable under the terms of the contract.

## COUNT II

### (Breach of Contract)

108.   The MWC incorporates by reference each of the allegations in the preceding paragraphs.

109.   Section 7.01 of the Scheduling Agreement provides in relevant part:

> Accordingly, as a material inducement to MWC's willingness to enter into and perform its obligations under this Agreement, the Pac-12 covenants and agrees that, if (A) at any time prior to the two year anniversary of the expiration or termination of this Agreement pursuant to Article IV (the "Withdrawal Fee Period"), the Pac-12 makes an offer to any MWC Member Institution (other than an offer to all MWC Member Institutions to join Pac-12 as Pac-12 member institutions in accordance with the terms of Section 8.01) to join the Pac-12 as a Pac-12 member institution or affiliate member, which any such MWC Member Institution accepts, or announces that it will accept, during the Withdrawal Fee Period (each such MWC Member Institution, an "Accepting MWC Member Institution"), the Pac-12 shall pay liquidated damages to MWC in the form of the a termination fee as set forth on Schedule 7 (the "Withdrawal Fee").

110.   The Scheduling Agreement terminated on August 1, 2025.[78]

---

[78] Scheduling Agreement at § 4.01(b).

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

111.    In September 2024, five MWC schools announced that they were accepting offers to join the Pac-12.

112.    According to Schedule 7 of the Scheduling Agreement, the Aggregate Withdrawal Fee (i.e., the Termination Fees) for accepting five MWC member institutions is $55,000,000.

113.    According to Section 7.02 of the Scheduling Agreement, the Withdrawal Fee is due no later than 30 days following the announcement of acceptance.  In letters dated September 12, 2024 and September 26, 2024, the MWC requested payment from the Pac-12 of the $55,000,000 in Termination Fees.  As of the filing of this Counterclaim, the Pac-12 has not paid any Termination Fees to the MWC.  The $55,000,000 Withdrawal Fee payments thus have been overdue since October 2024.

114.    MWC has taken all steps required under the Scheduling Agreement to collect the overdue Withdrawal Fees.

115.    Section 7.02 further provides that "[t]he Parties acknowledge and agree that the Termination Fees are not penalties and are instead fair, reasonable and appropriate approximations of the losses that MWC may incur as a result of MWC's loss of any MWC Member Institution to Pac-12 and the failure to consummate the Definitive Transaction."[79]

116.    All of the conditions for the Pac-12's performance under the agreement have occurred, because the MWC has fully performed its obligations, and the Pac-12 has failed and refused to make payment as required under the terms of the Scheduling Agreement.

117.    As a direct and proximate cause of the Pac-12's actions, the MWC has been damaged in the principal sum of $55,000,000, which amount does not include costs, interest, or attorneys' fees due under the Scheduling Agreement.

118.    Additionally, Section 8.01 of the Scheduling Agreement requires that "the Parties [] negotiate in good faith the consummation, as promptly as reasonably practicable, of a definitive

---

[79] Scheduling Agreement at § 7.02.

transaction pursuant to which all MWC Member Institutions join Pac-12 as Pac-12 member institutions."

119.    On information and belief, the Pac-12 negotiated terms for MWC member institutions to depart the MWC and join the Pac-12 during the same time that the Pac-12 was negotiating with the MWC regarding a second season of scheduling games and raising the possibility of a merger.

120.    Accordingly, the Pac-12 did not negotiate the consummation of a definitive transaction in good faith per Section 8.01 of the Scheduling Agreement.

121.    The MWC is entitled to recover its attorneys' fees and costs of suit pursuant to Section 9.01 of the Scheduling Agreement, which provides that "[t]he Pac-12 Parties shall individually indemnify and hold harmless … the MWC Indemnitees from and against any and all claims, losses, costs, damages, expenses, demands, causes of actions and judgments (including reasonable legal costs and reasonable costs of attorney fees) ("Losses") … arising out of (a) any breach by that Pac-12 Party of any representation … made by it under this Agreement."[80]

## COUNT III

### (Promissory Fraud)

122.    The MWC incorporates by reference each of the allegations in the preceding paragraphs.

123.    The Pac-12 represented to the MWC that it would pay the Termination Fees. These representations were made orally and in writing, specifically, in the form of the Scheduling Agreement and the negotiations thereof.

124.    These representations were false.  The Pac-12 knew these representations were false when made, because the Pac-12 intended (i) to recruit fewer than all MWC teams and (ii) to refuse to pay the Termination Fees in that event by challenging the Termination Fees as unlawful and unenforceable.

---

[80] Scheduling Agreement at § 9.01

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

125.     During negotiations of the Scheduling Agreement between October and December 2023, the Pac-12 never stated that it believed Section 7.01 was unenforceable pursuant to antitrust laws, or any other law.

