**WILLKIE FARR & GALLAGHER LLP**
Krista S. Schwartz (Bar No. 303604)
kschwartz@willkie.com
Alexander L. Cheney (Bar No. 302157)
acheney@willkie.com
333 Bush Street, 34th Floor
San Francisco, CA 94104
Telephone: (415) 858-7400

**WILLKIE FARR & GALLAGHER LLP**
Wesley Powell (Bar No. 230430)
wpowell@willkie.com
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000

**WILLKIE FARR & GALLAGHER LLP**
Matt D. Basil (*Pro Hac Vice*)
mbasil@willkie.com
300 N. LaSalle Street
Chicago, IL 60654
Telephone: (312) 728-9000

Attorneys for Defendant
THE MOUNTAIN WEST CONFERENCE

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PAC-12 CONFERENCE,<br><br>Plaintiff,<br><br>vs.<br><br>THE MOUNTAIN WEST CONFERENCE,<br><br>Defendant. | CASE NO.: 5:24-cv-6685-SVK<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS**<br><br>Judge: Hon. Susan van Keulen<br><br>Date Filed: September 24, 2024<br><br>Trial Date: Not yet set |

## TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ................................................................................................1

II.  BACKGROUND .................................................................................................3

III. LEGAL STANDARD..........................................................................................6

IV.  ARGUMENT ......................................................................................................6

A.   The MWC Adequately Alleges a Claim for Promissory Fraud (Count III). .....6

    i.    The Counterclaims show the Pac-12's intent to defraud at the time of contracting...................................................................................................6

    ii.   The Counterclaims satisfy Rule 9(b)'s particularity standard. .............8

    iii.  The MWC alleges more than 'nonperformance'. ...............................11

    iv.   Neither *Noerr-Pennington* nor the litigation privilege protect the Pac-12........................................................................................................12

    v.    The economic loss rule does not bar the MWC's promissory-fraud claim.........................................................................................................14

B.   The MWC Alleges a Claim for Tortious Interference with Contractual Relations (Count IV).........................................................................................17

    i.    The relevant contracts are not "at-will". .............................................17

    ii.   The MWC alleges independently wrongful acts..................................18

C.   MWC States a Claim for Unjust Enrichment (Count V). ...............................21

    i.    The Court need not dismiss alternative claims now. ..........................24

V.   CONCLUSION..................................................................................................25

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S
COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aberin v. Am. Honda Motor Co., Inc.*,
   No. 16-CV-04384-JST, 2018 WL 1473085, at *9 (N.D. Cal. Mar. 26, 2018)) .......................24

*A.J. v. LMND Med. Grp.*,
   No. 24-cv-03288-RFL, 2024 WL 4579143 (N.D. Cal. Oct. 25, 2024)...................................24

*Adkins v. Comcast Corp.*,
   No. 16-CV-05969-VC, 2017 WL 3491973 (N.D. Cal. Aug. 1, 2017) ....................................25

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................................6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................................................6

*Bly-Magee v. California*,
   236 F.3d 1014 (9th Cir. 2001) ..............................................................................................9

*Buena Vista, LLC v. New Resource Bank*,
   No. 10–1502 CW, 2010 WL 3448561 (N.D. Cal. Aug 31, 2010) ..........................................21

*Cabrales v. Castle & Cooke Mortg., LLC*,
   No. 1:14-CV-01138-MCE, 2015 WL 3731552 (E.D. Cal. June 12, 2015) ............................25

*Cagno v. Supreme Mortg. Lending, Inc.*,
   No. 24-CV-04713, 2025 WL 445790 (N.D. Cal. Feb. 10, 2025) ..........................................10

*Coast Hematology-Oncology Assocs. Med. Grp., Inc. v. Long Beach Mem'l Med.*
   *Ctr.*,
   272 Cal. Rptr. 3d 715 (Cal. App. 2d 2020)..........................................................................21

*Colucci v. ZonePerfect Nutrition Co.*,
   No. 12–2907–SC, 2012 WL 6737800 (N.D. Cal. Dec. 28, 2012) ..........................................25

*Compliance Servs. of Am., LLC v. Houser Holdings, LLC*,
   No. 13-CV-01269, 2013 WL 4169119 (N.D. Cal. Aug. 9, 2013) ............................................6

*ConsumerDirect, Inc. v. Pentius, LLC*,
   No. 8:21-CV-01968-JVS, 2023 WL 8115863 (C.D. Cal. Oct. 4, 2023) .................................18

*Cress v. Nexo Financial LLC*,
   No. 23-CV-00882-TSH, 2023 WL 6609352 (N.D. Cal. Oct. 10, 2023)..................................12

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S
COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
   479 F.3d 1099 (9th Cir. 2007) ........................................................................................17

*Doe v. Meta Platforms, Inc.*,
   690 F. Supp. 3d 1064 (N.D. Cal. 2023) ..........................................................................24

*E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961)........................................................................................................12

*eBay Inc. v. Bidder's Edge Inc.*,
   No. C–99–21200 RMW, 2000 WL 1863564 (N.D. Cal. July 25, 2000) ..........................13

*Elec. Solidus, Inc. v. Furlong*,
   No. 25-2763, 2025 WL 3200745 (9th Cir. Nov. 12, 2025) ..............................................19

*Elec. Solidus, Inc. v. Proton Mgmt. Ltd.*,
   No. 2:24-CV-08280 MWC-EX, 2025 WL 1090941, at *13–16 (C.D. Cal. Apr. 9,
   2025) ...............................................................................................................................19

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ............................................................................................8

*In re Gen. Motors LLC CP4 Fuel Pump Litig.*,
   393 F. Supp. 3d 871 (N.D. Cal. 2019)  ...........................................................................24

*Grouse River Outfitters Ltd. v. NetSuite, Inc.*,
   No. 16-CV-02954-LB, 2016 WL 11690253 (N.D. Cal. Dec. 15, 2016) ...........................8, 9

*Hill v. Workday, Inc.*,
   773 F. Supp. 3d 779 (N.D. Cal. 2025) ...........................................................................7, 8

*Holmes v. Elec. Document Processing, Inc.*,
   966 F. Supp. 2d 925 (N.D. Cal. 2013)............................................................................13

*Ixchel Pharma, LLC. V. Biogen, Inc.*,
   9 Cal. 5th 1130, 470 P.3d 571 (2020)...................................................................18, 20, 21

*J2 Cloud Servs., Inc. v. Fax87*,
   No. 13-05353 DDP, 2016 WL 6833904 (C.D. Cal. Nov. 18, 2016) ..................................7

*Jones v. AIG Risk Mgmt., Inc.*,
   726 F. Supp. 2d 1049 (N.D. Cal. 2010) ...........................................................................10

*Laatz v. Zazzle, Inc.*,
   682 F. Supp. 3d 791 (N.D. Cal. 2023) ......................................................................6, 8, 12

*Pattern Design LLC v. We are Sechey Inc.*,
   2024 WL 4369668 (N.D. Cal. Oct. 1, 2024)....................................................................11, 15

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S
COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

*Pro 49 Dev., LLC v. Ness Express 1, LLC*,
No. 2:24-CV-01850-JAM-JDP, 2025 WL 437549 (E.D. Cal. Feb. 7, 2025) .........................17

*Quelimane Co. v. Stewart Title Guaranty Co.*,
960 P.2d 513 (Cal. 1998) ................................................................................................18

*R Power Biofuels, LLC v. Chemex LLC*,
No. 16-CV-00716-LHK, 2017 WL 1164296 (N.D. Cal. Mar. 29, 2017) ...............................12

*Rattagan v. Uber Techs., Inc.*,
553 P.3d 1213 (Cal. 2024) .....................................................................................14, 15, 19

*Reeves v. Hanlon*,
95 P.3d 513 (Cal. 2004) ...................................................................................................21

*Richardson v. Reliance Nat'l Indem. Co.*,
No. C 99-2952 CRB, 2000 WL 284211 (N.D. Cal. Mar. 9, 2000)..........................................11

*Rosenthal v. Great W. Fin. Sec. Corp.*,
14 Cal. 4th 394 (1996) .....................................................................................................16

*Select Portfolio Serv. v. Valentino*,
875 F. Supp. 2d 975 (N.D. Cal. 2012) ..................................................................................13

*Shah v. Cap. One Fin. Corp.*,
768 F. Supp. 3d 1033 (N.D. Cal. 2025) ..........................................................................23, 24

*Swartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) ........................................................................................9, 16

*Tenzer v. Superscope, Inc.*,
39 Cal. 3d 18 (Cal. 1985)..................................................................................................12

*Thompson v. Carmax*,
No. 23-CV-01364-JCS, 2023 WL 4034215 (N.D. Cal. Apr. 27, 2023), *report and
recommendation adopted*, No. 24-CV-02604-CRB, 2023 WL 4995718 (N.D. Cal.
May 31, 2023)..................................................................................................................11

*Toyo Tire Holdings of Americas Inc. v. Ameri & Partners, Inc.*,
753 F. Supp. 3d 966 (C.D. Cal. 2024) ...............................................................................14

*UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*,
117 F. Supp. 3d 1092 (C.D. Cal. 2015) ................................................................................8

*United Mine Workers of Am. v. Pennington*,
381 U.S. 657 (1965)........................................................................................................12

*Valentine v. Progressive Direct Ins. Co.*,
No. 22-CV-03066-SVK, 2022 WL 3083714 (N.D. Cal. Aug. 3, 2022)..................................10

iv

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S
COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

*Vicuna v. Alexia Foods, Inc.*,
No. C 11–6119 PJH, 2012 WL 1497507 (N.D. Cal. Apr. 27, 2012) ......................................25

*W. Air Charter, Inc. v. Sojitz Corp.*,
No. CV 18-7361 JGB, 2019 WL 4509304 (C.D. Cal. May 2, 2019) ......................................18


**Other Authorities**

Fed. R. Civ. P. 9(b) ...............................................................................................................2, 8, 9

Fed. R. Civ. P. 12(b)(6)..............................................................................................................2, 6

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S
COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

## I.    **INTRODUCTION**

This lawsuit arises from a short-term football Scheduling Agreement between two collegiate athletic conferences: the Mountain West Conference ("MWC") and the Pac-12 Conference ("Pac-12"). Both the MWC and the Pac-12 are part of the Football Bowl Subdivision ("FBS") conference. In 2023, several member schools announced that they were departing from the Pac-12 for other conferences. In response, the Pac-12 reached out to the MWC to help fulfill the Pac-12's National Collegiate Athletic Association's ("NCAA") minimum membership and FBS requirements, and the Pac-12 negotiated a bespoke, short-term Scheduling Agreement[1] that gave the Pac-12 privileged access to MWC institutions and decision-makers. However, unbeknownst to the MWC, the Pac-12 never intended to comply with key provisions of the Scheduling Agreement intended to protect the MWC. The Pac-12 executed a deliberate, pre-contract strategy to secure the benefits of the Scheduling Agreement—while simultaneously positioning itself to evade the very risk-pricing terms it agreed to, then racing to court to nullify them.

During negotiations of the Scheduling Agreement, the MWC proposed narrow, time-limited provisions to price the foreseeable risk of selective raids on its members by other conferences. These provisions provide for a "Termination Fee" should some, but not all, MWC member schools receive and accept offers to join the Pac-12 within two years' after the Scheduling Agreement's expiration. The Pac-12, represented by sophisticated counsel and with Board-level oversight, agreed to those bargained-for protections as part of an integrated exchange. The MWC then delivered on its contemplated cooperation and access. The Pac-12 took the benefits and, once those obligations came due, sought to shed the risk it had knowingly accepted by immediately filing suit to rebrand and invalidate the agreed-upon Termination Fees as an anticompetitive "Poaching Penalty." That Trojan-horse tactic is precisely what the MWC's counterclaims are designed to remedy.

The Pac-12 seeks to dismiss three of MWC's five counterclaims: (Count III) promissory fraud, (Count IV) tortious interference of contract, and (Count V) unjust enrichment.[2] The Pac-12's

---

[1] All capitalized terms not otherwise defined herein have the same meaning as the Counterclaims. *See* ECF No. 50.
[2] The Pac-12 does not seek to dismiss MWC's other two counterclaims: (Count I) declaration that the Termination Fees are enforceable and (Count II) breach of contract.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

motion to dismiss depends on a false premise: that the MWC's counterclaims are a meritless attempt to "change the subject" from an unlawful "Poaching Penalty." The motion cannot be squared with the MWC's well-pleaded and detailed facts, or with FRCP Rules 12(b)(6) and 9(b). It should be denied.

The MWC's fraud counterclaim (Count III) is not a dressed-up contract dispute as the Pac-12 argues. It is grounded in contemporaneous facts showing the Pac-12's preexisting selective-recruitment plan and its immediate effort to nullify its written promise, which was central to the parties' Scheduling Agreement. As pleaded, Pac-12 leadership was presented with a plan in spring 2023 to invite "the top football schools" from the MWC to pair with Washington State University ("WSU") and/or Oregon State University ("OSU")—the exact conduct that would trigger the Termination Fees. It then pursued covert solicitations of MWC schools and finally raced to court to invalidate the very Termination Fees it used to induce the MWC's performance. Those allegations plausibly establish that the Pac-12 did not intend to perform its obligations under the Scheduling Agreement when it was formed, satisfy Rule 9(b)'s "who, what, when, where, and how" requirements, and satisfy the requirements of the fraudulent-inducement exception to the economic-loss rule. The Pac-12's motion, which attempts to recharacterize these detailed allegations as a breach of the Scheduling Agreement, ignores the pleaded pre-Agreement plan, the particularized negotiation-stage representations, and the immediate litigation to nullify the Termination Fees.

The MWC likewise states a claim for tortious-interference (Count IV). The counterclaims identify the MWC's enforceable Bylaws, Handbook, and Membership Agreements, and they allege that the Pac-12 knew of those contracts. They also plead that the Pac-12 engaged in independently wrongful acts that disrupted performance under those agreements, including: leveraging conflicted participation in MWC governance, using undisclosed pre-announcement term sheets, and offering conditional inducements designed to undermine exit-fee and loyalty obligations. The motion's attempt to recast MWC membership as purely at-will and the conduct as mere recruiting ignores the pleaded conflicts, timing, and inducements that destabilized the MWC from within.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

Finally, the unjust enrichment claim (Count V) is expressly pleaded in the alternative if the Termination Fees are invalid. The counterclaims allege that the Pac-12 obtained and retained concrete, non-game benefits (such as confidential access, relationship capital, recruiting leverage, and media positioning). These are distinct from the per-game fees and priced by the Scheduling Agreement's risk-allocation framework. At the pleading stage, that alternative restitution theory is proper and cannot be dismissed as a disguised effort to enforce an "illegal" provision.

The Pac-12 invited this dispute when it chose to accept the benefits of a negotiated bargain and then sued to erase the agreed-upon price of the risks to the MWC. The counterclaims are tailored to hold the Pac-12 accountable for fraud, for interference that crossed the line from competition into legally proscribed conduct, and, in the alternative, for restitution of the incremental benefits it pocketed if its challenge to the Termination Fees succeeds. The motion to dismiss should be denied in full. In the alternative, the MWC should be granted leave to file amended counterclaims.

## II.    <u>BACKGROUND</u>

The MWC and the Pac-12 are both NCAA Division I athletic conferences, who negotiated a short-term Scheduling Agreement. ECF No. 50 ("Counterclaims" or "CC") ¶ 8. The parties anticipated selective recruitment risk and expressly allocated it in Section 7.01 and Schedule 7 of their December 1, 2023 Scheduling Agreement ("Section 7" or "Termination Fees"), allowing the Pac-12 to recruit MWC members while requiring Pac-12 to pay the Termination Fees if an MWC school accepted a Pac-12 offer within two years after expiration. CC ¶¶ 3–4, 42, 45–47. The parties agreed that those Termination Fees reasonably approximated the damage to the MWC should the Pac-12 recruit some but not all MWC teams, and that such harms were otherwise impracticable to quantify precisely. CC ¶ 3. Both the Pac-12, which held nearly a quarter-billion dollars, and the MWC were represented by experienced and sophisticated counsel. *Id.* at ¶¶ 33, 38–39. The Pac-12 never stated that it believed the Termination Fees were unlawful, and it did not attempt to eliminate or lower them. *Id.* ¶¶ 125–26.

Unbeknownst to the MWC, by spring 2023, Pac-12 leadership was planning a selective-recruitment strategy to invite "the top football schools" from the MWC to pair with WSU

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

or OSU, *id.* at ¶ 69—the precise conduct that would trigger the Termination Fees. *Id.* ¶¶ 45–47.

