KEKER, VAN NEST & PETERS LLP
ERIC H. MACMICHAEL - # 231697
emacmichael@keker.com
NICHOLAS S. GOLDBERG - # 273614
ngoldberg@keker.com
ANJALI SRINIVASAN - # 304413
asrinivasan@keker.com
KELLY S. KAUFMAN - # 328827
kkaufman@keker.com
PAUL H. VON AUTENRIED - # 335917
pvonautenried@keker.com
CHARLOTTE KAMAI - # 344786
ckamai@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Plaintiff THE PAC-12 CONFERENCE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| THE PAC-12 CONFERENCE,<br><br>                    Plaintiff,<br><br>          v.<br><br>THE MOUNTAIN WEST CONFERENCE,<br><br>                    Defendant. | Case No. 5:24-cv-6685-SVK<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS**<br><br>Date:          *To be set by Court [Dkt. 57]*<br>Time:          *To be set by Court [Dkt. 57]*<br>Dept.:         Courtroom 6 – 4th Floor<br>Judge:         Hon. Susan van Keulen<br><br>Date Filed:  September 24, 2024<br><br>Trial Date:  July 6, 2027 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................1

II.   ARGUMENT .......................................................................................................2

    A.    The MWC fails to adequately address the numerous deficiencies in its
promissory fraud claim (Count III)..................................................................2

    B.    The MWC fails to plead a plausible claim for interference with the MWC's
membership agreements (Count IV)..................................................................7

        1.    The MWC fails to plausibly allege a breach that the Pac-12
induced.................................................................................................8

        2.    The MWC's claim fails under *Ixchel*..................................................8

            a.    The membership agreements gave the MWC no legal
assurance that its members would stay beyond the 2025-
2026 season..................................................................................8

            b.    The MWC fails to plead any independently wrongful act...........11

    C.    The MWC's unjust enrichment claim seeks payment of an illegal contract
penalty and alleges agreed-upon benefits for which the Pac-12 paid
millions (Count V). .......................................................................................12

III.  CONCLUSION..................................................................................................15

4054866

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A.J. v. LMND Med. Grp., Inc.*,
2024 WL 4579143 (N.D. Cal. Oct. 25, 2024)............................................................................14

*Adkins v. Comcast Corp.*,
2017 WL 3491973 (N.D. Cal. Aug. 1, 2017) ............................................................................15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................................14

*Binh v. Long Prairie Project Invs. LLC*,
2025 WL 254902 (W.D. Wash. Jan. 21, 2025)........................................................................15

*Bird v. First Alert, Inc.*,
2014 WL 7248734 (N.D. Cal. Dec. 19, 2014) .................................................................. *passim*

*Boat People S.O.S., Inc. v. VOICE*,
2024 WL 3914508 (C.D. Cal. July 31, 2024)............................................................................6

*Business Integration Technology v. Mulesoft Inc.*,
2012 WL 13041534 (N.D. Cal. Mar. 23, 2012)........................................................................12

*Cabrales v. Castle & Cooke Mortg., LLC*,
2015 WL 3731552 (E.D. Cal. June 12, 2015) ..........................................................................15

*Cagno v. Supreme Mortg. Lending, Inc.*,
2025 WL 445790 (N.D. Cal. Feb. 10, 2025) ..............................................................................2

*Colucci v. ZonePerfect Nutrition Co.*,
2012 WL 6737800 (N.D. Cal. Dec. 28, 2012) ..........................................................................15

*Confluent, Inc. v. Slower, LLC*,
2025 WL 315415 (N.D. Cal. Jan. 28, 2025) ............................................................................12

*ConsumerDirect, Inc. v. Pentius, LLC*,
2023 WL 8115863 (C.D. Cal. Oct. 4, 2023) ............................................................................10

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
479 F.3d 1099 (9th Cir. 2007) ..................................................................................................10

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ....................................................................................14

*Eidmann v. Walgreen Co.*,
522 F. Supp. 3d 634 (N.D. Cal. 2021) ........................................................................................5

*ESG Cap. Partners, LP v. Stratos*,
    828 F.3d 1023 (9th Cir. 2016) ...........................................................................13

*Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*,
    868 F. Supp. 2d 983 (E.D. Cal. 2012)...................................................................4

*In re General Motors*,
    393 F. Supp. 3d 871 (N.D. Cal. 2019) .................................................................15

*Grand Fabrics Int'l Ltd. v. Melrose Textile, Inc.*,
    2018 WL 5880175 (C.D. Cal. Aug. 6, 2018)........................................................4

*Grouse River Outfitters Ltd. v. NetSuite, Inc.*,
    2016 WL 11087057 (N.D. Cal. Oct. 31, 2016).....................................................7

*Grouse River Outfitters Ltd. v. NetSuite, Inc.*,
    2016 WL 11690253 (N.D. Cal. Dec. 15, 2016) ....................................................7

*Intelligraphics, Inc. v. Marvell Semiconductor, Inc.*,
    2009 WL 330259 (N.D. Cal. Feb. 10, 2009) .......................................................4

*United States ex rel. Lee v. SmithKline Beecham, Inc.*,
    245 F.3d 1048 (9th Cir. 2001) .............................................................................6

*Lopez v. Washington Mut. Bank, F.A.*,
    2010 WL 1558938 (E.D. Cal. Apr. 19, 2010) ...................................................14

*Mahoney v. Fid. Nat. Title Co.*,
    2008 WL 4286934 (C.D. Cal. Sept. 15, 2008) ..................................................14

*Oracle USA, Inc. v. XL Glob. Servs., Inc.*,
    2009 WL 2084154 (N.D. Cal. July 13, 2009).......................................................3

