UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAC-12 CONFERENCE,<br><br>Plaintiff,<br><br>v.<br><br>MOUNTAIN WEST CONFERENCE,<br><br>Defendant. | Case No. 24-cv-06685-SVK<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS COUNTERCLAIMS**<br><br>Re: Dkt. No. 59 |

The Parties to this antitrust lawsuit are Plaintiff Pac-12 Conference (the "Pac-12") and Defendant Mountain West Conference (the "MWC"), two athletic conferences within Division 1 of the National Collegiate Athletic Association ("NCAA"). Dkt. 1 ("Complaint"), ¶¶ 12-14. As described in this Court's Prior Order, "[a]fter the Pac-12 lost 10 of its 12 member schools to rival athletic conferences in 2022 and 2023, it entered into a Scheduling Agreement with the MWC to secure a complete football schedule for its two remaining member schools during the 2024-2025 football season." Dkt. 48 ("Prior Order") at 1. The Scheduling Agreement also contemplated that the Parties would engage in negotiations for all of the MWC's member schools to join the Pac-12 as Pac-12 member schools. Dkt. 1-1 ("Scheduling Agreement"), § 8.01. However, the Scheduling Agreement contained a clause that if fewer-than-all of the MWC's schools joined the Pac-12, the MWC would be owed a termination fee for each school that departed. *Id.*, Art. VII. "After five MWC schools decided to move to the Pac-12, the MWC demanded that the Pac-12 pay tens of millions of dollars in termination fees" and the Pac-12 filed this lawsuit, challenging the termination fee provision under federal and California antitrust law, and California unfair competition and common law. Dkt. 48 at 1. This Court denied the MWC's motion to dismiss these claims on September 30, 2025.

Thereafter, the MWC filed its Answer, Defenses and Counterclaims to the Complaint

seeking (1) declaratory relief that the termination fees in the Scheduling Agreement are enforceable;  and asserting (2) that the Pac-12 had breached the Scheduling Agreement's good-faith negotiation provision, (3) that the Pac-12 engaged in promissory fraud in promising to pay the termination fees while never intending to, (4) that the Pac-12 has tortiously interfered with the MWC's contracts with the five departing member schools and (5) that, the extent the termination fee provision is deemed invalid or unenforceable, the MWC is entitled to restitution under a quasi-contract theory.  Dkt. 50 at 73-86 (collectively, "the MWC's Counterclaims").  Now before the Court is the Pac-12's partial motion to dismiss, seeking dismissal of Counts III, IV and V of the MWC's Counterclaims.  Dkt. 59 (the "Motion").

This matter may be resolved without oral argument.  Civil L.R. 7-1(b).  For the reasons that follow, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

The factual background of this dispute, as alleged by the Pac-12, is set forth in the Court's Prior Order.  Dkt. 48 at 2-5.  However, the MWC's Counterclaims "serve as the operative complaint on a motion to dismiss counterclaims," and the Court must thus "accept all factual allegations in the counterclaims as true, [while] the allegations in the original complaint are not entitled to the presumption of truth….".  *Confluent, Inc. v. Slower, LLC.*, No. 24-cv-04447-SVK, 2026 WL 673582, at *1, *3 (N.D. Cal. Mar. 10, 2026) (internal citations and quotation marks omitted).  For efficiency, where basic background facts are undisputed or not at issue, the Court omits them here.  What follows are those facts which are relevant to the MWC's Counterclaims and either additional to those set forth in the Prior Order or else disputed (in which case, the Court takes the version of facts set forth in the MWC's Counterclaims as true).