126.     The Pac-12 did not attempt to eliminate or lower the Termination Fees.

127.     Upon information and belief, the Pac-12 pursued a strategy of (i) agreeing to the Scheduling Agreement, including the Termination Fees; (ii) taking full advantage of the benefits of the Scheduling Agreement, including the expanded football opportunities for Pac-12's teams; (iii) recruiting fewer than all MWC teams; and (iv) refusing to pay any Termination Fees. The Pac-12 intended and expected that the MWC would rely on Pac-12's representations—both in negotiations and in the Scheduling Agreement—as part of its strategy of inducing the MWC to enter into the Scheduling Agreement.

128.     Indeed, the Pac-12 was lying in wait and preparing to assert this very lawsuit, claiming that the Termination Fees it agreed to in the Scheduling Agreement and represented as enforceable were now unenforceable and unlawful. The Pac-12 filed this lawsuit on September 24, 2024, *just two weeks* after MWC Commissioner Nevarez sent the Pac-12 a letter on September 12, 2024, reminding the Pac-12 of the Termination Fees the Pac-12 freely agreed to for the then-four departing schools, and *just one day* after Utah State announced its intended departure on September 23, 2024. Having received the benefits of the Scheduling Agreement, including a full season of twelve games for the 2024–2025 athletic season and unique access to the MWC's members, the Pac-12 seeks to write out the Termination Fees the Pac-12 used to induce the MWC to enter into the Scheduling Agreement.

129.     The MWC reasonably relied on the Pac-12's representations – both in negotiations and in the Scheduling Agreement – that it would pay the Termination Fees. The MWC's reliance on the Pac-12's representation was a substantial factor in causing its harm, and the MWC has been harmed in the principal sum of $55,000,000, which amount does not include costs, interest, or attorneys' fees.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

**COUNT IV**

**(Tortious Interference With Contractual Relations)**

130. The MWC incorporates by reference each of the allegations in the preceding paragraphs.

131. The Pac-12 knowingly and deliberately interfered with the Departing Members' contractual obligations to the MWC, including (1) the Departing Members' contractual obligations set forth in the MWC Handbook, which includes the MWC's Bylaws; and (2) the Departing Members' respective membership agreement obligations to the MWC.

132. The MWC Handbook, which contains the MWC Bylaws, constitutes a valid and enforceable contract between the MWC and each of the Departing Members. Specifically, all MWC Members are contractually bound to abide by the terms in the MWC's handbook, which includes MWC's Bylaws (the MWC "Handbook").[81] The MWC's Handbook has been publicly available on the MWC website and disclosed both the conflict of interest provision and Exit Fees provision.

133. Appendix K of the MWC Handbook sets forth the MWC's "Conflict of Interest" policy, which requires any Board Member to refrain from discussing, participating, or voting in any proceeding for which that Board Member has a conflict.[82]

134. Likewise, MWC Bylaw 1.04 also establishes procedures for schools to resign from the conference. Any school may resign from the conference on June 30 of a given year by providing written notice to the MWC and its other members "on or before June 1st of the preceding year" and by payment of a "non-refundable $5,000" Exit Deposit. The resigning school must also pay a fee "equal to three times the average per Member Conference distribution payment for the preceding year."[83]

---

[81] *See* MWC Handbook, https://themw.com/2024-25-mountain-west-handbook/ (last visited Oct. 22, 2025).
[82] *Id.*
[83] *Id.*

135.    Each Departing Member's membership agreement with the MWC also constitutes valid and enforceable contracts between the MWC and each of the Departing Members. Pursuant to each Departing Member's respective membership agreement, each Departing Member agreed to comply with the MWC Handbook, and the MWC Bylaws in the MWC Handbook.

136.    The Pac-12 had actual knowledge of each Departing Member's contractual obligations to the MWC, including its obligations relating to the conflict of interest provision and exit fees provision contained in the MWC Handbook and MWC Bylaws.  This is evidenced through the Pac-12's letters offering membership to the Departing Members ("Membership Terms & Condition Letters"), sent as part of the Pac-12's offer of conference membership to each Departing School.[84]

137.    In the Membership Terms & Condition Letters, the Pac-12 conditioned providing benefits to the Departing Members on contributing to the universities' withheld MWC distributions and exit fees, which are disclosed in the publicly available MWC Handbook.

138.    Namely, in the Membership Terms & Condition Letters, the Pac-12 requires that the Departing Members each "shall provide the Mountain West Conference with written notice of its withdrawal therefrom and provide the Pac-12 with a copy of such notice."  The Pac-12 further stated that if a Departing Member did not timely join the Pac-12, "the Pac-12 will not provide the contributions towards their withheld Mountain West Conference ('MWC') distributions or exit fees as set forth in the 'Contributions Towards Institutional Exit Fees' section of the Membership Terms."[85]

139.    The implication is unmistakable: the Pac-12 held out contributions toward MWC distributions and exit fees as a benefit contingent on joining the Pac-12.