The parties nonetheless negotiated and executed the Scheduling Agreement in late 2023, with the Pac-12 affirming in writing that the Termination Fees "are not penalties and are instead fair, reasonable and appropriate approximations" of the MWC's losses and agreeing that those fees would be the MWC's sole and exclusive remedy for selective recruitment. *Id.* ¶¶ 47, 53. The Agreement's preamble likewise recognized that the collaboration would involve exchanges of confidential information and "special access," and that safeguards, "including certain fees," were essential to protect against misuse, fracturing, and loss of integrity for both conferences. *Id.* ¶¶ 7, 57–58. The resulting deal delivered significant value to the Pac-12, including a turnkey FBS slate, governance continuity, and brand preservation, alongside consumer-facing benefits from competitive matchups and preserved television inventory. *Id.* ¶¶ 42, 44. The twelve-person Pac-12 board of directors (the "Pac-12 Board"), which at that point included *ten disinterested members*, unanimously supported it. *Id.* ¶¶ 37, 41.

For 2024–2025, the Scheduling Agreement provided OSU and WSU with six football games each (twelve total), including MWC-hosted contests supported by MWC officiating and replay services—games that would not have been played absent the Agreement. *Id.* ¶¶ 42, 104, 150. In addition, the Scheduling Agreement provided unique access to MWC schools through campus visits, production meetings, and game-week operations, deepening the Pac-12's relationships with MWC members and expanding the Pac-12's recruiting and media footprint. *Id.* ¶ 153. Those interactions created relationship capital and pathways later used to recruit MWC members to the Pac-12, yielding competitive and financial benefits to the Pac-12. *Id.* ¶¶ 153–54, 156.

For 2025–2026, the Agreement contemplated a possible second-year renewal by September 1, 2024 and required the parties to negotiate in good faith toward a definitive transaction (a merger) bringing all MWC members into the Pac-12. *Id.* ¶¶ 60, 118. When the parties began negotiating a renewal of the Scheduling Agreement's slate of games, the Pac-12 stalled. *Id.* ¶ 65.

Rather than negotiate a merger in good faith as promised and required, the Pac-12 executed its long-standing plan: it recruited MWC members—Boise State, Colorado State, Fresno State, and

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

San Diego State—by executing detailed term sheets and effectively inducing MWC members to shirk obligations to pay an exit fee to the MWC. *Id.* ¶¶ 17, 69–70, 91–92, 98–99. In reliance on the Pac-12's promises, the MWC had already signed agreements with its members allocating millions of dollars. *Id.* ¶¶ 69–70. On September 12, 2024, those schools' admissions to the Pac-12 were announced, and the MWC demanded the contractually specified $43 million in Termination Fees. *Id.* ¶¶ 70–71. On September 23, 2024, Utah State announced that it would join the Pac-12 as well, increasing the aggregate Termination Fees to $55 million. *Id.* ¶ 72. Rather than honor those obligations, the Pac-12 filed this lawsuit on September 24, 2024—the day after Utah State's announcement and two weeks after the first Termination Fee demand—seeking to invalidate the Termination Fees rather than pay them. *Id.* ¶¶ 72–73.

Adding Utah State was the capstone of the Pac-12's interference with the MWC. On September 17, 2024, Utah State President Elizabeth Cantwell attended an MWC Board meeting regarding replacements for departing schools while Utah State was secretly executing a Pac-12 term sheet. *Id.* ¶¶ 91–93. By February 16, 2025, it was publicly evident that the four initial defectors had already signed term sheets with the Pac-12 covering expansion, consent, grant of rights, revenue sharing, and governance that favored WSU and OSU, as shown in a photo of MWC representatives at a Pac-12 Board meeting and statements by outgoing WSU President Kirk Schulz. *Id.* ¶ 99.

Indeed, the Pac-12 or its agents had already told departing MWC members (the "Departing Members") that they would receive offers. *Id.* ¶¶ 86–88, 100. No Departing Member raised those clear conflicts—which existed *while they were voting on whether to renew the Scheduling Agreement*—that the Pac-12 created. Indeed, despite the Departing Members' membership in the MWC and obligations under MWC bylaws and membership agreements, the Pac-12 referred to them *as "Pac-12 members*," *id.* ¶ 96 (emphasis added), in its pleadings. These actions reflected the Pac-12's selective-recruitment strategy during the period governed by the Scheduling Agreement, leveraging access to MWC institutions and decision-makers to solicit departures. *Id.* ¶¶ 90–96. Those touchpoints—campus visits, production meetings, game-week operations, and other interactions—materially strengthened lines of communication with presidents, chancellors, athletics

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

directors, and coaches; expanded the Pac-12's recruiting and media footprint; and created relationship capital and goodwill that paved the road for future membership discussions. *Id.* ¶¶ 152–54. The Pac-12 then used those benefits to solicit, admit, and announce the future admission of five MWC members during the Scheduling Agreement period, realizing and continuing to realize, competitive, strategic, and financial gains from those admissions, including enhanced media-rights leverage, brand stability, additional conference games and scheduling assets, and preservation of FBS status. *Id.* ¶¶ 153–54. Fighting it off proved extremely costly to the MWC. In response, the MWC filed these Counterclaims to hold the Pac-12 accountable for its false promises and tortious interference with the MWC's Bylaws, Membership Agreements, and Handbook policies.

## III.   LEGAL STANDARD

In resolving a motion to dismiss, "the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the [nonmoving party]." *Laatz v. Zazzle, Inc.*, 682 F. Supp. 3d 791, 802 (N.D. Cal. 2023). To survive a Rule 12(b)(6) motion, the nonmoving party need only "raise a right to relief above the speculative level" and allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A claim is facially plausible when the nonmoving party pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under Federal Rule of Civil Procedure Rule 9(b), a claim sounding in fraud requires "particularized allegations regarding the 'circumstances constituting fraud,' . . . including 'the who, what, when, where, and how of the misconduct charged.'" *Laatz*, 682 F. Supp. 3d at 812 (citations omitted). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Compliance Servs. of Am., LLC v. Houser Holdings, LLC*, No. 13-CV-01269, 2013 WL 4169119, at *7 (N.D. Cal. Aug. 9, 2013) (citation and quotations omitted).

## IV.   ARGUMENT

### A.   The MWC Adequately Alleges a Claim for Promissory Fraud (Count III).

#### i.   The Counterclaims show the Pac-12's intent to defraud at the time of contracting.

Promissory fraud requires: "(1) a promise made regarding a material fact without any

6

intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promise[e]." *J2 Cloud Servs., Inc. v. Fax87*, No. 13-05353 DDP, 2016 WL 6833904, at *2 (C.D. Cal. Nov. 18, 2016). The MWC's promissory-fraud claim is straightforward: the Pac-12 promised to honor a key provision to the MWC, the Termination Fees, when it negotiated and executed the Scheduling Agreement, knowing all the while that it would trigger the provision and simply seek to invalidate the fees. CC ¶¶ 7, 69. The Pac-12 agreed to the Termination Fees to induce the MWC into entering the Scheduling Agreement, which the MWC reasonably relied upon, then refused to pay, resulting in damages to the MWC. *See, e.g.*, *id.* ¶¶ 122–29.

The Pac-12's plan predated the fall 2023 negotiations and informed both the December 1, 2023 Scheduling Agreement and its covert membership solicitations, supporting an inference of fraudulent intent at formation. *Id.* ¶¶ 69, 36, 41, 88. The Counterclaims connect this plan to contemporaneous conduct—including undisclosed term sheets executed by the Departing Members before public resignations—while the Pac-12 was ostensibly "negotiating" merger and extension options with the MWC. *Id.* ¶¶ 92–93. Where promises of compensation are made during negotiation of a contract inherently designed to induce one party to perform on that contract, here the MWC, failure of the other party (the Pac-12) to perform constitutes promissory fraud. *Hill v. Workday, Inc.*, 773 F. Supp. 3d 779, 806–07 (N.D. Cal. 2025) (holding that intent to induce reliance was plausibly alleged where compensation promises were made during negotiations process and were inherently designed to secure performance).