*Ortiz v. Perkins & Co.*,
    2022 WL 16637993 (N.D. Cal. Nov. 2, 2022) ...................................................14

*Pro 49 Development, LLC v. Ness Express 1*,
    2025 WL 437549 (E.D. Cal. Feb. 7, 2025)........................................................10

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
    2013 WL 6229141 (C.D. Cal. Dec. 2, 2013)......................................................10

*Shah v. Capital One Fin. Corp.*,
    768 F. Supp. 3d 1033 (N.D. Cal. 2025) .............................................................14

*Shoemaker v. County of Glenn*,
    2010 WL 4835751 (E.D. Cal. Nov. 22, 2010)....................................................10

*Shroyer v. New Cingular Wireless Servs., Inc.*,
    622 F.3d 1035 (9th Cir. 2010) .............................................................................5

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS
Case No. 5:24-cv-6685-SVK

*Soil Retention Prods., Inc. v. Brentwood Indus., Inc.*,
  521 F. Supp. 3d 929 (S.D. Cal. 2021).........................................................................5

*Thompson v. Carmax*,
  2023 WL 4034215 (N.D. Cal. Apr. 27, 2023), *report and recommendation
  adopted*, 2023 WL 4995718 (N.D. Cal. May 31, 2023) ..............................................3

*UMG Recordings, Inc. v. Global Eagle Entertainment, Inc.*,
  117 F. Supp. 3d 1092 (C.D. Cal. 2015) ......................................................................6

*Vanguard Logistics Servs. (USA) Inc. v. Groupage Services of New England, LLC*,
  2022 WL 17369626 (C.D. Cal. Oct. 4, 2022)............................................................10

*Vicuna v. Alexia Foods, Inc.*,
  2012 WL 1497507 (N.D. Cal. Apr. 27, 2012) ...........................................................15

**State Cases**

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
  11 Cal. 4th 376 (1995) ...........................................................................................9, 10

*Garland Connect, LLC v. Wells Fargo Bank*,
  2023 WL 5523936 (Cal. Ct. App. Aug. 28, 2023) (unpublished) ............................11

*Ixchel Pharma., LLC v. Biogen, Inc.*,
  9 Cal. 5th 1130 (2020) ..................................................................................... *passim*

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ..........................................................................................9, 11

*Palm Springs Paint Co. v. Arenas*,
  242 Cal. App. 2d 682 (1966) ....................................................................................13

*Quelimane Co. v. Stewart Title Guaranty Co.*,
  19 Cal. 4th 26 (1998) .................................................................................................9

*Rattagan v. Uber Techs., Inc.*,
  17 Cal. 5th 1 (2024) ...................................................................................................3

*Robinson Helicopter Co. v. Dana Corp.*,
  34 Cal. 4th 979 (2004) ...............................................................................................3

*Shida v. Japan Food Corp.*,
  251 Cal. App. 2d 864 (1967) ....................................................................................10

*Tarlesson v. Broadway Foreclosure Invs., LLC*,
  184 Cal. App. 4th 931 (2010) ...................................................................................13

*Tenzer v. Superscope, Inc.*,
  39 Cal. 3d 18 (1985) ..............................................................................................3, 6

**Rules**

Fed. R. Civ. P. 9(b) ................................................................................................2, 6, 7

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS
Case No. 5:24-cv-6685-SVK

4054866

1

## I.    INTRODUCTION

2          The MWC's Opposition underscores—rather than cures—the fundamental defects in its

3   counterclaims. Despite extensive briefing, the MWC cannot escape a simple reality: its tort claims

4   rest on legal theories that California law has repeatedly rejected. No amount of speculative or

5   conclusory allegations can salvage the MWC's misguided attempt to recharacterize this

6   contractual dispute and the Pac-12's lawful competition as fraud, tortious interference, or unjust

7   enrichment. California law forecloses such efforts, and the Court should not permit these

8   defective claims to proceed.

9          Each of the challenged counterclaims fails for multiple, independent reasons. The MWC's

10  promissory fraud claim collapses under well-settled law. First, the MWC alleges nothing more

11  than that the Pac-12 entered into an agreement with the MWC and then many months later

12  disputed the legality of the Poaching Penalty—and therefore "must" never have intended to

13  perform. Courts have consistently rejected this sort of "failure to perform a contract" allegation as

14  a basis for fraud. Second, the economic loss rule bars the MWC's fraud claim seeking the same

15  economic damages arising from the parties' contractual relationship. Third, and compounding

16  these flaws, the MWC fails to plead particularized facts supporting any inference of fraudulent

17  intent at the time of contracting, relies almost exclusively on allegations made "on information

18  and belief," and does not even identify who made the alleged fraudulent misrepresentation or who

19  supposedly had the intent never to honor the Poaching Penalty. Each of these deficiencies is

20  independently fatal, and collectively they make clear the MWC has no claim for fraud.

21         The MWC's tortious interference claim fares no better. The claim is based on the premise

22  that the Pac-12 wrongfully induced MWC members to breach their agreements with the MWC.

23  But the counterclaims themselves establish that the challenged conduct—departing the MWC

24  after the 2025-2026 season—was expressly permitted by the governing membership agreements

25  and bylaws. The MWC therefore cannot plausibly allege that the Pac-12 induced any breach at all

26  because each of the departing schools was allowed to leave and join any conference it wanted in

27  2026. Moreover, because the alleged interference concerns, at most, a prospective economic

28  relationship, California law requires the MWC to plead an independently wrongful act under a

determinable legal standard. The MWC does not and cannot do so. The Pac-12 accepted applications from MWC members to join the conference *after* the expiration of any membership agreement obligations and offered to contribute to any potential exit fee obligations of the departing MWC schools (thereby helping the schools *not* breach their membership agreements). The law does not impose tort liability for this sort of lawful competition.