On December 1, 2023, the MWC and the Pac-12 entered into the Scheduling Agreement, which included termination fees as set forth in Sections 7.01-03 and Schedule 7.  Dkt. 50, ¶¶ 3-4, 41, 45-47;  Scheduling Agreement, §§ 7.01-03 and Schedule 7.[1]  As set forth in Section 7.02, the

---

[1] Although attached to the Pac-12's complaint, the Court deems the Scheduling Agreement also incorporated by reference in the MWC's Counterclaims, as it is quoted therein and several of the MWC's Counterclaims are based on sections (specifically, Sections 7.01 and 8.01) of the Scheduling Agreement. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

United States District Court
Northern District of California

"Parties acknowledge[d] and agree[d] that the Termination Fees are not penalties and are instead fair, reasonable and appropriate approximations of the losses that MWC may incur as a result of MWC's loss of any MWC Member Institution to Pac-12." Scheduling Agreement, § 7.02. The provisions of the Scheduling Agreement are not directly at issue in the Pac-12's Motion, however, as it challenges only the MWC's Counterclaims for promissory fraud, tortious interference with member-school agreements, and quasi-contract/unjust enrichment. *See* Dkt. 59. Thus, the critical facts are those surrounding the negotiation of the agreement and the Pac-12's actions in allegedly "poaching" the MWC's member schools.

### A.    The MWC's "Promissory Fraud" Allegations

The MWC conference alleges that the negotiations between the Parties were robust and sophisticated. *See, generally*, Dkt. 50, ¶¶ 31-44. Specifically, the MWC and the Pac-12 are both sophisticated entities (NCAA Division I athletic conferences) that were represented by independent and experienced counsel in the negotiations. *Id.*, ¶¶ 8, 36, 38. The Pac-12 at the time had "nearly a quarter of a billion dollars in its coffers." *Id.*, ¶ 4. The Parties discussed "the Termination Fees the Pac-12 agreed to pay if it offered membership to some, but not all, MWC schools, who then accepted those offers." *Id.*, ¶ 38. They also discussed "potential regulatory review, including possible antitrust scrutiny, of the Scheduling Agreement." *Id.*, ¶ 39. "At no point during the parties' negotiation of the Scheduling Agreement did the Pac-12 state that it believed the Termination Fees violated federal or state antitrust laws, or were otherwise unenforceable." *Id.* Ultimately, the "Pac-12 Board unanimously approved the Scheduling Agreement." *Id.*, ¶ 41.

The MWC alleges that, unbeknownst to it, in the Spring of 2023 "before the Pac-12 collapsed," it was "presented with a backup option in the event Oregon and Washington left for the Big Ten and the Four Corners schools bolted to the Big 12." *Id.*, ¶ 69. The plan was for "the Pac-12 to "[i]nvite the top football schools from the [MWC], [and] pair them with WSU and OSU," *i.e.*, the two schools expected to remain in the Pac-12 (Washington State University and Oregon State University). *Id.* In September, 2024, five of the MWC's member schools— Boise State University, Colorado State University, Fresno State University, Utah State University, and

San Diego State University (collectively, the "Departing Members")—"independently announced that they had received invitations to join the Pac-12" and their intent to do so. *Id.*, ¶¶ 70-72. One day after the last Departing Member's announcement, and in light of the MWC's demands for termination fees, "the Pac-12 filed the present lawsuit, [allegedly] seeking to evade its contractual promises." *Id.*, ¶ 73. The MWC alleges that this was always the Pac-12's intent: When "[t]he Pac-12 represented to the MWC that it would pay the Termination Fees," it "knew these representations were false … because [it] intended (i) to recruit fewer than all MWC teams and (ii) to refuse to pay the Termination Fees in that event by challenging the Termination Fees as unlawful and unenforceable." *Id.*, ¶ 124.

### B.    The MWC's "Tortious Interference" Allegations

Each of the Departing Members had contractual obligations to the MWC based on the MWC Handbook, including the MWC's Bylaws, as well as "the Departing Members' respective membership agreement obligations to the MWC." *Id.*, ¶ 131[2]. Among other things, these obligations included "Appendix K," a conflicts of interest policy that "requires any Board Member to refrain from discussing, participating, or voting in any proceeding for which that Board Member has a conflict." *Id.*, ¶ 133. Meanwhile, the "MWC Bylaw 1.04 [] establishes procedures for schools to resign from the conference," including a written notice requirement, an "Exit Deposit" and ultimately an exit fee. *Id.*, ¶ 134. The MWC alleges that the Pac-12 induced breach of both the conflict-of-interest and the exit-fee provisions.