---

[84] Bill Farley, *The New Pac-12 Admission Agreement is One of a Kind*, The Financial Playbook (Oct. 01, 2024), https://billfarley.substack.com/api/v1/file/8364fac5-0624-4326-8a61-fd8e8db7cb71.pdf.
[85] *Id.* at p. 2 ¶ 1.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

140.    The Pac-12's direct references to MWC distributions and exit fees, coupled with industry standard contracting practices, confirm its knowledge of the MWC's contracts and the legal obligations they impose.

141.    Public statements by San Diego State's leadership remove any doubt.  San Diego State athletic director and president, JD Wicker and Dr. Adela de la Torre, stated that "no state funds will cover expenditures related to this move" in connection with San Diego State's jump to the Pac-12.[86]  If state funds were not going to be used to pay a state university's fee, that implies the Pac-12 was going to help pick up the tab.  The same day, Wicker made explicit that the Pac-12 will help San Diego State pay the exit fee.[87]  The Pac-12 promised financial assistance to overcome any contractual obligations owed to the MWC, and it did so to accelerate withdrawal and induce breach.

142.    The interference did not stop at financial inducements.  Utah State's president, Elizabeth Cantwell, while serving as an MWC board member, attended a special MWC board meeting despite an obvious conflict of interest and in violation of the contract with the MWC.  Utah State thus breached the MWC's Conflict of Interest obligations while aligned with the Pac-12's plan to destabilize the MWC from within.

143.    That interference continued after Utah State defected to the Pac-12.  Shortly after this lawsuit was filed, the Departing Members sought records from the MWC on the MWC's actions in the wake of the Pac-12's raid.  Colorado State, Boise State, and Utah State subsequently filed suit to disavow the exit fees they were contractually bound to pay under MWC Bylaw 1.04, a provision all Departing Members had approved in April 2021.  The Departing Members' shirking of their exit fee obligations would be the Pac-12's gain.

---

[86] *SDSU, 3 Other Mountain West Schools to Join Pac-12 in 2026*, KPBS (Sept. 12, 2024), https://www.kpbs.org/news/living/2024/09/12/sdsu-three-other-mountain-west-schools-to-join-pac-12-in-2026.

[87] *SDSU, Colorado State Join Pac-12 with Two Other Mountain West Schools to Exit Mountain West Conference*, Axios San Diego (Sept. 12, 2024), https://www.axios.com/local/san-diego/2024/09/12/sdsu-colorado-state-join-pac-12-exit-mountain-west-conference.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

144.    As a direct result of Pac-12's actions, all Departing Members announced they would be leaving the MWC in September 2024, and submitted formal notices of resignation under MWC Bylaw 1.04 in May 2025.  All five are set to be full members of the Pac-12 in 2026 and beyond.  Rather than satisfy their exit fee obligations under their MWC membership agreements and the MWC Bylaws, the Departing Members have refused to pay.  Several of the Departing Members rushed to Colorado to file litigation in Colorado seeking to invalidate the exit fees, parroting theories that mirror those asserted here.[88]  This coordinated effort is no coincidence; it is the foreseeable and intended product of the Pac-12's interference.

145.    The harm to the MWC is concrete and ongoing.  The MWC was forced to form a special committee of disinterested board members, retain outside counsel, and devote substantial resources to mitigate the damages triggered by the departures and by Utah State's clear conflict of interest.  Pursuant to its contracts, the MWC withheld distributions to offset exit fees—prompting separate litigation in Colorado—and has engaged in significant effort to support its remaining member schools.

146.    Beyond immediate mitigation costs, the MWC's enterprise value has been severely diminished.  The loss of these long-tenured—and in two cases founding—members impacts the value of media rights, reduces revenues across sporting events, and impairs the conference's competitiveness for elite coaching and athletic talent.

147.    The causal chain is direct.  The Pac-12 targeted known contractual relationships, offered contingent financial inducements to prompt withdrawal and nonpayment, and deployed conflicted insiders to destabilize the MWC.  The Departing Members then breached and disrupted their MWC agreements.  As a direct and proximate result, the MWC has suffered, and continues to suffer, substantial damages in an amount to be determined at trial.  The MWC seeks judgment against the Pac-12, including compensatory damages, attorneys' fees, and all other relief the Court deems appropriate.

---

[88] *Bd. of Governors of the Colo. State Univ. Sys. v. Mountain W. Conf.*, No. 2024CV33874, Doc. No. 1, (Colo. Dist. Ct., Denver Cnty. Dec. 16, 2024).