Notably, from October through December 2023, the Pac-12 never suggested Sections 7.01 or 7.02 were unlawful and never sought to reduce the Termination Fees, despite sophisticated, arm's-length negotiations with Board-level review. CC ¶¶ 38, 41, 125–26. That atypical conduct for a party facing eight-figure exposure indicates it accepted the Fees to execute the Scheduling Agreement while planning not to honor them, later recasting its stance as limited bargaining power rather than fraud. *Id.* ¶¶ 36, 38–39, 126. In any event, the reason it failed to negotiate the Fees is a

factual question not resolvable on a motion to dismiss. *See Fecht v. Price Co.*, 70 F.3d 1078, 1080 (9th Cir. 1995).

The events that followed prove the Pac-12's intent. The MWC demanded the contractually specified $43 million in Termination Fees immediately after the Pac-12 triggered the provision, and then updated the demand to $55 million after Utah State's September 23 admission announcement. CC ¶¶ 70–72. The Pac-12 filed this lawsuit **the very next day**, just two weeks after the first demand. *Id.* ¶ 73. The Pac-12's nearly instantaneous pivot to litigation—without attempting to negotiate fee terms—is the culmination of the Pac-12's plan to evade payment from the beginning.

### ii.    The Counterclaims satisfy Rule 9(b)'s particularity standard.

The MWC's promissory-fraud claim satisfies Rule 9(b) because it pleads the who, what, when, where, and how of the Pac-12's misconduct with particularity. *See Laatz*, 682 F. Supp. 3d at 812; *see also Hill*, 773 F. Supp. 3d at 804 (finding promissory-fraud claim satisfied Rule 9(b)).

**Who:** The Pac-12 itself, including its authorized representatives who were "represented by independent and experienced legal counsel," satisfies the "who" requirement. CC ¶ 38. Those decision-makers made certain promises and representations to push the Scheduling Agreement negotiations forward. *Id.* ¶ 39. The Counterclaims also allege that the Scheduling Agreement, including the Termination Fees, was unanimously approved by the Pac-12 Board. *Id.* ¶ 41.

The Pac-12 contends there is no named speaker. It is wrong. The actionable misrepresentation is a *signed, contractual representation by the conference's authorized officer*, Former Pac-12 Commissioner, George Kliavkoff, which suffices under Rule 9(b). *See Grouse River Outfitters Ltd. v. NetSuite, Inc.*, No. 16-CV-02954-LB, 2016 WL 11690253, at *3 (N.D. Cal. Dec. 15, 2016).[3] He signed the Scheduling Agreement expressly representing that the Termination Fees

---

[3] The Pac-12's pleadings identify it as a California unincorporated nonprofit association, not a corporation, ECF No. 1 ("Complaint") ¶ 13, and its motion cites no authority extending *UMG*'s Rule 9(b) "corporate defendant" standard to unincorporated associations or to written contractual representations by an authorized signatory. *UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*, 117 F. Supp. 3d 1092, 1110 (C.D. Cal. 2015). Even if that standard applied, the MWC's allegations satisfy it; and the Pac-12 has not shown why it should govern given the Pac-12's organizational form and the nature of the written representation at issue.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

"are not penalties and are instead fair, reasonable and appropriate approximations of the losses that MWC may incur . . . ." Scheduling Agreement § 7.02. Courts routinely accept corporate-signatory statements in executed agreements as sufficient allegations of "who" under Rule 9(b) when the promissory fraud centers on the counterparty's contractual undertaking. *See, e.g.*, *Grouse River Outfitters*, 2016 WL 11690253, at *3 (denying motion to dismiss where plaintiff alleged company as the "who," which satisfied particularity).

The Pac-12 relies on *Swartz* and *Bly-Magee* to argue the Counterclaims "lack [] specificity," ECF No. 59 ("MTD") at 10, but that is misplaced. Unlike the plaintiffs in *Swartz* and *Bly-Magee*, the MWC readily identifies the particulars sufficient to meet the Rule 9(b) standard at this stage. *See Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (applying Washington law, affirming dismissal of plaintiff's fraud claim where plaintiff failed to attribute fraudulent conduct to *each named defendant* in the litigation, and reversing denial of leave to amend); *see also Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (affirming dismissal of plaintiff's fraud claim due to the "*complete* absence of particularity" in first amended complaint) (emphasis added).

**What:** The Pac-12 and its agents represented to the MWC that it would be bound to the Termination Fees and agreed they were "fair, reasonable and appropriate approximations" of the MWC's losses (Sections 7.01 and 7.02). The Pac-12 did this to induce the MWC to agree to the Scheduling Agreement's terms. CC ¶¶ 3, 128. These representations were made both orally and in writing. *Id.* Unbeknownst to the MWC, Pac-12 leadership was already planning to invite certain schools from the MWC to pair with WSU and OSU—the precise action that would trigger the Termination Fees—yet the Pac-12 proceeded to execute the Agreement with Kliavkoff's signature on the clause affirming those fees as valid.

**When/where:** In late October 2023, OSU, WSU, and the MWC began discussions relating to a nonconference scheduling alliance with the Pac-12. *Id.* ¶ 36. Over the next several weeks, the parties negotiated the terms that would eventually be finalized in the executed Scheduling Agreement, including the Termination Fees. *Id.* ¶¶ 37–41.

**How:** The Pac-12 used its promises to secure immediate, substantial benefits (a turnkey

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

2024 football schedule; unique access to MWC members; and increased exposure and goodwill), *id.* ¶¶ 34, 42, 153, while concealing a contemporaneous plan to admit select MWC members and later disavow the Termination Fees through litigation. *Id.* ¶¶ 69, 85–88, 127–28.

The Pac-12 cites a string of cases explaining that courts will not transform mere breach of contract claims into fraud claims. For instance, the Pac-12 relies on *Cagno*, *see* MTD at 10, where the only additional allegations supporting the plaintiff's fraud claim were that the defendant made a promise to pay him a certain sum of money without any intention of performing said promise and with the intent to defraud and induce the plaintiff to work for the defendant. *Cagno v. Supreme Mortg. Lending, Inc.*, No. 24-CV-04713, 2025 WL 445790, at *5 (N.D. Cal. Feb. 10, 2025). But unlike the plaintiff in *Cagno*, the MWC details how the Pac-12 induced the MWC to rely on its promises while intending to not perform. The Pac-12 did not simply fail to pay and defend on contract defenses; it filed this action first to obtain a declaration that Sections 7.01 and 7.02 are unlawful and unenforceable, and to nullify the Termination Fees altogether, which it dubs the "Poaching Penalty." That affirmative litigation posture is pleaded in the MWC's answer and Counterclaims and is reflected in the relief that the Pac-12 seeks. That goes beyond a broken promise case and supports a plausible inference that the Pac-12 never intended to honor those promises in the first place.

The Pac-12's contentions are completely untethered to the actual allegations in the MWC's fraud claim. The Pac-12 falsely asserts that: the MWC made only "boilerplate allegations"; the MWC "includes *no* allegations of contemporaneous statements or actions"; and the MWC's "fraud allegations [are made] 'on information and belief' alone." MTD at 5–6. The Pac-12's cited authorities also are inapposite because they involve promissory-fraud claims asking a court to infer intent to defraud when a contract was executed based on nothing more than a later failure to perform under the contract. *See, e.g.*, *Valentine v. Progressive Direct Ins. Co.*, No. 22-CV-03066-SVK, 2022 WL 3083714, at *6 (N.D. Cal. Aug. 3, 2022) (dismissing fraud claims arising from denial of auto insurance coverage because issuing a policy and later denying coverage did not amount to a false statement at the time of issuance); *Jones v. AIG Risk Mgmt., Inc.*, 726 F. Supp. 2d 1049, 1057–58

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

(N.D. Cal. 2010) (dismissing fraud claim for denial of insurance coverage because plaintiff failed to point to any "subsequent conduct of Defendants suggest[ing] that they never intended to perform the contract in the first place"); *Richardson v. Reliance Nat'l Indem. Co.*, No. C 99-2952 CRB, 2000 WL 284211, at *5 (N.D. Cal. Mar. 9, 2000) (dismissing promissory-fraud claims where plaintiff "merely point[ed] to statements of intent," noted defendants later did not perform, and requested court to infer falsity and intent at inception); *Thompson v. Carmax*, No. 23-CV-01364-JCS, 2023 WL 4034215, at *3 (N.D. Cal. Apr. 27, 2023), *report and recommendation adopted*, No. 24-CV-02604-CRB, 2023 WL 4995718 (N.D. Cal. May 31, 2023) (dismissing fraud-based claims for failing to identify specific fraudulent contractual representations or plead facts showing intent not to perform at formation or falsity when made); *Pattern Design LLC v. We are Sechey Inc.*, 2024 WL 4369668, at *6, *8 (N.D. Cal. Oct. 1, 2024) (dismissing promissory-fraud claim for failure to plead facts showing intent not to perform at formation and where representations were merely promises to adhere to contract).