Finally, Count V's unjust enrichment claim is an impermissible end run that seeks to recover in equity the very same money the MWC cannot obtain under the contract if the Poaching Penalty is declared illegal. California law does not permit unjust enrichment claims to enforce illegal contracts. And the MWC's fallback position that the unjust enrichment claim can survive simply because it is labeled as an "alternative" claim is legally incorrect. All claims, "alternative" or otherwise, must satisfy the applicable pleading standards.

For these reasons, and those set forth below and in the Pac-12's motion, the Court should dismiss the MWC's counterclaims for promissory fraud, tortious interference, and unjust enrichment without leave to amend.

## II.    ARGUMENT

### A.    The MWC fails to adequately address the numerous deficiencies in its promissory fraud claim (Count III).

The Opposition does not cure the four independent defects that doom the MWC's promissory fraud claim: the MWC (1) alleges nothing more than nonperformance of a contractual term; (2) seeks purely contractual harm barred by the economic loss rule; (3) pleads no non-speculative facts showing intent to defraud at the time of contracting; and (4) fails to plead fraud with the particularity required by Rule 9(b).

*First*, the MWC's contention that the Pac-12 allegedly committed fraud by agreeing to termination fees without intending to pay is nothing more than a breach of contract claim rebranded as fraud. The case law is clear that "[s]imply restating a breach of contract claim coupled with additional general averments that the accused breaching party never intended to perform under the contract, without any details, is not a sufficient pleading of a fraud cause of action." *Cagno v. Supreme Mortg. Lending, Inc.*, 2025 WL 445790, at *5 (N.D. Cal. Feb. 10,

2025); *see also Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30 (1985) (alleging nonperformance of a contract is insufficient to state a promissory fraud claim).

The MWC's protestations notwithstanding, this case is no different from the many cases dismissing fraud claims that merely repackage contract disputes, which are cited in the Pac-12's motion to dismiss. *See* Mot. 6 (collecting cases). The MWC concedes that the supposed misrepresentation underlying its fraud claim is the Pac-12's "represent[ation] to the MWC that it would be bound to the Termination Fees" in the Scheduling Agreement despite having no intention of honoring those representations. Opp. 9. This is plainly a claim based on the "failure to perform a contract" term initially agreed to, and it "does not constitute fraud." *Thompson v. Carmax*, 2023 WL 4034215, at *3 (N.D. Cal. Apr. 27, 2023), *report and recommendation adopted*, 2023 WL 4995718 (N.D. Cal. May 31, 2023). The MWC points to **no authority** permitting a plaintiff to proceed on a fraud claim based on the defendant's alleged failure to fulfill a contract term because that term is illegal or for any other reason, absent contemporaneous facts plausibly showing an intent to deceive at the time of contracting.

**Second**, the MWC's fraud claim seeks purely economic damages arising from the parties' contractual relationship and is therefore barred by the economic loss rule. The economic loss rule was designed to prevent "the law of contract and the law of tort from dissolving one into the other." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004). "[N]o tort cause of action will lie where the breach of duty is nothing more than a violation of a promise which undermines the expectations of the parties to an agreement." *Oracle USA, Inc. v. XL Glob. Servs., Inc.*, 2009 WL 2084154, at *4 (N.D. Cal. July 13, 2009). Tort claims for contract-related economic harms are generally barred unless: (1) the "injury-causing conduct violated a duty that is independent of the duties and rights assumed by the parties when they entered the contract," and (2) "the defendant's conduct must have caused injury to persons or property that was not reasonably contemplated by the parties when the contract was formed." *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1 (2024). The MWC's fraud claim fails both requirements.

The MWC fails to show that the "injury-causing conduct" violated any duty independent of the Scheduling Agreement. The Opposition confirms that the MWC's fraud claim is premised

on the Pac-12 allegedly harming the MWC by "disavow[ing] the Termination Fees" in the parties' agreement and refusing to pay. Opp. 9–10. This conduct is inseparable from the purported contractual obligation the MWC seeks to enforce. The MWC's argument that its fraud claim survives because the Pac-12 supposedly violated an "independent duty not to deceive" by agreeing to the termination fees without intending to pay them "would allow a fraud claim to be filed every time a contract was allegedly breached." *See Grand Fabrics Int'l Ltd. v. Melrose Textile, Inc.*, 2018 WL 5880175, at *3 (C.D. Cal. Aug. 6, 2018) (dismissing claim under the economic loss rule because "the misrepresentation at the center of Defendant's claim is the contract itself"); *Intelligraphics, Inc. v. Marvell Semiconductor, Inc.*, 2009 WL 330259, at *17 (N.D. Cal. Feb. 10, 2009) (allowing promissory fraud claim would "open the door to tort claims in virtually every case in which a party promised to make payments under a contract but failed to do so").[1] Opp. 14–15. But here, the only injury-causing conduct the MWC alleges is the Pac-12's refusal to pay the termination fees. CC ¶ 123 ("The Pac-12 represented to the MWC that it would pay the Termination Fees. . . . in the form of the Scheduling Agreement."). That conduct is coextensive with—not independent from—the contract term itself.

The MWC also cannot show that the Pac-12's conduct caused injury that was not reasonably contemplated at the time of contracting. The MWC seeks precisely the ***same*** damages under its fraud and contract theories: $55 million in termination fees. *Compare* CC ¶ 117 (breach of contract damages of $55,000,000); *with id.* ¶ 129 (fraud damages of $55,000,000). Where the damages a plaintiff seeks under a fraud claim "are the same economic losses arising from the alleged breach of contract," the economic loss rule requires dismissal. *See Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*, 868 F. Supp. 2d 983, 991 (E.D. Cal. 2012).