As to the former, the MWC alleges that, after the first four MWC schools departed on September 12, 2024, (*id.*, ¶ 70), it held "special MWC board meeting on September 17, 2024 … regarding the MWC's future—including whether to invite new members to replace those departing." *Id.*, ¶ 91. It alleges that the President of Utah State University ("Utah State") attended this board meeting notwithstanding that, just six days later, Utah State would announce its own departure from the MWC. *Id.* In a similar vein, the MWC alleges that, based on public

---

[2] A copy of the 2024-2025 MWC Handbook is available at https://themw.com/2024-25-mountain-west-handbook/, and is cited in the MWC's Counterclaims. Dkt. 50, ¶ 132 n. 81. Because the MWC's Fourth Counterclaim relies on the provisions of the MWC Handbook, the Court deems the 2024-2025 handbook incorporated by reference. *Khoja*, 899 F.3d at 1002.

United States District Court
Northern District of California

information, such as a statement of San Diego State University's athletic director JD Wicker, at least some of the Departing Members had been in "an ongoing discussion for a while [with the Pac-12]," with the conversations "pick[ing] up steam through August [2024]." *Id.*, ¶ 100; *see also id.*, ¶ 88.  The MWC notes that, at the same time, the Parties were engaged in negotiations over renewal of the Scheduling Agreement and negotiations over a potential merger.  *Id.*, ¶¶ 85-90.  Thus, the MWC alleges that, on information and belief, "the Pac-12 and its consultants decided early on to dismantle the MWC from the inside—ultimately hoping to recruit between four and six members, bleed the MWC dry to prompt others to leave, and then force a vote to dissolve the MWC such that the Pac-12 and any departing member could escape their financial commitments to the conference." *Id.*, ¶ 90.[3]

The MWC also alleges that, based on public reporting of the Pac-12's offer letters to members, the "Membership Terms & Condition Letters," the Pac-12 "promised financial assistance to overcome any contractual obligations owed to the MWC," including help in paying the exit fees.  *Id.*, ¶¶ 137-41.  However, "the Departing Members have refused to pay" and "[s]everal of the Departing Members rushed to Colorado to file litigation in Colorado seeking to invalidate the exit fees, parroting theories that mirror those asserted here." *Id.*, ¶ 144 (citing *Bd. of Governors of the Colo. State Univ. Sys. v. Mountain W. Conf.*, No. 2024CV33874, Doc. No. 1, (Colo. Dist. Ct., Denver Cnty. Dec. 16, 2024)).  The MWC alleges that this is a "coordinated effort" with the Pac-12 and constitutes tortious interference by Pac-12 with the contracts between the MWC and the Departing Members.  *Id.*, ¶¶ 144-47.

### C.     The MWC's Alternative "Quasi-Contract/Unjust Enrichment" Claim

Finally, although the MWC relies principally on Sections 7.01 and 8.01 of the Scheduling Agreement for its breach of contract and declaratory judgment claims, under which the termination fee "shall be MWC's sole and exclusive remedy," (Scheduling Agreement, § 7.02), the MWC pleads a quasi-contract/unjust enrichment theory in the alternative.  Dkt. 50 at 84-86. Specifically, "if Section 7.01 and Schedule 7 of the Scheduling Agreement are determined to be

---

[3] This allegation of bad-faith negotiation is also relevant to the promissory fraud allegations in Section I.A., above.

invalid and/or unenforceable, MWC states a claim for unjust enrichment," seeking damages for the actual benefits provided to the Pac-12 under the Scheduling Agreement. *Id.* The MWC alleges that, in order to facilitate games for OSU and WSU when they were the only remaining members of the Pac-12, "each MWC university removed one conference game against a fellow MWC school, and instead played one of the two Pac-12 universities" in the 2024-2025 athletic season. *Id.*, ¶¶ 150-52. Moreover, the MWC alleges that "[t]hrough scheduling these games," "the Pac-12 received game-week interactions, campus visits, athletics-department coordination, broadcast production meetings, and shared competitive platforms" that it would not have received otherwise, as well as "enhanced familiarity with and visibility into the Departing Members' personnel, facilities, and markets." *Id.*, ¶ 153. These benefits "materially strengthened lines of communication with presidents, chancellors, athletics directors, and coaches; expanded the Pac-12's recruiting and media footprint; and created relationship capital and goodwill that paved the road for future membership discussions." *Id.*