**COUNT V (Pled in the Alternative)**

**(Quasi-Contract/Unjust Enrichment)**

148.    The MWC incorporates by reference each of the allegations in the preceding paragraphs.

149.    In the alternative, if Section 7.01 and Schedule 7 of the Scheduling Agreement are determined to be invalid and/or unenforceable, MWC states a claim for unjust enrichment and alleges the following:

150.    The MWC provided OSU and WSU, the only members of the Pac-12, with six football games each.  In order to facilitate this, each MWC university removed one conference game against a fellow MWC school, and instead played one of the two Pac-12 universities.  Each Pac-12 university played three of those six games at home, and three at an MWC university's home stadium.  For each MWC home game, the MWC was responsible for referee, replay, and other necessary services.[89]  Accordingly, the MWC conferred a benefit on the Pac-12.

151.    At the time Section 7.01 and Schedule 7 of the Scheduling Agreement were agreed to, the Pac-12 claims it "was desperate to schedule football games."  (Complaint, ¶ 1.) Section 7.01 and Schedule 7 were a material part of MWC's assent to the Scheduling Agreement, which led to the scheduling of football games for the Pac-12 universities during the 2024–2025 athletic season.  Accordingly, the Pac-12 had an appreciation or knowledge of the benefit conferred upon it by the MWC's assent to the Scheduling Agreement, which included Section 7.01 and Schedule 7.

152.    Should Section 7.01 and Schedule 7 be determined to be invalid and/or unenforceable, the Pac-12 would be unjustly enriched.  Each of the five Departing Members played a football game against at least one of the two Pac-12 universities in 2024.  The ability for the Pac-12's universities to play football games against the MWC's universities in 2024 was not

---

[89] Scheduling Agreement at Schedule 1.

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK

merely about filling dates on a schedule; it provided essential on-field and off-field access that deepened the Pac-12's relationships with the Departing Members and their decision-makers.

153.    Through scheduling these numerous games, the Pac-12 received game-week interactions, campus visits, athletics-department coordination, broadcast production meetings, and shared competitive platforms.  The Pac-12 also obtained enhanced familiarity with and visibility into the Departing Members' personnel, facilities, and markets—access it would not otherwise have enjoyed at the same depth or frequency.  Those touchpoints materially strengthened lines of communication with presidents, chancellors, athletics directors, and coaches; expanded the Pac-12's recruiting and media footprint; and created relationship capital and goodwill that paved the road for future membership discussions.  The Pac-12 used those benefits to solicit, admit, and announce the future admission of the five Departing Members during the period governed by the Scheduling Agreement.

154.    The Pac-12 has realized and will continue to realize significant competitive, strategic, and financial gains from those admissions, including enhanced media rights leverage, brand stability, a number of conference games in football and other sports, and scheduling assets, in addition to the preservation of FBS status.  As such, the Pac-12 has accepted and retained the benefits afforded to it under the Scheduling Agreement.

155.    The MWC is therefore entitled to restitution in the form of the value the Pac-12 has derived from its specialized access to the MWC and its member universities.  As a direct and proximate result of the Pac-12's actions, the MWC has suffered harm.

156.    Equitable relief is appropriate because the MWC may lack an adequate remedy at law if Section 7.01 and Schedule 7 are determined to be invalid and/or unenforceable. Without compensation for the specialized access the MWC conferred to the Pac-12, which allowed the Pac-12 to offer membership to five MWC universities, the Pac-12 would be unjustly enriched.

157.    Accordingly, the MWC requests restitution in the amount of all benefits unjustly retained by the Pac-12 and disgorgement of any profits obtained as a result of the unjust enrichment,  in an amount to be determined at trial.

158.    WHEREFORE, the MWC requests the Court enter an Order of Judgment in favor of the MWC and against the Pac-12 and award compensatory damages, attorneys' fees, pre- and post- judgment interest, and any and all relief that this Court deems appropriate.

Dated:  October 23, 2025                          Respectfully Submitted,

                                                  WILLKIE FARR & GALLAGHER LLP
                                                  By:    _/s/ Krista Schwartz_____
                                                  Krista Schwartz
                                                  Alexander L. Cheney
                                                  Wesley Powell
                                                  Matt D. Basil (*Pro Hac Vice*)

                                                  Attorneys for THE MOUNTAIN WEST
                                                  CONFERENCE

MOUNTAIN WEST CONFERENCE'S ANSWER, DEFENSES, AND COUNTERCLAIMS IN
RESPONSE TO THE PAC-12 CONFERENCE'S COMPLAINT
Case No.: 5:24-CV-06685-SVK