Here, by contrast, the MWC alleges that, in the spring of 2023—mere months before the December 1, 2023 execution—the Pac-12's leadership was presented with a backup plan to invite "the top football schools" from the MWC to pair with WSU and OSU. CC ¶ 69. The MWC's Counterclaims tie that pre-Agreement plan to detailed contemporaneous conduct: signed statements in the Scheduling Agreement itself; undisclosed membership term sheets executed before public resignations; membership letters that referenced and conditioned "contributions" toward MWC distributions or exit fees; a dual track of covert recruiting while negotiating an extension and a merger; and an immediate suit filed to avoid payment as soon as payment was demanded. *Id.* ¶¶ 60–69, 73, 92, 93 n.66, 123. That factual matrix is precisely the sort of contemporaneous conduct those dismissal cases held was missing.

### iii.    The MWC alleges more than 'nonperformance'.

To the extent that the Pac-12 leans on decisions that required "something more" than nonperformance to infer scienter, the MWC supplies that "something more." MTD at 6. *Tenzer*'s admonition that a plaintiff must allege more than a broken promise is satisfied by the pleaded

11

pre-Agreement raid blueprint and the sequence of covert steps that followed. *See Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30 (Cal. 1985). Likewise, the Pac-12 tries to distinguish its malfeasance from cases where courts found contemporaneous inconsistency—like *Laatz*, *Cress*, and *R Power Biofuels*—by saying the MWC has none. MTD at 7 (citing *Laatz*, 682 F. Supp. 3d at 813; *Cress v. Nexo Financial LLC*, No. 23-CV-00882-TSH, 2023 WL 6609352, at *9–11 (N.D. Cal. Oct. 10, 2023); *R Power Biofuels, LLC v. Chemex LLC*, No. 16-CV-00716-LHK, 2017 WL 1164296, at *11–12 (N.D. Cal. Mar. 29, 2017)). But the MWC ***does*** allege contemporaneous inconsistency; while negotiating the Scheduling Agreement and a potential extension or merger, the Pac-12 was already implementing the very selective-recruitment strategy that would trigger, and then be used to attack, the Termination Fees. CC ¶¶ 119–20, 55, 85–90, 92–94. As discussed above, *supra* pp. 7–8, the Pac-12's choice to not negotiate lower fees also shows it never intended to pay them.

Finally, the Pac-12's suggestion that its performance of other provisions (such as paying for twelve games) negates fraudulent intent misreads the claim. MTD at 7. The MWC does not contend that nonpayment alone proves fraud. It alleges that the Pac-12 secured execution of the Scheduling Agreement with specific written representations about the Termination Fees' nature and enforceability while contemporaneously planning a selective-recruitment plan designed to trigger those fees and then avoid them through a pre-planned, coordinated legal challenge. CC ¶¶ 119–20, 55, 85–90, 92–94. The rapid filing for declaratory invalidity the ***day after*** the fifth admission and ***within two weeks*** of the first demand is not the liability-creating act. It was the Pac-12's capstone move that completed their fraud planned long before.

iv.      **Neither *Noerr-Pennington* nor the litigation privilege protect the Pac-12.**

The Pac-12's reliance on the *Noerr-Pennington* doctrine and the litigation privilege is misplaced because the MWC's Counterclaims do not seek to impose liability for the act of filing this lawsuit. *See E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965). The MWC's promissory-fraud claim is a based on pre-contract misrepresentation memorialized in the December 1, 2023

12

Scheduling Agreement and the negotiations that led to it, coupled with contemporaneous, non-petitioning conduct demonstrating the Pac-12's pre-existing plan to selectively recruit MWC members and then avoid payment. The MWC cites the timing of the Pac-12's lawsuit only as circumstantial evidence corroborating intent that had already been formed and acted upon; it does not request the Court to impose liability for the filing of the lawsuit itself. *Noerr-Pennington* shields conduct petitioning the government; not the underlying commercial scheme of covert recruitment and contractual deceit that the MWC has pleaded in detail. *See Select Portfolio Serv. v. Valentino*, 875 F. Supp. 2d 975, 984–85 (N.D. Cal. 2012) (where suit is "merely the incidental back-story" to a fraud claim, *Noerr-Pennington* does not apply); *eBay Inc. v. Bidder's Edge Inc.*, No. C–99–21200 RMW, 2000 WL 1863564, at *2 (N.D. Cal. July 25, 2000) (if there are allegations of anti-competitive conduct other than the filing of a lawsuit, *Noerr-Pennington* does not apply at the motion to dismiss stage).

The Pac-12's contention that the litigation privilege applies fares no better because the MWC's claims do not stem from communications made within any judicial or quasi-judicial proceeding. *See Holmes v. Elec. Document Processing, Inc.*, 966 F. Supp. 2d 925, 935 (N.D. Cal. 2013) (explaining the litigation privilege applies to communications "(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action") (citation and quotations omitted). Instead, the actionable statement for the MWC's promissory-fraud claim is the Pac-12's express, written representation in the Scheduling Agreement that the Termination Fees are valid liquidated damages and would be paid if the Pac-12 selectively recruited MWC schools. *See* CC ¶¶ 45, 47 (citing Scheduling Agreement §§ 7.01–7.02). That representation, and the surrounding negotiations, predate and are separate from this litigation. The privilege protects communications made within judicial and quasi-judicial proceedings, not commercial recruiting, contracting, or governance maneuvering. *See Holmes*, 966 F. Supp. 2d at 935.

Even if the Court were to disregard every reference to this litigation, the MWC's claims still stand: the Pac-12's signature endorsing the Termination Fees; the Pac-12's pre-Scheduling

Agreement plan to raid the MWC; the Pac-12's undisclosed term sheets executed with the Departing Members before public resignations; the Departing Members' membership letters that conditioned the Pac-12's "contributions" on the Departing Members' withdrawal steps; and the conflicted participation in MWC governance. CC ¶¶ 38–39, 69, 90–93, 99, 123, 126, 141. Those are non-communicative, pre- and extra-litigation acts from which fraudulent intent can be inferred.

### v.    The economic loss rule does not bar the MWC's promissory-fraud claim.

California law recognizes promissory fraud as a subspecies of fraud with its own, independent duty not to deceive, separate from contractual obligations. The California Supreme Court's formulation in *Rattagan*, the Pac-12's cited authority, confirms that the "economic loss rule does not apply to limit recovery for intentional tort claims like fraud." *Rattagan v. Uber Techs., Inc.*, 553 P.3d 1213, 1236 (Cal. 2024). Additionally, "California law has generally not treated fraud claims differently based on whether they allege affirmative deception or concealment." *Id.* at 1237. Those elements exist here because the MWC pleads the Pac-12 made express, written promises about the Termination Fees and their validity while harboring an undisclosed plan not to pay them if it selectively recruited MWC schools. CC ¶¶ 45, 47, 123–29.

The economic loss rule does not bar fraud claims when allegations are made independent from allegations brought for a breach of contract claim. *Toyo Tire Holdings of Americas Inc. v. Ameri & Partners, Inc.*, 753 F. Supp. 3d 966, 978–82 (C.D. Cal. 2024) (economic loss rule does not bar fraud claims "when the conduct 'violates a duty independent of the contract arising from the principles of tort law.'"). The MWC does not just allege a failure to pay. The MWC pleaded that, as early as spring 2023, Pac-12 leadership was presented with a plan to "[i]nvite the top football schools from the [MWC]" to pair with WSU/OSU—the exact selective-recruitment scenario that triggers the Termination Fees—followed by targeted solicitations and immediate litigation. CC ¶¶ 69–73. That contemporaneous, pre-contract plan and follow-through show deceit distinct from the MWC's breach of contract claims.