***Third,*** the MWC fails to plead facts supporting any plausible inference that the Pac-12 had an intent to defraud at the time of contracting. The MWC's own pleading gives away the

---

[1] The MWC concedes that *Noerr-Pennington* and litigation privilege bar liability based on the filing of a lawsuit. Opp. 12. Yet the MTC also appears to argue that the timing of the Pac-12's suit somehow supports a claim of fraudulent intent. It does not. The Pac-12's September 2024 filing is protected conduct and cannot support a civil claim. And even setting *Noerr-Pennington* and litigation privilege aside, the MTC offers no explanation for how filing a complaint ***a year*** after the agreement was executed could establish fraudulent intent at the time of contracting.

game: by basing its promissory fraud claim "[u]pon information and belief," the MWC makes clear that it cannot allege specific facts supporting its claim of fraudulent intent. CC ¶ 127. Bare allegations based "on information and belief" are insufficient to meet the evaluated pleading standard for a fraud claim. *See Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1042 (9th Cir. 2010) (claims made "on information and belief" are not particular enough, "unless they accompany a statement of ***facts*** on which the belief is founded." (emphasis added)). The Opposition offers no response to this failure.

Instead, the MWC relies on two allegations—neither contemporaneous with the negotiation or execution of the Scheduling Agreement—to manufacture an inference of fraudulent intent. *See* CC ¶¶ 122–29. First, the MWC cites a media report that "in the spring of 2023"—months ***before*** the negotiation and execution of the Scheduling Agreement—the former Pac-12 Commissioner George Kliavkoff was "presented with a backup option" involving inviting schools from the MWC to pair with WSU and OSU. CC ¶ 69. The MWC's reliance on this reporting is self-defeating. The same article on which the MWC relies reports that "***Kliavkoff never considered [the proposal],*** . . . nor did he request a fully formed proposal."[2] There is also no suggestion that the proposal contemplated a situation in which the Pac-12 would accept schools from the MWC intending not to pay any legitimate associated fees. Unsubstantiated media reporting about a "backup option" that was presented months before the Scheduling Agreement and "never considered" comes nowhere close to plausibly alleging fraudulent intent. *Cf. Soil Retention Prods., Inc. v. Brentwood Indus., Inc.*, 521 F. Supp. 3d 929, 942 (S.D. Cal. 2021) ("[P]laintiffs may plead themselves out of court by attaching exhibits inconsistent with their claims because the court may disregard contradictory allegations.").

Next, the MWC points to allegations that four departing MWC members executed undisclosed term sheets around the same time that the Pac-12 and the MWC were discussing a possible merger in Fall 2024—***nearly a year after*** the Scheduling Agreement was executed. CC

---

[2] Jon Wilner, *Pac-12 Expansion: Idea of Raiding the Mountain West Wasn't New, But This Time, It Wasn't Ignored*, Sports360AZ, https://archive.is/Zi0tL (emphasis added). This article is incorporated by reference into the MWC's counterclaims and therefore may be considered by the Court in ruling on the Pac-12's motion. *See Eidmann v. Walgreen Co.*, 522 F. Supp. 3d 634, 641 (N.D. Cal. 2021).

¶¶ 92–93. But these *post-contract* events cannot retroactively establish fraudulent intent at contract formation. *See* Mot. 7 (collecting cases). The MWC's counterclaim identifies no allegations supporting supposed fraudulent intentions or misrepresentations that purportedly occurred when the parties negotiated and executed their Scheduling Agreement in late 2023. CC ¶¶ 41, 123. Without any such allegations, the mere assertion that the contract was breached *a year later* cannot support a fraud claim.

Moreover, separate and apart from the fact that the MWC fails to allege any *contemporaneous* conduct, the MWC's allegations do not support an inference that the Pac-12 intended not to pay the Poaching Penalty. At most, the allegations suggest that the Pac-12 contemplated recruiting MWC schools—conduct that could *trigger* the Poaching Penalty. But intent to engage in conduct that may give rise to a contractual obligation is not intent to refuse to perform that obligation. As already explained, promissory fraud requires facts showing that the promisor never intended to perform the promise itself, not merely that it anticipated performance might be required. *See Tenzer*, 39 Cal. 3d at 30.

*Finally*, the MWC cannot get around its failure to plead its fraud claim with specificity as required by Rule 9(b). Attempting to satisfy the "who, what, when, where, and how" requirement, the MWC identifies the "who" as "[t]he Pac-12 itself, including its authorized representatives," and suggests a lower pleading standard applies because the Pac-12 is an association. Opp. 8; *accord* CC ¶ 123. That is wrong. Nothing in Rule 9(b) differentiates the pleading standard for fraud based on the defendant's organizational form, and the MWC cites no authority to support such a proposition. Where fraud is alleged against a corporate entity, "plaintiffs must allege the names of the employees or agents who purportedly made the fraudulent representations or omissions, or at a minimum identify them by their titles and/or job responsibilities." *See UMG Recordings, Inc. v. Global Eagle Entertainment, Inc.*, 117 F. Supp. 3d 1092, 1108 (C.D. Cal. 2015) (citing *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir. 2001)). Just like a corporation, an association is an entity that acts through individuals. To plead a fraud claim against an entity with adequate specificity, it is necessary to identify the individual who made the alleged misrepresentations or omissions with intent to deceive. *See Boat People*

*S.O.S., Inc. v. VOICE,* 2024 WL 3914508, at *7 (C.D. Cal. July 31, 2024) (dismissing fraud claims against nonprofit defendant where plaintiffs had alleged only that "VOICE [the nonprofit] lied to Plaintiffs," which was insufficient because the "[p]laintiffs fail[ed] to point out who any specific communications were sent to or from").