## II.    LEGAL STANDARD

Rule 12(b)(6) provides for a dismissal of an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff (or counter-plaintiff) must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the claimant to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For a 12(b)(6) motion, all well-pleaded allegations of material fact are accepted as true and construed in the light most favorable to the non-moving party. *Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012). However, a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). In deciding a motion under 12(b)(6), a court may consider only "the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061. (9th Cir. 2008).

United States District Court
Northern District of California

6

"A motion to dismiss a counterclaim brought pursuant to Federal Rule of Civil Procedure 12(b)(6) is evaluated under the same standard as a motion to dismiss a plaintiff's complaint." *AirWair Int'l Ltd. v. Schultz*, 84 F. Supp. 3d 943, 949 (N.D. Cal. 2015).  However, as noted above, "[f]or the purpose of a motion to dismiss counterclaims, the operative 'complaint' in the preceding judicial standard is the counterclaims."  *Confluent*, 2026 WL 673582, at *1, *3.  "Therefore, the Court accepts as true the facts alleged in the counterclaims and gives no presumption of truth to the allegations in the amended complaint, unless the counterclaimant 'endorses or relies' on those allegations."  *PharmacyChecker.com LLC v. LegitScript LLC*, No. 22-cv-252-SI, 2026 WL 207250, at *1 (D. Or. Jan. 27, 2026) (cleaned up) (quoting *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989)).  Otherwise, "the court does not consider the complaint or answer."  *Confluent*, 2026 WL 673582, at *3.

## III.   DISCUSSION

The Pac-12 seeks to dismiss the MWC's Third, Fourth and Fifth counterclaims.  *See, generally*, Dkt. 59.  The Court addresses each counterclaim in turn.

### A.   The MWC's Counterclaim for Promissory Fraud is Barred by California's Economic Loss Rule

The Pac-12 argues that MWC's Third Counterclaim must be dismissed because (1) it fails to plead facts establishing an intent to defraud, (2) it is barred by the economic loss rule and (3) it fails to allege the fraudulent conduct with sufficient particularity under Federal Rule of Civil Procedure 9(b).  Dkt. 59 at 11-17.  The Court agrees with the Pac-12's second contention and, accordingly, need not reach the Pac-12's other arguments.

"The economic loss rule is a device, among others, that courts have developed to address and protect the often elusive boundary line between tort and contract law.  Whereas contract actions are created to enforce the intentions of the parties to the agreement, tort law is primarily designed to vindicate 'social policy.'"  *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 19 (2024) (citations omitted).  "The economic loss rule requires a contractual party to recover in contract for purely economic loss due to disappointed expectations, unless the party can demonstrate harm above and beyond a broken contractual promise."  *Id.* at 20 (quoting *Robinson Helicopter Co. v.*

United States District Court
Northern District of California

*Dana Corp.*, 34 Cal. 4th 979, 988 (2004)) (cleaned up).  However, "[t]here are exceptions to the economic loss rule.  The rule does not prevent recovery in tort if (1) a 'special relationship' exists between the plaintiff and the defendant, or (2) the conduct 'violates a duty independent of the contract arising from principles of tort law.'"  *Pattern Design LLC v. We are Sechey Inc.*, No. 24-cv-02604-CRB, 2024 WL 4369668, at *7 (N.D. Cal. Oct. 1, 2024) (quoting *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 804 (1979) and *Erlich v. Menezes*, 21 Cal. 4th 543, 551 (1999), respectively).  The second exception is at issue here.