Contrary to the Pac-12's assertion, *see* MTD at 8, the economic loss rule does not bar the MWC's claim because *Rattagan* recognizes a narrow exception for fraudulent inducement: a

14
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

defendant's independent tort duty not to engage in fraud exists apart from contractual obligations. *See Rattagan*, 17 Cal. 5th at 38 (explaining that the independent duty to refrain from fraudulent conduct is well established in statute and common law). The MWC satisfies the first part of that exception. This case is not a garden-variety "you breached, now pay" dispute; it involves the Pac-12's pre-contract plan to raid the MWC and its immediate effort, once performance came due, to nullify the very provisions it used to induce the MWC to sign the Scheduling Agreement. The Pac-12 expressly represented that the Termination Fees "are not penalties and are instead fair, reasonable and appropriate approximations of the losses that MWC may incur," CC ¶ 47, but less than a year later filed suit taking the opposite position to avoid payment, *id.* ¶ 73, initiating litigation to invalidate those protections right after extracting the benefits of the bargain. This conduct goes well beyond mere assurances that the Pac-12 "would adhere to the [c]ontract," and thus fits squarely within *Rattagan*'s exception for promissory fraud. *See Pattern Design*, 2024 WL 4369668, at *8. The Pac-12's authorities addressing standard breach-of-contract claims are therefore inapposite. MTD at 9 (citing cases).

The MWC also meets part two of the *Rattagan* exception, which requires concrete "consequences . . . not reasonably contemplated when the contract was entered." *See Rattagan*, 553 P.3d at 1228. The MWC alleges governance disruption and conflicted-insider misconduct, including: Utah State President Elizabeth Cantwell attending a meeting of non-conflicted Board members about conference replacements six days before announcing her departure; execution, before any announcement, of detailed term sheets on expansion, grants of rights, revenue sharing, and governance; and immediate participation by the departing presidents in Pac-12 Board votes. CC ¶¶ 91–92, 99. The MWC also pleads that the Pac-12 executed a coordinated plan to avoid Exit Fee obligations by prompting the departing schools to bring a parallel Colorado lawsuit to invalidate those fees after obtaining access and admissions. *Id.* ¶ 98. These injuries stem from false statements during negotiations and violations of the conflict-of-interest policy—harms not priced into the contract's consideration for scheduling football games or for schools changing conferences.

The Pac-12 also argues that the promissory-fraud claim is barred because the MWC "seeks

the same $55 million" for both its contract breach and promissory-fraud claims. MTD at 8.[4] But the Pac-12 does not cite any authority suggesting that this is a basis to dismiss a promissory fraud claim on a motion to dismiss. Indeed, the only authority it cites for support is a summary judgment decision. *See Laub*, 2024 WL 3466876, at *16 (ruling on summary judgment). The MWC's allegations plausibly support reliance and other damages distinct from the payment term, including mitigation costs and conference enterprise harms, even if the Court later narrows the measure to avoid overlap. That may be a reason to tailor damages, but not to dismiss the claim outright.

The Pac-12's own authority confirms that a promissory fraud claim should not be dismissed based on the economic loss rule where—as is the case here—fraudulent inducement is adequately pleaded. *Synology*, 2023 WL 3149250, at *3 (finding fraudulent inducement is a "well-recognized exception to the economic loss rule") (citation and quotation omitted). "Fraudulent inducement occurs when 'the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is voidable.'" *Id.* (quoting *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 415 (1996)). As such, if "promissory fraud . . . induced [counterclaim-plaintiff] to enter a contract, . . . the fraudulent inducement exception to the economic loss rule . . . appl[ies]." *Id.* As pleaded, the MWC would not have entered into the Agreement but for the protections afforded by the Termination Fees. *See, e.g.*, CC ¶¶ 57, 104. As such, the economic loss rule does not bar the MWC's promissory-fraud claim.

The Pac-12 affirmatively sought to nullify the very contractual promise it made to induce the MWC's performance—immediately upon the obligations coming due—and did so against the backdrop of a pre-contract plan to raid the MWC. The motion to dismiss the MWC's promissory-fraud claim should be denied. In the alternative, the MWC should be given leave to amend its claims. *See Swartz*, 476 F.3d at 765 (reversing denial for leave to amend fraud claim).

---

[4] The Pac-12 additionally argues in a footnote the damages that are and are not available to the MWC. *See* MTD at 8 n.3. Aside from being irrelevant at this stage, it incorrectly argues that the MWC has "transformed" its breach of contract into a fraud claim. Not so. The breach of contract claim is a separate claim, not even challenged by the Pac-12 at this stage.

16

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

**B.** **The MWC Alleges a Claim for Tortious Interference with Contractual Relations (Count IV).**

A well-pled claim for tortious interference with contract under California law must allege: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1105 (9th Cir. 2007).

The MWC has plausibly pleaded each element. The MWC's Counterclaims (i) identify two enforceable sets of contracts between the MWC and its member institutions (the MWC Bylaws and Handbook and the universities' Membership Agreements), CC ¶¶ 132, 134–35; (ii) allege the Pac-12's knowledge of those contracts, *id.* ¶¶ 136, 138–41; (iii) describe intentional conduct that induced breaches and disrupted performance, *id.* ¶¶ 91–93; 143–44; (iv) plead actual breach or disruption because the Departing Members executed Pac-12 term sheets before resignations, attended an MWC Board meeting despite clear conflicts, announced departures and submitted resignation notices, refused to pay exit fees, and coordinated parallel litigation to invalidate those fees, *id.* ¶¶ 91–93; 143–44; and (v) allege resulting damage, including withheld distributions, mitigation efforts, and diminution of the MWC's enterprise value. *Id.* ¶ 145–46.

The Pac-12 does not dispute (and therefore concedes) that these five elements are met. The Pac-12 nevertheless argues that the tortious interference claim should be dismissed because the member relationships are "at-will" and the MWC fails to allege an "independently wrongful act." The Pac-12 misreads both the governing contractual framework and the pleaded facts.

**i.** **The relevant contracts are not "at-will".**

The "essence of an at-will contract" is the "freedom to walk away . . . with no consequences." *CRST Van Expedited*, 479 F.3d at 1106. That is not the case for any of the Membership Agreements. Members cannot terminate "at any time" without consequence. They may resign only on June 30 of a given year, must provide written notice by June 1 *of the prior year*, must tender an exit deposit, and must pay a defined exit fee. *Id.* (contract not at-will where terminating party would pay $3,600 to the other party); *Pro 49 Dev., LLC v. Ness Express 1, LLC*, No. 2:24-CV-01850-JAM-JDP, 2025

17

WL 437549, at *3 (E.D. Cal. Feb. 7, 2025). Members must also continue to honor ongoing governance and integrity obligations while they remain in the conference. Those features do not describe "at-will" relationships that can be ended at a party's discretion without notice, timing constraints, or economic consequence. *See ConsumerDirect, Inc. v. Pentius, LLC*, No. 8:21-CV-01968-JVS, 2023 WL 8115863, at *3 (C.D. Cal. Oct. 4, 2023). Therefore, the MWC need not even show an independently wrongful act—intentionally interfering with an existing contract is generally "a wrong in and of itself." *Quelimane Co. v. Stewart Title Guaranty Co.*, 960 P.2d 513, 530 (Cal. 1998).

The Pac-12's reliance upon *Ixchel Pharma, LLC. v. Biogen, Inc.*, 470 P.3d 571 (Cal. 2020) is misplaced. MTD at 10–13. There, the court found a contract was at-will because it required only sixty days' notice to terminate. The MWC Bylaws, in contrast, require *thirteen months* of notice and only allow exit on a certain day. CC ¶ 134. That precludes finding them an at-will contract. *See ConsumerDirect*, 2023 WL 8115863, at *3 (distinguishing *Ixchel Pharma* because contract at issue contained a 180-day notice requirement, and therefore finding the contract was not at-will).

### ii.    The MWC alleges independently wrongful acts.

The governing standard for interference with at-will contracts requires conduct that is independently wrongful, meaning conduct proscribed by a determinable legal standard such as a statute, regulation, or common law. *W. Air Charter, Inc. v. Sojitz Corp.*, No. CV 18-7361 JGB, 2019 WL 4509304, at *15 (C.D. Cal. May 2, 2019). The Pac-12's motion asserts that the MWC has not done so. The Counterclaims, however, allege a series of unlawful acts that go well beyond ordinary competition for members and that readily meet the "independently wrongful" requirement at the pleading stage. *See id.* (defining wrongful acts as those "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard") (citation omitted).