Recognizing this defect, the MWC pivots to an assertion that its claim satisfies Rule 9(b) because the MWC has identified former Commissioner Kliavkoff as the conference's signatory to the Scheduling Agreement. Opp. 8. This sleight of hand reveals the true nature of the MWC's claim: the alleged "fraud" is nothing more than a claim for breach of contract. The MWC cites a single unpublished order from a decade ago that involved fraud claims based on advertisements and public statements—and ***not*** a failure to comply with contractual terms—and does not detail how the plaintiff met Rule 9(b)'s heightened pleading requirements. *See Grouse River Outfitters Ltd. v. NetSuite, Inc.*, 2016 WL 11087057 (N.D. Cal. Oct. 31, 2016) ("*Grouse* SAC"); *see also generally Grouse River Outfitters Ltd. v. NetSuite, Inc.*, 2016 WL 11690253 (N.D. Cal. Dec. 15, 2016). Moreover, a cursory review of the operative complaint in *Grouse* reveals that the plaintiff ***did*** identify by name ***at least eight*** specific individuals employed by the defendant who the plaintiff accused of making false representations as well as the specific interactions those individuals had with the plaintiff's agents. *Grouse* SAC ¶¶ 52–92.

For each of these independent reasons, the Court should dismiss Count III with prejudice.

**B.    The MWC fails to plead a plausible claim for intentional interference with the MWC's membership agreements (Count IV).**

The MWC's Opposition does not save its tortious interference claim for multiple reasons. ***First***, the MWC has not alleged any breach of a contract that the Pac-12 induced.[3] ***Second***, the MWC fails to comply with the "independent wrongfulness" requirement under *Ixchel Pharma., LLC v. Biogen, Inc.*, 9 Cal. 5th 1130 (2020), which applies because the MWC's claim is

---

[3] The MWC's suggestion that the Pac-12 "does not dispute (and therefore concedes) that [the] five elements are met" is false. The Pac-12 repeatedly argued in its opening brief that the Pac-12 did not induce any breach. For example, the Pac-12 argued that its acceptance of departing MWC schools "did not breach or disrupt . . . a contractual relationship," *see, e.g.*, Mot. 12 (cleaned up), including because "[t]he departing schools were free to leave, and the Pac-12 was free to accept their applications for future membership," *see* Mot. 13, *see also id.* 1–2.

1  predicated on interference with a merely prospective relationship.

2      **1.**    **The MWC fails to plausibly allege a breach that the Pac-12 induced.**

3      As the MWC acknowledges, any claim for tortious interference must allege "intentional

4  acts designed to induce a breach or disruption of the contractual relationship" and "actual breach

5  or disruption." *Ixchel*, 9 Cal. 5th at 1141. But the MWC does not allege any "actual breach or

6  disruption" toward which the Pac-12 took any "intentional act."

7      As the MWC knows, it was not a breach of any agreement for MWC members to depart

8  for the Pac-12 beginning with the 2026-2027 season. Each school was expressly authorized under

9  the MWC bylaws to leave after "June 30 of a given year." CC ¶ 134. And no agreement—

10  including the MWC schools' then-existing grant of rights or media deals—required that the

11  MWC members remain in the MWC after the 2025-2026 season. In short, the MWC accuses the

12  Pac-12 of inducing conduct that the contracts permitted.

13      The MWC also suggests that the Pac-12 caused Utah State to breach its membership

14  agreement by attending a MWC board meeting while purportedly having a "conflict of interest."

15  *See, e.g.*, CC ¶¶ 133, 142. This allegation is untethered to any "intentional act" of the Pac-12, and

16  the MWC offers nothing to establish how the Pac-12 is responsible for Utah State purportedly

17  violating MWC policy.[4] And its Opposition cites no authority for the notion that MWC members'

18  independent actions "while aligned with the Pac-12's plan," *see* CC ¶ 142—which the

19  counterclaim never defines—creates tort liability for the Pac-12. *See generally* Opp. 19–20.

20      **2.**    **The MWC's claim fails under *Ixchel*.**

21      The tortious interference claim fails for another independent reason: there was nothing

22  wrongful about the Pac-12's acceptance of MWC schools starting with the 2026-2027 season.

23      **a.**    **The membership agreements gave the MWC no legal assurance**
24            **that its members would stay beyond the 2025-2026 season.**

25      The MWC contends that its contracts are not "at will" because its members could not

26  leave the conference "without notice, timing constraints, or economic consequence." *See* Opp. 18.

27
    ————————————————
28  [4] The MWC does not sufficiently allege that Utah State was conflicted at the time it attended the meeting. Rather, it alleges that Utah State President Elizabeth Cantwell attended a MWC board meeting "***six days before*** Utah State announced its departure for the Pac-12." CC ¶ 91.

But the MWC's focus on the procedure for leaving the conference does not undercut the fact that MWC members had a right to join any other conference after the 2025-2026 season. As such, the MWC had no legal assurance that those schools would remain in the conference. In other words, when the Pac-12 accepted five MWC members' applications to join the Pac-12 in a ***subsequent*** season, the Pac-12 could have only interfered with a ***prospective*** relationship.