"The MWC's promissory-fraud claim is straightforward: the Pac-12 promised to honor a key provision [of the Scheduling Agreement] to the MWC, the Termination Fees, when it negotiated and executed the Scheduling Agreement, knowing all the while that it would trigger the provision and simply seek to invalidate the fees."  Dkt. 65 at 13 (citing Dkt. 50, ¶¶ 7, 69).  The California Supreme Court has considered whether and under what circumstances claims sounding in intentional fraud, as alleged here, fit within the "independent tort" exception to the economic loss rule.  In *Rattagan*, answering a certified question from the Ninth Circuit, the California Supreme Court affirmed that fraud "in the performance of a contract" is "exempted from the economic loss rule," whether it is "accomplished through affirmative misrepresentation or concealment."  *Rattagan*, 17 Cal. 5th at 38-44.  At the same time, the *Rattagan* Court noted that "most fraudulent concealment allegations stem from precontractual negotiations … and are ultimately presented as causes of action for fraudulent inducement or promissory fraud."  *Id.* at 41.  Parties "may be permitted to assert causes of action for … promissory fraud" only "in the appropriate circumstances."  *See id.* at 28-29.

Here, the Court agrees with the Pac-12 that the circumstances are inappropriate for a separate tort claim of promissory fraud.  For cases under the "independent tort" exception, the plaintiff must show that the "defendant's injury-causing conduct violated a duty that is *independent of* the duties and rights assumed by the parties when they entered the contract."  *Rattagan*, 17 Cal. 5th at 20-21.  Here, the MWC concedes in its opposition that the fraud it alleges is Pac-12's "promise[] to honor a key provision" of the Scheduling Agreement, *i.e.*, the termination fees.  Dkt. 65 at 13.  This promise is plainly not independent of the duties and rights

8

United States District Court
Northern District of California

assumed by the Pac-12 when entering into the Scheduling Agreement; it is a promise to perform its duty (to pay the termination fee provision) under the agreement. *See Pattern Design LLC v. We are Sechey Inc.*, No. 24-cv-02604-CRB, 2024 WL 4369668, at *7 (N.D. Cal. Oct. 1, 2024) (holding that "statements" which are "nothing more than representations that [a party] would adhere to the Contract … cannot form the basis of a separate fraud claim) (collecting cases).

The MWC's only argument to the contrary is its contention that the alleged intentional deceit, *i.e.*, the Pac-12's alleged "contemporaneous, pre-contract plan and follow-through" to poach the MWC's member schools, is what separates this case from cases like *Pattern Design*. Dkt. 65 at 20-21. The Court is not persuaded. As the MWC recognizes, the "intent to deceive or induce the promise to enter into a transaction" is a necessary element of promissory fraud. Dkt. 65 at 13 (quoting *J2 Cloud Servs., Inc. v. Fax87*, No. 13-05353 DDP, 2016 WL 6833904, at *2 (C.D. Cal. Nov. 18, 2016). Thus, an intentional deceit will always be involved in a promissory fraud and "[v]irtually any time a contract has been breached, the party bringing suit can allege that the breaching party never intended to meet its obligations." *Oracle USA, Inc. v. XL Glob. Servs., Inc.*, No. 09-cv-00537-MHP, 2009 WL 2084154, at *6-*7 (N.D. Cal. July 13, 2009). That does not transform "simple disputes about bills," or even complex disputes about thoroughly-negotiated and detailed termination fees, into tort disputes. *See id.* (explaining that, even where the plaintiff alleged that the defendant "did not intend to perform the promise" to pay invoices at the time the promise was made, that did not transform the failure to pay into promissory fraud).