The Pac-12 contends that simply accepting applications for membership effective July 1, 2026 cannot be wrongful and it alleged offer to contribute toward the departing school's exit fees facilitates performance. MTD at 12–13. The MWC does not allege that the Pac-12 simply accepted applications for membership. It alleges that: (i) the Pac-12 committed promissory fraud (*supra* pp.

5–16); (ii) the Pac-12 offered conditional membership letters that exploited the MWC's exit-fee and distribution rules, CC ¶¶ 136–41; (iii) the Pac-12 negotiated with the departing schools pre-announcement term sheets that locked in governance and rights commitments before those schools resigned from the MWC, *id.* ¶¶ 92–94; (iv) the Pac-12 induced the Departing Members to participate in a MWC Board meeting on an issue of direct conflict, *id.* ¶¶ 91, 142; and (v) the Pac-12 coordinated the member schools' refusal to pay the exit fee. *id.* ¶¶ 143–44. Taken together, these pleaded steps describe independent wrongful acts meant to induce breach or disruption and plausibly show that the Pac-12's "contributions" induced schools to accelerate withdrawal on the Pac-12's terms and to undermine the MWC's contractual relationships.

***Promissory Fraud***. Fraud is a recognized tort independent of contract, and using deceit to receive benefits and disrupt another's contracts is independently wrongful. *Rattagan*, 553 P.3d at 1232–33. *Elec. Solidus, Inc. v. Proton Mgmt. Ltd.*, No. 2:24-CV-08280 MWC-EX, 2025 WL 1090941, at *13–16 (C.D. Cal. Apr. 9, 2025), *appeal dismissed sub nom. Elec. Solidus, Inc. v. Furlong*, No. 25-2763, 2025 WL 3200745 (9th Cir. Nov. 12, 2025) (finding competitor "engag[ing] in a detailed scheme to induce[*sic*] breaches of contractual confidentiality obligations" and other "provisions of their agreements in furtherance of the scheme"). As discussed in more detail above, *supra* pp. 5–16, the Pac-12 expressly represented in the executed Scheduling Agreement that the Termination Fees "are not penalties and are instead fair, reasonable and appropriate approximations of the losses that MWC may incur," and that the Pac-12 would pay those fees if it selectively recruited MWC schools during the defined window. CC ¶ 109, 115. When then-Pac-12 Commissioner George Kliavkoff signed the Agreement on December 1, 2023, Pac-12 leadership had already planned to "invite the top football schools from the [MWC]" and then refuse to honor the fee provisions by challenging them as unlawful. *Id.* ¶ 69. That pre-Agreement plan, coupled with the Pac-12's contrary representations and its immediate litigation to invalidate the very provisions the MWC relied on, pleads deceit separate from any at-will relationship.

***Conflicted Governance and Fiduciary Breaches***. The MWC also pleads that the Pac-12 induced and exploited conflicts of interest in MWC governance, which is wrongful under both

contractual and fiduciary principles. Appendix K of the MWC Handbook requires Board members to refrain from discussing, participating in, or voting on matters when a conflict exists. Utah State's president, Elizabeth Cantwell, attended a special MWC Board meeting on September 17, 2024, about replacing Departing Members while Utah State was secretly executing a Pac-12 term sheet to depart six days later. CC ¶ 91–92. According to the Counterclaims, this was part of a Pac-12 plan "to destabilize the MWC from within," alleging a coordinated strategy that culminated in conflicted participation, undisclosed pre-announcement term sheets, and then President Cantwell's move to WSU's presidency. *Id.* ¶ 142. Those facts plausibly allege aiding and abetting breaches of the duty of loyalty and violations of the conference's governing contract—conduct proscribed by common-law fiduciary standards and therefore independently wrongful under *Ixchel*'s framework. The Pac-12's assertion that the MWC "alleges no action by the Pac-12 related to any board member's activities," MTD at 12 (emphasis removed), is contradicted by the pleaded sequence linking the Pac-12's term sheets, the timed and conflicted meeting attendance, and the Pac-12's contemporaneous public statements that the departing presidents were already acting as Pac-12 Board members. CC ¶¶ 90–96, 142. Furthermore, after accepting Pac-12 invitations, the Departing Members in fact openly participated on the Pac-12's Board. *Id.* ¶ 95.

***Conditional Inducements and Unfair Competition***. The MWC further alleges that the Pac-12 used conditional financial inducements to undermine and disrupt performance of existing exit-fee obligations, amounting to unfair competition. The Pac-12 did not merely "promise[] financial assistance" to the Departing Members, as the Pac-12 argues. MTD at 13. It required each Departing Member to deliver a withdrawal notice to the MWC and copy the Pac-12, and they conditioned "contributions towards . . . withheld Mountain West Conference distributions or exit fees" on the school joining the Pac-12 on the Pac-12's timeline. CC ¶ 138. The MWC pairs those documents with public statements by San Diego State's leadership that no state funds would be used and that the Pac-12 would help pay the fees, and with the departing schools' coordinated efforts to avoid payment by suing to invalidate exit fees it had approved in the MWC Bylaws. *Id.* ¶ 142. These allegations plausibly plead an unfair method of competition under California's Unfair Competition

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

Law: the Pac-12 allegedly used contingent payments and leverage—combined with insider access gained through the Scheduling Agreement—to hasten withdrawal while fostering nonpayment and collateral attacks on the exit-fee regime. Under *Ixchel*, California's unfair competition doctrine may constitute an "independent wrong" where the conduct offends established public policy or is unscrupulous and causes substantial, unjustified injury not outweighed by benefits. The MWC's allegations fit that description and plausibly plead an unfair method of competition for purposes of the independently wrongful requirement.

*Competition Is Not a Blanket Defense*. The Pac-12 asserts that competition for members is protected. MTD at 13. California's law protects legitimate competition, but it does not immunize inducing contractual breaches or deploying conflicted insiders to destabilize a counterparty's governance and payment structures. *Reeves v. Hanlon*, 95 P.3d 513, 521–22 (Cal. 2004) (protection for competition only applies to parties engaging in lawful conduct). The MWC's claim targets those wrongful inducements and disruptions, not the mere act of offering conference membership. *Id.*

The Pac-12's cases do not support dismissal, either. *Coast Hematology-Oncology Assocs. Med. Grp., Inc. v. Long Beach Mem'l Med. Ctr.*, 272 Cal. Rptr. 3d 715 (Cal. App. 2d 2020), is a *summary judgment* case. The court reached its conclusions only after discovery. *Buena Vista, LLC v. New Resource Bank*, No. 10–1502 CW, 2010 WL 3448561 (N.D. Cal. Aug 31, 2010), fares no better. There, the plaintiff identified no injury to a probable economic relationship. *Id.* at *9. Here, however, the MWC has repeatedly shown injuries to *current* economic relationships (*see supra* pp. 2–3 (detailing contractual relationship); 12–13 (noting mitigation, nonpayment, conference enterprise costs); *infra* pp. 22 (non-game capital, competitive advantage with admissions, uncompensated insider access)).

C.    MWC States a Claim for Unjust Enrichment (Count V).

The MWC states a claim for unjust enrichment. If Section 7.01 and Schedule 7 are found invalid, the Pac-12 still retained concrete competitive and strategic benefits not covered by the per-game fees. The Pac-12's two objections here—that equity cannot be used to resurrect an illegal provision and that the Pac-12 fully paid for whatever it received—misread the MWC's claim and

do not defeat an alternative restitution theory at this stage. MTD at 13–15.

The Pac-12's "illegal contract" argument misses the point because the MWC's claim is for unjust enrichment, not for enforcing the Termination Fees. The Pac-12 asserts equity cannot be used to enforce an illegal restraint or penalty, *id.* at 14, but the MWC is not asking the Court to do so. The Scheduling Agreement's preamble explains that "mutual cooperation and exchanges of confidential information would not be feasible, however, without safeguards, including certain fees, which protect against the misuse of information, protect the MWC from fracturing, and preserve the integrity of the MWC and Pac-12," and that such safeguards were "essential to promote the competitive opportunities" offered under the Agreement. CC ¶ 57. If found invalid, equity prevents a party's retention of benefits conditioned on those safeguards. Nor does unjust enrichment require unlawful conduct. Restitution can be tailored to avoid recreating any challenged restraint or penalty. The Counterclaims seek disgorgement equal to the value of the specialized access and relationship-building benefits that the Pac-12 accepted and then used to solicit and admit MWC members. *Id.* ¶¶ 153–54. That fact-specific remedy neither enforces Section 7 by another name, nor frustrates antitrust policy. It simply prevents a windfall if the protective consideration for that access is removed.