To bring a claim based on a prospective relationship, the MWC must allege an independently wrongful act. California law distinguishes "formally cemented economic relationship[s]," which are "worthy of protection," from merely prospective relationships, which "subsist in a zone where the rewards and risks of competition are dominant." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 392 (1995). "Because [a prospective relationship] is weaker and the interest in maintaining open competition is stronger," the California Supreme Court has repeatedly reaffirmed that plaintiffs must meet a higher pleading standard for interference. *Ixchel*, 9 Cal. 5th at 1146–47 (citing *Della Penna*, 11 Cal. 4th at 392 (recognizing interest in "maximiz[ing] areas of competition free of legal penalties")).[5] In *Ixchel*, the Court held that at-will agreements "resemble[] . . . prospective economic relationships" because they "may be terminated . . . at the prerogative of a single party," such that neither party has a "legal claim to continued relations with the other." 9 Cal. 5th at 1146–47. Interference with a mere expectancy is not "a wrong in and of itself," so it is only actionable if the defendant also engaged in an independently wrongful act. *Id.* at 1147 (citation omitted).

The MWC contends that its member agreements at not "at will," but the label does not make a difference. There can be no dispute that the membership agreements with which the MWC alleges the Pac-12 interfered are "prospective relationships." The MWC Bylaws provide the schools with the right to end the relationship with the conference. Indeed, the MWC pleads— that "[a]ny school may resign from the conference" on its own prerogative, without any action by the MWC. CC ¶ 134. The fact that this unilateral action must be accompanied by advance notice is insufficient to transform this into a "formally cemented economic relationship" as the MWC

---

[5] *See also Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26 (1998); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003).

suggests, Opp. 18. *See Della Penna*, 11 Cal. 4th at 392. To be sure, advance notice (including longer than the 60 days in *Ixchel*) is customary in at-will agreements. *See Shoemaker v. County of Glenn*, 2010 WL 4835751, at *3 (E.D. Cal. Nov. 22, 2010) (contract terminable by one party with 120 days' notice is "unambiguous that Plaintiff is an at will employee"); *Vanguard Logistics Servs. (USA) Inc. v. Groupage Services of New England, LLC*, 2022 WL 17369626, at *5 (C.D. Cal. Oct. 4, 2022) (same, as to 90-day notice); *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 6229141, at *11 n.7 (C.D. Cal. Dec. 2, 2013) (same, as to 90-day and 30-day notice).

The MWC cites no case standing for a bright-line rule—much less one binding on this Court—that the required notice transformed the member schools' relationships with the conference into a cemented economic relationship. Indeed, the MWC's cases regarding the duration of notice are readily distinguishable. In *CRST*, the plaintiff alleged interference during the ***defined term*** of a contract, when it could only be terminated ***for cause***—not interference with a relationship like the membership agreements, which can terminate at one party's option ***at any time*** and ***for any reason***. *See CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1105 (9th Cir. 2007) (holding contract did not create "an at-will employment relationship during the first year . . . the period when it was allegedly the subject of Werner's interference"). *Pro 49* similarly involved a contract that—as both parties agreed—"could be terminated only under specific conditions," such that no unilateral termination was available. *See Pro 49 Development, LLC v. Ness Express 1*, 2025 WL 437549, at *2 (E.D. Cal. Feb. 7, 2025). And *ConsumerDirect*'s contract, containing a 180-day notice period, was nothing like the membership agreements here. The parties there agreed to an "exclusive term of three years," but the MWC members made no such "exclusive" commitment to the MWC for the 2026-2027 season or later. *Cf. ConsumerDirect, Inc. v. Pentius, LLC*, 2023 WL 8115863, at *3 (C.D. Cal. Oct. 4, 2023).

The MWC's contention that its membership agreements are not at will—and thus its interference claim may proceed despite no independently wrongful act—elevates form over function. Courts recognize that interference with many types of agreements, even if not expressly labeled "at-will," must be treated as interference with prospective economic advantage because future transactions are speculative. *See, e.g., Shida v. Japan Food Corp.*, 251 Cal. App. 2d 864,

1  866 (1967) (treating contract to purchase goods subject to yearly renewal as at-will); *Garland*

2  *Connect, LLC v. Wells Fargo Bank*, 2023 WL 5523936, at *8–9 (Cal. Ct. App. Aug. 28, 2023)

3  (unpublished) (same, as to agreement with option to extend after initial term); *see also Ixchel*, 9

4  Cal. 5th at 1139 (same, as to collaboration agreement). In all these situations, there is no "legal

5  assurance" that one's "contracting partner will not terminate," and thus an independently

6  wrongful act is required to impose tort liability. *See Garland*, 2023 WL 5523936, at *10–11.

7  Here too, the MWC could only hope—not insist—that its members would extend their

8  relationship with the conference past the 2025-2026 season (*i.e.*, not terminate). Like in *Garland*,

9  the MWC accuses the Pac-12 of inducing MWC members "who ha[ve] a right under the

10  [membership agreements] to take an action"—leave the conference in 2026—to "actually take

11  [that] action." *See id.* at *10. That claim is "similar enough to a claim for interference with an at-

12  will contract that the independently-wrongful act requirement applies." *See id.* at *11. Indeed,

13  allowing the MWC's claim to "proceed without requiring [it] to plead and prove an independently

14  wrongful act would, in effect, allow [the MWC] to restrict the rights" of its members to "pursue

15  alternative[]," despite never having bargained for such control. *See id.* That certain members

16  pursued the "alternative" of the Pac-12 does not open the Pac-12 to tort liability without more.

17  The Court should not allow the MWC to continue its anticompetitive conduct by attempting to

18  restrict the mobility of its member schools.