Additionally, the particular nature of the termination fee provision of the Scheduling Agreement and the MWC's allegations as to the negotiation process further support dismissal. As made clear in *Rattagan*, many of the considerations behind California's economic loss rule are informed by public policy. *See, generally*, 17 Cal. 5th at 39-43. In particular where it relates to fraudulent concealment, the economic loss doctrine assumes that "rational parties often do enter into a contract anticipating that there may be certain factual matters of which they wish to be made aware during the performance of a contract, and in negotiations, they often can allocate the risk of not learning that information…." *Id.* at 42. For example, while "parties do not generally enter into a contract anticipating their counterparts will *affirmatively lie* to them, … [t]hey may,

9

however, enter into a contract anticipating the other party may *withhold or conceal* certain facts during performance unless they demand an agreement not to do so." *Id.* Thus,

> When a potential injury stemming from a nondisclosure is determined to have been within the reasonable contemplation of known risks to the parties before entering into their agreement and the parties accounted for that risk, the resulting action is "ex contractu" or arising from a breach of a promise set forth in the contract. In such a case, public policy considerations tip away from the objective of encouraging a business climate free of fraud and toward the goal of enforcing the contractual obligations that the parties voluntarily assumed in the "mini-universe" they agree to inhabit.

*Rattagan*, 17 Cal. 5th at 42 (cleaned up) (internal citations omitted). The MWC's own allegations suggest that the precise risk at issue—that the Pac-12 would sign some, but not all, members of the MWC and thus undermine the MWC—was contemplated and the Parties accounted for that risk by structuring the termination fees as they did in Schedule 7. *See, e.g.*, Dkt. 50, ¶¶ 5, 7, 80 106 (*e.g.*, "The Termination Fees not only compensate the remaining MWC members for the cost to rebuild their conference after losing five schools, but also allow the Pac-12 to carve out its identity as it sees fit. … The Scheduling Agreement specifically permits the Pac-12 to recruit less than all MWC member institutions [but] provides that certain Termination Fees are due to the MWC upon acceptance, or announcement of acceptance by an MWC member institution.").

Accordingly, the Court **GRANTS** the Pac-12's Motion to dismiss the MWC's Third Counterclaim as barred by the economic loss doctrine. Moreover, "a plaintiff cannot amend pleadings to directly contradict an earlier assertion made in the same proceeding." *See, e.g.*, *Flickinger v. Castillo*, No. 24-cv-02915-SVK, 2025 WL 3255026, at *12 (N.D. Cal. Aug. 27, 2025), *report and recommendation adopted,* No. 24-cv-02915-NW, 2026 WL 517973 (N.D. Cal. Feb. 25, 2026)). Accordingly, in light of the facts already alleged by the MWC, leave to amend would be futile and is **denied**.

**B.    The MWC's Counterclaim for Tortious Interference is Sufficiently Pleaded**

"California has traditionally recognized two economic relations torts: interference with the performance of a contract and interference with a prospective economic relationship." *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1140-41 (2020) (internal citations omitted). The MWC alleges tortious interference by the Pac-12 "with the Departing Members' contractual

10

obligations to the MWC," *i.e.*, the existing contractual relationships, rather than prospective relationships. *See* Dkt. 50, ¶ 131. Such a claim requires:

> (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.

*Id.* at 1141. Ordinarily, that is all a claimant must plead. "It is generally not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself." *Id.*

However, the California Supreme Court in *Ixchel* clarified that, in the case of "interference with an at-will contract by a third party, the plaintiff must allege that the defendant engaged in an independently wrongful act." *Id.* at 1148 (disapproving of prior cases to the extent they are inconsistent with the *Ixchel* opinion). The Pac-12 asserts that the MWC's contracts with the Departing Members were at-will contracts such that the MWC must state an independent wrongful act and that the MWC has failed to do so. The Court begins with the threshold "at-will" issue.

### 1. The MWC's Handbook and Bylaws, as Alleged at this Stage, Are Not At-Will Contracts

The Pac-12 argues that the MWC Bylaws permit its members to resign from the conference for any reason and thus are "at will." Dkt. 59 at 18-19. The MWC responds that while member schools may leave, they may not do so at any time and only subject to certain conditions. Dkt. 65 at 23-24. The Court agrees with the MWC.