The Pac-12's attack on unjust enrichment also fails because it relies almost exclusively on antitrust illegality and ignores the other pleaded grounds for invalidating Section 7—unfair competition and unenforceable liquidated damages. MTD at 14. Unjust enrichment also lies if the provisions constitute unfair competition or unenforceable liquidated damages. If the Court accepts either theory, the same restitution problem arises: the Pac-12 would keep non-game benefits—access, relationship capital, and competitive advantages from five admissions—without the contractual safeguard the parties used to allocate that value. The Pac-12 gives no reason why equity would be off-limits if Section 7 fails as an unfair practice or a penalty. Targeting only antitrust and leaving the unfair-competition and unenforceable-liquidated-damages predicates unanswered, the Pac-12 has not carried its burden to dismiss unjust enrichment at the pleadings stage.

The Counterclaims plead that the Pac-12 received benefits far beyond twelve football games.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK

CC at ¶¶ 153–55. Each MWC member replaced a conference game to host or travel to OSU or WSU, and for MWC-hosted games, the MWC supplied officiating, replay, and related services. Game-week operations, campus visits, production meetings, and athletic-department coordination supplied on-field and off-field access and the exchange of confidential information that deepened the Pac-12's relationships with the very MWC institutions it later solicited and admitted to its own conference. *Id.* ¶¶ 57, 150. These interactions built relationship capital, expanded the Pac-12's recruiting and media footprint, and created pathways to the five admissions that the Pac-12 announced during the Scheduling Agreement period. *Id.* at ¶¶ 152–54. The MWC also pleaded that the Pac-12 has realized, and will continue to realize, enhanced media leverage, brand stability, preserved FBS status, and tangible scheduling assets from those admissions. *Id.* Taken as true at this stage, these allegations plausibly show that the Pac-12 obtained benefits beyond the paid-for games.

The Pac-12's paid-in-full argument raises a fact dispute, not a pleading defect. The Pac-12 claims it paid over $14 million for twelve games, leaving nothing to disgorge. MTD at 15. But the Counterclaims specify that participation and scheduling fees compensated scheduling services and game inventory, CC at ¶¶ 23, 57, 150, 152–54, and that distinct value of "unique access" to MWC institutions and decision-makers, deeper visibility into personnel and markets, and relationship capital used to secure future admissions were *not* priced by those game-related fees. *Id.* That value was addressed instead by Section 7's risk-allocation and protective framework, including the MWC's agreement to an exclusive remedy if selective recruiting occurred. If that framework is invalid, per-game payments do not *ipso facto* compensate for the separate access-and-solicitation benefits that the Pac-12 extracted and used to solicit five MWC schools. Whether the Pac-12 fully compensated the MWC is a fact issue that cannot be resolved on a motion to dismiss. *Shah v. Cap. One Fin. Corp.*, 768 F. Supp. 3d 1033, 1051 (N.D. Cal. 2025) (holding that plaintiffs' allegations that defendant "benefitted from using [p]laintiffs' information and that [p]laintiffs' remedies at law [were] inadequate" was sufficient for their unjust enrichment claim to survive defendant's motion to dismiss). The Counterclaims also detail how those non-game benefits materialized: specific

touchpoints (campus visits, production meetings, game-week operations) and the admissions that followed during the Agreement window, plus concrete competitive and financial gains realized by the Pac-12. At this stage, the Court does not weigh or monetize those benefits; it asks only whether the MWC has plausibly alleged that the Pac-12 received and unjustly retained them. It has.

The Counterclaims make clear that the MWC pleads its unjust enrichment theory in the alternative: the MWC is entitled to relief only if Section 7 is adjudged invalid or unenforceable. CC ¶ 148–57. That is an appropriate posture for quasi-contract relief. The MWC would not have provided confidential access to MWC meetings and other interactions that enabled the Pac-12 to recruit MWC members absent the safeguards and fees in Section 7. *Id.* If those safeguards fall away, equity fills the resulting gap to prevent the Pac-12 from retaining the incremental benefits of that access for free. That is precisely when courts allow restitution-based claims to proceed in the alternative, because the validity and enforceability of the governing provision is in dispute and may ultimately deprive the plaintiff of an adequate remedy at law.

To state unjust enrichment, a plaintiff must show the defendant "unjustly retained a benefit at the plaintiff's expense." *Shah*, 768 F. Supp. 3d at 1051. *Shah* held that allegations of benefit from plaintiffs' information and inadequate legal remedies suffice to defeat dismissal. *Id.*; *see also A.J. v. LMND Med. Grp.*, No. 24-cv-03288-RFL, 2024 WL 4579143, at *4 (N.D. Cal. Oct. 25, 2024) (finding that plaintiffs' allegation that defendant benefitted from their information by exchanging it without their consent and that plaintiffs failed to receive the benefit of their bargain was sufficient to preclude dismissal); *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1086 (N.D. Cal. 2023) (permitting plaintiffs to plead an unjust enrichment claim in a motion to dismiss because plaintiffs allege that their remedies at law are inadequate).

### i.    The Court need not dismiss alternative claims now.

Courts in this District routinely allow unjust enrichment to proceed in exactly this posture, declining to foreclose alternative remedies when contract enforceability and the adequacy of legal relief remain unsettled. *See In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 882 (N.D. Cal. 2019) ("[W]hile it is true that Plaintiffs may not recover for unjust enrichment if they

obtain relief on other claims, this Court declines to bar 'the pursuit of alternative remedies at the pleadings stage.'" quoting *Aberin v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2018 WL 1473085, at *9 (N.D. Cal. Mar. 26, 2018)); *e.g.*, *Adkins v. Comcast Corp.*, No. 16-CV-05969-VC, 2017 WL 3491973, at *3 (N.D. Cal. Aug. 1, 2017) ("A few federal courts seem to have decided that claims for equitable relief should be dismissed at the pleading stage if the plaintiff manages to state a claim for relief that carries a remedy at law. . . . But this Court is aware of no basis in California or federal law for prohibiting the plaintiffs from pursuing their equitable claims in the alternative to legal remedies at the pleadings stage."); *Cabrales v. Castle & Cooke Mortg., LLC*, No. 1:14-CV-01138-MCE, 2015 WL 3731552, at *3 (E.D. Cal. June 12, 2015) (the pleading of alternative remedies "is amply supported by Ninth Circuit cases applying California law"); *Colucci v. ZonePerfect Nutrition Co.*, No. 12–2907–SC, 2012 WL 6737800 at *10 (N.D. Cal. Dec. 28, 2012) ("[C]laims for restitution or unjust enrichment may survive the pleadings stage when pled as an alternative avenue of relief, though the claims, as alternatives, may not afford relief if other claims do."); *Vicuna v. Alexia Foods, Inc.*, No. C 11–6119 PJH, 2012 WL 1497507 at *3 (N.D. Cal. Apr. 27, 2012) ("[W]hile a claim for restitution is inconsistent and incompatible with a related claim for breach of contract or a claim in tort, at the pleading stage, a plaintiff is allowed to assert inconsistent theories of recovery[.]"). In *Gen. Motors Litig.*, the court rejected a manufacturer's request to dismiss unjust enrichment where the claim rested on conduct and benefits not priced by the express contract. *Id.* The same logic applies here. The MWC's restitution theory is expressly contingent on invalidation of Section 7 and is tied to incremental benefits outside the fees that the Pac-12 paid for games. Like in *Gen. Motors Litig.*, here the best course is to preserve the alternative claim now and address any duplication or measure-of-relief issues on a fuller record, once the Court resolves the enforceability and adequacy questions that the Pac-12 itself has put at issue. *Id.*

## V.    CONCLUSION

For the foregoing reasons, the Court should deny the Pac-12's Motion to Dismiss. In the alternative, this Court should grant the MWC leave to amend its Counterclaims.

Dated: January 16, 2026                    Respectfully Submitted,

                                           WILLKIE FARR & GALLAGHER LLP

                                           By:    /s/ Alexander Cheney____
                                                  Alexander L. Cheney
                                                  Krista Schwartz
                                                  Wesley Powell
                                                  Matt D. Basil (*Pro Hac Vice*)

                                                  Attorneys for THE MOUNTAIN WEST
                                                  CONFERENCE

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S
COUNTERCLAIMS
Case No. 5:24-CV-6685-SVK