19  **b.    The MWC fails to plead any independently wrongful act.**

20  None of the purported independently wrongful acts that the MWC identifies for the first

21  time in its Opposition are sufficient under *Ixchel*, which requires that the Pac-12 have violated the

22  constitution, a statute, a regulation, or "some other determinable legal standard." *Korea Supply*,

23  29 Cal. 4th at 1138.  **First**, the Pac-12 did not commit promissory fraud, *see supra* II.A, and the

24  MWC may not bootstrap one meritless claim to save another.

25  **Second**, the MWC's allegations are silent on how the Pac-12 "induced and exploited

26  conflicts of interest in MWC governance." None of the paragraphs the MWC now cites, *see* Opp.

27  20, identify wrongful acts attributable to the **Pac-12**. Paragraphs 91, 92, 93, 94, 96, and 142 each

28  describe the conduct of MWC members or their presidents, not what anyone at the Pac-12 did or

1  said. Paragraph 95 states that the Pac-12 publicly announced that MWC members would join the

2  conference, but the MWC makes no argument that such publicity was illegal or improper. And

3  Paragraph 90 reveals the MWC's weakness: all allegations about any Pac-12 "plan" to "dismantle

4  the MWC" are made "on information and belief," not any particularized facts. *See* CC ¶ 90. Such

5  unspecific allegations fail to state a claim for tortious interference as a matter of law. *See, e.g.,*

6  *Confluent, Inc. v. Slower, LLC*, 2025 WL 315415, at *2 (N.D. Cal. Jan. 28, 2025) (van Keulen, J.)

7  (dismissing claim for intentional interference with prospective economic advantage where

8  allegedly wrongful act based only on "information and belief"); *Business Integration Technology*

9  *v. Mulesoft Inc.*, 2012 WL 13041534, at *5 (N.D. Cal. Mar. 23, 2012) (same, under UCL).

10      ***Third***, the MWC's "exit fee" argument is illogical. The MWC theorizes that the Pac-12

11  induced MWC members to join the Pac-12 when they were free to leave by promising

12  contributions towards potential exit fees. If the Pac-12 conditioned "contributions towards . . .

13  withheld [MWC] distributions or exit fees" on agreement to join the Pac-12, the MWC has not

14  explained how such a condition was illegal, much less "unfair competition." *See* Opp. 20 (citing

15  CC ¶ 138). And any argument that the Pac-12 induced the MWC members to depart ***without***

16  paying any alleged exit fees, Opp. 20, is contradicted by the MWC's allegations that the Pac-12

17  offered to "contribut[e]" to their potential exit fees. *See* CC ¶ 138. If anything, the Pac-12's

18  actions only helped MWC members ***not*** breach their membership agreements with the MWC.

19      In sum, the MWC schools that announced their departure for the Pac-12 did exactly what

20  their membership agreements allowed. The Pac-12 did not induce any breach or commit any

21  independently wrongful act. The Court should therefore dismiss Count IV with prejudice.

22      **C.**    **The MWC's unjust enrichment claim seeks payment of an illegal contract
23  penalty and alleges agreed-upon benefits for which the Pac-12 paid millions
(Count V).**

24      The MWC has not shown that its unjust enrichment claim is anything more than a

25  backdoor attempt to collect an illegal contract penalty. Nor has it demonstrated that the Pac-12

26  benefited beyond what the parties contemplated. The Court should dismiss this claim.

27      ***First***, the MWC's Opposition makes clear that its unjust enrichment claim is nothing more

28  than another shot at collecting the Poaching Penalty if antitrust, unfair competition, or public

4054866

1   policy considerations render the contract provision unenforceable. But as California courts have

2   long recognized, a party to a contract prohibited by law generally "may not recover on principles

3   of quasi contract for benefits allegedly conferred under the contract." *Palm Springs Paint Co. v.*

4   *Arenas*, 242 Cal. App. 2d 682, 688 (1966). "The purpose of the rule is not to effect justice

5   between the parties but to protect the public interest by discouraging prohibited transactions." *Id.*;

6   *see also Tarlesson v. Broadway Foreclosure Invs., LLC*, 184 Cal. App. 4th 931, 938 (2010)

7   (courts allow recovery for unjust enrichment only "where its application involves no violation or

8   frustration of law or opposition to public policy, either directly or indirectly") (citation omitted);

9   Mot. 14 (collecting additional cases dismissing unjust enrichment claims where they would

10  frustrate law or public policy).

11         None of the MWC's asserted justifications overcome this settled law. The Scheduling

12  Agreement's preamble cannot supply an equitable basis for recovery if the Poaching Penalty itself

13  is declared illegal. Nor does the MWC's attempt to recharacterize its claim as seeking

14  "disgorgement equal to the value of the ***specialized access and relationship-building benefits***"

15  change the analysis. Opp. 22 (emphasis added). That theory merely enforces Section 7 by another

16  name. Section 7 directly contemplates termination fees in part due to the Pac-12's "***unique access***

17  ***to MWC Member Institutions***." Dkt. 1-1 (Scheduling Agreement (SA)) § 7.01 (emphasis added).

18  Relabeling the requested payment as "disgorgement" does not transform an illegal penalty into a

19  permissible equitable remedy.

20         ***Second***, the MWC fails to plausibly allege that the Pac-12 "received and unjustly retained

21  a benefit at [the MWC's] expense." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th

22  Cir. 2016). The MWC argues that the Pac-12 was unjustly enriched because "for MWC-hosted

23  games, the MWC supplied officiating, replay, and related services." Opp. 23. But those services

24  were not only contemplated by the parties ***as part of scheduling football games***—they were

25  already priced and ***paid for by the Pac-12***. *See* SA, Article II (identifying Schedule 1 as

26  establishing terms of football games and discussing scheduling fees); Schedule 1 ("MWC will be

27  responsible for referee, replay, and other necessary services for each MWC Football Home Game

28  . . . ."). Gameday operations, media coverage, and "interactions" with the MWC were all part and

1  parcel of participating in the football games for which the Pac-12 paid $14 million, which

2  drastically exceeded the market rate for such games. The same is true for the alleged "on-field

3  and off-field access" through "[g]ame week operations" and "athletic-department coordination,"

4  Opp. 23–24, which are inherent to the various fees that the Pac-12 paid. *See* SA §§ 2.02

5  (Administrative Fee), 3.01(b) (Football Participation Fee), 3.01(d) (General Participation Fees).