First, the Parties' arguments focus on whether "the MWC's membership agreements and Bylaws" are at-will contracts based on the withdrawal provisions therein. *See* Dkt. 59 at 18-19; Dkt. 65 at 23-24. The Pac-12 does not argue, however, that the MWC *Handbook* is an at-will contract. *Contra* Dkt. 59 at 18-19. The MWC alleges that the MWC Handbook is broader than the MWC Bylaws (specifically, it "includes" the MWC Bylaws) and that "Appendix K of the MWC Handbook sets forth the MWC's 'Conflict of Interest' policy." Dkt. 50, ¶¶ 132-33. As explained in the background section, part of the MWC's claim for tortious interference is based on the Pac-12 allegedly interfering with Utah State's performance under the conflict of interest provisions in September of 2024. *See, supra*, § I.B. (citing ¶¶ 70, 85-91, 100, 131-34). Because

United States District Court
Northern District of California

the MWC Handbook, and the Conflict of Interest policy contained therein, is not an at-will contract, at least part of the MWC's Fourth Counterclaim survives the Pac-12's challenge.

Moreover, even as to the MWC's Bylaws and the exit-fee provision contained therein, the MWC's Fourth Counterclaim survives because the Bylaws, too, are not at-will. True, the MWC alleges that a member school may depart the MWC. *See* Dkt. 50, ¶ 134. It does not allege, however, that a member school may do so at any time or free of encumberments. Rather, member schools may depart: (a) only after written notice (b) with at least a 13-month lead time (c) along with payment of an Exit Deposit and (d) to be consummated by paying an exit "fee equal to three times the average per Member Conference distribution payment for the preceding year." *Id.* "[T]he essence of an at-will contract" is the parties' "freedom to walk away … with no consequences." *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1106 (9th Cir. 2007).[4] Particularly at the pleading stage, where the Court must draw reasonable inferences in the non-movant's favor, such features are sufficient to allege a non-at-will relationship.

Accordingly, because the MWC's Handbook and Bylaws are not at-will, the MWC is not required to allege an independently wrongful act. Thus, the Court does not reach the second issue and **DENIES** the Pac-12's motion to dismiss the MWC's Fourth Counterclaim.

### C.    The MWC's Alternative Counterclaim for Quasi-Contract May Proceed

Finally, the Pac-12 challenges the MWC's assertion of an alternative quasi-contract / unjust enrichment counterclaim (the "quasi-contract"[5] claim). The Pac-12 argues that the quasi-contract claim must be dismissed for two reasons. First, it argues that because the MWC's

---

[4] The Pac-12's suggestion that *CRST Van* is inapplicable is unpersuasive. *CRST Van* is readily applicable because, although the employment relationship there was nominally "for cause," the employer could forgo that requirement by "forego[ing] reimbursement of $3600." *CRST Van*, 479 F.3d at 1106 (9th Cir. 2007). While *CRST Van* does not set out a bright line rule here, a Departing Member's requirement to pay a sizeable exit fee to resign from the MWC similarly weighs against finding an at-will relationship.

[5] Parties and courts often use the terms "quasi-contract" and "unjust enrichment" imprecisely. "[I]n California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). "Rather, they describe the theory underlying a claim that a defendant has been unjustly conferred a benefit through mistake, fraud, coercion, or request. The return of that benefit is the remedy typically sought in a quasi-contract cause of action. When a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution." *Id.* (internal quotation marks and citations omitted). The Court does so here.

"alternative" pleading presupposes that Section 7 of the Scheduling Agreement will be "declared illegal by the Court," the quasi-contract claim is foreclosed since the Court may not "in substance [] enforce an illegal contract." Dkt. 59 at 20-21. Second, it argues that even if the claim were not foreclosed, the MWC has not alleged that the Pac-12 "received and unjustly retained a benefit at [the MWC's] expense," as required for an unjust enrichment remedy, because the Pac-12 paid for the benefits it received. *Id.* at 22. The Court addresses each argument in turn.