6  Unjust enrichment requires a benefit retained ***without*** payment; the MWC alleges none.

7      The MWC does not plausibly allege any benefit to the Pac-12 beyond the football games

8  and related services for which the Pac-12 paid more than $14 million.  Where, as here, the MWC

9  already received payment under the Scheduling Agreement "which [it] expected," there is "no

10  equitable reason for invoking restitution." *Ortiz v. Perkins & Co.*, 2022 WL 16637993, at *7

11  (N.D. Cal. Nov. 2, 2022) (citation omitted); *Mahoney v. Fid. Nat. Title Co.*, 2008 WL 4286934, at

12  *5 (C.D. Cal. Sept. 15, 2008) (dismissing unjust enrichment claim because movant received "a

13  title insurance policy in exchange for the agreed-upon price").

14      The MWC attempts to evade dismissal by suggesting there is a fact dispute as to whether

15  the Pac-12 was unjustly enriched. Not so. The MWC's allegations permit no "reasonable

16  inference" that the Pac-12 unjustly retained a benefit, *Ashcroft v. Iqbal*, 556 U.S. 662, 678,

17  (2009), and California courts dismiss unjust enrichment claims under similar circumstances. *See*

18  *Lopez v. Washington Mut. Bank, F.A.*, 2010 WL 1558938, at *10 (E.D. Cal. Apr. 19, 2010)

19  (dismissing claim in part because complaint failed to show party "received and retained benefits

20  . . . to which they were not entitled."); *Mahoney*, 2008 WL 4286934, at *5 (dismissing claim

21  where party "got exactly the exchange which he expected"). The MWC's cited class action cases

22  involving unauthorized sale of personal information to third parties are inapposite. Those cases do

23  not involve attempts to circumvent illegal contracts through unjust enrichment theories. *See Shah*

24  *v. Capital One Fin. Corp.*, 768 F. Supp. 3d 1033, 1041, 1051 (N.D. Cal. 2025) (defendant

25  benefitted from sharing personal and financial information with third parties); *see also A.J. v.*

26  *LMND Med. Grp., Inc.*, 2024 WL 4579143, at *4 (N.D. Cal. Oct. 25, 2024) (same, from sharing

27  medical information with third parties for "enhanced advertising services and more cost-efficient

28  marketing"); *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1086 (N.D. Cal. 2023)

(defendant sold plaintiffs' data "without consent and unjustly retained the proceeds"). In sum, the Pac-12 received no benefit beyond the games for which it paid millions of dollars.

**Finally**, the MWC cannot rescue its flawed claim by framing it as an "alternative remed[y]." Opp. 24. The MWC appears to suggest that an unjust enrichment claim should always survive when pled in the alternative even if the allegations do not satisfy the pleading standard. That is not the law. If the MWC were correct, it would insulate every alternative claim from dismissal on the pleadings, regardless of its compliance with the pleading standard. *Bird v. First Alert, Inc.*, 2014 WL 7248734, at *4 (N.D. Cal. Dec. 19, 2014) ("Although plaintiffs are allowed to plead in the alternative, on a motion to dismiss the plaintiff must allege facts that plausibly suggest an entitlement to relief.") (citation omitted); *Binh v. Long Prairie Project Invs. LLC*, 2025 WL 254902, at *3 (W.D. Wash. Jan. 21, 2025) ("[P]leading claims in the alternative does not relieve a plaintiff of their obligation to provide facts demonstrating a plausible claim."). *In re General Motors*, 393 F. Supp. 3d 871 (N.D. Cal. 2019), does not support a contrary result. There, the unjust enrichment claim survived in part because it concerned conduct that occurred *before* the parties entered into an agreement and thus was not covered by the agreement. *Id.* at 881. Here, there is no such extra-contractual conduct. The MWC's other cases are easily distinguishable. *See Adkins v. Comcast Corp.*, 2017 WL 3491973, at *1 (N.D. Cal. Aug. 1, 2017) (dispute about existence of contract and no discussion of unjust enrichment claim); *Cabrales v. Castle & Cooke Mortg., LLC*, 2015 WL 3731552, at *3 (E.D. Cal. June 12, 2015) (no underlying contract and unjust enrichment claim brought under Utah law); *Colucci v. ZonePerfect Nutrition Co.*, 2012 WL 6737800, at *10 (N.D. Cal. Dec. 28, 2012) (unjust enrichment pled in alternative to tort, no express contract); *Vicuna v. Alexia Foods, Inc.*, 2012 WL 1497507, at *3 (N.D. Cal. Apr. 27, 2012) (no express contract between parties and unjust enrichment "would come into play only in the event of a finding of liability on some other on-contractual claim"). The Court should dismiss the MWC's unjust enrichment claim with prejudice.

## III.    CONCLUSION

For the foregoing reasons, the Court should dismiss Counts III, IV, and V of the MWC's counterclaims without leave to amend.

4054866

1    Dated: January 30, 2026                    KEKER, VAN NEST & PETERS LLP

2

3                                          By:    /s/ Eric H. MacMichael
                                                  ERIC H. MACMICHAEL

4                                          Attorneys for Plaintiff THE PAC-12
                                           CONFERENCE
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS
Case No. 5:24-cv-6685-SVK
4054866