### 1. The MWC's Quasi-Contract Claim is not Foreclosed at this Juncture

The Court agrees with the Pac-12 that, generally, "no court will lend its assistance in any way towards carrying out the terms of an illegal contract." *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982). The Pac-12 goes too far, however, in asserting that the MWC's Fifth Counterclaim assumes the contract will be declared *illegal*. Rather, as the MWC explains, its quasi-contract counterclaim assumes only that "Section 7.01 and Schedule 7 of the Scheduling Agreement," *i.e.*, the termination fee provisions, will be deemed "invalid and/or unenforceable." *See* Dkt. 65 at 28; Dkt. 50, ¶ 149. Thus, the MWC would only be foreclosed from seeking the Court's assistance in enforcing the *termination fees* and only if they are declared illegal, *e.g.*, as against public policy or as unlawful under antitrust laws. For example, if the termination fees are deemed unenforceable as a liquidated-damages penalty, the Pac-12 has cited no authority as to why the Court could not grant non-penalizing, restitution damages. *Cf. Dollar Tree Stores Inc. v. Toyama Partners LLC*, 875 F. Supp. 2d 1058, 1074 (N.D. Cal. 2012) ("In contrast, numerous courts have held that a party is entitled to actual damages after finding a liquidated damages clause in a contract unenforceable.") (collecting cases).

Accordingly, the viability of the MWC's quasi-contract claim depends not just on whether the Court declares the termination fees "invalid and/or unenforceable," but on its reasons for doing so. It is thus premature to dismiss the MWC's quasi-contract claim at this stage.

### 2. The MWC's Sufficiently Pleads that the Pac-12 was Unjustly Enriched

As to the second issue, the Pac-12 argues that it "paid over $14 million for the games with MWC opponents that the MWC was contractually obligated to provide." Dkt. 59 at 22. Thus, it argues that—apart from the termination fees for signing the five Departing Members, which the

United States District Court
Northern District of California

13

United States District Court
Northern District of California

MWC's quasi-contract claim assumes will be at least unenforceable—it has paid for the benefits it received under the Scheduling Agreement. *Id.* The Court disagrees for two reasons.

First, on a motion to dismiss, the Court is bound by the claimant's allegations – here, the MWC's Counterclaims. The counterclaims do not allege what amount the Pac-12 paid for the scheduled games, if any, and the Court is not convinced that it may look to the Answer (even if the receipt of this amount does not appear to be denied). *See PharmacyChecker.com*, 2026 WL 207250, at *1 (the Court does not look to the complaint or answer unless the "unless the counterclaimant 'endorses or relies' on those allegations.").

Second, however, even if the Court accepted the Pac-12's figure at this stage as contemplated in the Scheduling Agreement, (*see* Scheduling Agreement, §§ 2.01, 3.01 (setting forth a $2,000,000 payment for "administrative fee[s]" and various amounts totaling $12,000,000 for "participation fees")), the Pac-12's argument at best raises a factual dispute as to the money paid vis-à-vis the benefits received. The MWC alleges that the Pac-12 received the following benefits "[t]hrough scheduling these numerous games":

- "received game-week interactions;"
- "campus visits;"
- "athletics-department coordination;"
- "broadcast production meetings;"
- "shared competitive platforms;" and
- "enhanced familiarity with and visibility into the Departing Members' personnel, facilities, and markets."

Dkt. 50, ¶ 153. The Pac-12 argues that these benefits are "exactly what the MWC bargained for when it sold the Pac-12 football games in exchange for millions of dollars per game," while the MWC argues that they are distinct benefits. *Compare* Dkt. 59 at 22 *with* Dkt. 65 at 29-30. The Court finds that either inference is reasonable based on the MWC's allegations and declines to resolve this factual dispute at the pleading stage.

Accordingly, the Pac-12's motion to dismiss the MWC's quasi-contract claim seeking unjust enrichment, *i.e.*, restitution damages is **DENIED**.

14

United States District Court
Northern District of California

**IV.   CONCLUSION**

For the foregoing reasons, the Pac-12's Motion is **GRANTED IN PART** and **DENIED IN PART**.  The MWC's Third Counterclaim is **dismissed without leave to amend** as barred by the economic loss rule, while the MWC's Fourth and Fifth Counterclaims may proceed.

The Pac-12 shall file its answer to the MWC's Counterclaims **no later than April 10, 2026**.


**SO ORDERED.**


Dated: March 27, 2026

_____
SUSAN VAN KEULEN
United States Magistrate Judge